UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. _____

| | |
|---|---|
| TING PENG and LIN FU, on behalf of themselves individually and all others similarly situated, and derivatively on behalf of HARBOURSIDE FUNDING, LP, a Florida limited partnership,<br><br>        Plaintiffs,<br><br>vs.<br><br>NICHOLAS A. MASTROIANNI II; RICHARD L. YELLEN; FLORIDA REGIONAL CENTER, LLC, a Delaware limited liability company; HARBOURSIDE FUNDING GP, LLC, a Florida limited liability company; and HARBOURSIDE PLACE, LLC, a Delaware limited liability company,<br><br>        Defendants,<br><br>and<br><br>HARBOURSIDE FUNDING, LP, a Florida limited partnership,<br><br>        Nominal Defendant. | <u>JURY DEMAND</u> |

**CLASS-ACTION AND DERIVATIVE COMPLAINT
FOR EQUITABLE RELIEF AND DAMAGES**

Plaintiffs Ting Peng and Lin Fu, on behalf of themselves and all others similarly situated, and derivatively on behalf of Nominal Defendant Harbourside Funding, LP, allege as follows upon personal knowledge as to Plaintiffs' own conduct and experience, and on information and belief as to all other matters based on an investigation by counsel:

## INTRODUCTION

1.     Although the facts are somewhat complicated, the principal issue in this case is simple and straightforward. Defendants Nicholas Mastroianni and Richard Yellen created a group of companies to perpetrate a fraudulent scheme by which they obtained $99,500,000 from a group of immigrant investors for the purpose of funding a construction loan that was to have been repaid when it matured more than two years ago, but had no intention of keeping their promise to repay. Thus, when the loan matured over two years ago, Defendants used the money they obtained for the loan to buy an equity interest in one of their companies in which the immigrant investors (including Plaintiffs Peng and Fu) have no rights and no ability to recover the money that was stolen from them.

2.     To achieve this objective, Defendants availed themselves of an opportunity Congress created when it enacted the EB-5 Immigrant Investor Visa Program (the "EB-5 Program"). The EB-5 Program's purpose is to enable immigrants to secure permanent residence in the United States in exchange for investing at least $500,000 in a commercial enterprise that uses the investment to create or preserve at least 10 American jobs. Although the EB-5 Program had existed since the 1990s, interest in the program increased significantly when financing for commercial real estate projects became difficult to obtain after the Great Recession of 2008.

3.     One of the commercial enterprises that made use of funding from the EB-5 Program is Harbourside Place (the "Harbourside Project"), a large commercial development in Jupiter,

Florida, that includes a municipal center, a hotel, retail shopping, dining, and office space. To obtain funding from the EB-5 Program, Mastroianni and Yellen created, and were the Principals who controlled, a group of entities called the Harbourside Group, which included, *inter alia,* Defendant Florida Regional Center, LLC (the "Regional Center"), Nominal Defendant Harbourside Funding, LP (the "Funding Partnership"), Defendant Harbourside Funding, GP (the "General Partner"), and Defendant Harbourside Place, LLC (the "Developer"). In addition to his role as one of the Principals who controlled the entire Harbourside Group, Mastroianni and Yellen appointed themselves co-managers of the General Partner and the Regional Center, and Mastroianni as manager of the Developer.

4.      Each of these entities played a key role in the EB-5 funding process. Shortly after receiving federal approval to administer the EB-5 Program in the Palm Beach area in 2010, the Regional Center began promoting the Harbourside Project to foreign investors who sought green cards via the EB-5 Program ("EB-5 Investors"). The General Partner managed the Funding Partnership, which offered  200 units of membership in its limited partnership EB-5 Investors for $500,000 each (plus a $40,000 administration fee) for the purpose of using the sale proceeds to fund a loan of up to $100 million that was secured by first-priority liens (the "EB-5 Loan") to the Developer, which owned and was in charge of the construction of Harbourside Place.

5.      To promote interest in the Harbourside Project, prospective EB-5 Investors were told (among other things) that the project's completion was guaranteed by a major insurance company, that

> the value of just the real estate collateral is more than twice the amount of the EB-5 loans, and the security of the funds is fully guaranteed. The [Harbourside] Project is a four-year bridge loan with a safe and reliable exit mechanism: Ackman-Ziff, the largest real estate company in New York, has signed a contract to provide a $100 million refinancing loan after the Project is completed and put into operation. Investors will recover 50% of their funds immediately after receiving their

permanent green card, and the full amount of the investment will be safely recovered in the fourth year. . . .

6.     Defendants made similar statements in the Offering Documents[1] (which were printed in English and which Plaintiffs and other prospective EB-5 Investors were shown only the signature pages by Defendants' agents in China), including a promise that the EB-5 Loan would not be subordinated to loans by other lenders unless and until the General Partner was unable to sell all 200 units of membership in the Funding Partnership, and even then, the Developer would borrow no more than a total of $110,000,000, including the amount of the EB-5 Loan.

7.     According to the Offering Documents, the EB-5 Loan would be repaid no later than November 30, 2017 (the "Maturity Date") and, to ensure timely repayment when the EB-Loan matured, the Developer would "[r]efinance the [EB-5] Loan with an institutional lender" and/or "[r]epay the Loan with the proceeds of a sale of all or a portion of Harbourside Place."

8.     The Offering Documents also stated, however, that "[i]f the Developer is unable to repay the Loan at maturity, the Developer intends to convert the entire outstanding principal amount of the Loan into an ownership interest in the Developer." The Developer could not exercise the conversion provision, however, if an Event of Default—which is defined to include, among other things, a breach of the EB-5 Loan Agreement and any misrepresentation of material fact by the Developer—had occurred and was neither cured by the Developer nor waived by the Limited Partners as of the Maturity Date.

---

[1] The Offering Documents are composed of Subscription Instructions and a Confidential Offering Memorandum ("Offering Memorandum") to which the following exhibits are attached: the Limited Partnership Agreement for the Funding Partnership (the "Limited Partnership Agreement"); the Subscription Agreement; Charts Summarizing the Immigration and Investment Procedures; the Escrow Agreement; a Rendering, Aerial Photo and Area Maps of Harbourside Place; and the Amended Restated Convertible Loan Agreement (the "EB-5 Loan Agreement").

9.      An Event of Default occurred while the General Partner was still selling units of membership in the Funding Partnership to EB-5 Investors. The EB-5 Loan Agreement makes clear that funds from the EB-5 Loan would be used only for the costs of constructing the Harbourside Project and interest payments to the Funding Partnership.

10.     The EB-5 Loan Agreement also makes clear that the EB-5 Loan could not be subordinated to loans by alternative lenders unless fewer than all 200 units of membership in the Funding Partnership were sold (*i.e.,* if less than $100,000,000 was raised by the sale of membership units) and that the maximum amount the Developer could borrow was $110,000,000, including the amount of the EB-5 Loan. For example, if 190 membership units were sold to fund a $95,000,000 EB-5 Loan to the Developer, the most the Developer could borrow from other sources would be $15,000,000.

11.     Nonetheless, in July 2012—while units of membership in the Funding Partnership were still being sold—the Developer borrowed nearly ***$13,000,000*** from another lender via (a) a loan that was secured by a first priority mortgage lien on Harbourside Place and (b) a $9,000,000 revolving credit line. Several months later (in December 2012), the Developer used funds from the EB-5 Loan to repay the mortgage loan and to pay down the debt on the line of credit.

12.     Shortly thereafter, the General Partner chose to stop selling units of membership in the Funding Partnership when ***199*** units had been sold—one short of the 200 units that prevented the Developer from subordinating the EB-5 Loan to loans by other lenders (which it had already done in July 2012)—despite continuing high demand for membership units.

13.     Despite having borrowed $99,500,000 from the Funding Partnership and nearly $20,000,000 from the credit line, in March 2014 Defendants sent a letter to advise the Limited Partners that the Harbourside Project was proceeding successfully, but that the Developer needed

to borrow approximately $60,000,000, which would "be used, among other things, to repay the existing bridge loan . . . ." Defendants later advised the Limited Partners that a new report "certified" the value of the Harbourside Project at $187,000,000.

14.     But there were two different versions of the proposed resolution and some of Defendants' agents signed it on the Limited Partners' behalf without their knowledge or consent. So although Defendants purport to have received more than 100 signatures, the did not receive a true majority of the Limited Partners' consent.

15.     By December 2016, the Developer had yet to make *any* of the monthly interest payments that were required by the EB-5 Loan. Nonetheless, that month Mastroianni contacted the Limited Partners again, requesting that they consent to extending the Maturity Date by three years (November 2017 to December 2020). This time, the Limited Partners declined the request.

16.     In August 2017, Mastroianni wrote to the Limited Partners again, advising them that "net operating income generated by the Project's operations is not sufficient to pay interest payments that have accrued and continue to accrue . . ." and that "the debt encumbering the Project substantially exceeds the fair market value of the Project"—even though Defendants had represented that the Harbourside Project's certified value was $187,000,000 three years earlier.

17.     In the same letter, Mastroianni proposed that the Limited Partners consent to one of two proposals in exchange for their interests in the Funding Partnership in exchange for a "general release that releases the Partnership, the General Partner, and the Developer and affiliated and associated persons from claims relating to the Partnership and their limited partnership interest that arise prior to the Conversion."

18.     The first proposal involved converting the EB-5 Loan into "preferred" equity in the Developer, coupled with a promise to pay each Limited Partner $85,000 by the time they received

their green cards and $25,000 annual payments that would be "backstopped" by yet another company owned and managed by Mastroianni, and a promise to repurchase the equity stake in the Developer within three to five years of the conversion. The second proposal involved providing each Limited Partner with common equity interests in the Developer with no voting rights.

19.     By now, the Limited Partners had no reason to trust Defendants—particularly in light of the most recent proposals, which amounted to nothing more than another extension of the Maturity Date coupled with a release of liability that guaranteed they would have no recourse if (when) Defendants failed to abide by their commitments again.

20.     The Limited Partners declined Mastroianni's proposals. Shortly thereafter, Mastroianni advised the Limited Partners that they had two choices: accept an offer to acquire "preferred" equity membership interests in the Developer or the Developer would exercise its "right" to convert the balance of the Funding Partnership's loan to common membership interests in the Developer—even though no effort had been made to obtain a loan from an institutional lender and/or sell some or all of Harbourside Place to repay the EB-5 Loan, as promised in the Offering Documents.

21.     When the Limited Partners declined the offer, Mastroianni managed to purchase the outstanding senior loans through a new entity he created and managed, Waterways Bridge, LLC (the "New Senior Lender"), which resulted in the Developer owing the New Senior Lender more than $61,000,000. Then, notwithstanding the existence of multiple defaults that negated the right to exercise the conversion provision and notwithstanding that no effort had been made to obtain a loan or sell Harbourside Place to repay the EB-5 Loan, Mastroianni caused the Developer to exercise the conversion provision—without providing any notice to the Limited Partners, as the

General Partner (and Mastroianni as its manager) was required to do under the Limited Partnership Agreement.

22.     Then, despite explicit terms of the EB-5 Loan Agreement that required the Developer to issue units of common membership in its Florida LLC—which would have guaranteed the Limited Partners voting rights when those units were distributed to them pursuant to the Limited Partnership Agreement—Mastroianni caused the Developer (as its managing member) to issue and the General Partner (as its managing member) to accept a single "preferred" membership interest in the Developer, which was then converted from a Florida LLC to a Delaware LLC (the "New LLC"). This not only negated any rights the Limited Partners would have had if the conversion had been exercised as described in the Offering Documents, it constituted an entirely different "Other Investment" that required the Limited Partners' unanimous approval, which Defendants never sought, much less received.

23.     When the smoke cleared, Defendants caused the Funding Partnership to use the EB-5 loan principal to purchase a single unit of "preferred" membership interest in the Developer, which left the Limited Partners at the mercy of Mastroianni and Yellen, who controlled the General Partner as well as the Developer, and allowed Mastroianni and Yellen to obtain the Limited Partners' capital for their own use for an indeterminate period, if not indefinitely.

24.     By perpetrating a fraudulent scheme to convert the EB-5 Loan principal into a so-called "preferred" equity interest in the Developer, despite the express terms of the EB-5 Loan Agreement, which prohibited it, and to convert the Developer from a Florida LLC to the New LLC without the requisite consent of the Limited Partners, Mastroianni, Yellen, and the General Partner breached their fiduciary duties to the Limited Partners and the Funding Partnership, and knowingly

and purposefully committed civil theft of the Limited Partners' assets in violation of F.S.A. § 812.014.

26. Accordingly, Plaintiffs bring this action on behalf of themselves and the proposed class of Limited Partners and derivatively on behalf of the Funding Partnership to obtain a judicial declaration that the conversion is invalid as a matter of law, an award of treble damages for civil theft, and an award of compensatory and punitive damages for, *inter alia,* Defendants' breaches of fiduciary duty and fraud.

## PARTIES

### PLAINTIFFS

26. Plaintiff Ting Peng is an individual EB-5 Investor who became a Limited Partner in the Funding Partnership on April 2, 2013. Ms. Peng was born in mainland China and has been employed as a teacher and a corporate financial planner. Ms. Peng now resides in Sammamish, Washington.

27. Plaintiff Lin Fu is an individual EB-5 Investor who became a Limited Partner in the Funding Partnership on December 16, 2011. Ms. Fu was born in mainland China and is a physician who received her medical degree from Shanghai Medical University and practice as an OB/Gyn for more than a decade in Shanghai, China. Ms. Fu now resides in Princeton, New Jersey.

### DEFENDANTS

28. Defendant Nicholas Mastroianni is an individual who resides in Palm Beach County, Florida. At all times relevant to the allegations in this Complaint, Mr. Mastroianni was one of two principals who controlled a group of companies called the "Harbourside Group," which are among the entities named Defendants in this action.

29.     Defendant Richard L. Yellen is an individual who resides in New York, New York. At all times relevant to the allegations in this Complaint, Mr. Yellen is an attorney and (with Defendant Mastroianni) one of the two principals of the Harbourside Group.

30.     Defendant Florida Regional Center, LLC (the "Regional Center") is a Delaware limited liability company and is one of the entities that comprise the Harbourside Group.

31.     Defendant Harbourside Place, LLC (the "Developer") was formed as a Florida limited liability company and was converted to a Delaware limited liability company in or about December 2017. The Developer was created and operated by Defendants Mastroianni and Yellen, was managed by Defendant Mastroianni, and is one of the entities that comprise the Harbourside Group.

32.     Defendant Harbourside Funding GP, LLC (the "General Partner") is a Florida limited liability company that served as the general partner of the Funding Partnership. The General Partner was created and operated by Defendants Mastroianni and Yellen, was managed by Defendant Mastroianni, and is one of the entities that comprise the Harbourside Group.

33.     Nominal Defendant Harbourside Funding, LP (the "Funding Partnership") is a Florida limited liability company that was established for the purpose of financing the Harbroside Project with a loan to the Developer, which was funded by EB-5 investors' purchase of membership units in the Funding Partnership and who, like Plaintiffs, became Limited Partners in the Funding Partnership. The Funding Partnership is one of the entities that comprise the Harbourside Group.

## JURISDICTION AND VENUE

34.     **JURISDICTION**.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court,

exclusive of interest and costs, and Plaintiffs and Defendants are citizens of, and domiciled in, different states.

35.     **VENUE**. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. 1391(b)(2) because the vast majority of acts and omissions giving rise to the claims asserted herein occurred and continue to occur in this District, and a substantial part of the property that is the subject of this action is situated here.

## GENERAL ALLEGATIONS

### THE EB-5 PROGRAM

36.     To provide an incentive for foreign investment to benefit the American economy by creating or preserving U.S. jobs, Congress created the EB-5 Immigrant Investor Visa Program (the "EB-5 Program") in 1990 with the enactment of the Immigration Act of 1990. Pub. L. 101-649, 104 Stat. 4978. The EB-5 Program enabled immigrant investors to become permanent residents of the United States by investing at least $500,000 in a U.S. business that will use the funds in a manner that creates or maintains at least 10 full-time American jobs. *See, e.g.,* 8 U.S.C. § 1153(b)(5).

37.     At the outset of the application process, which normally takes two or more years before it is complete, the EB-5 Investor submits a Form I-526 Immigration Petition by Alien Entrepreneur ("I-526 Petition"), which, if approved, permits the EB-5 Investor to reside and travel within the U.S. while his or her application is pending. If the I-526 Petition is approved, the EB-5 Investor may then seek permanent U.S. residency status (and obtain a green card) by submitting a Form I-829 Petition by Entrepreneur to Remove Conditions ("I-829 Petition"). If the I-829 Petition is granted, the EB-5 Investor and his or her immediate family members are granted permanent immigrant visas (*i.e.,* green cards).

38.     In 1993, Congress modified the EB-5 Program by adding the Immigrant Investor Pilot Program, which allowed EB-5 Investors to invest in a commercial enterprise associated with a regional center. Regional centers, like the one involved in the present case, are private entities that have received approval from the U.S. Citizenship & Immigration Services ("USCIS") to administer EB-5 investments in a given geographical area, and enable EB-5 Investors to pool their investments in a specific project with other EB-5 Investors, thereby making it easier to demonstrate that a given project has created or preserved at least 10 jobs per investment.

39.     Although EB-5 was created in the 1990s, it was not commonly used to fund real estate projects until after the Great Recession in 2008, when funding became more difficult to obtain and EB-5 represented an alternative source of capital.

### FUNDING THE HARBOURSIDE PROJECT VIA THE EB-5 PROGRAM

40.     In September 2010, USCIS approved Defendant Mastroianni's proposal to designate Defendant Florida Regional Center as the administrator of the regional center for Palm Beach County, Florida, and to approve the Harbourside Project as the first capital investment project that would be located in the Florida Regional Center.

41.     To fund the Harbourside Project, Mastroianni and Yellen created the Funding Partnership for the purpose of raising up to $100 million through the sale of up to 200 membership units to EB-5 Investors for $500,000 per unit plus a $40,000 administration fee.

42.     In advertising materials circulated by the Regional Center, prospective EB-5 Investors were told that the Harbourside Project's completion was guaranteed by a $750 million policy issued by a major insurance company, and that

the value of just the real estate collateral is more than twice the amount of the EB-5 loans, and the security of the funds is fully guaranteed. The [Harbourside] Project is a four-year bridge loan with a safe and reliable exit mechanism: Ackman-Ziff, the largest real estate company in New York, has signed a contract to provide a

$100 million refinancing loan after the Project is completed and put into operation. Investors will recover 50% of their funds immediately after receiving their permanent green card, and the full amount of the investment will be safely recovered in the fourth year. . . .

43.    As explained in the Offering Documents, each EB-5 Investor's $500,000 investment would be paid into an escrow fund, which would provide up to $100 million for the EB-5 Loan to the Developer for the construction of the Harbourside Project.

44.    The EB-5 Loan would be secured by a perfected, first-priority lien and would yield interest at a rate of 2.0% per year that would be paid in monthly installments to the EB-5 Investors who became Limited Partners in the Funding Partnership.[2]

45.    The Offering Memorandum explained that the EB-5 Loan would be repaid. "within five years from the date the last potential investor submits his or her I-526 Petition to USCIS, or, no later than November 30, 2012, as determined by the Partnership in good faith." And, to do so, the Developer would "[r]efinance the Loan with an institutional lender" and/or "[r]epay the Loan with the proceeds of a sale of all or a portion of Harbourside Place."

46.    In the event the Developer was unable to refinance the Loan or sell some or all of Harbourside Place to repay it, prospective EB-5 Investors were told that "the Developer intends to convert the entire outstanding principal amount of the Loan into an ownership interest in the Developer." As the EB-5 Loan Agreement explained, this would entail converting the outstanding principal "into units of common membership interest in the [Developer]," but that conversion could not be effectuated if an Event of Default had occurred and was continuing on the Maturity Date.

---

[2] Although the EB-5 Program requires that each applicant's investments remain "at risk" during their conditional residency status (*i.e.,* until their I-829 Petition is granted), "[n]othing prevents an immigrant investor from receiving a return on his or her capital in the form of profits from the new commercial enterprise." USCIS Policy Manual, Chapter 2.

47.     Although there was no minimum principal amount for the EB-5 Loan, the General Partner had the right to terminate the offering at any time before 50 membership units were sold. After 80 membership units were sold, the General Partner had the right to refrain from selling any additional membership units in the Limited Partnership if  it was reasonably determined that (a) the sale of additional membership units would not result in a sufficient number of jobs or (b) there was insufficient interest in purchasing additional membership units.

48.     Neither eventuality occurred. Demand for membership units remained high. And although the General Partner had the right to stop selling additional membership units after 160 units were sold, sales continued through 2013 and, as the Offering Documents acknowledged, there was a need to sell every single membership unit:

> The Developer currently does not have sufficient funding to purchase, develop, construct and operate Harbourside Place, even if the Partnership were to extend the maximum principal Loan amount of $100.0 million. For this and other reasons, the Developer may need to finance Harbourside Place through additional funding, a portion of which may rank senior in terms of payment and priority to the Partnership's Loan to the Developer.

49.     But the Offering Documents also stated that $110 million was the ***maximum*** amount of funds that could be raised for the Harbourside Project—***including*** the funds raised by the sale of membership units to EB-5 Investors—and borrowing additional funds from other sources was permitted only if ***fewer than 200*** membership units were sold:

> If for any reason the maximum principal amount of the [EB-5] Loan is less than $100.0 million, the Principals reserve the right to seek funding from alternative sources, provided that the total principal amount of any additional indebtedness, together with the total principal amount of the Loan, may not exceed $110.0 million.

50.     Despite the ongoing high demand for membership units, however, the General Partner stopped selling them after only ***199*** of the 200 membership units had been sold because Mastroianni and Yellen never intended to sell all 200 units. This single-unit shortfall thus triggered

the Principals' (*i.e.,* Mastroianni and Yellen's) right under the EB-5 Loan Agreement to seek an additional $10,500,000 in the form of loans from alternative sources because the sale of 199 membership units generated only $99,500,000 of the $100 million principal amount for the EB-5 Loan.

### THE DEVELOPER BORROWS FROM ALTERNATIVE SOURCES IN VIOLATION OF THE EXPRESS TERMS OF THE EB-5 LOAN AGREEMENT

51.     Yet, in July 2012—the year ***before*** the sale of membership units ceased— Mastroianni and Yellen had ***already*** procured two senior loans from a third party, Putnam Bridge Funding III ("Putnam"), on behalf of the Developer, which totaled ***$12,700,000*** ($2,700,000 ***more*** than the $110 million maximum allowed by the terms of the EB-5 Loan Agreement ***if*** 200 membership units had not been sold), without advising the Limited Partners or prospective EB-5 investors who had yet to become Limited Partners in the Funding Partnership. Moreover, during the next several months, the Developer borrowed an additional ***$7,498,000*** from the same lender (*i.e.,* Putnam), bringing the total amount of loans from an alternative source to approximately $20 million before the end of 2012.

52.     Specifically, Mastroianni and Yellen procured for the Developer an $11,350,000 bridge loan that was secured by a first priority mortgage on the property on which the Harbourside Project was built (the "Mortgage Loan"), and a $9,000,000 revolving-credit loan, from which Mastroianni and Yellen had already drawn $1,350,000 on behalf of the Harbourside Project by July 2012, which was secured by a second-priority mortgage (the "Revolving Loan"). Several months later, Mastroianni and Yellen borrowed an additional $7,498,000 under the Revolving Loan, for a total of more than $20 million. Thus, the Developer substantially exceeded the $10,500,000 limit on additional funds—***even though EB-5 Investors were still buying membership units well into 2013***—in utter disregard of the EB-5 Loan Agreement.

53.     Shortly thereafter, Mastroianni and Yellen caused the Developer to breach the EB-5 Loan Agreement again. On December 27, 2012, Mastroianni and Yellen caused the Developer to expend $11,350,000 of the EB-5 Loan funds to pay off the Mortgage Loan. Four days later (on December 31, 2012), Mastroianni and Yellen caused the Developer to expend $3,500,000 of the EB-5 Loan Funds to repay part of the Revolving Loan. Mastroianni and Yellen's use of loan funds for this purpose was expressly prohibited by the EB-5 Loan Agreement, which states unambiguously that

> [t]he purpose of the Loan is to provide funds ***for certain Lender-approved hard and soft construction costs (together with an interest reserve) for the purchase of the Property and the construction of the improvements within the Project***. The Loan shall be fully reserved for the cost ***to complete the improvements funded with proceeds of the Loan***. . . .

(Emphasis added.)

54.     It was not until April 15, 2013—after Plaintiffs and most other EB-5 Investors had already purchased their membership units and became Limited Partners in the Funding Partnership—that Mastroianni even hinted at the existence of the Mortgage Loan or the Revolving Loan. On that date, Mastroianni, acting in his capacity as Managing Member of the General Partner and the Florida Regional Center, circulated a letter to the Limited Partners (the "April 2013 letter") that states, among other things, that in December 2012 "a mortgage was recorded against the Property in favor of the [Funding] Partnership to secure repayment of the [EB-5] Loan" and that $26 million in EB-5 Loan funds were released from escrow and used "to fund construction of Harbourside Place." (Plaintiff Fu received the April 2013 letter in May 2013 and Plaintiff Peng never received it.)

55.     Mastroianni also stated that, "in December 2012, the Developer obtained an Additional Loan of up to $18 million from Putnam Bridge Funding III, LLC as Senior Lender **to provide the Developer with additional construction funds**." (Emphasis added.)

56.     This was also false and misleading. In actuality, Mastroianni and Yellen had caused the Developer to borrow from Putnam a total of $12,700,000 in **July 2012**, and had spent $14,850,000 of the EB-5 Loan funds to **repay** the $11,350,000 Mortgage Loan and $3,500,000 of the $8,848,000 Revolving Loan in December 2012. Yet, the April 2013 letter says nothing about this unauthorized expenditure of EB-5 Loan funds, nor anything about Mastroianni and Yellen's decision to borrow an additional $7,498,000 from Putnam on behalf of the Developer in December 2012 via the Revolving Loan.

57.     Aside from oblique references, the April 2013 Report provides no substantive (or truthful) information about the Mortgage Loan or the Revolving Loan, such as when, how, or why the money was borrowed in July 2012, why they decided to subordinate the EB-5 Loan to two other loans for millions of dollars each, or why they chose to use EB-5 Loan funds to repay the Mortgage Loan before borrowing more from the credit line made available by the Revolving Loan.

58.     The April 2013 letter did, however, advise the Limited Partners that, the

[Funding] Partnership has entered into a revised [EB-5] Loan Agreement with the Developer, amending and restating earlier versions of the Loan Agreement dated as of July 22, 2011 and as of September 1, 2011, to effect changes to the [EB-5] Loan required by the intercreditor agreement and the different versions of the Offering Memorandum. As stated in the Offering Memorandum, Developer has the option to convert all outstanding principal into units of ownership interest in the Developer (the "Developer Units"). **The actual number of Developer Units that would be acquired upon conversion will depend on the Appraised Value of Harbourside Place and the principal amount of the Loan outstanding at the time**.

(Emphasis added.)

59.     Mastroianni also explained that, "[p]ursuant to Section 19.6.2 of the [Limited] Partnership Agreement, the General Partner has amended and restated the [Limited] Partnership Agreement . . . ." Although Section 19.6.1 of the Limited Partnership agreement states that the General Partner may amend the Limited Partnership Agreement in writing "with the consent of the Limited Partners given by Ordinary Resolution," Section 19.6.2 provides an exception to the consent requirement if an amendment is necessary "for the protection of the Limited Partners" or "to cure an ambiguity" or inconsistency that exists in a written opinion of counsel to the Limited Partnership.

60.     Mastroianni went on to explain that the following provisions had been added to the Limited Partnership Agreement:

1.      If the Partnership decides to distribute the Developer Units [*i.e.,* units of common membership in the Developer's LLC], or the proceeds of any sale of the Developer Units, to the Limited Partners, all Limited Partners will participate in the distribution pro rata in accordance with their Unit holdings until Developer Units, or the proceeds of any sale of Developer Units, equal to 65% of all issued and outstanding Developer Units on the date of conversion have been distributed; and

2.      All remaining Developer Units (the "Excess Developer Units"), or the proceeds of any sale of Excess Developer Units, will be distributed to the Initial Limited Partners, pro rata in accordance with their holdings.

61.     Less than a year later, in March 2014, Mastroianni issued a report to the Limited Partners (the "March 2014 Report") together with an Ordinary Resolution that sought the Limited Partners' approval for the Developer to borrow more than $60 million in the form of another senior mortgage loan (the "Senior Loan") to which the EB-5 Loan would be subordinated. Mastroianni also advised the Limited Partners "that *if we do not receive a signed copy of the Ordinary resolution from a Limited Partner on or before April 15, 2014, the Partnership will consider that you have consented to the Ordinary Resolution*." (Emphasis added.)

- 17 -

62.     Thus, the Limited Partners were told that *not* returning a signed Ordinary Resolution would have the same effect as signing it. Although Defendants claim that a majority of the Limited Partners "signed" the Ordinary Resolution, this is not true. In actuality, there were *two different versions* of the Ordinary Resolution. Moreover, some of the Limited Partners' agents signed it without their knowledge or consent. Thus, although Defendants purportedly received over 100 signatures, many of those signatures were submitted by agents acting on behalf of Defendants and the existence of two versions of the Ordinary Resolution meant that the Limited Partners who actually did consent were consenting to two different proposals. Accordingly, there actually was no majority vote in favor of the Ordinary Resolution.

63.     Nonetheless, Mastroianni and Yellen proceeded as though a majority of the Limited Partners had validly approved the Ordinary Resolution and took the Senior Loan on behalf of the Developer.

64.     Despite the rosy picture that Mastroianni and Yellen painted in the March 2014 Report, the Developer still had yet to make a single monthly interest payment to the Limited Partners, as required by the EB-5 Loan Agreement. Instead, in a letter dated December 14, 2016, Mastroianni advised the Limited Partners that the Senior Loan would be replaced by another Senior Loan and asked them to consent to another Ordinary Resolution that would extend the Maturity Date of the EB-5 Loan from November 30, 2017, to December 31, 2020.

65.     This time, the Limited Partners simply declined Mastroianni's proposal.

66.     Thus, on August 25, 2017, Mastroianni tried again in a letter he wrote to the Limited Partners in his capacity as General Partner. There, Mastroianni promised to pay all the interest that had accrued to date, to repay the loan principal, and to effectuate a plan that would protect the

Limited Partners' interests in exchange for their consent to convert the Funding Partnership's investment into a "preferred" equity stake in the Developer.

67.     Like the proposal that was made with the March 2014 Report, Mastroianni included with this proposal a pronouncement that "*[i]f we do not receive the required number of consents, the Loan will be converted to common equity* under the same formula (in accordance with the existing [EB-5] Loan Agreement) . . . ." (Emphasis in original.)

68.     Nonetheless, when the Limited Partners did not consent to this proposal, Mastroianni wrote to the Limited Partnership again on October 13, 2017. There, Mastroianni advised the Limited Partnership that the Developer had "elected to exercise the Conversion Right pursuant to the terms of the Loan Agreement." Although Mastroianni was also the managing member of the General Partner, he failed to circulate to that notice to the Limited Partners, as required by Section 17.3 of the Limited Partnership Agreement, which provides that "the General Partner shall send to each Limited Partner a copy of any Conversion Notice within fifteen days following its receipt thereof."

69.     Mastroianni went on in the October 13 letter to note that "[t]he Conversion Right contemplates conversion of the outstanding principal of the loan into common equity membership interests of Borrower, but Borrower hereby acknowledges that Borrower and Lender may conduct good faith negotiations to enhance the terms of the conversion (e.g., preferred equity membership interests), though Borrower is under no obligation to do so."

70.     Mastroianni was not offering to simply forego the "right" to convert the EB-5 Loan principal into common equity interests and give the Limited Partners a "preferred" equity interest out of the goodness of his heart. In actuality, "preferred" equity status was just another way of extending the Maturity Date. It also meant that the Limited Partners would an illiquid investment

with no voting rights—notwithstanding that the EB-5 Loan Agreement provided that the conversion would result multiple common membership interests to which they were entitled under the Limited Partnership, which were guaranteed voting rights as provided by F.S.A. § 605.04073(1)(a).

71.     Similarly, Mastroianni expressed a "willingness" to negotiate because he knew that, although the EB-5 Loan Agreement includes a provision that *contemplated* conversion from a loan into units of a common membership interest in the Developer, the conversion could not be effectuated without the approval of the Limited Partners for two basic reasons.

72.     *First*, multiple Events of Default existed at the time the Developer sought to exercise its "right" of conversion, and the EB-5 Loan Agreement as well as the Offering Documents make clear that the EB-5 Loan could not be converted if an Event of Default existed at the time of a proposed conversion.

73.     The EB-5 Loan Agreement defines "Events of Default" as follows:

**EVENTS OF DEFAULT**. The occurrence of any one or more of the following events is a Default hereunder and the continuance of any such Default beyond the period (if any) provided below within which such Defaults may be cured shall be an Event of Default hereunder and under the Loan:

(1)     Any breach of the terms of the Loan Documents; or

(2)     Any material noncompliance with the Requirements; or

(3)     Any material representation, warranty, statement, certificate, schedule or report made or furnished by Borrower proves to have been false or erroneous in any material respect at the time of the making thereof, or to have omitted any substantial liability or claim against Borrower, of if on the date of execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed therein, which change shall not have been disclosed to Lender at or prior to the time of such execution . . . .

74.     At the time the Developer invoked the conversion provision of the EB-5 Loan Agreement, Events of Default existed as a result of the Developer taking the Mortgage Loan and

the Revolving Loan, which subordinated the EB-5 Loan to the Mortgage Loan, and as a result of the Developer using EB-5 Loan funds to pay off the Mortgage Loan in contravention of the express purpose of the EB-5 Loan Agreement. All of this was inconsistent with the representations made about these issues in the Offering Documents, as was the Developer's failure to make any effort to repay the EB-5 Loan by taking a loan and/or selling some or all of Harbourside Place.

75.     **Second**, the conversion could not occur without the approval of the Limited Partners, even if the Events of Default had not precluded it. Although the Offering Memorandum, the EB-5 Loan Agreement, and the Limited Partnership Agreement all refer to the prospect of converting the EB-5 Loan into units of a common membership interest in the Developer, the actual conversion plan was significantly different than the one described in those documents.

76.     Despite the existence of Events of Default and despite the lack of consent from the Limited Partners, Defendants simply proceeded to convert the EB-5 Loan principal to a "preferred" equity interest in the Developer for the Funding Partnership as an entity, rather than issuing units of common membership interests for distribution to the Limited Partners, as provided in the Loan Agreement and the revised Limited Partnership Agreement—both of which had been amended for that purpose, purportedly for the "protection" of the Limited Partners. Defendants then converted the Developer from a Florida LLC to the New LLC.

77.     Moreover, rather than paying off the Senior Loan and freeing the Developer of that debt, Mastroianni purchased the loans via the New Senior Lender with funds from a different EB-5 Project, thereby ensuring that the Developer would continue to be saddled with debt while Mastroianni profited from it.

78.     None of this was mentioned in the Offering Documents, nor was it agreed to by the Limited Partners, as required by Section 620.2103 of the Florida Revised Uniform Partnership Act of 2005.

79.     The failure to obtain the Limited Partners' approval as to the plan for converting the Developer to the New LLC also violated Section 16.8 of the Limited Partnership Agreement, which requires *unanimous* consent of the Limited Partners as a prerequisite to placing their investment in a LLC that was governed by Delaware law and an entirely different operating agreement (*i.e.,* an "Other Investment," as that term is defined by Section 1.1.33 of the Limited Partnership Agreement.

80.     Once again, Limited Partners' approval was neither sought nor obtained.

## VEIL-PIERCING ALLEGATIONS

81.     Mastroianni and Yellen are the sole Principals of the Harbourside Group. Mastroianni and Yellen used this status to dominate and control the entities within the Harbourside Group, which includes, *inter alia*, the Funding Partnership, the General Partner, the Developer, and the Regional Center to such an extent that these entities' independent existence was in fact non-existent and Mastroianni and Yellen were in fact their alter egos. Mastroianni and Yellen used these entities' limited liability status for fraudulent and other improper purposes, which caused injury to the Limited Partners, the Funding Partnership and the Developer.

82.     Indeed, as the former Chief Financial Officer for the Developer and the Regional Center has stated, "Mastroianni, along with those in his employ, routinely conducted side deals, and funneled money in and out of various accounts without conferring with the CFO and . . . in non-compliance with the EB-5 requirements, something that would cause serious problems should

there ever be a USCIS or SEC audit." *Finkelstein v. Allied Capital and Devel. of So. Fla., LLC,* No. 2014CA006733 (Palm Beach Cty. Cir. Ct.) ¶ 32.

## DERIVATIVE ACTION ALLEGATIONS

83.    Plaintiffs bring this action derivatively on behalf of the Funding Partnership, pursuant to Fed. R. Civ. P. 23.1 and F.S.A. § 620.2002(2), to enforce the claims for relief set forth below against each Defendant.

84.    The conduct about which Plaintiffs complain herein occurred while Plaintiffs were limited partners in the Funding Partnership, hence they standing to pursue this derivative action for damages and other relief on behalf of the Funding Partnership, which is necessary and proper to protect the interests of the Funding Partnership.

85.    If Plaintiff s are successful in this action, the recovery will be of substantial benefit to the Funding Partnership and its Limited Partners, each of whom was a member of the Funding Partnership when it was converted to the New LLC.

## DEMAND FUTILITY

86.    Plaintiffs did not make a demand that Defendants Mastroianni and Yellen to take action in their capacities as the former Principals/managing member of the General Partner to remedy the harm Plaintiffs have alleged before they filed this Complaint because such a demand would have been futile. This was so for several reasons, including, but not limited to, the following circumstances:

        a.    ***First***, Mastroianni and Yellen face a substantial likelihood of liability in connection with their role in fraudulently concealing material facts from the Funding Partnership, grossly mismanaging the Funding Partnership, breaching their fiduciary duties to the Funding Partnership, and violating state and federal law to effectuate their fraudulent schemes and self-

dealing in a manner that harmed the Funding Partnership and ultimately resulted in the demise of the Funding Partnership and the conversion of its assets.

b.    *Second,* Mastroianni and Yellen's conduct, as alleged herein, deprived them of the requisite independence and valid business judgment needed to properly assess a demand that the General Partner take action to remedy alleged harm to the Funding Partnership.

c.    *Third*, the blatantly unfair and one-sided nature of the decision to convert the EB-5 Loan principal to a membership interest in the Developer made it impossible to approve that decision through the exercise of valid business judgment, as did the lack of good faith with which Mastroianni and Yellen required to exercise valid business judgment in any event, as evidenced by their failure to disclose material information to the EB-5 Investors and their failure to comply with the most basic provisions of the EB-5 Loan Agreement, the Limited Partnership Agreement and the Florida Revised Uniform Partnership Act of 2005 in carrying out the conversion of the Developer from a Florida LLC to the New LLC.

d.    *Fourth,* Mastroianni and Yellen's direct involvement in the unlawful, unfair, and fraudulent conduct alleged herein negates the presumption that they could have considered a pre-suit demand in an objective, disinterested manner.

e.    *Fifth,* Mastroianni and Yellen created and controlled each of the other entities that comprise the Harbourside Group, which also participated in the unlawful, unfair, and fraudulent conduct alleged herein, and are subject to personal liability for their actions in connection with that conduct. These facts also negates the presumption that Mastroianni and Yellen could have considered a pre-suit demand in an objective, disinterested manner

f.    *Sixth,* Mastroianni and Yellen, together with the entities that comprise the Harbourside Group, have already been named as defendants in a related action that was filed by

79 individual EB-5 Investors in Palm Beach County Circuit Court in or about October 11, 2018. *See Fu v. Mastroianni,* No. 502018CA012883 (Palm Beach Cir. Ct, 15th Jud. Cir.). Under the circumstances, Mastroianni and Yellen would have been unable to evaluate a pre-suit demand with the requisite disinterest and independence, much less exercise disinterested business judgment.

## CLASS ALLEGATIONS

87.    Plaintiffs bring this lawsuit as a Class action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

88.    The Class is defined as follows: All persons who invested in the Funding Partnership (*i.e.,* all Limited Partners). Excluded from this Class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees; the Court and its staff; and any Limited Partner who has entered into an enforceable agreement with Defendants to settle or otherwise resolve their claims against Defendants.

89.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether class certification is appropriate.

90.    The Class satisfies the requirements of Rule 23(a), as well as 23(b)(3).

91.    **NUMEROSITY**. The Class consists of approximately 199 geographically dispersed individual Limited Partners. Joinder of the Class members is not practicable. The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

92.    **ASCERTAINABILITY**. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by the Developer and the General Partner. Notice of this action can thus be provided to all members of the proposed Class.

93. **TYPICALITY**. Plaintiffs were investors in the Harbourside Project at the time of the wrongdoing alleged herein. Plaintiffs' claims are typical of the claims of all Class members as all Class members are similarly affected by Defendants' wrongful conduct as complained of herein.

94. **ADEQUACY**. Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class-action litigation, including litigation relating to investment fraud. Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.

95. **COMMONALITY AND PREDOMINANCE**. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. The questions of law and fact common to the Class include, but are not limited to, the following:

a. Whether Defendants breached their fiduciary duties to the proposed Class;

b. Whether Defendants engaged in civil theft in violation of F.S.A. § 812.014; and

c. Whether Defendants engaged in a civil conspiracy.

96. The Class may be certified under Rule 23(b)(3). Questions of law or fact common to Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this action as a Class action.

## CLAIMS FOR RELIEF

### COUNT I
### DECLARATORY RELIEF

97.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

98.    This claim for relief is brought on behalf of Plaintiffs individually and on behalf of the proposed Class and derivatively on behalf of the Funding Partnership and the Developer pursuant to Federal Rule of Civil Procedure 57 for the purpose of obtaining a judicial declaration of the parties' respective rights and duties.

99.    Among the unfair, fraudulent, and unlawful conduct Plaintiffs have alleged in this Complaint are **(a)** Defendants' improper exercise of the conversion provisions of the EB-5 Loan Agreement despite the existence of multiple Events of Default, which were neither cured nor waived at the time the loan-conversion provisions were invoked and **(b)** Defendants' failure to obtain the Limited Partners' approval of the plan of conversion, which transformed their investment in the Funding Partnership into a materially different investment that was not discussed in the Offering Documents or mentioned to the Limited Partners until after the new plan of conversion was effectuated in late November/early December 2017. As a result of Defendants' conduct, the exercise of the conversion provisions of the EB-5 Loan Agreement, and the conversion of the Developer from a Florida limited liability company to a Delaware limited liability company (*i.e.,* the New LLC) are invalid and void as a matter of law.

100.    Plaintiffs are informed and believe that Defendants will dispute these allegations. Therefore, an actual controversy has arisen and now exists between Plaintiffs and Defendants. Accordingly, Plaintiffs hereby request a judicial declaration of the rights and duties of the parties with respect to each of the foregoing issues in controversy.

**COUNT II**
**BREACH OF FIDUCIARY DUTIES**

101.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

102.    This claim for relief is brought on behalf of Plaintiffs and the proposed class, and derivatively on behalf of the Funding Partnership against Defendants Mastroianni, Yellen, and the General Partner.

103.    This claim for relief is based on Defendants' breaches of fiduciary duties of loyalty and care to the Funding Partnership and to Plaintiffs and members of the proposed class as Limited Partners in the Funding Partnership.

104.    These Defendants are fiduciaries of the Funding Partnership and the Limited Partners, and they owed a duty to conduct the business of those entities loyally, faithfully, carefully, diligently, and prudently.

105.    In blatant disregard for their fiduciary duties to the Funding Partnership and the Limited Partners, Mastroianni and Yellen exploited their authority as Principals of the Harbourside Group and as co-managers of the General Partner and the Developer by, *inter alia*, causing the Developer to borrow $12,700,000 from Putnam in or about July through December 2012 in utter disregard for the express terms of the EB-5 Loan Agreement, which prohibited the Developer from subordinating the EB-5 Loan to loans from other lenders unless and until the General Partner failed to sell all 200 units of membership in the Funding Partnership and limited the amount of such borrowing to no more than a total of $110 million (including the funds raised by the sale of membership units in the Funding Partnership) from alternative sources. Moreover, despite ongoing demand for units of membership in the Funding Partnership, Defendants stopped selling such units

after 199 units were sold for the purpose of exploiting the subordination provisions of the EB-5 Loan Agreement.

106.    Mastroianni and Yellen also breached their fiduciary duties to the Funding Partnership and the Limited Partners by, *inter alia*, causing the Developer to default on the EB-5 Loan Agreement **(a)** by causing the Developer to fail to pay monthly interest payments; **(b)** by causing covertly obtaining, fraudulently concealing, and failing to disclose the existence of the Mortgage Loan and the Revolving Loan from the Limited Partners; **(c)** by causing the Developer to use EB- 5 Loan funds to, *inter alia*, repay the Mortgage Loan and the Revolving Loan in breach of the express terms of the EB-5 Loan Agreement and the rules and regulations governing the EB-5 Program; **(d)** by failing to make any effort to obtain a loan and/or sell some or all of Harbourside Place to repay the loan principal to the Funding Partnership; **(e)** by failing to repay the $99,500,000 loan principal to the Funding Partnership on the Maturity Date; **(f)** by causing the Developer to improperly invoke the conversion provisions of the EB-5 Loan Agreement notwithstanding the existence of multiple Events of Default; **(g)** by causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners; and **(h)** by causing the Developer to be converted from a Florida LLC (in which members are guaranteed voting rights) into the New LLC.

107.    Defendants also breached their fiduciary duties by, *inter alia,* acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval; by using funds from other EB-5 Projects to purchase over $60,000,000 in Senior Loans to the Developer, thereby ensuring that the Developer continued to be saddled with debt represented by the New Senior Loan so

Defendants could profit from it; and by failing to take any action to protect the interests of the Funding Partnership or the Limited Partners in response to the conduct described in this paragraph and the preceding paragraph.

108.    Such conduct and inaction contravened Defendants' duty to promote the interests of the Funding Partnership and the Limited Partners, and could not have been a good-faith exercise of disinterested business judgment.

109.    As a direct and proximate result of Defendants' conduct, the Funding Partnership, and the Limited Partners have been damaged in amounts that will be proved at trial.

110.    In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership and the Limited Partners with a conscious disregard of their rights, which entitles the Funding Partnership and the Limited Partners to an award of punitive and exemplary damages.

## COUNT III
### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

111.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

112.    This claim for relief is brought on behalf of Plaintiffs and the proposed class, and derivatively on behalf of the Funding Partnership against Defendants Regional Center and the Developer.

113.    As alleged in Count II, above, Defendants Mastroianni, Yellen, and the General Partner had fiduciary duties to the Funding Partnership and to the Plaintiffs and members of the proposed class as Limited Partners, and those Defendants breached those duties.

114.     The Regional Center and the Developer, with knowledge of Mastroianni, Yellen, and the General Partner's breaches of fiduciary duty, aided and abetted, provided substantial assistance, and encouraged those breaches of duty.

115.     As a proximate result of Defendants' conduct, the Funding Partnership and the Limited Partners have been damaged in amounts that will be proved at trial.

116.     In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership and the Limited Partners with a conscious and intentional disregard of their rights, which entitles the Funding Partnership and the Limited Partners to an award of punitive and exemplary damages.

### COUNT IV
### BREACH OF CONTRACT

117.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

118.     This claim for relief is brought derivatively on behalf of the Funding Partnership against the Developer.

119.     The Funding Partnership entered into the EB-5 Loan Agreement with the Developer on September 1, 2011.

120.     The Funding Partnership did all, or substantially all, of the significant things that the EB-5 Loan Agreement required it to do.

121.     All conditions required for the Funding Partnership's performance had occurred when it deposited the proceeds from the sale of units of membership in the Funding Partnership, the aggregate amount of which was $99,500,000, into the escrow account for the purpose of funding the EB-5 Loan.

122.    The EB-5 Loan Agreement prohibited the Developer from subordinating the EB-5 Loan to loans from alternative sources unless the General Partner was unable to sell all 200 units of membership in the Funding Partnership.

123.    The EB-5 Loan Agreement prohibited the Developer from borrowing more than a total of $110,000,000, including the funds the Developer borrowed under the EB-5 Loan.

124.    The EB-5 Loan Agreement restricted the Developer from using funds from the EB-5 Loan for any purpose other than the payment of interest to the Funding Partnership and to pay for the cost of construction of the Harbourside Project.

125.    Notwithstanding the foregoing provisions of the EB-5 Loan Agreement, the Developer (a) borrowed nearly $13 million from Putnam in or about July 2012, (b) used EB-5 Loan funds to repay some or all of those loans; and (c) continued to borrow from Putnam while the General Partner was still selling units of membership in the Funding Partnership.

126.    The Developer's conduct constituted multiple Events of Default, as defined by the EB-5 Loan Agreement, which precluded the Developer from exercising the conversion provisions of the EB-5 Loan Agreement.

127.    The Developer breached its obligations under the EB-5 Loan Agreement, which required the Developer to repay the EB-5 Loan on the Maturity Date. Notwithstanding the existence of this and other Events of Default that had occurred, which the Developer did not cure and the Funding Partnership did not waive, the Developer failed to repay the EB-5 Loan and purported to invoke the conversion provisions of the EB-5 Loan Agreement instead.

128.    As a proximate result of the Developer's breaches of contract, the Funding Partnership has been damaged in an amount equal to the $99,500,000 agreed to return to the Partnership on the Maturity Date, plus applicable interest.

## COUNT V
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

129.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

130.     This claim for relief is brought derivatively on behalf of the Funding Partnership against the Developer.

131.     The Funding Partnership entered into the EB-5 Loan Agreement with the Developer on September 1, 2011.

132.     The Funding Partnership did all, or substantially all, of the significant things that the EB-5 Loan Agreement required it to do.

133.     All conditions required for the Funding Partnership's performance had occurred when it deposited the proceeds from the sale of units of membership in the Funding Partnership, the aggregate amount of which was $99,500,000, into the escrow account for the purpose of funding the EB-5 Loan.

134.     The EB-5 Loan Agreement prohibited the Developer from subordinating the EB-5 Loan to loans from alternative sources unless the General Partner was unable to sell all 200 units of membership in the Funding Partnership.

135.     The EB-5 Loan Agreement prohibited the Developer from borrowing more than a total of $110,000,000, including the funds borrowed under the EB-5 Loan.

136.     The EB-5 Loan Agreement restricted the Developer from using funds from the EB-5 Loan for any purpose other than the payment of interest to the Funding Partnership and to pay for the cost of construction of the Harbourside Project.

137.     Notwithstanding the foregoing provisions of the EB-5 Loan Agreement, the Developer (a) borrowed nearly $13 million from Putnam in or about July 2012, (b) used EB-5

Loan funds to repay some or all of those loans; and (c) continued to borrow from Putnam while the General Partner was still selling units of membership in the Funding Partnership.

138.    The Developer's conduct constituted Events of Default, as that term is defined in the EB-5 Loan Agreement, which precluded the Developer from exercising the conversion provisions of the EB-5 Loan Agreement.

139.    The EB-5 Loan Agreement required the Developer to repay the EB-5 Loan on the Maturity Date. Notwithstanding the existence of this and other Events of Default that had occurred, which the Developer did not cure and the Funding Partnership did not waive, the Developer failed to repay the EB-5 Loan and purported to invoke the conversion provisions of the EB-5 Loan Agreement instead.

140.    The Developer failed to repay the EB-5 Loan and purported to invoke the conversion provisions of the EB-5 Loan Agreement, and thereby consciously and deliberately refused to comply with its obligations under the EB-5 Loan Agreement, frustrating the agreed common purpose of the parties' agreement and disappointing the reasonable expectations of the Funding Partnership.

141.    As a proximate result of the Developer's breaches of the covenant of good faith and fair dealing, the Funding Partnership has been damaged in an amount equal to the $99,500,000 the Developer agreed to return to the Funding Partnership on the Maturity Date, plus applicable interest.

## COUNT VI
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

142.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

143.     This claim for relief is brought derivatively on behalf of the Plaintiffs and members of the proposed class against the General Partner.

144.     Plaintiffs and proposed class members entered into the Limited Partnership Agreement with the General Partner at various time as they purchased units of membership in the Funding Partnership and became Limited Partners.

145.     The Limited Partners did all, or substantially all, of the significant things that the Limited Partnership Agreement required them to do.

146.     All conditions required for the Limited Partnership Agreement's performance had occurred when the Limited Partners had made their $540,000 payment and complied with all that was required of them in connection with the I-526 and I-829 Petitions.

147.     The Limited Partnership Agreement and its fiduciary duties to the Limited Partners called for the General Partner to obtain from the Developer individual units of common membership in the Developer (*i.e.,* Developer Units") pursuant to the EB-5 Loan Agreement and distribute the Developer Units *pro rata* among the Limited Partners. The General Partner failed to discharge those obligations.

148.     Instead, the General Partner accepted a "preferred" equity interest in the Developer and allowed the Funding Partnership to become a member of the Developer, which was then converted from a Florida LLC to the New LLC, leaving the Limited Partners with no rights vis-à-vis the Developer except through the Funding Partnership itself, which was controlled by the General Partner and managed by Defendant Mastroianni.

149.     As a proximate result of the General Partner's breaches of the covenant of good faith and fair dealing, the Limited Partners have been damaged in an amount to be proved at trial.

## COUNT VII
### CONVERSION

150.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

151.    This claim for relief is brought on behalf of Plaintiffs and the proposed Class against Defendants Mastroianni, Yellen, and the Developer.

152.    Defendants have engaged in acts of dominion wrongfully asserted over the Limited Partners' property—namely, Plaintiffs and members of the proposed class each deposited $500,000 in escrow, which amounted to an aggregate deposit of $99,500,000, for the purpose of funding the EB-5 Loan (the "Property")—in a manner inconsistent with their ownership of that property. Defendants' conduct, as alleged herein, deprived the Limited Partners of that Property permanently or for an indefinite period of time.

153.    As a proximate cause of Defendants' unlawful conduct, Plaintiffs and the proposed class have each been damaged by the deprivation of their Property, which amounts to $500,000 each, plus applicable interest.

## COUNT VIII
### CIVIL THEFT

154.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

155.    This claim for relief is brought on behalf of Plaintiffs and the proposed Class against Defendants Mastroianni, Yellen, and the General Partner.

156.    Plaintiffs and members of the proposed class each deposited $500,000 in escrow, which amounted to an aggregate deposit of $99,500,000, for the purpose of funding the EB-5 Loan (the Property).

157.    To deprive Plaintiffs and members of the proposed class of their Property when it was due to be returned to each of them, Defendants knowingly and in violation of F.S.A. § 812.014 participated in a fraudulent scheme by which they improperly invoked the conversion provisions of the EB-5 Loan Agreement to transform the Property into an illiquid investment that was, at best, an indirect interest that was devoid of any rights, control, or reasonable return.

158.    As a result of this fraudulent and deceptive transaction, Mastroianni and Yellen, with criminal intent, used their control of the General Partner and the Developer to knowingly and intentionally obtain the Property belonging to Plaintiffs and members of the proposed class for the purpose of depriving their Property.

159.    Mastroianni and Yellen intended to appropriate and/or has appropriated the Property to their own use without any legitimate entitlement to those funds.

160.    Defendants' actions were the product of a scheme of deceit and theft.

161.    Defendants intentionally violated Florida Statute § 812.014, which prohibits theft.

162.    As a result of Defendants' violation of Florida Statute § 812.014, Plaintiffs and members of the proposed class have been injured and have lost at least $500,000 each.

163.    On December 23, 2019, before the filing of this Complaint, Plaintiffs made written demand for payment and return the Property in accordance with F.S.A. § 772.11 (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit 1**.

164.    Defendants have yet to agree to return the Property to Plaintiffs or members of the proposed class or to pay treble damages for their theft of it.

165.    Plaintiffs and members of the proposed class have been injured because of Defendants violations of F.S.A. § 812.014.

166.     Pursuant to F.S.A. § 772.11(a), Defendants are liable to Plaintiffs and members of the proposed class in the amount of three times the value of the funds Defendants have stolen from them.

167.     Plaintiffs and members of the proposed class are entitled to recover reasonable attorneys' fees and costs, as well as accrued interest, as a result of Defendants' civil theft. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

### COUNT IX
### ACCOUNTING

168.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

169.     This claim for relief is brought derivatively on behalf of the Funding Partnership Defendants Mastroianni, Yellen, the General Partner, the Developer, and the Regional Center.

170.      Plaintiffs seek an equitable accounting of the accounts, assets, and liabilities of the Funding Partnership.

171.     The Funding Partnership and the Developer acting through Mastroianni and Yellen as Principals of the Harbourside Group and as managers of the General Partner and the Developer, and the General Partner, the Developer, and the Regional Center have engaged in self-dealing and have mismanaged the business and affairs of the Funding Partnership and the Developer in the manner alleged herein, thereby placing the Funding Partnership's assets at undue risk.

172.     Plaintiffs do not have an adequate remedy at law because Defendants have control over the accounts, records, and assets of the Funding Partnership and the Developer.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals, and derivatively on behalf of the Funding Partnership, demand judgment against Defendants as follows:

(1)     declaring this action to be a proper class action maintainable pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and  23(b)(3), and to be a proper derivative action maintainable pursuant to Federal Rule of Civil Procedure 23.1 and declaring Plaintiffs and their counsel to be representatives of the proposed class;

(2)     declaring that Defendants' exercise of the conversion provisions of the EB-5 Loan Agreement, and the conversion of the Developer from a Florida limited liability company to a Delaware limited liability company, were invalid and void, as alleged in Count I;

(3)     awarding compensatory and punitive damages for Defendants' breaches of fiduciary duty, as alleged in Count II;

(4)     awarding compensatory and punitive damages for Defendants' aiding and abetting breaches of fiduciary duty, as alleged in Count III;

(5)     awarding compensatory damages for Defendants breaches of contract, as alleged in Count IV;

(6)     awarding compensatory damages for Defendants breaches of the covenant of good faith and fair dealing, as alleged in Counts V and VI;

(7)     awarding compensatory and punitive damages for Defendants' conversion of the Property, as alleged in Count VII;

(8)     awarding treble damages and attorney fees and costs as a result of Defendants' civil theft, as alleged in Count VIII; and

(9)     an accounting of the Funding Partnership's assets, as alleged in Count IX;

(10)    awarding Plaintiffs and members of the proposed class attorney fees and costs pursuant to the common fund doctrine and F.S.A. § 772.1(a);

(11)    awarding the Funding Partnership, Plaintiffs and the members of the proposed class prejudgment interest at the maximum rate allowable by law; and

(12)    awarding such other and further relief the Court deems just, proper and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and the proposed Class, and deriviatively on behalf of the Funding Partnership, hereby request a jury trial for any and all Counts for which a trial by jury is permitted by law.

DATED: JANUARY 24, 2020                     Respectfully submitted,


BY /s/ *Matthew Fornaro*

Matthew Fornaro (mfornaro@fornarolegal.com)
Florida Bar No. 0650641
**MATTHEW FORNARO, P.A.**
11555 Heron Bay Boulevard, Suite 200
Coral Springs, FL 33076
T: 954-324-3651
F: 954-248-2099

Jeffrey L. Fazio (jfazio@dehengsv.com)
*Pro Hac Vice* application pending
**DEHENG LAW OFFICES**
Silicon Valley Office
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-5856
F: 925-397-1976

*Counsel for Plaintiffs*

## <u>VERIFICATION</u>

I, Ting Peng, under penalty of perjury, state as follows:

I am one of the Plaintiffs in the above-captioned action. I have read the foregoing Complaint and have authorized its filing. Based on the investigation of my counsel, the facts alleged in the Complaint are true to the best of my knowledge, information, and belief.

Dated:  January 22, 2020

_Ting Peng_
_____
Ting Peng

<u>VERIFICATION</u>

I, Lin Fu, under penalty of perjury, state as follows:

I am one of the Plaintiffs in the above-captioned action. I have read the foregoing Complaint and have authorized its filing. Based on the investigation of my counsel, the facts alleged in the Complaint are true to the best of my knowledge, information, and belief.

Dated:  January 22, 2020

_____

Lin Fu



EXHIBIT 1

 **DeHeng Law Offices**

December 20, 2019

**BY OVERNIGHT DELIVERY**

Nicholas A. Mastroianni, Manager
Harbourside Funding GP, LLC
115 Front Street, Suite 300
Jupiter, FL 33477

Richard L. Yellen
Richard L. Yellen & Associates
111 Broadway, 11th Floor
New York, NY 10006

     Re:   *Peng, et al. v. Mastroianni, et al.*
            Demand Letter (F.S.A. § 772.11(1))

Gentlemen:

     This firm represents Ting Peng and Lin Fu, who will be filing suit against you on behalf of themselves and a proposed class of other immigrant investors in the Harbourside Place project (collectively, "Plaintiffs"), and derivatively, on behalf of Harbourside Funding, LP (the "Funding Partnership"). A draft of the Complaint we intend to file accompanies this letter.

     The purpose of this letter is to provide notice pursuant to F.S.A. § 772.11(1) of Plaintiffs' demand for treble damages for the civil theft you have perpetrated by way of a fraudulent scheme to knowingly obtain for your own use the $99,500,000 Plaintiffs invested in the Funding Partnership. The scheme is described in detail in the Complaint.

     As a result of that scheme, you have obtained the outstanding loan principal for your own use, despite knowing that it should have been returned to Plaintiffs more than two years ago. Consequently, you are liable for civil theft in violation of F.S.A. § 812.014.

Silicon Valley Office address: 7901 Stoneridge Dr #208, Pleasanton, CA 94588
http://www.dehenglaw.com/     Phone: (925) 399 5856     Fax: (925) 397 1976

Beijing  Shanghai  Shenzhen  Guangzhou  Tianjin  Jinan  Dalian  Changchun  Shenyang  Changsha  Xi'an
Chongqing  Hangzhou  Wuhan  Zhengzhou  Nanjing  Fuzhou  Taiyuan  Urumqi  Hefei  Chengdu  Kunming
Zhuhai  Suzhou  Wenzhou  Wuxi  Dongguan  Sanya  Paris  New York  The Hague  Brussels  Dubai  Silicon Valley

**Nicholas A. Mastroianni, Richard L. Yellen — December 20, 2019 — Page 2**

     Accordingly, Plaintiffs hereby demand $1,500,000 in treble damages owed to each of them as a result of your civil theft. If you comply with this demand within 30 days after receipt of this letter, our clients will provide you with a written release from further liability for the specific acts of theft described herein.

     We look forward to hearing from you.

                    Sincerely,

                    Jeffrey L. Fazio

Enclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. _____

| | |
|---|---|
| TING PENG and LIN FU, on behalf of themselves individually and all others similarly situated, and derivatively on behalf of HARBOURSIDE FUNDING, LP, a Florida limited partnership, | |
| Plaintiffs, | JURY DEMAND |
| vs. | |
| NICHOLAS A. MASTROIANNI II; RICHARD L. YELLEN; FLORIDA REGIONAL CENTER, LLC, a Delaware limited liability company; HARBOURSIDE FUNDING GP, LLC, a Florida limited liability company; and HARBOURSIDE PLACE, LLC, a Delaware limited liability company, | |
| Defendants, | |
| and | |
| HARBOURSIDE FUNDING, LP, a Florida limited partnership, | |
| Nominal Defendant. | |

**CLASS-ACTION AND DERIVATIVE COMPLAINT
FOR EQUITABLE RELIEF AND DAMAGES**

Plaintiffs Ting Peng and Lin Fu, on behalf of themselves and all others similarly situated, and derivatively on behalf of Nominal Defendant Harbourside Funding, LP, allege as follows upon personal knowledge as to Plaintiffs' own conduct and experience, and on information and belief as to all other matters based on an investigation by counsel.

## INTRODUCTION

1.     Although the facts are somewhat complicated, the principal issue in this case is simple and straightforward. Defendants Nicholas Mastroianni and Richard Yellen created a group of companies to perpetrate a fraudulent scheme by which they obtained $99,500,000 from a group of immigrant investors for the purpose of funding a construction loan that was to have been repaid when it matured more than two years ago, but had no intention of keeping their promise to repay. Thus, when the loan matured over two years ago, Defendants used the money they obtained for the loan to buy an equity interest in one of their companies in which the immigrant investors (including Plaintiffs Peng and Fu) have no rights and no ability to recover the money that was stolen from them.

2.     To achieve this objective, Defendants availed themselves of an opportunity Congress created when it enacted the EB-5 Immigrant Investor Visa Program (the "EB-5 Program"). The EB-5 Program's purpose is to enable immigrants to secure permanent residence in the United States in exchange for investing at least $500,000 in a commercial enterprise that uses the investment to create or preserve at least 10 American jobs. Although the EB-5 Program had existed since the 1990s, interest in the program increased significantly when financing for commercial real estate projects became difficult to obtain after the Great Recession of 2008.

3.     One of the commercial enterprises that made use of funding from the EB-5 Program is Harbourside Place (the "Harbourside Project"), a large commercial development in Jupiter,

Florida, that includes a municipal center, a hotel, retail shopping, dining, and office space. To obtain funding from he EB-5 Program, Mastroianni and Yellen created, and were the Principals who controlled, a group of entities called the Harbourside Group, which included, *inter alia,* Defendant Florida Regional Center, LLC (the "Regional Center"), Nominal Defendant Harbourside Funding, LP (the "Funding Partnership"), Defendant Harbourside Funding, GP (the "General Partner"), and Defendant Harbourside Place, LLC (the "Developer"). In addition to his role as one of the Principals who controlled the entire Harbourside Group, Mastroianni and Yellen appointed themselves co-managers of the General Partner and the Regional Center, and Mastroianni as manager of the Developer.

4.     Each of these entities played a key role in the EB-5 funding process. Shortly after receiving federal approval to administer the EB-5 Program in the Palm Beach area in 2010, the Regional Center began promoting the Harbourside Project to foreign investors who sought green cards via the EB-5 Program ("EB-5 Investors"). The General Partner managed the Funding Partnership, which offered  200 units of membership in its limited partnership EB-5 Investors for $500,000 each (plus a $40,000 administration fee) for the purpose of using the sale proceeds to fund a loan of up to $100 million that was secured by first-priority liens (the "EB-5 Loan") to the Developer, which owned and was in charge of the construction of Harbourside Place.

5.     To promote interest in the Harbourside Project, prospective EB-5 Investors were told (among other things) that the project's completion was guaranteed by a major insurance company, that

> the value of just the real estate collateral is more than twice the amount of the EB-5 loans, and the security of the funds is fully guaranteed. The [Harbourside] Project is a four-year bridge loan with a safe and reliable exit mechanism: Ackman-Ziff, the largest real estate company in New York, has signed a contract to provide a $100 million refinancing loan after the Project is completed and put into operation. Investors will recover 50% of their funds immediately after receiving their

permanent green card, and the full amount of the investment will be safely recovered in the fourth year. . . .

6.      Defendants made similar statements in the Offering Documents[1] (which were printed in English and which Plaintiffs and other prospective EB-5 Investors were shown only the signature pages by Defendants' agents in China). According to the Offering Documents, repayment of the EB-5 Loan would occur five years after the last Limited Partner submitted his or her green card application to the government, but no later than November 30, 2019 (the "Maturity Date"). To ensure timely repayment when the EB-Loan matured, the Developer would "[r]efinance the [EB-5] Loan with an institutional lender" and/or "[r]epay the Loan with the proceeds of a sale of all or a portion of Harbourside Place."

7.      The Offering Documents also stated, however, that "[i]f the Developer is unable to repay the Loan at maturity, the Developer intends to convert the entire outstanding principal amount of the Loan into an ownership interest in the Developer." The Developer could not exercise the conversion provision, however, if an Event of Default—which is defined to include, among other things, a breach of the EB-5 Loan Agreement and any misrepresentation of material fact by the Developer—had occurred and was neither cured by the Developer nor waived by the Limited Partners as of the Maturity Date.

8.      An Event of Default occurred while the General Partner was still selling units of membership in the Funding Partnership to EB-5 Investors. The EB-5 Loan Agreement makes clear

---

[1] The Offering Documents are composed of Subscription Instructions and a Confidential Offering Memorandum ("Offering Memorandum") to which the following exhibits are attached: the Limited Partnership Agreement for the Funding Partnership (the "Limited Partnership Agreement"); the Subscription Agreement; Charts Summarizing the Immigration and Investment Procedures; the Escrow Agreement; a Rendering, Aerial Photo and Area Maps of Harbourside Place; and the Amended Restated Convertible Loan Agreement (the "EB-5 Loan Agreement").

that funds from the EB-5 Loan would be used only for the costs of constructing the Harbourside Project and interest payments to the Funding Partnership.

9.      The EB-5 Loan Agreement also makes clear that the EB-5 Loan could not be subordinated to loans by alternative lenders unless fewer than all 200 units of membership in the Funding Partnership were sold (*i.e.,* if less than $100,000,000 was raised by the sale of membership units) and that the maximum amount the Developer could borrow was $110,000,000, including the amount of the EB-5 Loan. For example, if 190 membership units were sold to fund a $95,000,000 EB-5 Loan to the Developer, the most the Developer could borrow from other sources would be $20,000,000.

10.      Nonetheless, in July 2012—while units of membership in the Funding Partnership were still being sold—the Developer borrowed nearly ***$13,000,000*** from another lender via (a) a loan that was secured by a first priority mortgage lien on Harbourside Place and (b) a $9,000,000 revolving credit line. Several months later (in December 2012), the Developer used funds from the EB-5 Loan to repay the mortgage loan and to pay down the debt on the line of credit.

11.      Shortly thereafter, the General Partner chose to stop selling units of membership in the Funding Partnership when 199 units had been sold—one short of the 200 units that prevented the Developer from subordinating the EB-5 Loan to loans by other lenders (which it had already done in July 2012)—despite continuing high demand for membership units.

12.      Despite having borrowed $99,500,000 from the Funding Partnership and nearly $20,000,000 from the credit line, in March 2014 Defendants sent a letter to advise the Limited Partners that the Harbourside Project was proceeding successfully, but that the Developer needed to borrow approximately $60,000,000, which would "be used, among other things, to repay the

existing bridge loan . . . ." Defendants later advised the Limited Partners that a new report certified the value of the Harbourside Project at $187,000,000.

13.     But there were two different versions of the proposed resolution and some of Defendants' agents signed it on the Limited Partners' behalf without their knowledge or consent. So although Defendants received more than 100 signatures, the did not receive a true majority of the Limited Partners' consent.

14.     By December 2016, the Developer had yet to make *any* of the monthly interest payments that were required by the EB-5 Loan. Nonetheless, that month Mastroianni contacted the Limited Partners again, requesting that they consent to extending the Maturity Date by three years (November 2017 to December 2020). This time, the Limited Partners declined the request.

15.     In August 2017, Mastroianni wrote to the Limited Partners again, advising them that "net operating income generated by the Project's operations is not sufficient to pay interest payments that have accrued and continue to accrue . . ." and that "the debt encumbering the Project substantially exceeds the fair market value of the Project"—even though Defendants had represented that the Harbourside Project's certified value was $187,000,000 three years earlier.

16.     In the same letter, Mastroianni proposed that the Limited Partners consent to one of two proposals in exchange for their interests in the Funding Partnership in exchange for a "general release that releases the Partnership, the General Partner, and the Developer and affiliated and associated persons from claims relating to the Partnership and their limited partnership interest that arise prior to the Conversion."

17.     The first proposal involved converting the EB-5 Loan into "preferred" equity in the Developer, coupled with a promise to pay each Limited Partner $85,000 by the time they received their green cards and $25,000 annual payments that would be "backstopped" by yet another

company owned and managed by Mastroianni, and a promise to repurchase the equity stake in the Developer within three to five years of the conversion. The second proposal involved providing each Limited Partner with common equity interests in the Developer with no voting rights.

18.     By now, the Limited Partners had no reason to trust Defendants—particularly in light of the most recent proposals, which amounted to nothing more than another extension of the Maturity Date coupled with a release of liability that guaranteed they would have no recourse if (when) Defendants failed to abide by their commitments again.

19.     The Limited Partners declined Mastroianni's proposals. Shortly thereafter, Mastroianni advised the Limited Partners that they had two choices: accept an offer to acquire "preferred" equity membership interests in the Developer or the Developer would exercise its "right" to convert the balance of the Funding Partnership's loan to common membership interests in the Developer—even though no effort had been made to obtain a loan from an institutional lender and/or sell some or all of Harbourside Place to repay the EB-5 Loan, as promised in the Offering Documents.

20.     When the Limited Partners declined the offer, Mastroianni managed to purchase the outstanding senior loans through created a new entity he created and managed, Waterways Bridge, LLC (the "New Senior Lender"), which resulted in the Developer owing the New Senior Lender more than $61,000,000. Then, notwithstanding the existence of multiple defaults that negated the right to exercise the conversion provision, notwithstanding that no effort had been made to obtain a loan or sell Harbourside Place repay the EB-5 Loan, Mastroianni caused the Developer to exercise the conversion provision—without providing any notice to the Limited Partners, as the General Partner (and Mastroianni as its manager) was required to do under the Limited Partnership Agreement.

21.     Then, despite explicit terms of the EB-5 Loan Agreement that required the Developer to issue units of common membership in its Florida LLC—which would have guaranteed the Limited Partners voting rights when those units were distributed to them pursuant to the Limited Partnership Agreement—Mastroianni caused the Developer (as its managing member) to issue and the General Partner (as its managing member) to accept a single "preferred" membership interest in the Developer, which was then converted from a Florida LLC to a Delaware LLC. This not only negated any rights the Limited Partners would have had if the conversion had been exercised as described in the Offering Documents, it constituted an entirely different "Other Investment" that required the Limited Partners' unanimous approval, which Defendants never sought, much less received.

22.     When the smoke cleared, Defendants caused the Funding Partnership to use the EB-5 loan principal to purchase a single unit of "preferred" membership interest in the Developer, which left the Limited Partners at the mercy of Mastroianni and Yellen, who controlled the General Partner as well as the Developer, and allowed Mastroianni and Yellen to obtain the Limited Partners' capital for their own use for an indeterminate period, if not indefinitely.

23.     By perpetrating a fraudulent scheme to convert the EB-5 Loan principal into a so-called "preferred" equity interest in the Developer, despite the express terms of the EB-5 Loan Agreement, which prohibited it, and to convert the Developer from a Florida LLC to a Delaware LLC without the requisite consent of the Limited Partners, Mastroianni, Yellen, and the General Partner breached their fiduciary duties to the Limited Partners and the Funding Partnership, and knowingly and purposefully committed civil theft of the Limited Partners' assets in violation of F.S.A. § 812.014.

24.     Accordingly, Plaintiffs bring this action on behalf of themselves and the proposed class of Limited Partners and derivatively on behalf of the Funding Partnership to obtain a judicial declaration that the conversion is invalid as a matter of law, an award of treble damages for civil theft, and an award of compensatory and punitive damages for, *inter alia,* Defendants' breaches of fiduciary duty and fraud.

## PARTIES

### PLAINTIFFS

25.     Plaintiff Ting Peng is an individual EB-5 Investor who became a Limited Partner in the Funding Partnership on April 2, 2013.  Ms. Peng was born in mainland China and has been employed as a teacher and a corporate financial planner. Ms. Peng now resides in Sammamish, Washington.

26.     Plaintiff Lin Fu is an individual EB-5 Investor who became a Limited Partner in the Funding Partnership on December 16, 2011. Ms. Fu was born in mainland China and is a physician who received her medical degree from Shanghai Medical University and worked for more than a decade as a Clinical Doctor at the Obstetrics and Gynecology Hospital at Fudan University, Shanghai, China. Ms. Fu now resides in Princeton, New Jersey.

### DEFENDANTS

27.     Defendant Nicholas Mastroianni is an individual who resides in Palm Beach County, Florida. At all times relevant to the allegations in this Complaint, Mr. Mastroianni was one of two principals who controlled a group of companies called the "Harbourside Group," which are among the entities named Defendants in this action.

28.     Defendant Richard L. Yellen is an individual who resides in New York, New York. At all times relevant to the allegations in this Complaint, Mr. Yellen is an attorney and (with Defendant Mastroianni) one of the two principals of the Harbourside Group.

29.     Defendant Harbourside Place, LLC (the "Developer") was formed as a Florida limited liability company and was converted to a Delaware limited liability company in or about December 2017. The Developer was created and operated by Defendants Mastroianni and Yellen, was managed by Defendant Mastroianni, and is one of the entities that comprise the Harbourside Group.

30.     Defendant Harbourside Funding GP, LLC (the "General Partner") is a Florida limited liability company that served as the general partner of the Funding Partnership. The General Partner was created and operated by Defendants Mastroianni and Yellen, was managed by Defendant Mastroianni, and is one of the entities that comprise the Harbourside Group.

31.     Nominal Defendant Harbourside Funding, LP (the "Funding Partnership") is a Florida limited liability company that was established for the purpose of financing the Harborside Project with a loan to the Developer, which was funded by EB-5 investors' purchase of membership units in the Funding Partnership and who, like Plaintiffs, became Limited Partners in the Funding Partnership. The Funding Partnership is one of the entities that comprise the Harbourside Group.

**JURISDICTION AND VENUE**

32.     **JURISDICTION**.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and Plaintiffs and Defendants are citizens of, and domiciled in, different states.

33.     **VENUE**. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. 1391(b)(2) because the vast majority of acts and omissions giving rise to the claims asserted herein occurred and continue to occur in this District, and a substantial part of the property that is the subject of this action is situated here.

## GENERAL ALLEGATIONS

### THE EB-5 PROGRAM

34.     To provide an incentive for foreign investment to benefit the American economy by creating or preserving U.S. jobs, Congress created the EB-5 Immigrant Investor Visa Program (the "EB-5 Program") in 1990 with the enactment of the Immigration Act of 1990. Pub. L. 101-649, 104 Stat. 4978. The EB-5 Program enabled immigrant investors to become permanent residents of the United States by investing at least $500,000 in a U.S. business that will use the funds in a manner that creates or maintains at least 10 full-time American jobs. *See, e.g.,* 8 U.S.C. § 1153(b)(5).

35.     At the outset of the application process, which normally takes two or more years before it is complete, the EB-5 Investor submits a Form I-526 Immigration Petition by Alien Entrepreneur ("I-526 Petition"), which, if approved, permits the EB-5 Investor to reside and travel within the U.S. while his or her application is pending. If the I-526 Petition is approved, the EB-5 Investor may then seek permanent U.S. residency status (and obtain a green card) by submitting a Form I-829 Petition by Entrepreneur to Remove Conditions ("I-829 Petition"). If the I-829 Petition is granted, the EB-5 Investor and his or her immediate family members are granted permanent immigrant visas (*i.e.,* green cards).

36.     In 1993, Congress modified the EB-5 Program by adding the Immigrant Investor Pilot Program, which allowed EB-5 Investors to invest in a commercial enterprise associated with

a regional center. Regional centers, like the one involved in the present case, are private entities that have received approval from the U.S. Citizenship & Immigration Services ("USCIS") to administer EB-5 investments in a given geographical area, and enable EB-5 Investors to pool their investments in a specific project with other EB-5 Investors, thereby making it easier to demonstrate that a given project has created or preserved at least 10 jobs per investment.

37.    Although EB-5 was created in the 1990s, it was not commonly used to fund real estate projects until after the Great Recession in 2008, when funding became more difficult to obtain and EB-5 represented an alternative source of capital.

### FUNDING THE HARBOURSIDE PROJECT VIA THE EB-5 PROGRAM

38.    In September 2010, USCIS approved Defendant Mastroianni's proposal to designate Defendant Florida Regional Center as the administrator of the regional center for Palm Beach County, Florida, and to approve the Harbourside Project as the first capital investment project that would be located in the Florida Regional Center.

39.    To fund the Harbourside Project, Mastroianni and Yellen created the Funding Partnership for the purpose of raising up to $100 million through the sale of up to 200 membership units to EB-5 Investors for $500,000 per unit plus a $40,000 administration fee.

40.    In advertising materials circulated by the Regional Center, prospective EB-5 Investors were told that the Harbourside Project's completion was guaranteed by a $750 million policy issued by a major insurance company, and that

> the value of just the real estate collateral is more than twice the amount of the EB-5 loans, and the security of the funds is fully guaranteed. The [Harbourside] Project is a four-year bridge loan with a safe and reliable exit mechanism: Ackman-Ziff, the largest real estate company in New York, has signed a contract to provide a $100 million refinancing loan after the Project is completed and put into operation. Investors will recover 50% of their funds immediately after receiving their permanent green card, and the full amount of the investment will be safely recovered in the fourth year. . . .

41.     As explained in the Offering Documents, each EB-5 Investor's $500,000 investment would be paid into an escrow fund, which would provide up to $100 million for the EB-5 Loan to the Developer for the construction of the Harbourside Project.

42.     The EB-5 Loan would be secured by a perfected, first-priority lien and would yield interest at a rate of 2.0% per year that would be paid in monthly installments to the EB-5 Investors who became Limited Partners in the Funding Partnership.[2]

43.     The Offering Memorandum explained that the EB-5 Loan would be repaid. "within five years from the date the last potential investor submits his or her I-526 Petition to USCIS, or, no later than November 30, 2012, as determined by the Partnership in good faith." And, to do so, the Developer would "[r]efinance the Loan with an institutional lender" and/or "[r]epay the Loan with the proceeds of a sale of all or a portion of Harbourside Place."

44.     In the event the Developer was unable to refinance the Loan or sell some or all of Harbourside Place to repay it, prospective EB-5 Investors were told that "the Developer intends to convert the entire outstanding principal amount of the Loan into an ownership interest in the Developer." As the EB-5 Loan Agreement explained, this would entail converting the outstanding principal "into units of common membership interest in the [Developer]," but that conversion could not be effectuated if an Event of Default had occurred and was continuing on the Maturity Date.

45.     Although there was no minimum principal amount for the EB-5 Loan, the General Partner had the right to terminate the offering at any time before 50 membership units were sold.

---

[2] Although the EB-5 Program requires that each applicant's investments remain "at risk" during their conditional residency status (*i.e.,* until their I-829 Petition is granted), "[n]othing prevents an immigrant investor from receiving a return on his or her capital in the form of profits from the new commercial enterprise." USCIS Policy Manual, Chapter 2.

After 80 membership units were sold, the General Partner had the right to refrain from selling any additional membership units in the Limited Partnership if it was reasonably determined that (a) the sale of additional membership units would not result in a sufficient number of jobs or (b) there was insufficient interest in purchasing additional membership units.

46.     Neither eventuality occurred. Demand for membership units remained high. And although the General Partner had the right to stop selling additional membership units after 160 units were sold, sales continued through 2013 and, as the Offering Documents acknowledged, there was a need to sell every single membership unit:

> The Developer currently does not have sufficient funding to purchase, develop, construct and operate Harbourside Place, even if the Partnership were to extend the maximum principal Loan amount of $100.0 million. For this and other reasons, the Developer may need to finance Harbourside Place through additional funding, a portion of which may rank senior in terms of payment and priority to the Partnership's Loan to the Developer.

47.     But the Offering Documents also stated that $110 million was the ***maximum*** amount of funds that could be raised for the Harbourside Project—***including*** the funds raised by the sale of membership units to EB-5 Investors—and borrowing additional funds from other sources was permitted only if ***fewer than 200*** membership units were sold:

> If for any reason the maximum principal amount of the [EB-5] Loan is less than $100.0 million, the Principals reserve the right to seek funding from alternative sources, provided that the total principal amount of any additional indebtedness, together with the total principal amount of the Loan, may not exceed $110.0 million.

48.     Despite the ongoing high demand for membership units, however, the General Partner stopped selling them after only ***199*** of the 200 membership units had been sold because Mastroianni never intended to sell all 200 units. This single-unit shortfall thus triggered the Principals' (*i.e.,* Mastroianni and Yellen's) right under the EB-5 Loan Agreement to seek an additional $10,500,000 in the form of loans from alternative sources because the sale of 199

membership units generated only $99,500,000 of the $100 million principal amount for the EB-5 Loan.

**THE DEVELOPER BORROWS FROM ALTERNATIVE SOURCES
IN VIOLATION OF THE EXPRESS TERMS OF THE EB-5 LOAN AGREEMENT**

49.      Yet, in July 2012—the year *before* the sale of membership units ceased—Mastroianni and Yellen had *already* procured two senior loans from a third party, Putnam Bridge Funding III ("Putnam"), on behalf of the Developer, which totaled *$12,700,000* ($2,700,000 *more* than the $110 million maximum allowed by the terms of the EB-5 Loan Agreement *if* 200 membership units had not been sold), without advising the Limited Partners or prospective EB-5 investors who had yet to become Limited Partners in the Funding Partnership. Moreover, during the next several months, the Developer borrowed an additional *$7,498,000* from the same lender (*i.e.,* Putnam), bringing the total amount of loans from an alternative source to approximately $20 million before the end of 2012.

50.      Specifically, Mastroianni and Yellen procured for the Developer an $11,350,000 bridge loan that was secured by a first priority mortgage on the property on which the Harbourside Project was built (the "Mortgage Loan"), and a $9,000,000 revolving-credit loan, from which Mastroianni and Yellen had already drawn $1,350,000 on behalf of the Harbourside Project by July 2012, which was secured by a second-priority mortgage (the "Revolving Loan"). Several months later, Mastroianni and Yellen borrowed an additional $7,498,000 under the Revolving Loan, for a total of more than $20 million. Thus, the Developer substantially exceeded the $10,500,000 limit on additional funds—*even though EB-5 Investors were still buying membership units well into 2013*—in utter disregard of the EB-5 Loan Agreement.

51.      Shortly thereafter, Mastroianni and Yellen caused the Developer to breach the EB-5 Loan Agreement again. On December 27, 2012, Mastroianni and Yellen caused the Developer

to expend $11,350,000 of the EB-5 Loan funds to pay off the Mortgage Loan. Four days later (on December 31, 2012), Mastroianni and Yellen caused the Developer to expend $3,500,000 of the EB-5 Loan Funds to repay part of the Revolving Loan. Mastroianni and Yellen's use of loan funds for this purpose was expressly prohibited by the EB-5 Loan Agreement, which states unambiguously that

> [t]he purpose of the Loan is to provide funds **for certain Lender-approved hard and soft construction costs (together with an interest reserve) for the purchase of the Property and the construction of the improvements within the Project**. The Loan shall be fully reserved for the cost **to complete the improvements funded with proceeds of the Loan**. . . .

(Emphasis added.)

52.     It was not until April 15, 2013—after Plaintiffs and most other EB-5 Investors had already purchased their membership units and became Limited Partners in the Funding Partnership—that Mastroianni even hinted at the existence of the Mortgage Loan or the Revolving Loan. On that date, Mastroianni, acting in his capacity as Managing Member of the General Partner and the Florida Regional Center, circulated a letter to the Limited Partners (the "April 2013 letter") that states, among other things, that in December 2012 "a mortgage was recorded against the Property in favor of the [Funding] Partnership to secure repayment of the [EB-5] Loan" and that $26 million in EB-5 Loan funds were released from escrow and used "to fund construction of Harbourside Place."

53.     Mastroianni also state that, "in December 2012, the Developer obtained an Additional Loan of up to $18 million from Putnam Bridge Funding III, LLC as Senior Lender **to provide the Developer with additional construction funds**." (Emphasis added.)

54.     This was also false and misleading. In actuality, Mastroianni and Yellen had caused the Developer to borrow from Putnam a total of $12,700,000 in **July 2012**, and had spent

$14,850,000 of the EB-5 Loan funds to *repay* the $11,350,000 Mortgage Loan and $3,500,000 of the $8,848,000 Revolving Loan in December 2012. Yet, the April 2013 letter says nothing about this unauthorized expenditure of EB-5 Loan funds, nor anything about Mastroianni and Yellen's decision to borrow an additional $7,498,000 from Putnam on behalf of the Developer in December 2012 via the Revolving Loan.

55.     Aside from oblique references, the April 2013 Report provides no substantive (or truthful) information about the Mortgage Loan or the Revolving Loan, such as when, how, or why the money was borrowed in July 2012, why they decided to subordinate the EB-5 Loan to two other loans for millions of dollars each, or why they chose to use EB-5 Loan funds to repay the Mortgage Loan before borrowing more from the credit line made available by the Revolving Loan.

56.     The April 2013 letter did, however, advise the Limited Partners that, the

> [Funding] Partnership has entered into a revised [EB-5] Loan Agreement with the Developer, amending and restating earlier versions of the Loan Agreement dated as of July 22, 2011 and as of September 1, 2011, to effect changes to the [EB-5] Loan required by the intercreditor agreement and the different versions of the Offering Memorandum. As stated in the Offering Memorandum, Developer has the option to convert all outstanding principal into units of ownership interest in the Developer (the "Developer Units"). ***The actual number of Developer Units that would be acquired upon conversion will depend on the Appraised Value of Harbourside Place and the principal amount of the Loan outstanding at the time***.

(Emphasis added.)

57.     Mastroianni also explained that, "[p]ursuant to Section 19.6.2 of the [Limited] Partnership Agreement, the General Partner has amended and restated the [Limited] Partnership Agreement . . . ." Although Section 19.6.1 of the Limited Partnership agreement states that the General Partner may amend the Limited Partnership Agreement in writing "with the consent of the Limited Partners given by Ordinary Resolution," Section 19.6.2 provides an exception to the consent requirement if an amendment is necessary "for the protection of the Limited Partners" or

"to cure an ambiguity" or inconsistency that exists in a written opinion of counsel to the Limited Partnership.

58.     Mastroianni went on to explain that the following provisions had been added to the Limited Partnership Agreement:

1.     If the Partnership decides to distribute the Developer Units [*i.e.,* units of common membership in the Developer's LLC], or the proceeds of any sale of the Developer Units, to the Limited Partners, all Limited Partners will participate in the distribution pro rata in accordance with their Unit holdings until Developer Units, or the proceeds of any sale of Developer Units, equal to 65% of all issued and outstanding Developer Units on the date of conversion have been distributed; and

2.     All remaining Developer Units (the "Excess Developer Units"), or the proceeds of any sale of Excess Developer Units, will be distributed to the Initial Limited Partners, pro rata in accordance with their holdings.

59.     Less than a year later, in March 2014, Mastroianni issued a report to the Limited Partners (the "March 2014 Report") together with an Ordinary Resolution that sought the Limited Partners' approval for the Developer to borrow more than $60 million in the form of another senior mortgage loan (the "Senior Loan") to which the EB-5 Loan would be subordinated. Mastroianni also advised the Limited Partners "that *if we do not receive a signed copy of the Ordinary resolution from a Limited Partner on or before April 15, 2014, the Partnership will consider that you have consented to the Ordinary Resolution*." (Emphasis added.)

60.     Thus, the Limited Partners were told that *not* returning a signed Ordinary Resolution would have the same effect as signing it. Although Defendants claim that a majority of the Limited Partners "signed" the Ordinary Resolution, this is not true. In actuality, there were *two different versions* of the Ordinary Resolution. Moreover, some of the Limited Partners' agents signed it without their knowledge or consent. Thus, although Defendants purportedly received over 100 signatures, many of those signatures were submitted by agents acting on behalf of Defendants

- 17 -

and the existence of two versions of the Ordinary Resolution meant that the Limited Partners who actually did consent were consenting to two different proposals. Accordingly, there actually was no majority vote in favor of the Ordinary Resolution.

61.     Nonetheless, Mastroianni and Yellen proceeded as though a majority of the Limited Partners had validly approved the Ordinary Resolution and took the Senior Loan on behalf of the Developer.

62.     Despite the rosy picture that Mastroianni and Yellen painted in the March 2014 Report, the Developer still had yet to make a single monthly interest payment to the Limited Partners, as required by the EB-5 Loan Agreement. Instead, in a letter dated December 14, 2016, Mastroianni advised the Limited Partners that the Senior Loan would be replaced by another Senior Loan and asked them to consent to another Ordinary Resolution that would extend the Maturity Date of the EB-5 Loan from November 30, 2017, to December 31, 2020.

63.     This time, the Limited Partners simply declined Mastroianni's proposal.

64.     Thus, on August 25, 2017, Mastroianni tried again in a letter he wrote to the Limited Partners in his capacity as General Partner. There, Mastroianni promised to pay all the interest that had accrued to date, to repay the loan principal, and to effectuate a plan that would protect the Limited Partners' interests in exchange for their consent to convert the Funding Partnership's investment into a "preferred" equity stake in the Developer.

65.     Like the proposal that was made with the March 2014 Report, Mastroianni included with this proposal a pronouncement that "*[i]f we do not receive the required number of consents, the Loan will be converted to common equity* under the same formula (in accordance with the existing [EB-5] Loan Agreement) . . . ." (Emphasis in original.)

66.     Nonetheless, when the Limited Partners did not consent to this proposal, Mastroianni wrote to the Limited Partnership on October 13, 2017. There, Mastroianni advised the Limited Partnership that the Developer had "elected to exercise the Conversion Right pursuant to the terms of the Loan Agreement." Although Mastroianni was also the managing member of the General Partner, he failed to circulate to that notice to the Limited Partners, as required by Section 17.3 of the Limited Partnership Agreement, which provides that "the General Partner shall send to each Limited Partner a copy of any Conversion Notice within fifteen days following its receipt thereof."

67.     Mastroianni went on in the October 13 letter to note that "[t]he Conversion Right contemplates conversion of the outstanding principal of the loan into common equity membership interests of Borrower, but Borrower hereby acknowledges that Borrower and Lender may conduct good faith negotiations to enhance the terms of the conversion (e.g., preferred equity membership interests), though Borrower is under no obligation to do so."

68.     Mastroianni was not offering to simply forego the "right" to convert the EB-5 Loan principal into common equity interests and give the Limited Partners a "preferred" equity interest out of the goodness of his heart. In actuality, "preferred" equity status was just another way of extending the Maturity Date. It also meant that the Limited Partners would an illiquid investment with no voting rights—notwithstanding that the EB-5 Loan Agreement provided that the conversion would result multiple common membership interests to which they were entitled under the Limited Partnership, which were guaranteed voting rights as provided by F.S.A. § 605.04073(1)(a).

69.     Similarly, Mastroianni expressed a "willingness" to negotiate because he knew that, although the EB-5 Loan Agreement includes a provision that *contemplated* conversion from a loan

- 19 -

into units of a common membership interest in the Developer, the conversion could not be effectuated without the approval of the Limited Partners for two basic reasons.

70.   *First*, multiple Events of Default existed at the time the Developer sought to exercise its "right" of conversion, and the EB-5 Loan Agreement as well as the Offering Documents make clear that the EB-5 Loan could not be converted if an Event of Default existed at the time of a proposed conversion.

71.   The EB-5 Loan Agreement defines "Events of Default" as follows:

**EVENTS OF DEFAULT**. The occurrence of any one or more of the following events is a Default hereunder and the continuance of any such Default beyond the period (if any) provided below within which such Defaults may be cured shall be an Event of Default hereunder and under the Loan:

    (1)   Any breach of the terms of the Loan Documents; or

    (2)   Any material noncompliance with the Requirements; or

    (3)   Any material representation, warranty, statement, certificate, schedule or report made or furnished by Borrower proves to have been false or erroneous in any material respect at the time of the making thereof, or to have omitted any substantial liability or claim against Borrower, of if on the date of execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed therein, which change shall not have been disclosed to Lender at or prior to the time of such execution . . . .

72.   At the time the Developer invoked the conversion provision of the EB-5 Loan Agreement, Events of Default existed as a result of the Developer taking the Mortgage Loan and the Revolving Loan, which subordinated the EB-5 Loan to the Mortgage Loan, and as a result of the Developer using EB-5 Loan funds to pay off the Mortgage Loan in contravention of the express purpose of the EB-5 Loan Agreement. All of this was inconsistent with the representations made about these issues in the Offering Documents, as was the Developer's failure to make any effort to repay the EB-5 Loan by taking a loan and/or selling some or all of Harbourside Place.

73.     ***Second***, the conversion could not occur without the approval of the Limited Partners, even if the Events of Default had not precluded it. Although the Offering Memorandum, the EB-5 Loan Agreement, and the Limited Partnership Agreement all refer to the prospect of converting the EB-5 Loan into units of a common membership interest in the Developer, the actual conversion plan was significantly different than the one described in those documents.

74.     Despite the existence of Events of Default and despite the lack of consent from the Limited Partners, Defendants simply proceeded to convert the EB-5 Loan principal to a "preferred" equity interest in the Developer for the Funding Partnership as an entity, rather than issuing units of common membership interests for distribution to the Limited Partners, as provided in the Loan Agreement and the revised Limited Partnership Agreement—both of which had been amended for that purpose, purportedly for the "protection" of the Limited Partners. Defendants then converted the Developer from a Florida LLC to a Delaware LLC.

75.     Moreover, rather than paying off the Senior Loan and freeing the Developer of that debt, Mastroianni purchased the loans via the New Senior Lender with funds from a different EB-5 Project, thereby ensuring that the Developer would continue to be saddled with debt while Mastroianni profited from it.

76.     None of this was mentioned in the Offering Documents, nor was it agreed to by the Limited Partners, as required by Section 620.2103 of the Florida Revised Uniform Partnership Act of 2005.

77.     The failure to obtain the Limited Partners' approval as to the plan for converting the Developer to a Delaware LLC also violated Section 16.8 of the Limited Partnership Agreement, which requires ***unanimous*** consent of the Limited Partners as a prerequisite to placing their investment in a LLC that was governed by Delaware law and an entirely different operating

agreement (*i.e.,* an "Other Investment," as that term is defined by Section 1.1.33 of the Limited Partnership Agreement.

78.     Once again, Limited Partners' approval was neither sought nor obtained.

## VEIL-PIERCING ALLEGATIONS

79.     Mastroianni and Yellen are the sole Principals of the Harbourside Group. Mastroianni and Yellen used this status to dominate and control the entities within the Harbourside Group, which includes, *inter alia*, the Funding Partnership, the General Partner, the Developer, and the Regional Center to such an extent that these entities' independent existence was in fact non-existent and Mastroianni and Yellen were in fact their alter egos. Mastroianni and Yellen used these entities' limited liability status for fraudulent and other improper purposes, which caused injury to the Limited Partners, the Funding Partnership and the Developer.

80.     Indeed, as the former Chief Financial Officer for the Developer and the Regional Center has stated, "Mastroianni, along with those in his employ, routinely conducted side deals, and funneled money in and out of various accounts without conferring with the CFO and . . . in non-compliance with the EB-5 requirements, something that would cause serious problems should there ever be a USCIS or SEC audit." *Finkelstein v. Allied Capital and Devel. of So. Fla., LLC*, No. 2014CA006733 (Palm Beach Cty. Cir. Ct.). ¶ 32.

## DERIVATIVE ACTION ALLEGATIONS

81.     Plaintiffs bring this action derivatively on behalf of the Funding Partnership, pursuant to Fed. R. Civ. P. 23.1 and F.S.A. § 620.2002(2), to enforce the claims for relief set forth below against each Defendant.

82.     The conduct about which Plaintiffs complain herein occurred while Plaintiffs were limited partners in the Funding Partnership, hence they standing to pursue this derivative action

for damages and other relief on behalf of the Funding Partnership, which is necessary and proper to protect the interests of the Funding Partnership.

83.     If Plaintiff s are successful in this action, the recovery will be of substantial benefit to the Funding Partnership and its Limited Partners, each of whom was a member of the Funding Partnership when it was converted to the New LLC.

## **DEMAND FUTILITY**

84.     Plaintiffs did not make a demand that Defendants Mastroianni and Yellen to take action in their capacities as the former Principals/managing member of the General Partner to remedy the harm Plaintiffs have alleged before they filed this Complaint because such a demand would have been futile. This was so for several reasons, including, but not limited to, the following circumstances:

a.     ***First***, Mastroianni and Yellen face a substantial likelihood of liability in connection with their role in fraudulently concealing material facts from the Funding Partnership, grossly mismanaging the Funding Partnership, breaching their fiduciary duties to the Funding Partnership, and violating state and federal law to effectuate their fraudulent schemes and self-dealing in a manner that harmed the Funding Partnership and ultimately resulted in the demise of the Funding Partnership and the conversion of its assets.

b.     ***Second,*** Mastroianni and Yellen's conduct, as alleged herein, deprived them of the requisite independence and valid business judgment needed to properly assess a demand that the General Partner take action to remedy alleged harm to the Funding Partnership.

c.     ***Third***, the blatantly unfair and one-sided nature of the decision to convert the EB-5 Loan principal to a membership interest in the Developer made it impossible to approve that decision through the exercise of valid business judgment, as did the lack of good faith with

which Mastroianni and Yellen required to exercise valid business judgment in any event, as evidenced by their failure to disclose material information to the EB-5 Investors and their failure to comply with the most basic provisions of the EB-5 Loan Agreement, the Limited Partnership Agreement and the Florida Revised Uniform Partnership Act of 2005 in carrying out the conversion of the Developer from a Florida LLC to a Delaware LLC.

d. **Fourth,** Mastroianni and Yellen's direct involvement in the unlawful, unfair, and fraudulent conduct alleged herein negates the presumption that they could have considered a pre-suit demand in an objective, disinterested manner.

e. **Fifth,** Mastroianni and Yellen created and controlled each of the other entities that comprise the Harbourside Group, which also participated in the unlawful, unfair, and fraudulent conduct alleged herein, and are subject to personal liability for their actions in connection with that conduct. These facts also negates the presumption that Mastroianni and Yellen could have considered a pre-suit demand in an objective, disinterested manner

f. **Sixth,** Mastroianni and Yellen, together with the entities that comprise the Harbourside Group, have already been named as defendants in a related action that was filed by 79 individual EB-5 Investors in Palm Beach County Circuit Court in or about October 11, 2018. *See Fu v. Mastroianni,* No. 502018CA012883 (Palm Beach Cir. Ct, 15th Jud. Cir.). Under the circumstances, Mastroianni and Yellen would have been unable to evaluate a pre-suit demand with the requisite disinterest and independence, much less exercise disinterested business judgment.

## CLASS ALLEGATIONS

85. Plaintiffs bring this lawsuit as a Class action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

86.     The Class is defined as follows: All persons who invested in the Funding Partnership (*i.e.,* all Limited Partners). Excluded from this Class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees; the Court and its staff; and any Limited Partner who has entered into an enforceable agreement with Defendants to settle or otherwise resolve their claims against Defendants.

87.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether class certification is appropriate.

88.     The Class satisfies the requirements of Rule 23(a), as well as 23(b)(3).

89.     NUMEROSITY. The Class consists of approximately 199 geographically dispersed individual Limited Partners. Joinder of the Class members is not practicable. The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

90.     ASCERTAINABILITY. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by the Developer and the General Partner. Notice of this action can thus be provided to all members of the proposed Class.

91.     TYPICALITY. Plaintiffs were investors in the Harbourside Project at the time of the wrongdoing alleged herein. Plaintiffs' claims are typical of the claims of all Class members as all Class members are similarly affected by Defendants' wrongful conduct as complained of herein.

92.     ADEQUACY. Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class-action litigation, including litigation relating to investment fraud. Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.

93.     **COMMONALITY AND PREDOMINANCE**. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. The questions of law and fact common to the Class include, but are not limited to, the following:

a.      Whether Defendants breached their fiduciary duties to the proposed Class;

b.      Whether Defendants engaged in civil theft in violation of F.S.A. § 812.014; and

c.      Whether Defendants engaged in a civil conspiracy.

94.     The Class may be certified under Rule 23(b)(3). Questions of law or fact common to Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this action as a Class action.

## CLAIMS FOR RELIEF

### COUNT I
### DECLARATORY RELIEF
Against All Defendants

95.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

96.     This claim for relief is brought on behalf of Plaintiffs individually and on behalf of the proposed Class and derivatively on behalf of the Funding Partnership and the Developer pursuant to Federal Rule of Civil Procedure 57 for the purpose of obtaining a judicial declaration of the parties' respective rights and duties.

97.     Among the unfair, fraudulent, and unlawful conduct Plaintiffs have alleged in this Complaint are **(a)** Defendants' ostensible exercise of the conversion provisions of the EB-5 Loan Agreement despite the existence of multiple Events of Default, which were neither cured nor waived at the time the conversion provisions were invoked and **(b)** Defendants' failure to obtain the Limited Partners' approval of the plan of conversion, which transformed their investment in the Funding Partnership into a materially investment that was not mentioned in the Offering Documents. As a result of Defendants' conduct, the exercise of the conversion provisions of the EB-5 Loan Agreement, and the conversion of the Developer from a Florida LLC to a Delaware LLC, are invalid and void as a matter of law.

98.     Plaintiffs are informed and believe that Defendants will dispute these allegations. Therefore, an actual controversy has arisen and now exists between Plaintiffs and Defendants. Accordingly, Plaintiffs hereby request a judicial declaration of the rights and duties of the parties with respect to each of the foregoing issues in controversy.

## COUNT II
### BREACH OF FIDUCIARY DUTIES

99.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

100.    This claim for relief is brought on behalf of Plaintiffs and the proposed class, and derivatively on behalf of the Funding Partnership against Defendants Mastroianni, Yellen, and the General Partner.

101.    This claim for relief is based on Defendants' breaches of fiduciary duties of loyalty and care to the Funding Partnership and to Plaintiffs and members of the proposed class as Limited Partners in the Funding Partnership.

102.    These Defendants are fiduciaries of the Funding Partnership and the Limited Partners, and they owed a duty to conduct the business of those entities loyally, faithfully, carefully, diligently, and prudently.

103.    In blatant disregard for their fiduciary duties to the Funding Partnership and the Limited Partners, Mastroianni and Yellen exploited their authority as Principals of the Harbourside Group and as co-managers of the General Partner and the Developer by causing the Developer to borrow $12,700,000 from Putnam in or about July through December 2012 in utter disregard for the express terms of the EB-5 Loan Agreement, which prohibited the Developer from subordinating the EB-5 Loan to loans from other lenders unless and until the General Partner failed to sell all 200 units of membership in the Funding Partnership and limited the amount of such borrowing to no more than a total of $110 million (including the funds raised by the sale of membership units in the Funding Partnership) from alternative sources. Moreover, despite ongoing demand for units of membership in the Funding Partnership, Defendants stopped selling such units after 199 units were sold for the purpose of exploiting the subordination provisions of the EB-5 Loan Agreement.

104.    Mastroianni and Yellen also breached their fiduciary duties to the Funding Partnership and the Limited Partners by causing the Developer to default on the EB-5 Loan Agreement **(a)** by causing the Developer to fail to pay monthly interest payments; **(b)** by causing covertly obtaining, fraudulently concealing, and failing to disclose the existence of the Mortgage Loan and the Revolving Loan from the Limited Partners; **(c)** by causing the Developer to use EB-5 Loan funds to, *inter alia*, repay the Mortgage Loan and the Revolving Loan in breach of the express terms of the EB-5 Loan Agreement and the rules and regulations governing the EB-5 Program; **(e)** by failing to make any effort to obtain a loan and/or sell some or all of Harbourside

- 28 -

Place to repay the loan principal to the Funding Partnership; **(f)** by failing to repay the $99,500,000 loan principal to the Funding Partnership on the Maturity Date; **(g)** by causing the Developer to improperly invoke the conversion provisions of the EB-5 Loan Agreement notwithstanding the existence of multiple Events of Default; **(h)** by causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners; **(i)** by causing the Developer to be converted from a Florida LLC (in which members are guaranteed voting rights) into a Delaware LLC (in which voting rights may be extinguished in the LLC operating agreement); **(j)** thereby acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval; **(k)** by using funds from other EB-5 Projects to buy over $60,000,000 in Senior Loans to the Developer, thereby ensuring that the Developer continued to be saddled with debt so that Defendants could profit from it; and **(l)** by failing to take any action to protect the interests of the Funding Partnership or the Limited Partners in response to the conduct described in this paragraph.

105.    Such conduct and inaction contravened Defendants' duty to promote the interests of the Funding Partnership and the Limited Partners, and could not have been a good-faith exercise of disinterested business judgment.

106.    As a direct and proximate result of Defendants' conduct, the Funding Partnership, and the Limited Partners have been damaged in amounts that will be proved at trial.

107.    In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership and the Limited Partners with a conscious disregard of

their rights, which entitles the Funding Partnership and the Limited Partners to an award of punitive and exemplary damages.

## COUNT III
### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

108.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

109.    This claim for relief is brought on behalf of Plaintiffs and the proposed class, and derivatively on behalf of the Funding Partnership against Defendants Regional Center and the Developer.

110.    As alleged in Count II, above, Defendants Mastroianni, Yellen, and the General Partner had fiduciary duties to the Funding Partnership and to the Plaintiffs and members of the proposed class as Limited Partners, and those Defendants breached those duties.

111.    The Regional Center and the Developer, with knowledge of Mastroianni, Yellen, and the General Partner's breaches of fiduciary duty, aided and abetted, provided substantial assistance, and encouraged those breaches of duty.

112.    As a proximate result of Defendants' conduct, the Funding Partnership and the Limited Partners have been damaged in amounts that will be proved at trial.

113.    In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership and the Limited Partners with a conscious disregard of their rights, which entitles the Funding Partnership and the Limited Partners to an award of punitive and exemplary damages

**COUNT IV**
**BREACH OF CONTRACT**

114.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of

the preceding paragraphs of this Complaint.

115.     This claim for relief is brought derivatively on behalf of the Funding Partnership

against the Developer.

116.     The Funding Partnership entered into the EB-5 Loan Agreement with the Developer

on September 1, 2011.

117.     The Partnership did all, or substantially all, of the significant things that the EB-5

Loan Agreement required it to do.

118.     All conditions required for the Funding Partnership's performance had occurred

when it deposited the proceeds from the sale of units of membership in the Funding Partnership,

the aggregate amount of which was $99,500,000, into the escrow account for the purpose of

funding the EB-5 Loan.

119.     The EB-5 Loan Agreement prohibited the Developer from subordinating the EB-5

Loan to loans from alternative sources unless the General Partner was unable to sell all 200 units

of membership in the Funding Partnership.

120.     The EB-5 Loan Agreement prohibited the Developer from borrowing more than a

total of $110,000,000, including the funds borrowed under the EB-5 Loan.

121.     The EB-5 Loan Agreement restricted the Developer from using funds from the EB-

5 Loan for any purpose other than the payment of interest to the Funding Partnership and to pay

for the cost of construction of the Harbourside Project.

122.     Notwithstanding the foregoing provisions of the EB-5 Loan Agreement, the

Developer (a) borrowed nearly $13 million from Putnam in or about July 2012, (b) used EB-5

- 31 -

Loan funds to repay some or all of those loans; and (c) continued to borrow from Putnam while the General Partner was still selling units of membership in the Funding Partnership.

123.     The Developer's conduct constituted Events of Default, as that term is defined in the EB-5 Loan Agreement, which precluded the Developer from exercising the conversion provisions of the EB-5 Loan Agreement.

124.     The Developer breached its obligations under the EB-5 Loan Agreement, which required the Developer to repay the EB-5 Loan on the Maturity Date. Notwithstanding the existence of this and other Events of Default that had occurred, which the Developer did not cure and the Funding Partnership did not waive, the Developer failed to repay the EB-5 Loan and purported to invoke the conversion provisions of the EB-5 Loan Agreement instead.

125.     As a proximate result of the Developer's breaches of contract, the Funding Partnership has been damaged in an amount equal to the $99,500,000 agreed to return to the Partnership on the Maturity Date, plus applicable interest.

## COUNT V
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

126.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

127.     This claim for relief is brought derivatively on behalf of the Funding Partnership against the Developer.

128.     The Funding Partnership entered into the EB-5 Loan Agreement with the Developer on September 1, 2011.

129.     The Partnership did all, or substantially all, of the significant things that the EB-5 Loan Agreement required it to do.

130.     All conditions required for the Funding Partnership's performance had occurred when it deposited the proceeds from the sale of units of membership in the Funding Partnership, the aggregate amount of which was $99,500,000, into the escrow account for the purpose of funding the EB-5 Loan.

131.     The EB-5 Loan Agreement prohibited the Developer from subordinating the EB-5 Loan to loans from alternative sources unless the General Partner was unable to sell all 200 units of membership in the Funding Partnership.

132.     The EB-5 Loan Agreement prohibited the Developer from borrowing more than a total of $110,000,000, including the funds borrowed under the EB-5 Loan.

133.     The EB-5 Loan Agreement restricted the Developer from using funds from the EB-5 Loan for any purpose other than the payment of interest to the Funding Partnership and to pay for the cost of construction of the Harbourside Project.

134.     Notwithstanding the foregoing provisions of the EB-5 Loan Agreement, the Developer (a) borrowed nearly $13 million from Putnam in or about July 2012, (b) used EB-5 Loan funds to repay some or all of those loans; and (c) continued to borrow from Putnam while the General Partner was still selling units of membership in the Funding Partnership.

135.     The Developer's conduct constituted Events of Default, as that term is defined in the EB-5 Loan Agreement, which precluded the Developer from exercising the conversion provisions of the EB-5 Loan Agreement.

136.     The EB-5 Loan Agreement required the Developer to repay the EB-5 Loan on the Maturity Date. Notwithstanding the existence of this and other Events of Default that had occurred, which the Developer did not cure and the Funding Partnership did not waive, the Developer failed

to repay the EB-5 Loan and purported to invoke the conversion provisions of the EB-5 Loan Agreement instead.

137.    The Developer failed to repay the EB-5 Loan and purported to invoke the conversion provisions of the EB-5 Loan Agreement, and thereby consciously and deliberately refused to comply with its obligations under the EB-5 Loan Agreement, frustrating the agreed common purpose of the parties' agreement and disappointing the reasonable expectations of the Funding Partnership.

138.    As a proximate result of the Developer's breaches of the covenant of good faith and fair dealing, the Funding Partnership has been damaged in an amount equal to the $99,500,000 the Developer agreed to return to the Funding Partnership on the Maturity Date, plus applicable interest.

### COUNT VI
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

139.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

140.    This claim for relief is brought derivatively on behalf of the Plaintiffs and members of the proposed class against the General Partner.

141.    Plaintiffs and proposed class members entered into the Limited Partnership Agreement with the General Partner at various time as they purchased units of membership in the Funding Partnership and became Limited Partners.

142.    The Limited Partners did all, or substantially all, of the significant things that the Limited Partnership Agreement required them to do.

143.    All conditions required for the Limited Partnership Agreement's performance had occurred when the Limited Partners had made their $540,000 payment and complied with all that was required of them in connection with the I-526 and I-829 Petitions.

144.    The Limited Partnership Agreement and its fiduciary duties to the Limited Partners called for the General Partner to obtain from the Developer individual units of common membership in the Developer (*i.e.,* Developer Units") pursuant to the EB-5 Loan Agreement and distribute the Developer Units *pro rata* among the Limited Partners. The General Partner failed to discharge those obligations.

145.    Instead, the General Partner accepted a "preferred" equity interest in the Developer and allowed the Funding Partnership to become a member of the Developer, which was then converted from a Florida LLC to a Delaware LLC, leaving the Limited Partners with no rights vis-à-vis the Developer except through the Funding Partnership itself, which was controlled by the General Partner and managed by Defendant Mastroianni.

146.    As a proximate result of the General Partner's breaches of the covenant of good faith and fair dealing, the Limited Partners have been damaged in an amount to be proved at trial.

### COUNT VII
### CONVERSION

147.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

148.    This claim for relief is brought on behalf of Plaintiffs and the proposed Class against Defendants Mastroianni, Yellen, and the Developer.

149.    Defendants have engaged in acts of dominion wrongfully asserted over the Limited Partners' property—namely, Plaintiffs and members of the proposed class each deposited $500,000 in escrow, which amounted to an aggregate deposit of $99,500,000, for the purpose of

funding the EB-5 Loan (the "Property")—in a manner inconsistent with their ownership of that property. Defendants' conduct, as alleged herein, deprived the Limited Partners of that Property permanently or for an indefinite period of time.

150.    As a proximate cause of Defendants' unlawful conduct, Plaintiffs and the proposed class have each been damaged by the deprivation of their Property, which amounts to $500,000 each, plus applicable interest.

## COUNT VIII
## CIVIL THEFT

151.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

152.    This claim for relief is brought on behalf of Plaintiffs and the proposed Class against Defendants Mastroianni, Yellen, and the General Partner.

153.    Plaintiffs and members of the proposed class each deposited $500,000 in escrow, which amounted to an aggregate deposit of $99,500,000, for the purpose of funding the EB-5 Loan (the Property).

154.    To deprive Plaintiffs and members of the proposed class of their Property when it was due to be returned to each of them, Defendants knowingly and in violation of F.S.A. § 812.014 participated in a fraudulent scheme by which they improperly invoked the conversion provisions of the EB-5 Loan Agreement to transform the Property into an illiquid investment that was, at best, an indirect interest that was devoid of any rights, control, or reasonable return.

155.    As a result of this fraudulent and deceptive transaction, Mastroianni and Yellen, with criminal intent, used their control of the General Partner and the Developer to knowingly and intentionally obtain the Property belonging to Plaintiffs and members of the proposed class for the purpose of depriving their Property.

156.     Mastroianni and Yellen intended to appropriate and/or has appropriated the Property to their own use without any legitimate entitlement to those funds.

157.     Defendants' actions were the product of a scheme of deceit and theft.

158.     Defendants intentionally violated Florida Statute § 812.014, which prohibits theft.

159.     As a result of Defendants' violation of Florida Statute § 812.014, Plaintiffs and members of the proposed class have been injured and have lost at least $500,000 each.

160.     On December 23, 2019, before the filing of this Complaint, Plaintiffs made written demand for payment and return the Property in accordance with F.S.A. § 772.11 (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit 1**.

161.     Defendants have yet to agree to return the Property to Plaintiffs or members of the proposed class or to pay treble damages for their theft of it.

162.     Plaintiffs and members of the proposed class have been injured because of Defendants violations of F.S.A. § 812.014.

163.     Pursuant to F.S.A. § 772.11(a), Defendants are liable to Plaintiffs and members of the proposed class in the amount of three times the value of the funds Defendants have stolen from them.

164.     Plaintiffs and members of the proposed class are entitled to recover reasonable attorneys' fees and costs, as well as accrued interest, as a result of Defendants' civil theft. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

### COUNT IX
### ACCOUNTING

165.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

166.     This claim for relief is brought derivatively on behalf of the Funding Partnership Defendants Mastroianni, Yellen, the General Partner, the Developer, and the Regional Center.

167.     Plaintiffs seek an equitable accounting of the accounts, assets, and liabilities of the Funding Partnership.

168.     The Funding Partnership and the Developer acting through Mastroianni and Yellen as Principals of the Harbourside Group and as managers of the General Partner and the Developer, and the General Partner, the Developer, and the Regional Center have engaged in self-dealing and have mismanaged the business and affairs of the Funding Partnership and the Developer in the manner alleged herein, thereby placing the Funding Partnership's assets at undue risk.

169.     Plaintiffs do not have an adequate remedy at law because Defendants have control over the accounts, records, and assets of the Funding Partnership and the Developer.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals, and derivatively on behalf of the Funding Partnership, demand judgment against Defendants as follows:

(1)     declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(3) and to be a proper derivative action pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the proposed class;

(2)     declaring that Defendants' exercise of the conversion provisions of the EB-5 Loan Agreement, and the conversion of the Developer from a Florida limited liability agreement to a Delaware limited liability agreement, were invalid and void, as alleged in Count I;

(3)     awarding compensatory and punitive damages for Defendants' breaches of fiduciary duty, as alleged in Count II;

(4)     awarding compensatory and punitive damages for Defendants' aiding and abetting breaches of fiduciary duty, as alleged in Count III;

(5)     awarding compensatory damages for Defendants breaches of contract, as alleged in Count IV;

(6)     awarding compensatory damages for Defendants breaches of the covenant of good faith and fair dealing, as alleged in Counts V and VI;

(7)     awarding compensatory and punitive damages for Defendants' conversion of the Property, as alleged in Count VII;

(8)     awarding treble damages and attorney fees and costs as a result of Defendants' civil theft, as alleged in Count VIII; and

(9)     an accounting of the Funding Partnership's assets, as alleged in Count IX;

(10)     awarding Plaintiffs and members of the proposed class attorney fees and costs pursuant to the common fund doctrine and F.S.A. § 772.1(a);

(11)     awarding the Funding Partnership, Plaintiffs and the members of the proposed class prejudgment interest at the maximum rate allowable by law; and

(12)     awarding such other and further relief the Court deems just, proper and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Class, and deriviatively on behalf of the Funding Partnership, hereby request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully Submitted,


by_____

## **VERIFICATION**

I, Ting Peng, under penalty of perjury, state as follows:

I am one of the Plaintiffs in the above-captioned action. I have read the foregoing Complaint and have authorized its filing. Based on the investigation of my counsel, the facts alleged in the Complaint are true to the best of my knowledge, information, and belief.

Dated:  December ___, 2019                      _____
                                                                                       Ting Peng

(3)     awarding compensatory and punitive damages for Defendants' breaches of fiduciary duty, as alleged in Count II;

(4)     awarding compensatory and punitive damages for Defendants' aiding and abetting breaches of fiduciary duty, as alleged in Count III;

(5)     awarding compensatory damages for Defendants breaches of contract, as alleged in Count IV;

(6)     awarding compensatory damages for Defendants breaches of the covenant of good faith and fair dealing, as alleged in Counts V and VI;

(7)     awarding compensatory and punitive damages for Defendants' conversion of the Property, as alleged in Count VII;

(8)     awarding treble damages and attorney fees and costs as a result of Defendants' civil theft, as alleged in Count VIII; and

(9)     an accounting of the Funding Partnership's assets, as alleged in Count IX;

(10)     awarding Plaintiffs and members of the proposed class attorney fees and costs pursuant to the common fund doctrine and F.S.A. § 772.1(a);

(11)     awarding the Funding Partnership, Plaintiffs and the members of the proposed class prejudgment interest at the maximum rate allowable by law; and

(12)     awarding such other and further relief the Court deems just, proper and equitable.