UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 9:20-cv-80102-RAR-BR

| | |
|---|---|
| TING PENG and LIN FU, on behalf of themselves individually and all others similarly situated, and derivatively on behalf of HARBOURSIDE FUNDING, LP, a Florida limited partnership, | |
| | |
| Plaintiffs, | <u>JURY DEMAND</u> |
| | |
| vs. | |
| | |
| NICHOLAS A. MASTROIANNI II; FLORIDA REGIONAL CENTER, LLC, a Delaware limited liability company; HARBOURSIDE FUNDING GP, LLC, a Florida limited liability company; and HARBOURSIDE PLACE, LLC, a Delaware limited liability company, | |
| | |
| Defendants, | |
| | |
| and | |
| | |
| HARBOURSIDE FUNDING, LP, a Florida limited partnership, | |
| | |
| Nominal Defendant. | |

**FIRST AMENDED VERIFIED CLASS-ACTION AND DERIVATIVE COMPLAINT
FOR EQUITABLE RELIEF AND DAMAGES**

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiffs Ting Peng and Lin Fu, on behalf of themselves and all others similarly situated, and derivatively on behalf of Nominal Defendant Harbourside Funding, LP, hereby submit this verified First Amended Complaint in response to Defendants' Motion to Dismiss Plaintiffs' Verified Class-Action and Derivative Complaint (ECF 19), and allege as follows upon personal knowledge as to Plaintiffs' own conduct and experience, and on information and belief as to all other matters based on an investigation by counsel:

## <u>INTRODUCTION</u>

1.       In or about 2010, Defendant Nicholas Mastroianni and attorney Richard Yellen became the principals of the Harbourside Group, a group of entities they created for the purpose of building a mixed-use commercial development in Jupiter, Florida (the "Harbourside Project"), financed by a loan to Harbourside Place, LLC (the "Developer"). The loan was funded by the sale of membership units in Harbourside Funding, LP (the "Funding Partnership") at $500,000 per unit to immigrant investors who applied for permanent residence in the United States via the EB-5 Immigrant Investor Visa Program (the "EB-5 Program").

2.       Defendants sold 199 of the 200 available units of membership in the Funding Partnership, which provided $99,500,000 in funding for the Developer. Members of the Funding Partnership (the "Limited Partners") were to receive interest payments each month until the loan matured on November 30, 2017, when the $99,500,000 principal was to be repaid in full. If the Developer's capital was insufficient to repay the principal when it became due, the Developer was to obtain refinancing from an institutional lender or obtain the necessary capital through the sale of some or all of the Harbourside Project. And if those efforts failed, the principal could be

- 1 -

converted to common membership units in the Developer unless one or more events of default had occurred and had not been cured as of the maturity date.

3.     As of August 2017, the Developer had yet to pay a single monthly interest payment to the Limited Partners. Mastroianni offered to pay all the interest that had accrued, repay the loan principal, and establish a plan that would protect the Limited Partners' interests if they would consent to converting the Funding Partnership's investment into a "preferred" equity stake in the Developer. And although the Developer had made no effort to refinance the loan or to sell some or all of the Harbourside Project, Mastroianni also told the Limited Partners that the principle would be converted to common membership interests in the Developer per the conversion provision in the loan agreement.

4.     When the Limited Partners declined his proposal, Mastroianni advised the Funding Partnership that the Developer would exercise the conversion provision of the loan agreement, and that the debt would be converted to equity in the Developer.

5.     The conversion was invalid for three basic reasons. *First*, Mastroianni had failed to distribute to the Limited Partners notice of the Developer's intent to invoke the conversion provision of the loan agreement, as required by the Limited Partnership Agreement. *Second,* the Developer had engaged in multiple events of default, which precluded the exercise of the conversion provision. *Third,* the conversion required the Limited Partners' approval, which was neither sought nor obtained, (a) because the Developer was converted from a Florida LLC to a Delaware LLC, which constitutes a change in the plan described in the offering documents and constitutes an "Other Investment," as that term is defined in the Limited Partners' Agreement; and (b) because the loan principal was to have been converted to common units of membership interest in the Developer, but was converted instead to a single unit of "preferred" membership that was

issued in the name of the Funding Partnership, which prevented the Limited Partners from exercising rights of membership in the Developer.

6.      As a result of engaging in this course of conduct, Mastroianni and the general partner of the Funding Partnership have breached their fiduciary duties to the Funding Partnership and to the Limited Partners, and Mastroianni and the Developer have breached the loan agreement and have seized control of the limited partners' property—*i.e.,* the $500,000 investments that were to have been returned to each of them when the loan matured in November 2017—which renders Mastroianni and the Developer liable for conversion and civil theft under Florida law.

7.      Accordingly, Plaintiffs bring this action on behalf of themselves and a proposed class of limited partners and derivatively on behalf of the limited partnership to obtain judicial declarations (a) that exercising the conversion provision was prohibited by the loan agreement and (b) that the conversion of the developer from a Florida LLC to a Delaware LLC, and the conversion of the debt to a single unit of "preferred" membership in the developer LLC, are invalid due to the failure to obtain the Limited Partners' approval.

8.      Plaintiffs also seek an award of compensatory and, where applicable, punitive damages for, *inter alia,* Defendants' breaches of fiduciary duty, breaches of contract, conversion, and an award of treble damages for civil theft.

## PARTIES

### PLAINTIFFS

9.      Plaintiff Ting Peng is an individual participant in the EB-5 Program who became a member of the Funding Partnership on April 2, 2013. Ms. Peng was born in mainland China and has been employed as a teacher and a corporate financial planner. Ms. Peng now resides in Sammamish, Washington.

10.      Plaintiff Lin Fu is an individual participant in the EB-5 Program who became a member of the Funding Partnership on December 16, 2011. Ms. Fu was born in mainland China and is a physician who received her medical degree from Shanghai Medical University and practice as an OB/Gyn for more than a decade in Shanghai, China. Ms. Fu now resides in Princeton, New Jersey.

### DEFENDANTS

11.      Defendant Nicholas Mastroianni is an individual who resides in Palm Beach County, Florida. Mastroianni, along with attorney Richard Yellen, was one of two principals who controlled a group of companies called the "Harbourside Group," which are among the entities named Defendants in this action.[1]

---

[1] As discussed in paragraph 137, below, on December 23, 2019, Plaintiffs served Defendants with a demand letter as required by F.S.A. § 772.11 and a draft of the original complaint. After meeting and conferring with Defendants' counsel, Plaintiffs filed the original complaint on January 27, 2020. One month later (on February 28, 2020), Defendants advised Plaintiffs that Richard Yellen, who was named as a Defendant in the original complaint, had terminated his participation in the Harbourside Project as of September 30, 2014. On March 3, 2020, Plaintiffs offered a stipulated dismissal without prejudice of their claims against Yellen in exchange for an affidavit in which Yellen affirmed that he had no role in the Harbourside Project after that date, subject to Plaintiffs amending their complaint to include Yellen as a defendant if facts obtained in discovery contradicted Yellen's affidavit. On March 25, 2020, Yellen answered the complaint and filed a motion for judgment on the pleadings. Shortly thereafter, the parties agreed to a stipulation and proposed order dismissing their claims again Yellen without prejudice, which has been filed with this First Amended Complaint.

12.      Defendant Florida Regional Center, LLC (the "Regional Center") is a Delaware limited liability company and is one of the entities that comprise the Harbourside Group.

13.      Defendant Harbourside Place, LLC (the "Developer") was formed as a Florida limited liability company and was converted to a Delaware limited liability company in or about December 2017. The Developer was created and operated by Mastroianni and Yellen, was managed by Mastroianni, and is one of the entities that comprise the Harbourside Group.

14.      Defendant Harbourside Funding GP, LLC (the "General Partner") is a Florida limited liability company that served as the general partner of the Funding Partnership. The General Partner was created and operated by Mastroianni and Yellen, was managed by Mastroianni, and is one of the entities that comprise the Harbourside Group.

15.      Nominal Defendant Harbourside Funding, LP (the "Funding Partnership") is a Florida limited liability company that was established for the purpose of financing the "Harborside Project" (a mix-used commercial development in Jupiter, Florida) with a loan to the Developer, which was funded by EB-5 investors' purchase of membership units in the Funding Partnership and who, like Plaintiffs, became Limited Partners in the Funding Partnership. The Funding Partnership is one of the entities that comprise the Harbourside Group.

## JURISDICTION AND VENUE

16.      **JURISDICTION**.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and Plaintiffs and Defendants are citizens of, and domiciled in, different states. This action, which is brought in part under Fed. R. Civ. P. 23.1, is not a collusive one to confer jurisdiction that the court would otherwise lack.

17.   **VENUE**. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. 1391(b)(2) because the vast majority of acts and omissions giving rise to the claims asserted herein occurred and continue to occur in this District, and a substantial part of the property that is the subject of this action is situated here.

## **GENERAL ALLEGATIONS**

### **THE EB-5 PROGRAM**

18.   To provide an incentive for foreign investment to benefit the American economy by creating or preserving American jobs, Congress created the EB-5 Program in 1990 with the enactment of the Immigration Act of 1990. Pub. L. 101-649, 104 Stat. 4978. The EB-5 Program enabled immigrant investors ("EB-5 Investors") to become permanent residents of the United States by investing at least $500,000 in a U.S. business that will use the funds in a manner that creates or maintains at least 10 full-time American jobs. *See, e.g.,* 8 U.S.C. § 1153(b)(5).

19.   At the outset of the application process, which normally takes two or more years before it is complete, the EB-5 Investor submits a Form I-526 Immigration Petition by Alien Entrepreneur ("I-526 Petition"), which, if approved, permits the EB-5 Investor to reside and travel within the U.S. while his or her application is pending. If the I-526 Petition is approved, the EB-5 Investor may then seek permanent U.S. residency status (and obtain a green card) by submitting a Form I-829 Petition by Entrepreneur to Remove Conditions ("I-829 Petition"). If the I-829 Petition is granted, the EB-5 Investor and his or her immediate family members are granted permanent immigrant visas (*i.e.,* green cards).

20.   In 1993, Congress modified the EB-5 Program by adding the Immigrant Investor Pilot Program, which allowed EB-5 Investors to invest in a commercial enterprise associated with a regional center. Regional centers, like the one involved in the present case, are Regional centers

are essentially clearinghouses for eligible investment opportunities. They are private entities that have received approval from the U.S. Citizenship & Immigration Services ("USCIS") to administer EB-5 investments in a given geographical area, and enable EB-5 Investors to pool their investments in a specific project with other EB-5 Investors, thereby making it easier to demonstrate that a given project has created or preserved at least 10 jobs per investment.

21.     Although EB-5 was created in the 1990s, it was not commonly used to fund real estate projects until after the Great Recession in 2008, when funding became more difficult to obtain and EB-5 represented an alternative source of capital.

### FUNDING THE HARBOURSIDE PROJECT VIA THE EB-5 PROGRAM

22.     In September 2010, USCIS approved Defendant Mastroianni's proposal to designate Defendant Florida Regional Center as the administrator of the regional center for Palm Beach County, Florida, and to approve the Harbourside Project as the first capital investment project that would be located in the Florida Regional Center.

23.     To fund the Harbourside Project, Mastroianni and Yellen created the Funding Partnership for the purpose of raising up to $100 million through the sale of up to 200 membership units to EB-5 Investors for $500,000 per unit plus a $40,000 administration fee. The revenue generated by the sale of Funding Partnership membership units funded a loan to the Developer of up to $100,000,000 (the "EB-5 Loan").

24.     In advertising materials circulated by the Regional Center, prospective EB-5 Investors were told that the Harbourside Project's completion was guaranteed by a $750 million policy issued by a major insurance company, and that

> the value of just the real estate collateral is more than twice the amount of the EB-5 loans, and the security of the funds is fully guaranteed. The [Harbourside] Project is a four-year bridge loan with a safe and reliable exit mechanism: Ackman-Ziff, the largest real estate company in New York, has signed a contract to provide a

$100 million refinancing loan after the Project is completed and put into operation. Investors will recover 50% of their funds immediately after receiving their permanent green card, and the full amount of the investment will be safely recovered in the fourth year. . . .

25.      Defendants made similar statements in the Offering Documents[2] (which were printed in English and which Plaintiffs and other prospective EB-5 Investors were shown only the signature pages by Defendants' agents in China), including a promise that the EB-5 Loan would not be subordinated to loans by other lenders unless the General Partner failed to sell all 200 units of membership in the Funding Partnership, and even then, the Developer would borrow no more than a total of $110,000,000, including the amount of the EB-5 Loan. As explained in the Offering Documents, each EB-5 Investor's $500,000 investment would be paid into an escrow fund, which would provide up to $100 million for the EB-5 Loan to the Developer for the construction of the Harbourside Project.

26.      The EB-5 Loan would be secured by a perfected, first-priority lien and would yield interest at a rate of 2.0% per year that would be paid in monthly installments to the EB-5 Investors who became Limited Partners in the Funding Partnership.

27.      The Offering Memorandum explained that the EB-5 Loan would be repaid. "within five years from the date the last potential investor submits his or her I-526 Petition to USCIS, or, no later than November 30, 2012, as determined by the Partnership in good faith." And, to do so,

---

[2] The Offering Documents are composed of Subscription Instructions and a Confidential Offering Memorandum ("Offering Memorandum") to which the following exhibits are attached: the Limited Partnership Agreement for the Funding Partnership (the "Limited Partnership Agreement"); the Subscription Agreement; Charts Summarizing the Immigration and Investment Procedures; the Escrow Agreement; a Rendering, Aerial Photo and Area Maps of Harbourside Place; and the Amended Restated Convertible Loan Agreement (the "EB-5 Loan Agreement"). A true and correct copy of the Offering Documents, which has been bookmarked for ease of reference, is attached hereto as collective **Exhibit 1**.

the Developer would "[r]efinance the Loan with an institutional lender" and/or "[r]epay the Loan with the proceeds of a sale of all or a portion of Harbourside Place."

28.     In the event the Developer was unable to refinance the EB-5 Loan through an institutional investor or sell some or all of Harbourside Place to repay it, prospective EB-5 Investors were told that "the Developer intends to convert the entire outstanding principal amount of the Loan into an ownership interest in the Developer." As the EB-5 Loan Agreement explained, this would entail converting the outstanding principal "into units of common membership interest in the [Developer]," but that conversion could not be effectuated if an Event of Default had occurred and was continuing on the Maturity Date.[3]

29.     Although there was no minimum principal amount for the EB-5 Loan, the General Partner had the right to terminate the offering at any time before 50 membership units were sold. After 80 membership units were sold, the General Partner had the right to refrain from selling any additional membership units in the Limited Partnership if  it was reasonably determined that (a) the sale of additional membership units would not result in a sufficient number of jobs or (b) there was insufficient interest in purchasing additional membership units.

30.     Neither eventuality occurred. Demand for membership units remained high. And although the General Partner had the right to stop selling additional membership units after 160

---

[3] Although the EB-5 Program requires that each applicant's investments remain "at risk" during their conditional residency status (*i.e.,* until their I-829 Petition is granted), "[n]othing prevents an immigrant investor from receiving a return on his or her capital in the form of profits from the new commercial enterprise." USCIS Policy Manual, Chapter 2. And although the regulations require investors to continuously maintain their capital investment over the two years of their conditional residence, the regulations do not prevent investors from selling their investments after the end of the two-year period of conditional residence, or create requirements that extend beyond that period. *See* 8 C.F.R. § 216.6(c)(1)(iii).

units were sold, sales continued through 2013 and, as the Offering Documents acknowledged, there was a *need* to sell every single membership unit:

> The Developer currently does not have sufficient funding to purchase, develop, construct and operate Harbourside Place, even if the Partnership were to extend the maximum principal Loan amount of $100.0 million. For this and other reasons, the Developer may need to finance Harbourside Place through additional funding, a portion of which may rank senior in terms of payment and priority to the Partnership's Loan to the Developer.

31.     But the Offering Documents also state that $110 million is the *maximum* amount of funds that could be raised for the Harbourside Project—*including* the funds raised by the sale of membership units to EB-5 Investors—and borrowing additional funds from other sources is permitted only if *fewer than 200* membership units were sold:

> If for any reason the maximum principal amount of the [EB-5] Loan is less than $100.0 million, the Principals reserve the right to seek funding from alternative sources, provided that the total principal amount of any additional indebtedness, together with the total principal amount of the Loan, may not exceed $110.0 million.

32.     Despite the ongoing high demand for membership units, however, the General Partner stopped selling them after only *199* of the 200 membership units had been sold because Defendants never intended to sell all 200 units. This single-unit shortfall thus triggered the right under the EB-5 Loan Agreement to seek an additional $10,500,000 in the form of loans from alternative sources because the sale of 199 membership units generated only $99,500,000 of the $100 million principal amount for the EB-5 Loan.

### THE DEVELOPER BORROWS FROM ALTERNATIVE SOURCES IN VIOLATION OF THE EXPRESS TERMS OF THE EB-5 LOAN AGREEMENT

33.     In July 2012—the year *before* the sale of membership units ceased—Mastroianni and Yellen had *already* procured two senior loans from a third party, Putnam Bridge Funding III ("Putnam"), on behalf of the Developer, which totaled *$12,700,000* ($2,700,000 *more* than the

$110 million maximum allowed by the terms of the EB-5 Loan Agreement *if* 200 membership units had not been sold), without advising the Limited Partners or prospective EB-5 investors who had yet to become Limited Partners in the Funding Partnership. Moreover, during the next several months, the Developer borrowed an additional ***$7,498,000*** from the same lender (*i.e.,* Putnam), bringing the total amount of loans from an alternative source to approximately $20 million before the end of 2012.

34.     Specifically, Mastroianni and Yellen procured for the Developer an $11,350,000 bridge loan that was secured by a first priority mortgage on the property on which the Harbourside Project was built (the "Mortgage Loan"), and a $9,000,000 revolving-credit loan, from which Mastroianni and Yellen had already drawn $1,350,000 on behalf of the Harbourside Project by July 2012, which was secured by a second-priority mortgage (the "Revolving Loan"). Several months later, Mastroianni and Yellen borrowed an additional $7,498,000 under the Revolving Loan, for a total of more than $20 million. Thus, the Developer substantially exceeded the $10,500,000 limit on additional funds—***even though EB-5 Investors were still buying membership units well into 2013***—in utter disregard of the EB-5 Loan Agreement.

35.     Shortly thereafter, Mastroianni and Yellen caused the Developer to breach the EB-5 Loan Agreement again. On December 27, 2012, Mastroianni and Yellen caused the Developer to expend $11,350,000 of the EB-5 Loan funds to pay off the Mortgage Loan. Four days later (on December 31, 2012), Mastroianni and Yellen caused the Developer to expend $3,500,000 of the EB-5 Loan Funds to repay part of the Revolving Loan. Mastroianni and Yellen's use of loan funds for this purpose was expressly prohibited by the EB-5 Loan Agreement, which states unambiguously that

> [t]he purpose of the Loan is to provide funds ***for certain Lender-approved hard and soft construction costs (together with an interest reserve) for the purchase of***

***the Property and the construction of the improvements within the Project***. The Loan shall be fully reserved for the cost ***to complete the improvements funded with proceeds of the Loan***. . . .

(Emphasis added.)

36.     It was not until April 15, 2013—after Plaintiffs and most other EB-5 Investors had already purchased their membership units and became Limited Partners in the Funding Partnership—that Mastroianni even hinted at the existence of the Mortgage Loan or the Revolving Loan. On that date, Mastroianni, acting in his capacity as Managing Member of the General Partner and the Florida Regional Center, circulated a letter to the Limited Partners (the "April 2013 letter") that states, among other things, that in December 2012 "a mortgage was recorded against the Property in favor of the [Funding] Partnership to secure repayment of the [EB-5] Loan" and that $26 million in EB-5 Loan funds were released from escrow and used "to fund construction of Harbourside Place." (Plaintiff Fu received the April 2013 letter in May 2013 and Plaintiff Peng never received it.)

37.     Mastroianni also stated that, "in December 2012, the Developer obtained an Additional Loan of up to $18 million from Putnam Bridge Funding III, LLC as Senior Lender ***to provide the Developer with additional construction funds***." (Emphasis added.)

38.     This was also false and misleading. In actuality, Mastroianni and Yellen had caused the Developer to borrow from Putnam a total of $12,700,000 in ***July 2012***, and by December 2012 they had spent $14,850,000 of the EB-5 Loan funds to ***repay*** the $11,350,000 Mortgage Loan and $3,500,000 of the $8,848,000 Revolving Loan. Yet, the April 2013 letter says nothing about this unauthorized expenditure of EB-5 Loan funds, nor anything about the decision to borrow an additional $7,498,000 from Putnam on behalf of the Developer in December 2012 via the Revolving Loan.

39.     Aside from oblique references, the April 2013 Report provides no substantive (or truthful) information about the Mortgage Loan or the Revolving Loan, such as when, how, or why the money was borrowed in July 2012, why they decided to subordinate the EB-5 Loan to two other loans for millions of dollars each, or why they chose to use EB-5 Loan funds to repay the Mortgage Loan before borrowing more from the credit line made available by the Revolving Loan.

40.     The April 2013 letter did, however, advise the Limited Partners that, the

[Funding] Partnership has entered into a revised [EB-5] Loan Agreement with the Developer, amending and restating earlier versions of the Loan Agreement dated as of July 22, 2011 and as of September 1, 2011, to effect changes to the [EB-5] Loan required by the intercreditor agreement and the different versions of the Offering Memorandum. As stated in the Offering Memorandum, Developer has the option to convert all outstanding principal into units of ownership interest in the Developer (the "Developer Units"). ***The actual number of Developer Units that would be acquired upon conversion will depend on the Appraised Value of Harbourside Place and the principal amount of the Loan outstanding at the time***.

(Bold italics added.)

41.     Mastroianni also explained that, "[p]ursuant to Section 19.6.2 of the [Limited] Partnership Agreement, the General Partner has amended and restated the [Limited] Partnership Agreement . . . ." Although Section 19.6.1 of the Limited Partnership agreement states that the General Partner may amend the Limited Partnership Agreement in writing "with the consent of the Limited Partners given by Ordinary Resolution," Section 19.6.2 provides an exception to the consent requirement if an amendment is necessary "for the protection of the Limited Partners" or "to cure an ambiguity" or inconsistency that exists in a written opinion of counsel to the Limited Partnership.

42.     Mastroianni also stated that the following provisions had been added to the Limited Partnership Agreement:

1.     If the Partnership decides to distribute the Developer Units [*i.e.,* units of common membership in the Developer's LLC], or the proceeds of any sale

of the Developer Units, to the Limited Partners, all Limited Partners will participate in the distribution pro rata in accordance with their Unit holdings until Developer Units, or the proceeds of any sale of Developer Units, equal to 65% of all issued and outstanding Developer Units on the date of conversion have been distributed; and

2.      All remaining Developer Units (the "Excess Developer Units"), or the proceeds of any sale of Excess Developer Units, will be distributed to the Initial Limited Partners, pro rata in accordance with their holdings.

43.     Less than a year later, in March 2014, Mastroianni issued a report to the Limited Partners (the "March 2014 Report") together with an Ordinary Resolution that sought the Limited Partners' approval for the Developer to borrow more than $60 million in the form of another senior mortgage loan (the "Senior Loan") to which the EB-5 Loan would be subordinated. Mastroianni also advised the Limited Partners "that *if we do not receive a signed copy of the Ordinary resolution from a Limited Partner on or before April 15, 2014, the Partnership will consider that you have consented to the Ordinary Resolution*." (Emphasis added.)

44.     Thus, the Limited Partners were told that *not* returning a signed Ordinary Resolution would have the same effect as signing it. Although Defendants claim that a majority of the Limited Partners "signed" the Ordinary Resolution, this is not true. In actuality, there were *two different versions* of the Ordinary Resolution, hence the Limited Partners who actually did consent sign an Ordinary Resolution (and, in some cases, agents signed without the Limited Partners' knowledge or consent) were consenting to two materially different proposals. Accordingly, there actually was no majority vote in favor of the Ordinary Resolution.

45.     Even if the Limited Partners had validly authorized the Senior Loan, the Ordinary Resolution would not and could not have negated the effect of taking Mortgage Loan or the Revolving Loan before all 200 membership units had been sold, and would not and could not have

constituted ratification by the Limited Partners of Defendants' decision to take the Mortgage Loan or the Revolving Loan.

46.     In short, neither the Ordinary Resolution nor the March 2014 Report that accompanied it disclosed the existence, nature, magnitude, or duration of the Mortgage Loan or the Revolving Loan; rather, the Project Update Report makes a vague allusion to an "existing bridge loan" (in the singular) and to a "Putnam Bridge Loan" (in the singular) and contains no discussion of Mortgage Loan or the Revolving Loan, how much was borrowed, when or why the loans were taken, or that EB-5 Loan funds were used to repay those loans. Thus, the failure to disclose would render any purported ratification ineffective and the ratification language Defendants included in the Ordinary Resolution is applicable to the Mortgage Loan and the Revolving Loan in any event.

### DEFENDANTS PROCEED WITH CONVERTING THE LOAN PRINCIPAL TO EQUITY IN THE DEVELOPER

47.     The next time Defendants sought approval of an Ordinary Resolution, the Limited Partners flatly refused to provide it. Despite the rosy picture that Mastroianni and Yellen painted in the March 2014 Report, the Developer still had yet to make a single monthly interest payment to the Limited Partners, as required by the EB-5 Loan Agreement. Instead, in a letter dated December 14, 2016, Mastroianni advised the Limited Partners that the Senior Loan would be replaced by another Senior Loan and asked them to consent to another Ordinary Resolution that would extend the Maturity Date of the EB-5 Loan from November 30, 2017, to December 31, 2020.

48.     This time, the Limited Partners simply declined Mastroianni's proposal.

49.     Thus, on August 25, 2017, Mastroianni tried again in a letter he wrote to the Limited Partners in his capacity as General Partner. There, Mastroianni promised to pay all the interest that

had accrued to date, to repay the loan principal, and to effectuate a plan that would protect the Limited Partners' interests in exchange for their consent to convert the Funding Partnership's investment into a "preferred" equity stake in the Developer.

50.     Like the proposal that was made in the March 2014 Report, Mastroianni included with this proposal a pronouncement that "***[i]f we do not receive the required number of consents, the Loan will be converted to common equity*** under the same formula (in accordance with the existing [EB-5] Loan Agreement) . . . ." (Emphasis in original.)

51.     When the Limited Partners would not consent to this proposal, Mastroianni wrote to the Limited Partnership again on October 13, 2017. There, Mastroianni advised the Limited Partnership that the Developer had "elected to exercise the Conversion Right pursuant to the terms of the Loan Agreement." Although Mastroianni was also the managing member of the General Partner, he failed to circulate to that notice to the Limited Partners, as required by Section 17.3 of the Limited Partnership Agreement, which provides that "the General Partner shall send ***to each Limited Partner*** a copy of any Conversion Notice within fifteen days following its receipt thereof." (Emphasis added.)

52.     Mastroianni went on in the October 13 letter to note that "[t]he Conversion Right contemplates conversion of the outstanding principal of the loan into common equity membership interests of Borrower, but Borrower hereby acknowledges that Borrower and Lender may conduct good faith negotiations to enhance the terms of the conversion (e.g., preferred equity membership interests), though Borrower is under no obligation to do so."

53.     Mastroianni was not offering to simply forego the "right" to convert the EB-5 Loan principal into common equity interests and give the Limited Partners a "preferred" equity interest out of the goodness of his heart. In actuality, "preferred" equity status was just another way of

extending the Maturity Date. It also meant that the Limited Partners would an illiquid investment with no voting rights—notwithstanding that the EB-5 Loan Agreement provided that the conversion would result multiple common membership interests to which they were entitled under the Limited Partnership, which were guaranteed voting rights as provided by F.S.A. § 605.04073(1)(a).

54.     Similarly, Mastroianni expressed a "willingness" to negotiate because he knew that, although the EB-5 Loan Agreement includes a provision that ***contemplated*** conversion from a loan into units of a common membership interest in the Developer, the conversion could not be effectuated without the approval of the Limited Partners for two basic reasons.

55.     ***First***, multiple Events of Default existed at the time the Developer sought to exercise its "right" of conversion, and the EB-5 Loan Agreement as well as the Offering Documents make clear that the EB-5 Loan could not be converted if an Event of Default existed at the time of a proposed conversion.

56.     The EB-5 Loan Agreement defines "Events of Default" as follows:

**<u>EVENTS OF DEFAULT</u>**. The occurrence of any one or more of the following events is a Default hereunder and the continuance of any such Default beyond the period (if any) provided below within which such Defaults may be cured shall be an Event of Default hereunder and under the Loan:

(1)     Any breach of the terms of the Loan Documents; or

(2)     Any material noncompliance with the Requirements; or

(3)     Any material representation, warranty, statement, certificate, schedule or report made or furnished by Borrower proves to have been false or erroneous in any material respect at the time of the making thereof, or to have omitted any substantial liability or claim against Borrower, of if on the date of execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed therein, which change shall not have been disclosed to Lender at or prior to the time of such execution . . . .

57.     At the time the Developer invoked the conversion provision of the EB-5 Loan Agreement, Events of Default existed as a result of the Developer taking the Mortgage Loan and the Revolving Loan, which subordinated the EB-5 Loan to the Mortgage Loan, and as a result of the Developer using EB-5 Loan funds to pay off the Mortgage Loan in contravention of the express purpose of the EB-5 Loan Agreement. All of this was inconsistent with the representations made about these issues in the Offering Documents, as was the Developer's failure to make any effort to repay the EB-5 Loan by taking a loan and/or selling some or all of Harbourside Place.

58.     *Second*, the conversion could not occur without the approval of the Limited Partners, even if the Events of Default had not precluded it. Although the Offering Memorandum, the EB-5 Loan Agreement, and the Limited Partnership Agreement all refer to the prospect of converting the EB-5 Loan into units of a common membership interest in the Developer, the actual conversion plan was significantly different than the one described in those documents.

59.     Despite the existence of Events of Default and despite the lack of consent from the Limited Partners, Defendants simply proceeded to convert the EB-5 Loan principal to a "preferred" equity interest in the Developer for the Funding Partnership as an entity, rather than issuing units of common membership interests for distribution to the Limited Partners, as provided in the Loan Agreement and the revised Limited Partnership Agreement—both of which had been amended for that purpose, purportedly for the "protection" of the Limited Partners. Defendants then converted the Developer from a Florida LLC to the New LLC.

60.     Moreover, rather than paying off the Senior Loan and freeing the Developer of that debt, Mastroianni purchased the senior loans by creating the New Senior Lender with funds from a different EB-5 Project, thereby ensuring that the Developer would continue to be saddled with

debt after the Funding Partnership was made a member of the Developer, while Mastroianni profited from that debt.

61.     None of this was mentioned in the Offering Documents, nor was it agreed to by the Limited Partners, as required by Section 620.2103 of the Florida Revised Uniform Partnership Act of 2005.

62.     The failure to obtain the Limited Partners' approval as to the plan for converting the Developer to the New LLC also violated Section 16.8 of the Limited Partnership Agreement, which requires *unanimous* consent of the Limited Partners as a prerequisite to placing their investment in a LLC that was governed by Delaware law and an entirely different operating agreement (*i.e.*, an "Other Investment," as that term is defined by Section 1.1.33 of the Limited Partnership Agreement. Once again, Limited Partners' approval was neither sought nor obtained.

## **VEIL-PIERCING ALLEGATIONS**

63.     Mastroianni is now the sole Principal of the Harbourside Group after Richard Yellen allegedly withdrew as a Principal and as a manager of the Harbourside Group entities on September 30, 2014. Mastroianni and, until his withdrawal, Yellen, used this status to dominate and control the entities within the Harbourside Group to such an extent that these entities' independent existence was in fact non-existent and Mastroianni and Yellen were in fact their alter egos. Mastroianni commingled these entities' assets and used their limited liability status as mere instrumentalities for personal benefit and other improper and misleading purposes, such as frustrating creditors (*i.e.*, the Limited Partners), to the detriment of and injury to the Funding Partnership and the Limited Partners.

64.     As David Finkelstein, the former Chief Financial Officer for the Developer and the Regional Center, has explained, "Mastroianni, along with those in his employ, routinely conducted

side deals, and funneled money in and out of various accounts without conferring with the CFO and . . . in non-compliance with the EB-5 requirements, something that would cause serious problems should there ever be a USCIS or SEC audit." *Finkelstein v. Allied Capital and Devel. of So. Fla., LLC*, No. 2014CA006733 (Palm Beach Cty. Cir. Ct.) ¶ 32.

## **DERIVATIVE ACTION ALLEGATIONS**

65.     Plaintiffs bring this action derivatively on behalf of the Funding Partnership, pursuant to Fed. R. Civ. P. 23.1 and F.S.A. § 620.2002(2), to enforce the claims for relief set forth below against each Defendant.

66.     The conduct about which Plaintiffs complain herein occurred while Plaintiffs were limited partners in the Funding Partnership, hence they standing to pursue this derivative action for damages and other relief on behalf of the Funding Partnership, which is necessary and proper to protect the interests of the Funding Partnership.

67.     If Plaintiffs are successful in this action, the recovery will be of substantial benefit to the Funding Partnership and its Limited Partners, each of whom was a member of the Funding Partnership when it was converted to the New LLC.

## **DEMAND FUTILITY**

68.     Plaintiffs did not make a demand that Defendant Mastroianni take action in his capacity as the Principal of the Harbourside Group and/or as managing member of the General Partner to remedy the harm alleged herein before they filed this Complaint because such a demand would have been futile. This was so for several reasons, including, but not limited to, the following circumstances:

     a.     ***First***, Mastroianni faces a substantial likelihood of liability in connection with his role in failing to disclose material facts to the Funding Partnership, grossly mismanaging

the Funding Partnership, breaching his fiduciary duties to the Funding Partnership, and violating state and federal law to effectuate the conversion provision of the EB-5 Loan despite the existence of Events of Defaults that precluded it, and other acts of self-dealing that harmed the Funding Partnership and the conversion of its assets.

b.      ***Second,*** Mastroianni's conduct, as alleged herein, deprived him of the requisite independence and valid business judgment needed to properly assess a demand that the General Partner take action to remedy alleged harm to the Funding Partnership.

c.      ***Third***, the blatantly unfair and one-sided nature of the decision to convert the EB-5 Loan principal to a membership interest in the Developer made it impossible to approve that decision through the exercise of valid business judgment, as did the lack of good faith with which Mastroianni was required to exercise valid business judgment in any event, as evidenced by the failure to disclose material information to the EB-5 Investors and their failure to comply with the most basic provisions of the EB-5 Loan Agreement, the Limited Partnership Agreement and the Florida Revised Uniform Partnership Act of 2005 in carrying out the conversion of the Developer from a Florida LLC to the New LLC.

d.      ***Fourth,*** Mastroianni's direct involvement in the unlawful conduct alleged herein negates the presumption that they could have considered a pre-suit demand in an objective, disinterested manner.

e.      ***Fifth,*** Mastroianni created and controlled each of the other entities that comprise the Harbourside Group, which also participated in the unlawful, unfair, and fraudulent conduct alleged herein, and are subject to personal liability for their actions in connection with that conduct. These facts also negate the presumption that Mastroianni could have considered a pre-suit demand in an objective, disinterested manner

f.      ***Sixth,*** Mastroianni and entities that are part of the Harbourside Group have already been named as defendants in a related action that was filed by 79 individual EB-5 Investors in Palm Beach County Circuit Court in or about October 11, 2018. *See Fu v. Mastroianni,* No. 502018CA012883 (Palm Beach Cir. Ct, 15th Jud. Cir.). Under the circumstances, Mastroianni would have been unable to evaluate a pre-suit demand with the requisite disinterest and independence, much less exercise disinterested business judgment.

## CLASS ALLEGATIONS

69.      Plaintiffs bring this lawsuit as a Class action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

70.      The Class is defined as follows: All persons who invested in the Funding Partnership (*i.e.,* all Limited Partners). Excluded from this Class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees; the Court and its staff; and any Limited Partner who has entered into an enforceable agreement to settle, waive, or otherwise resolve their claims against Defendants.

71.      Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether class certification is appropriate.

72.      The Class satisfies the requirements of Rule 23(a), as well as 23(b)(3).

73.      **NUMEROSITY**. The Class consists of approximately 199 geographically dispersed individual Limited Partners. Joinder of the Class members is not practicable. The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

74.      **ASCERTAINABILITY**. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by the

Developer and the General Partner. Notice of this action can thus be provided to all members of the proposed Class.

75.    **TYPICALITY**. Plaintiffs were investors in the Harbourside Project at the time of the wrongdoing alleged herein. Plaintiffs' claims are typical of the claims of all proposed Class members as all Limited Partners are similarly affected by Defendants' wrongful conduct as complained of herein.

76.    **ADEQUACY**. Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the proposed Class, and have retained competent counsel who are experienced in class-action and derivative litigation, including that pertaining to breaches of fiduciary duty, breaches of contract, conversion, and other claims like those alleged herein. Plaintiffs have no interests antagonistic to or in conflict with other members of the proposed Class.

77.    **COMMONALITY AND PREDOMINANCE**. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. The questions of law and fact common to the Class include, but are not limited to, the following:

a.    Whether Defendants breached their fiduciary duties to the proposed Class;

b.    Whether Defendants converted the property of the proposed Class; and

c.    Whether Defendants engaged in civil theft in violation of F.S.A. § 812.014.

78.    The Class may be certified under Rule 23(b)(3). Questions of law or fact common to proposed Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote

efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this action as a Class action.

## CLAIMS FOR RELIEF

### COUNT I
#### DECLARATORY RELIEF ON BEHALF OF THE FUNDING PARTNERSHIP

79.     This Count is brought derivatively on behalf of the Funding Partnership against Defendants Mastroianni, the General Partner, and the Developer pursuant to Federal Rule of Civil Procedure 57 for the purpose of obtaining a judicial declaration of the parties' respective rights and duties.

80.     Plaintiffs have alleged that Defendants' exercise of the conversion provisions of the EB-5 Loan Agreement were improper as a matter of law due to the existence of multiple uncured Events of Default that resulted from Defendants' conduct in in connection with the Mortgage Loan and the Revolving Loan, as described in paragraphs 33 to 39, above.

81.     In short, the EB-5 Loan Agreement permitted the Developer to take additional loans only if the Funding Partnership's loan amounted to less than $100,000,000, and even then the Developer was permitted to borrow no more than a total of $110,000,000, including the funds raised for the EB-5 Loan. Moreover, the Developer's use of the loan proceeds was limited to the "purchase, development, construction and operation of Harbourside Place."

82.     Nonetheless, as alleged in paragraphs 33 to 39, above, Mastroianni caused the Developer to breach each of these provisions, which constitute Events of Default under paragraph 15 of the EB-5 Loan Agreement, which have never been cured or waived, thereby precluding the Developer's right to convert the loan principal to equity in the Developer. In addition, Defendants

failed to circulate notice to the Limited Partners, as required by Section 17.3 of the Limited Partnership Agreement.

83.     Defendants dispute these allegations, contending, *inter alia,* that "[a]ny alleged default was cured by payment prior to the debt conversion, which each Plaintiff accepted without protest or reservation." Therefore, an actual controversy has arisen and now exists between Plaintiffs and Defendants. Accordingly, Plaintiffs hereby request a judicial declaration of the rights and duties of the parties with respect to the foregoing issues in controversy.

## COUNT II
### DECLARATORY RELIEF ON BEHALF OF PLAINTIFFS AND THE OTHER LIMITED PARTNERS

84.     This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Mastroianni, the General Partner, and the Developer pursuant to Federal Rule of Civil Procedure 57 for the purpose of obtaining a judicial declaration of the parties' respective rights and duties in connection with the allegations set forth in paragraph 47 to 62, above.

85.     Plaintiffs have alleged that Defendants' decision to convert the Developer from a Florida LLC to a Delaware LLC was not mentioned in the plan of conversion discussed in the Offering Documents, hence it required a vote by the Limited Partners in accordance with Section 620.2103 of the Florida Revised Uniform Partnership Act of 2005. Moreover, the plan to convert the Developer from a Florida LLC to a Delaware LLC constituted an "Other Investment," as that term is defined by the Limited Partnership Agreement, which required unanimous approval by the Limited Partners. Plaintiffs have also alleged that Mastroianni and the General Partner failed to seek or obtain the requisite approval from the Limited Partners, but proceeded with the plan to convert the Developer to a Delaware LLC nonetheless, thereby rendering the conversion invalid.

86.     Plaintiffs also allege that the conversion provision of the EB-5 Loan Agreement calls for converting the loan principal into units of common membership interest in the Developer

as a Florida LLC, but that Mastroianni and the Developer converted the loan principal into a single unit of membership in the Developer after it had become a Delaware LLC, and that the unit of membership was issued to the Funding Partnership, which prevented the Limited Partners from exercising rights of membership in the Developer they would have had if the Developer had remained a Florida LLC and they had received units of common membership interest, as contemplated by the Offering Documents.

87.     Defendants dispute these allegations. Therefore, an actual controversy has arisen and now exists between Plaintiffs and Defendants. Accordingly, Plaintiffs hereby request a judicial declaration of the rights and duties of the parties with respect to each of the foregoing issues in controversy.

### COUNT III
### BREACH OF FIDUCIARY DUTIES OWED TO THE FUNDING PARTNERSHIP

88.     This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Mastroianni and the General Partner.

89.     Defendants are fiduciaries of the Funding Partnership and they owed a duty to conduct its business loyally, faithfully, carefully, diligently, and prudently.

90.     In blatant disregard for his fiduciary duties and for the conflicts of interests resulting from roles as a Principal of the Harbourside Group, as manager of the General Partner, and as manager of the Developer, Mastroianni breached his fiduciary duties to the Funding Partnership by, *inter alia*, engaging in the following conduct:

a.     failing to make any effort to obtain a loan and/or sell some or all of Harbourside Place as a means of repaying the loan principal to the Funding Partnership on or after the Maturity Date (November 30, 2017);

b.      failing to repay the $99,500,000 loan principal to the Funding Partnership on the Maturity Date;

c.      causing the Developer to improperly invoke the conversion provisions of the EB-5 Loan Agreement notwithstanding the existence of multiple Events of Default;

d.      causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

e.      causing the Developer to be converted from a Florida LLC (in which members are guaranteed voting rights) into the New LLC; and

f.      creating the New Senior Lender with funds from a different EB-5 Project, thereby ensuring that the Developer would continue to be saddled with debt after the Funding Partnership was made a member of the Developer, while Mastroianni profited from that debt.

91.    Mastroianni and the General Partner breached their fiduciary duties to the Funding Partnership by, *inter alia*, acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval of that plan, and by failing to take any action to protect the interests of the Funding Partnership in response to the conduct described above.

92.    Such conduct and inaction contravened Defendants' duty to promote the interests of the Funding Partnership, and could not have been a good-faith exercise of disinterested business judgment.

93.    As a direct and proximate result of Defendants' conduct, the Funding Partnership has been damaged in amounts that will be proved at trial.

94.     In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership with a conscious disregard of their fiduciary duties, which entitles the Funding Partnership to an award of punitive and exemplary damages.

**COUNT IV**
**BREACH OF FIDUCIARY DUTIES OWED TO PLAINTIFFS AND THE OTHER LIMITED PARTNERS**

95.     This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Mastroianni and the General Partner.

96.     Defendants are fiduciaries of Plaintiffs and the other Limited Partners, and they owed a duty to conduct the business of the General Partner and the Funding Partnership loyally, faithfully, carefully, diligently, and prudently.

97.     In blatant disregard for his fiduciary duties and for the conflicts of interests resulting from roles as a Principal of the Harbourside Group, as manager of the General Partner, and as manager of the Developer, Mastroianni breached his fiduciary duties to Plaintiffs and the other Limited Partners by, *inter alia*, engaging in the following conduct:

a.     failing to make any effort to obtain a loan and/or sell some or all of Harbourside Place as a means of repaying the loan principal to the Funding Partnership on or after the Maturity Date;

b.     failing to repay the $99,500,000 loan principal to the Funding Partnership on the Maturity Date;

c.     causing the Developer to improperly invoke the conversion provisions of the EB-5 Loan Agreement notwithstanding the existence of multiple Events of Default;

      d.     causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

      e.     using funds from other EB-5 Projects to purchase over $60,000,000 in Senior Loans to the Developer, thereby ensuring that the Developer continued to be saddled with debt represented by the New Senior Loan so Defendants could profit from it; and

      f.     causing the Developer to be converted from a Florida LLC (in which members are guaranteed voting rights) into the New LLC.

98. Mastroianni and the General Partner breached their fiduciary duties to the Funding Partnership by, *inter alia*, engaging in the following conduct:

      g.     acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval;

      h.     causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

      i.     acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval; and

      j.     failing to take any action to protect the interests of Plaintiffs and the other Limited Partners in response to the conduct described above.

99.     Such conduct and inaction contravened Defendants' duty to promote the interests of the Funding Partnership, and could not have been a good-faith exercise of disinterested business judgment.

100.    As a direct and proximate result of Defendants' conduct, the Funding Partnership has been damaged in amounts that will be proved at trial.

101.    In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership with a conscious disregard of their fiduciary duties, which entitles the Funding Partnership to an award of punitive and exemplary damages.

### COUNT V
### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY TO THE FUNDING PARTNERSHIP

102.    This Count is brought derivatively on behalf of the Funding Partnership against Defendants Regional Center and the Developer.

103.    As alleged in Count III, above, Defendants Mastroianni and the General Partner had fiduciary duties to the Funding Partnership, and Defendants breached those duties for the reasons described therein.

104.    The Regional Center and the Developer, with knowledge of Mastroianni and the General Partner's breaches of fiduciary duty, aided and abetted, provided substantial assistance, and encouraged those breaches of duty.

105.    As a proximate result of Defendants' conduct, the Funding Partnership has been damaged in amounts that will be proved at trial.

106.    In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent

to vex and injure the Funding Partnership with a conscious and intentional disregard of its rights, which entitles the Funding Partnership to an award of punitive and exemplary damages.

### COUNT VI
### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY TO PLAINTIFFS AND THE OTHER LIMITED PARTNERS

107.    This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Regional Center and the Developer.

108.    As alleged in Count IV, above, Defendants Mastroianni and the General Partner had fiduciary duties to Plaintiffs and the other Limited Partners, and Defendants breached those duties.

109.    The Regional Center and the Developer, with knowledge of Mastroianni and the General Partner's breaches of fiduciary duty, aided and abetted, provided substantial assistance, and encouraged those breaches of duty.

110.    As a proximate result of Defendants' conduct, Plaintiffs and the other Limited Partners have been damaged in amounts that will be proved at trial.

111.    In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure Plaintiffs and the other Limited Partners with a conscious and intentional disregard of their rights, which entitles Plaintiffs and the other Limited Partners to an award of punitive and exemplary damages.

## COUNT VII
### BREACH OF CONTRACT

112.    This Count is brought derivatively on behalf of the Funding Partnership against the Developer.

113.    The Funding Partnership entered into the EB-5 Loan Agreement with the Developer on or about September 1, 2011.

114.    The Funding Partnership did all, or substantially all, of the significant things that the EB-5 Loan Agreement required it to do.

115.    All conditions required for the Funding Partnership's performance had occurred when it deposited the proceeds from the sale of units of membership in the Funding Partnership, the aggregate amount of which was $99,500,000, into the escrow account for the purpose of funding the EB-5 Loan.

116.    The EB-5 Loan Agreement prohibited the Developer from borrowing more than a total of $110,000,000, including the funds the Developer borrowed under the EB-5 Loan.

117.    The EB-5 Loan Agreement restricted the Developer from using funds from the EB-5 Loan for any purpose other than the payment of interest to the Funding Partnership and to pay for the cost of construction of the Harbourside Project.

118.    Notwithstanding the foregoing provisions of the EB-5 Loan Agreement, the Developer (a) borrowed nearly $13 million from Putnam in or about July 2012, (b) used EB-5 Loan funds to repay some or all of those loans; and (c) continued to borrow from Putnam while the General Partner was still selling units of membership in the Funding Partnership.

119.    The Developer's conduct, as alleged in paragraphs 33 to 62, above, constituted multiple Events of Default, as defined by the EB-5 Loan Agreement, which precluded the Developer from exercising the conversion provisions of the EB-5 Loan Agreement.

120.    The Developer breached its obligations under the EB-5 Loan Agreement, which required the Developer to repay the EB-5 Loan on the Maturity Date. Notwithstanding the existence of this and other Events of Default that had occurred, which the Developer did not cure and the Funding Partnership did not waive, the Developer failed to repay the EB-5 Loan and purported to invoke the conversion provisions of the EB-5 Loan Agreement instead.

121.    As a proximate result of the Developer's breaches of contract, the Funding Partnership has been damaged in an amount equal to the $99,500,000 agreed to return to the Partnership on the Maturity Date, plus applicable interest.

### COUNT VIII
### CONVERSION

122.    This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Mastroianni and the Developer.

123.    Defendants have engaged in acts of dominion wrongfully asserted over the Limited Partners' property—namely, the $500,000 that Plaintiffs and other Limited Partners each deposited in escrow, which amounted to an aggregate deposit of $99,500,000, for the purpose of funding the EB-5 Loan (the "Property")—in a manner inconsistent with Plaintiffs and the other Limited Partners' ownership and immediate right of possession of the Property.

124.    Specifically, Defendants explained in the Offering Memorandum that the EB-5 Loan would be repaid "within five years from the date the last potential investor submits his or her I-526 Petition to USCIS, or, no later than November 30, 2012, as determined by the Partnership in good faith." To ensure repayment, the Developer was to "[r]efinance the Loan with an institutional lender" and/or "[r]epay the Loan with the proceeds of a sale of all or a portion of Harbourside Place."

125.     Thus, Plaintiffs and the other Limited Partners had an immediate right of possession of their $500,000 investments as of the EB-5 Loan's Maturity Date—November 30, 2017—regardless of the EB-5 Program's requirement that each EB-5 investor' funds be "at risk" during the pendency of the I-829 Petition. By that date, Plaintiffs and most, if not all, of the other Limited Partners' I-829 Petitions had been granted and, because EB-5 investors are free to withdraw from the EB-5 Program if they no longer seek permanent residency status, any Limited Partner whose I-829 Petition had not been granted had the right to withdraw and to the repayment of his or her $500,000.

126.     Defendants did not ask any Limited Partner whose I-829 Petitions had yet to be granted whether he or she wished to receive repayment, regardless of whether doing so would preclude them from receiving permanent residency status. Nor did Defendants even attempt to repay the EB-5 Loan. Defendants made no effort to refinance the EB-5 Loan with an institutional lender, and no effort to sell all or a portion of Harbourside Place, despite their obligation to do so. Instead, Defendants ignored the prohibition against invoking the conversion provision of the EB-5 Loan and proceeded to invoke it anyway for the purpose of retaining possession of Plaintiffs and other Limited Partners' Property.

127.     Defendants' conduct, as alleged herein, deprived Plaintiffs and the other Limited Partners of the Property permanently or for an indefinite period of time.

128.     As a proximate cause of Defendants' unlawful conduct, Plaintiffs and the other Limited Partners have each been damaged by the deprivation of their Property, which amounts to $500,000 each, plus applicable interest.

## COUNT IX
## CIVIL THEFT

129.     This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Mastroianni and the Developer.

130.     Plaintiffs and the other Limited Partners each deposited $500,000 in escrow, which amounted to an aggregate deposit of $99,500,000, for the purpose of funding the EB-5 Loan (*i.e.,* the Property).

131.     To deprive Plaintiffs and the other Limited Partners of their Property when it was due to be returned to each of them, Defendants knowingly and in violation of F.S.A. § 812.014 participated in a scheme by which they improperly invoked the conversion provisions of the EB-5 Loan Agreement to transform the Property into an illiquid investment that was, at best, an indirect interest that was devoid of any rights, control, or reasonable return.

132.     As a result of this brazenly deceptive transaction, Mastroianni, with criminal intent, used his control of the General Partner and the Developer to knowingly and intentionally obtain the Property belonging to Plaintiffs and members of the proposed class for the purpose of depriving them of their Property.

133.     Mastroianni intended to appropriate and/or has appropriated the Property to his own use without any legitimate entitlement to those funds.

134.     Mastroianni's actions were the product of a scheme of deceit and theft.

135.     Defendants intentionally violated Florida Statute § 812.014, which prohibits theft.

136.     As a result of Defendants' violation of Florida Statute § 812.014, Plaintiffs and the other Limited Partners have been injured and have lost at least $500,000 each.

137.     On December 23, 2019, before the filing of the original Complaint, Plaintiffs made written demand for payment and return the Property in accordance with F.S.A. § 772.11.

138.    Defendants have yet to agree to return the Property to Plaintiffs or other Limited Partners or to pay treble damages for their theft of it.

139.    Plaintiffs and the other Limited Partners have been injured because of Defendants violations of F.S.A. § 812.014.

140.    Pursuant to F.S.A. § 772.11(a), Defendants are liable to Plaintiffs and the other Limited Partners in the amount of three times the value of the funds Defendants have stolen from them.

141.    Plaintiffs and the other Limited Partners are entitled to recover reasonable attorneys' fees and costs, as well as accrued interest, as a result of Defendants' civil theft.

**COUNT X**
**ACCOUNTING**

142.    This Count is brought derivatively on behalf of the Funding Partnership against Defendants Mastroianni, the General Partner and the Developer.

143.    Plaintiffs seek an equitable accounting of the accounts, assets, and liabilities of the Funding Partnership.

144.    Mastroianni, as Principal of the Harbourside Group and acting by and for the General Partner, the Developer, and the Regional Center as those entities' manager, has engaged in self-dealing and have mismanaged the business and affairs of the Funding Partnership and the Developer in the manner alleged herein, thereby placing the Funding Partnership's assets at undue risk due to the Funding Partnership having become a member of the Developer.

145.    Plaintiffs do not have an adequate remedy at law because Defendants have control over the accounts, records, and assets of the Funding Partnership and the Developer.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals, and derivatively on behalf of the Funding Partnership, demand judgment against Defendants as follows:

(1)      declaring this action to be a proper class action maintainable pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and   23(b)(3), and to be a proper derivative action maintainable pursuant to Federal Rule of Civil Procedure 23.1 and declaring Plaintiffs and their counsel to be representatives of and counsel for the proposed class;

(2)      declaring that Defendants' exercise of the conversion provisions of the EB-5 Loan Agreement, as alleged in Count I;

(3)      declaring that the conversion of the Developer from a Florida limited liability company to a Delaware limited liability company, was invalid and void, as alleged in Count II;

(4)      awarding compensatory and punitive damages for Defendants' breaches of fiduciary duty, as alleged in Count III;

(5)      awarding compensatory and punitive damages for Defendants' breaches of fiduciary duty, as alleged in Count IV;

(6)      awarding compensatory and punitive damages for Defendants' aiding and abetting breaches of fiduciary duty, as alleged in Count V;

(7)      awarding compensatory and punitive damages for Defendants' aiding and abetting breaches of fiduciary duty, as alleged in Count VI;

(8)      awarding compensatory damages for Defendants breaches of contract, as alleged in Count VII;

(9)     awarding compensatory and punitive damages for Defendants' conversion of the Property, as alleged in Count VIII;

(10)    awarding treble damages and attorney fees and costs as a result of Defendants' civil theft, as alleged in Count IX; and

(11)    an accounting of the Funding Partnership and the Developer's assets, as alleged in Count X;

(12)    awarding Plaintiffs and members of the proposed class attorney fees and costs pursuant to the common fund doctrine and F.S.A. § 772.1(a);

(13)    awarding the Funding Partnership, Plaintiffs and the members of the proposed class prejudgment interest at the maximum rate allowable by law; and

(14)    awarding such other and further relief the Court deems just, proper and equitable.

Dated: APRIL 7, 2020                              Respectfully submitted,

                                                  by /s/ *Matthew Fornaro*

                                                  Matthew Fornaro (mfornaro@fornarolegal.com)
                                                  Florida Bar No. 0650641
                                                  **MATTHEW FORNARO, P.A.**
                                                  11555 Heron Bay Boulevard, Suite 200
                                                  Coral Springs, FL 33076
                                                  T: 954-324-3651
                                                  F: 954-248-2099

                                                  Jeffrey L. Fazio (jfazio@dehengsv.com)
                                                  Admitted *Pro Hac Vice*
                                                  **DEHENG LAW OFFICES**
                                                  Silicon Valley Office
                                                  7901 Stoneridge Drive, Suite 208
                                                  Pleasanton, CA 94588
                                                  T: 925-399-5856
                                                  F: 925-397-1976

                                                  *Counsel for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and the proposed Class of Limited Partners, and deriviatively on behalf of the Funding Partnership, hereby request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: APRIL 7, 2020

Respectfully submitted,

by /s/ *Matthew Fornaro*

Matthew Fornaro (mfornaro@fornarolegal.com)
Florida Bar No. 0650641
**MATTHEW FORNARO, P.A.**
11555 Heron Bay Boulevard, Suite 200
Coral Springs, FL 33076
T: 954-324-3651
F: 954-248-2099

Jeffrey L. Fazio (jfazio@dehengsv.com)
Admitted *Pro Hac Vice*
**DEHENG LAW OFFICES**
Silicon Valley Office
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-5856
F: 925-397-1976

*Counsel for Plaintiffs*

## VERIFICATION

I, Ting Peng, under penalty of perjury, state as follows:

I am one of the Plaintiffs in the above-captioned action. I have read the foregoing First Amended Complaint and have authorized its filing. Based on the investigation of my counsel, the facts alleged in the Complaint are true to the best of my knowledge, information, and belief.

Dated: April 6, 2020

Ting Peng

_____
Ting Peng

<u>VERIFICATION</u>

I, Lin Fu, under penalty of perjury, state as follows:

I am one of the Plaintiffs in the above-captioned action. I have read the foregoing First Amended Complaint and have authorized its filing. Based on the investigation of my counsel, the facts alleged in the Complaint are true to the best of my knowledge, information, and belief.

Dated:  April 6, 2020

_____
Lin Fu

**44**



EXHIBIT 1

Offeree:  LIN, Fu                                          Number:  B-0119

# CONFIDENTIAL PRIVATE OFFERING

# SUBSCRIPTION DOCUMENTS

## HARBOURSIDE FUNDING, LP

## (a Florida Limited Partnership)

### Up to $100,000,000

### Up to 200 Units of Limited Partnership Interest

### Dated November 1, 2010

#### Revision date: September 2, 2011

**HARBOURSIDE FUNDING, LP**

**TABLE OF CONTENTS**

**OF**

**SUBSCRIPTION DOCUMENTS**

<u>Tab</u>      <u>Document</u>

1.      Subscription Instructions

2.      Confidential Offering Memorandum

       List of Exhibits

       A.      Limited Partnership Agreement

       B.      Subscription Agreement

       C.      Charts Summarizing the Immigration and Investment Procedures

       D.      Escrow Agreement

       E.      Rendering, Aerial Photo and Area Maps for Harbourside Place

       F.      Amended and Restated Convertible Loan Agreement

**HARBOURSIDE FUNDING, LP**

**SUBSCRIPTION INSTRUCTIONS**

**Step 1          Deposit and Preliminary Information**

If you are interested in making this investment, please do the following:

1.   Complete and sign a Pre-Subscription Letter Agreement and Investor Suitability Questionnaire; deliver one copy of each signed document to the General Partner by fax to +1 561 799 0061 or by email to subscriptions@HarboursideFunding.com;

2.   Provide legible copies of your **passport** and **one** of the following to the General Partner by fax to +1 561 799 0061 or by email to subscriptions@HarboursideFunding.com:
   - Credit Card
   - Student Identification Card
   - Workplace Identification Card
   - Non-US Driver's License

**Step 2          Document Execution**

After the General Partner has confirmed in writing that you may proceed with the investment, please do the following:

| | | |
|---|---|---|
| 1. | Subscription Agreement: | Review carefully, complete and sign. |
| 2. | Accredited Investor Questionnaire, IRS Forms W-7 and W-8BEN (attached to the Subscription Agreement) | Review carefully, complete and sign. |
| 3. | Limited Partnership Agreement | Review carefully, complete and sign. |
| 4. | Escrow Agreement | Review carefully. |

**Step 3          Delivery of Executed Documents and Funds**

After you have signed the documents, please do the following:

1.   Deliver one copy of each signed document to the General Partner by email to subscriptions@HarboursideFunding.com;

2.   Deliver one original of each signed document by courier to Harbourside Funding GP, LLC, 11770 US Highway One, Suite 301, Palm Beach Gardens, FL 33408, Attention: Managing Member; and

3.   For each Unit to be purchased, wire transfer $540,000 to the Escrow Agent as payment of (i) the subscription price for each Unit and (ii) the $40,000 Administrative Fee as follows:

>   CITIBANK, N.A.
>   SWIFT ID: CITIUS33 (For use when remitting funds from outside the U.S.)
>   ABA: 0210-0008-9 (For use when remitting funds from within the U.S.)
>   Account Name: # 36935369 FRC/Harbourside Funding Concentration Account
>   CREDIT A/C No.: Reference: #798622 FRC/Harbourside Funding Escrow Account

**THIS OFFERING MEMORANDUM, ITS EXHIBITS AND CERTAIN OTHER DOCUMENTS RELATED THERETO HAVE BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL**

## HARBOURSIDE FUNDING, LP

**Private Offering of a Maximum of**

**200 Limited Partnership Units**

**US $540,000 per Limited Partnership Unit**

**(comprising $500,000, plus $40,000 of issue expenses per Unit)**

**Dated November 1, 2010**

**Revision date: September 2, 2011**

## CONFIDENTIAL OFFERING MEMORANDUM

This Confidential Memorandum (the "Memorandum") has been prepared solely for, and is being delivered on a confidential basis to, potential investors considering the purchase of units of limited partnership interest (the "Units") in Harbourside Funding, LP (the "Partnership"). The offering of Units pursuant to this Memorandum is referred to as the "Offering." Any reproduction or distribution of this Memorandum, in whole or in part, or the disclosure of its contents, without the prior written consent of Harbourside Funding GP, LLC (the "General Partner"), is prohibited and all recipients agree they will keep confidential all information contained herein and not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Partnership.   By accepting this Memorandum, each potential investor agrees to the foregoing.

The Partnership is part of a group of legal entities (the "Harbourside Group") established to build and operate Harbourside Place in Jupiter, Florida ("Harbourside Place"). Harbourside Place is an approximately 300,000 square foot mixed-use commercial complex to be constructed on waterfront property with a gross surface area of approximately 9.6 acres located at the northeast quadrant of Indiantown Road and US Highway One. Harbourside Place is expected to comprise a four-star hotel, offices, restaurants, retail space, marina, amphitheater and spa. Harbourside Place is part of a 2.5-mile waterfront promenade connecting a series of entertainment, retail and residential complexes along a pedestrian waterfront walkway.

The Partnership was formed to make investments through the United States EB-5 immigrant investor program (the "Pilot Program"), which grants lawful permanent resident status in the United States to individuals who make qualifying investments under the provisions of the United States Immigration and Nationality Act (the "Act"). See U.S.C. §1153(b)(5)(a)(i)-(iii) and (c). Under the Act, all investments made by the Partnership through the Pilot Program must be in one or more qualifying capital investment projects that are projected to create the required number of jobs in a Targeted Employment Area ("TEA") as part of a regional center, each such investment termed a "Qualifying Investment." See "Pilot Program" section beginning on page 1.

The Harbourside Group is under the ultimate control of Nicholas A. Mastroianni II and Richard L. Yellen (collectively, the "Principals"). See "Harbourside Group" section beginning on page 5 and "Conflicts of Interest" section beginning on page 34. The following legal entities comprise the Harbourside Group:

- Allied Capital and Development of South Florida, LLC ("Allied"), a Florida-based developer of commercial and residential real estate and the initial developer of Harbourside Place;

- Jupiter Waterways, LLC ("Jupiter Waterways"), a Florida limited liability company, owned in part by the Principals; Jupiter Waterways is the current owner of a portion of the land and related entitlements on which Harbourside Place is to be constructed;

- Florida Regional Center, LLC (the "Regional Center Administrator"), a newly formed Florida limited liability company, owned by the Principals; the Regional Center Administrator has received and will administer the "regional center" designation under the Pilot Program;

- Harbourside Place, LLC (the "Developer"), a newly formed Florida limited liability company, owned by the Principals; the Developer will purchase from Jupiter Waterways certain of the land and related entitlements on which Harbourside Place will be constructed and will develop, construct and operate Harbourside Place;

- The Partnership, a newly formed Florida limited partnership that, using the proceeds of the Offering, will make a convertible loan (the "Loan") to the Developer to finance the purchase, development, construction and operation of Harbourside Place; and

- Harbourside Funding GP, LLC (the "General Partner"), a newly formed Florida limited liability company, owned by the Principals and managed on their behalf by R. Bowen Gillespie, an attorney for the Principals; the General Partner will serve as general partner of the Partnership.

Construction of Harbourside Place began in July 2011 using the proceeds of an approximately $3.7 million unsecured loan (the "CRA Loan") made available to Jupiter Waterways by The Jupiter Community Redevelopment Agency (the "CRA"), together with a $1.865 million Florida Inland Navigation District grant.

Potential investors should make their own investigation of the investment described herein, including the merits and risks involved and the legality and tax consequences of such an investment. Each potential investor should make his or her own inquiries and consult his or her advisors as to the Partnership and this Offering and as to legal, tax and related matters concerning an investment in the Units.

Notwithstanding anything to the contrary in this Memorandum, each potential investor (and each employee, representative, or other agent of such potential investor) may disclose to any and all persons, without limitation of any kind, the tax structure and tax treatment of the Partnership and all materials of any kind (including opinions or other tax analyses) that are provided to the potential investor relating to such tax structure and tax treatment, provided, however, that such disclosure shall not include the name (or other identifying information not relevant to the tax structure or tax treatment) of any person and shall not include information for which nondisclosure is reasonably necessary in order to comply with applicable securities laws.

Potential investors receiving this Memorandum have completed an initial Investor Suitability Questionnaire and delivered it to the General Partner together with other preliminary information. The General Partner will give potential investors the opportunity to ask questions of and receive answers and additional information from it and its representatives concerning the Offering and other relevant matters. None of the Harbourside Group or their respective affiliates, officers, directors, members, employees, agents or advisers (the "Harbourside Parties") is making any representation or warranty to any potential investor regarding the legality of an investment in the Partnership by such potential investor or about the income and other tax consequences to them of such an investment. For answers to those questions, potential investors should consult their personal legal counsel and tax advisors.

This Memorandum was prepared solely for use by potential investors in connection with the Offering. The Harbourside Parties expressly disclaim any representation or warranty regarding involvement in or responsibility for any forward looking statements contained in this Memorandum.  None of the Harbourside Parties is acting as investment adviser to potential purchasers in connection with the Units offered in this Memorandum. Potential investors must make their own investment decisions.

iv

Each Unit is offered at a total price of $540,000, being the minimum $500,000 capital investment required pursuant to the Pilot Program, plus issue expenses of $40,000 (the "Administrative Fee"). In the event that actual issue expenses, including for example legal, accounting, printing, escrow and overseas marketing expenses, are more than $40,000 per Unit, the excess will be borne by the General Partner and in the event that such issue expenses are less than such amount, the difference will be paid to the General Partner.

In order to invest in the Pilot Program through the Partnership, a potential investor must meet investor criteria set forth in this Memorandum (see "Potential Investors" section beginning on page 1), follow the subscription procedures required in this Memorandum (see "Subscription Procedures" section beginning on page 20), and complete the required immigration procedures (see "Immigration Procedures" section beginning on page 2). The Partnership Agreement governs the rights and obligations of each holder of Units, and the Principals will manage the Partnership through the General Partner (see "Management of Partnership" section beginning on page 17). The Partnership Agreement, the Subscription Agreement and a diagram of the visa application and investment processes are attached to this Memorandum as Exhibits A, B and C, respectively.

Provided a potential investor meets the "Investor Criteria" and follows the "Subscription Procedures," the General Partner may, at its discretion, notify the potential investor to deliver the full $500,000 subscription price per Unit, together with the $40,000 Administrative Fee per Unit, to an escrow account with Citibank, N.A. (the "Escrow Agent") to be held without interest or deduction pursuant to the Escrow Agreement among the Regional Center Administrator, the Partnership and the Escrow Agent attached to this Memorandum as Exhibit D.

There is no firm commitment by any person to purchase or sell any Units, and there is no assurance that any of the Units will be sold. The General Partner reserves the right to terminate the Offering prior to receipt into escrow of subscription proceeds totaling $25.0 million. Following receipt of this minimum amount of subscription proceeds, the Offering shall continue until either (a) all of the unsold Units are sold, or until (b) the General Partner closes the Offering. If the Offering is terminated, amounts deposited into the escrow will be refunded to potential investors.

At the direction of the General Partner, each potential investor will prepare and submit a Form I-526 Immigrant Petition by Alien Entrepreneur (an "I-526 Petition") for conditional permanent residence in the United States to the United States Citizenship and Immigration Service (the "USCIS"). Upon submission of a potential investor's I-526 Petition to USCIS evidenced by official notice from USCIS confirming receipt, the General Partner and the Regional Center Administrator may instruct the Escrow Agent to deliver the $40,000 Administrative Fee to the Regional Center Administrator. Upon approval by USCIS of a potential investor's I-526 Petition, the remaining funds held in escrow on account of that investor will be delivered to the Partnership, the potential investor will be issued the corresponding number of Units and the potential investor's investment will be final and irrevocable.

If a potential investor's I-526 Petition is denied, the $500,000 investment and $40,000 Administrative Fee will be returned to the potential investor, unless the denial resulted from the potential investor's fraud or misrepresentation, in which case the potential investor's $40,000 Administrative Fee will be forfeited.

Following approval of the I-526 Petition and issuance of a Unit to the investor, in the event that an investor's subsequent application for an immigrant visa is denied, the investor's $500,000 investment will remain invested in the Partnership and part of the Loan under the terms and subject to the conditions of the Partnership Agreement, and the $40,000 Administrative Fee will be non-refundable.

The Regional Center Administrator has retained legal counsel to advise it in connection with the Pilot Program and each investor's participation in and compliance with the Pilot Program. The same legal counsel is available to advise potential investors, although each potential investor is responsible for

retaining his or her own immigration legal counsel and for paying legal fees and expenses pursuant to the immigration process.

The Partnership's sole Qualifying Investment is anticipated to be the Loan to the Developer to finance the purchase, development, construction and operation of Harbourside Place. See "Loan Agreement" section beginning on page 14.

The Partnership believes the Loan will be deemed a Qualifying Investment under the Pilot Program due to the fact that USCIS has designated Palm Beach County, Florida, as the "Florida Regional Center" and the Regional Center Administrator has identified Harbourside Place as a capital investment project within a TEA located in the Florida Regional Center (together, the "USCIS Approvals").

The USCIS Approvals impose certain conditions on the Regional Center Administrator. If for any reason the Regional Center Administrator fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the USCIS Approvals, which may have an adverse impact on the Offering and on the status of an investor's ability to complete the required immigration procedures or to maintain his or her visa status. See "Pilot Program" section beginning on page 1.

This Memorandum, its exhibits, and certain other documents related thereto have been initially written in the English language; in the event of any conflict between the original English version and any translations into other languages, the original English version shall control.

THE UNITS OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR BY ANY SECURITIES REGULATORY AUTHORITY IN ANY OTHER JURISDICTION, NOR HAS ANY SUCH AUTHORITY OR COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE UNITS HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS OR THE LAWS OF ANY FOREIGN JURISDICTION. THE UNITS WILL BE OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND BY REGULATION S AND REGULATION D PROMULGATED THEREUNDER AND OTHER EXEMPTIONS OF SIMILAR IMPORT UNDER THE LAWS OF THE UNITED STATES AND OTHER JURISDICTIONS WHERE THE OFFERING WILL BE MADE.   THE PARTNERSHIP WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940 (THE "INVESTMENT COMPANY ACT") IN RELIANCE ON ONE OR MORE EXEMPTIONS THEREUNDER. CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT.

THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT") THE APPLICABLE STATE SECURITIES LAWS AND THE APPLICABLE LAWS OF ANY OTHER RELEVANT JURISDICTION PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. IN ADDITION, SUCH UNITS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, HEDGED OR HYPOTHECATED, IN WHOLE OR IN PART, EXCEPT AS PROVIDED IN THE PARTNERSHIP AGREEMENT.   ACCORDINGLY, INVESTORS WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE UNITS FOR AN INDEFINITE PERIOD OF TIME. THERE WILL BE NO PUBLIC MARKET FOR THE UNITS, AND THERE IS NO OBLIGATION ON THE PART OF ANY PERSON TO REGISTER THE UNITS UNDER THE SECURITIES ACT, THE EXCHANGE ACT, ANY STATE SECURITIES LAWS OR THE

SECURITIES LAWS OF ANY OTHER JURISDICTION. INVESTMENT IN THE UNITS INVOLVES SIGNIFICANT INVESTMENT RISKS, INCLUDING RISKS OF LOSS OF CAPITAL OR ENTIRE INVESTMENT.

THE UNITS ARE OFFERED SUBJECT TO PRIOR SALE, AND SUBJECT TO THE RIGHT OF THE GENERAL PARTNER TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART.  IN CONSIDERING THE PRIOR PERFORMANCE INFORMATION CONTAINED HEREIN, POTENTIAL INVESTORS SHOULD BEAR IN MIND THAT PAST PERFORMANCE IS NOT INDICATIVE OF FUTURE RESULTS, AND THERE CAN BE NO ASSURANCE THAT THE PARTNERSHIP WILL ACHIEVE COMPARABLE RESULTS. IN ADDITION, THERE CAN BE NO ASSURANCE THAT UNREALIZED INVESTMENTS WILL BE REALIZED AT THE VALUATIONS SHOWN AS ACTUAL REALIZED RETURNS WILL DEPEND ON, AMONG OTHER FACTORS, FUTURE OPERATING RESULTS, THE VALUE OF THE ASSETS AND MARKET CONDITIONS AT THE TIME OF DISPOSITION, ANY RELATED TRANSACTION COSTS, AND THE TIMING AND MANNER OF SALE, ALL OF WHICH MAY DIFFER FROM THE ASSUMPTIONS ON WHICH THE VALUATIONS CONTAINED HEREIN ARE BASED.

THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE LIMITED PARTNERSHIP AGREEMENT OF THE PARTNERSHIP (THE "PARTNERSHIP AGREEMENT"), THE SUBSCRIPTION AGREEMENT RELATED THERETO (THE "SUBSCRIPTION AGREEMENT") AND THE ESCROW AGREEMENT (THE "ESCROW AGREEMENT"). NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PARTNERSHIP, THE GENERAL PARTNER, THE HARBOURSIDE GROUP OR THE PRINCIPALS. STATEMENTS IN THIS MEMORANDUM ARE MADE AS OF THE DATE HEREOF UNLESS STATED OTHERWISE HEREIN, AND NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME, NOR ANY SALE HEREUNDER, SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO SUCH DATE.

THIS OFFERING WILL INCLUDE OFFERS OF THE UNITS TO NON-U.S. PERSONS OUTSIDE THE UNITED STATES PURSUANT TO REGULATION S PROMULGATED UNDER THE SECURITIES ACT. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY OTHER THAN THE UNITS OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO, INCLUDING, WITHOUT LIMITATION, ANY FOREIGN JURISDICTION. ADDITIONAL DISCLOSURE WITH RESPECT TO AN INVESTMENT IN THE PARTNERSHIP BY CERTAIN U.S. AND NON-U.S. PERSONS IS SET FORTH AT THE BACK OF THIS MEMORANDUM. THE PARTNERSHIP RESERVES THE RIGHT TO MODIFY ANY OF THE TERMS OF THE OFFERING AND THE UNITS DESCRIBED HEREIN.

CERTAIN INFORMATION CONTAINED HEREIN CONCERNING ECONOMIC TRENDS AND PERFORMANCE IS BASED ON OR DERIVED FROM INFORMATION PROVIDED BY INDEPENDENT THIRD PARTY SOURCES. THE PARTNERSHIP BELIEVES THAT SUCH INFORMATION IS ACCURATE AND THAT THE SOURCES FROM WHICH IT HAS BEEN OBTAINED ARE RELIABLE.  THE PARTNERSHIP CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION, HOWEVER, AND HAS NOT INDEPENDENTLY VERIFIED THE ASSUMPTIONS ON WHICH SUCH INFORMATION IS BASED.

CERTAIN INFORMATION CONTAINED IN THIS MEMORANDUM CONSTITUTES "FORWARD-LOOKING STATEMENTS," WHICH CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "WILL," "SHOULD," "EXPECT," "ANTICIPATE," "TARGET," "PROJECT," "ESTIMATE," "INTEND," "CONTINUE" OR "BELIEVE," OR THE NEGATIVES THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  DUE TO VARIOUS RISKS AND UNCERTAINTIES, ACTUAL EVENTS OR RESULTS OR THE ACTUAL PERFORMANCE OF THE FUND MAY DIFFER MATERIALLY FROM THOSE REFLECTED OR CONTEMPLATED IN SUCH FORWARD-LOOKING STATEMENTS.

THE HARBOURSIDE GROUP AND THE PRINCIPALS DO NOT PROVIDE ANY TAX ADVICE. ANY TAX STATEMENT HEREIN REGARDING ANY US FEDERAL TAX IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES.  ANY SUCH STATEMENT HEREIN WAS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTION(S) OR MATTER(S) TO WHICH THE STATEMENT RELATES. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.  ALL CURRENCIES WITHIN THE MEMORANDUM ARE IN US DOLLARS UNLESS OTHERWISE NOTED.

AN INVESTMENT IN THE PARTNERSHIP INVOLVES CERTAIN RISKS, INCLUDING WITH REGARD TO GENERAL ECONOMIC CONDITIONS, LOCAL ECONOMIC CONDITIONS IN THE TEA AND PARTICULAR RISKS RELATED TO THE TARGET BUSINESS (INCLUDING THE LOAN TO THE DEVELOPER), THAT INVESTMENT RETURNS MAY BE BELOW MARKET FOR SIMILAR INVESTMENTS, THAT SOME OR ALL OF THE INVESTOR'S CAPITAL MAY NOT BE RETURNED AND THAT THE UNITS REPRESENT AN ILLIQUID INVESTMENT WHICH CANNOT BE TRANSFERRED. POTENTIAL INVESTORS SHALL CONSIDER THE RISKS SET FORTH UNDER THE HEADING "RISK FACTORS" BEGINNING ON PAGE 25 OF THIS MEMORANDUM.

IN ADDITION, THERE CAN BE NO ASSURANCE THAT INVESTORS WILL OBTAIN FINAL IMMIGRATION STATUS UNDER THE ACT OR THAT THE JOBS REQUIRED TO BE CREATED AND MAINTAINED UNDER THE PILOT PROGRAM WILL BE ACHIEVED.

A POTENTIAL INVESTOR'S INVESTMENT IN THE UNITS MUST BE DERIVED WHOLLY FROM HIS OR HER PERSONAL ASSETS AND ARE ENTIRELY AT RISK. THE POTENTIAL INVESTOR MUST ESTABLISH THE SOURCE OF THE MONIES INVESTED SO THAT THE USCIS MAY DETERMINE THAT ALL MONIES PAID IN WERE BOTH LAWFULLY OBTAINED AND INVESTED. FOR FURTHER CERTAINTY, THERE IS NO DIRECT OR INDIRECT LOAN OR OTHER DEBT ARRANGEMENT CONTEMPLATED OR AVAILABLE BETWEEN THE PARTNERSHIP AND ANY POTENTIAL INVESTOR.

THE GENERAL PARTNER UNDERTAKES NO RESPONSIBILITY TO UPDATE THE INFORMATION CONTAINED IN THIS MEMORANDUM BEYOND THE STATED REVISION DATE OF THIS MEMORANDUM.

## **TABLE OF CONTENTS**

I.   POTENTIAL INVESTORS ................................................................................................ 1

II.   THE PILOT PROGRAM ................................................................................................ 1

III.   IMMIGRATION PROCEDURES ................................................................................... 2

IV.   USE OF PROCEEDS .................................................................................................... 5

V.   HARBOURSIDE GROUP ............................................................................................. 5

VI.   THE HARBOURSIDE PLACE PROJECT ................................................................... 6
  THE MARKET: PALM BEACH COUNTY, FLORIDA .......................................................... 7
  HARBOURSIDE PLACE / JUPITER RIVERWALK DISTRICT ............................................... 7
    Acquisition of the Property from Jupiter Waterways and the Town of Jupiter .................... 8
    Hotel Component .................................................................................................... 9
    Retail and Restaurant Component ............................................................................. 10
    Office Component ................................................................................................. 10
    Marina Component ................................................................................................ 11
    Parking Component ............................................................................................... 11
    Funding ............................................................................................................. 11
    General Contractor ............................................................................................... 13
    Architect ........................................................................................................... 13

VII.   CONSTRUCTION BUDGET ....................................................................................... 14

VIII.   LOAN AGREEMENT ................................................................................................ 14
  PURPOSE OF LOAN ................................................................................................... 14
  AMOUNT OF LOAN ................................................................................................... 15
  TERMS OF LOAN ...................................................................................................... 15
  RIGHT TO CONVERT LOAN PRINCIPAL AT MATURITY .................................................. 15
  DISBURSEMENT OF LOAN .......................................................................................... 16
  SECURITY ............................................................................................................... 17
  POTENTIAL SUBORDINATION TO ADDITIONAL LOAN ..................................................... 17

IX.   MANAGEMENT OF THE PARTNERSHIP ................................................................. 17

X.   INVESTMENT STRATEGY ........................................................................................ 18

XI.   RETURN OF CAPITAL .............................................................................................. 19

XII.   SUBSCRIPTION PROCEDURES ................................................................................ 20

XIII.   SUMMARY OF PARTNERSHIP AGREEMENT ....................................................... 22
  UNITS ARE ALL EQUAL .............................................................................................. 22
  PARTNERSHIP PURPOSE ............................................................................................. 22
  POWERS OF LIMITED PARTNERS .................................................................................. 22
  PARTNERSHIP CAPITAL .............................................................................................. 22
  PREFERRED RETURN .................................................................................................. 23
  ALLOCATIONS AND DISTRIBUTIONS ............................................................................ 23
  PARTNERSHIP EXPENSES ............................................................................................ 23
  LIMITED PARTNER DECISIONS .................................................................................... 24
  TERM AND TERMINATION .......................................................................................... 24
  INDEMNIFICATION .................................................................................................... 24
  TRANSFERABILITY OF INTERESTS AND WITHDRAWAL .................................................. 24
  REPORTS ................................................................................................................ 24

AMENDMENTS ........................................................................................................................24

XIV.    RISK FACTORS ...........................................................................................................25
Risks Relating to Real Estate and Financing of Real Estate...............................................25
Risks Related to the Offering and the Units ......................................................................28
Risks Related to the Regional Center Designation and Visa Process..................................30
Risks Related to Performance and Management of Harbourside Group ............................31
Legal, tax and regulatory risks.........................................................................................33

XV.     CONFLICTS OF INTEREST .........................................................................................34
Acquisition of the Primary Property from Jupiter Waterways, LLC ...................................35
Diverse Membership .......................................................................................................35
Management of the Partnership .......................................................................................35
Lack of Separate Representation ......................................................................................35

XVI.    INCOME TAX CONSIDERATIONS................................................................................36

XVII.   TAX AND LEGAL ASPECTS .......................................................................................36

XVIII.  RESTRICTIONS ON TRANSFERABILITY ....................................................................36

This Memorandum, its exhibits, and certain other documents related thereto have been initially written in the English language; in the event of any conflict between the original English version and any translations into other languages, the original English version shall control.

## I.   POTENTIAL INVESTORS

The Units will be offered and sold without registration under the Securities Act or any state securities laws or the laws of any foreign jurisdiction only as follows (the "Investor Criteria"):

- outside the United States, in reliance upon Regulation S promulgated under the Securities Act, only to persons who are not "U.S. Persons" within the meaning of Regulation S and only to persons who are "Accredited Investors;" and/or

- within the United States, in reliance upon Section 4(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, only to persons who are "Accredited Investors."

Units will not be offered or sold to any person in any place except as set forth above. Any person wishing to buy a Unit outside the United States will be required to demonstrate that he or she is both a non-U.S. Person and an Accredited Investor. Any person wishing to buy a Unit within the United States will be required to demonstrate that he or she is both a U.S. Person and an Accredited Investor. Any person wishing to buy a Unit will be required to certify that he or she will only resell the Units pursuant to either the registration requirements under the Securities Act or exemptions from such registration requirements. This Memorandum does not constitute an offer to sell to, or a solicitation of an offer to buy from, any person in any jurisdiction to whom such an offer or solicitation would be unlawful.

For the purposes of this Memorandum, "Accredited Investor" means any person who comes within any of the following categories, or whom the General Partner reasonably believes comes within any of the following categories, at the time of the sale of a Unit to that person:

- any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1.0 million, excluding the value of the primary residence of such natural person; or

- any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

For the purposes of this Memorandum, "U.S. Person" means any natural person resident in the United States.

## II.   THE PILOT PROGRAM

The Pilot Program and the Act provide for an employment-based preference immigrant visa category for immigrants seeking to enter the United States to engage or invest in a commercial enterprise that will benefit the U.S. economy and create at least ten full-time jobs. Pursuant to the Act, up to 10,000 EB-5 immigrant visas are allocated each year for qualified immigrant investors, who ordinarily must invest at least $1.0 million in a qualifying business. However, up to 3,000 EB-5 immigrant visas are allocated each year for qualified immigrant investors who invest a reduced threshold amount of $500,000 in a Qualifying Investment located in a state-designated high unemployment urban area or a qualifying rural area (a "Targeted Employment Area" or "TEA") inside the geographic boundaries of a USCIS-designated regional center.

On September 14, 2010, USCIS issued the USCIS Approvals, approving the Regional Center Administrator's application to have Palm Beach County, Florida, designated as the "Florida Regional Center" under the Pilot Program. The Regional Center Administrator's application identified Harbourside

1

Place as a capital investment project within a TEA located in the approved Florida Regional Center. See Exhibit E attached to this Memorandum for maps of the Florida Regional Center, the TEA designated by the State of Florida and Harbourside Place.

An advantage of the USCIS Approvals is that the required job creation criteria under the Pilot Program may be direct or indirect. Based upon the USCIS Approvals, the Partnership believes an investment in Units to fund its proposed Loan to the Developer and the purchase, development, construction and operation of Harbourside Place would constitute a Qualifying Investment. Therefore, as described in this Memorandum, the threshold investment for potential investors required would be $500,000 under the Act, plus the $40,000 Administrative Fee.

See "Immigration Procedures" section beginning on page 2 for a summary of immigration procedures in connection with the Pilot Program.

Under the Pilot Program, the potential investor is required to be an "active participant" in the management of the commercial enterprise, but such participation in connection with the activities of a limited partnership is subject to limitations set out in the relevant legislation. Notwithstanding such limitations, limited partnerships have been recognized as appropriate investment vehicles under the Pilot Program. See "Limited Partner Decisions" section beginning on page 24.

The USCIS Approvals impose certain conditions on the Harbourside Group intended to ensure that the Florida Regional Center continues to meet the statutory requirements of the Pilot Program. In particular, the Regional Center Administrator is required to maintain records, data and information to enable it to report to USCIS upon request regarding:

- investment activities under the Regional Center Administrator's sponsorship;

- activities of the Partnership and the Developer in carrying out the Offering and the purchase, development, construction and operation of Harbourside Place;

- compliance with subscription and immigration procedures by individual investors; and

- direct and indirect job creation statistics.

In addition, the USCIS Approvals require the Regional Center Administrator to notify USCIS within 15 business days regarding certain material changes to, among other things, its management and administration, its basis for designation as a regional center, and its agreements with third parties to represent or act on its behalf.

If for any reason the Regional Center Administrator fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the USCIS Approvals, which may have an adverse impact on the Offering and on the status of an investor's ability to complete the required immigration procedures or to maintain his or her visa status.

## III.   IMMIGRATION PROCEDURES

A diagram summarizing the immigration procedures is attached to this Memorandum as Exhibit C. To qualify for lawful permanent residency, an investor must file an I-526 Petition at the designated USCIS center. Tax returns and substantial documentation evidencing that a potential investor's funds intended for investment in the Partnership were derived from lawful sources must be included with the I-526 Petition. Such evidence may include information concerning real estate transactions, business income, proceeds from the sale of a business, employment income, investments, bank accounts and dealings, licenses or similar evidence. If investment funds are derived from a loan, gift or inheritance, an appropriate affidavit and/or other evidence will be required to be filed.

Following completion of the Subscription Procedures (see "Subscription Procedures" section beginning on page 20), the General Partner will send documentation regarding the Partnership and Harbourside Place to potential investors for their immigration attorneys to use in connection with preparation of the I-526 Petition. Within 30 days after receipt of this documentation, potential investors are required to send their I-526 Petitions to the Regional Center Administrator for review by its legal counsel, Foster Quan LLP, prior to filing with USCIS. Potential investors may not file their I-526 Petitions with USCIS unless and until the Regional Center Administrator confirms in writing that they may do so. The purpose of the review is to facilitate compliance with the requirements of the Pilot Program, and the Harbourside Parties are not responsible for any errors or omissions to any I-526 Petition, the contents of which are the sole responsibility of the potential investor.

Persons applying for United States residency must demonstrate that they are admissible to the United States in accordance with Section 212 of the Act. Section 212 sets forth various grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving an immigrant visa or entering the United States. Aliens precluded from entering the United States include:

- persons who are determined to have a communicable disease of public health significance;

- persons who are found to have, or have had, a physical or mental disorder, and behavior associated with the disorder which poses, or may pose, a threat to the property, safety, or welfare of the alien or of others, or have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur or to lead to other harmful behavior;

- persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

- persons who have been convicted of any law or regulation relating to a controlled substance, admitted to having committed or admits committing acts which constitute the essential elements of same;

- persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude, persons who are known, or for whom there is reason to believe, are, or have been, traffickers in controlled substances;

- persons engaged in prostitution or commercialized vice;

- persons who have committed in the United States certain serious criminal offenses, regardless of whether such offense was not prosecuted as a result of diplomatic immunity;

- persons excludable on grounds related to national security, related grounds, or terrorist activities;

- persons determined to be excludable by the Secretary of State of the United States on grounds related to foreign policy;

- persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

- persons who are likely to become a public charge at any time after entry;

- persons who were previously deported or excluded and deported from the United States;

- persons who by fraud or willfully misrepresenting a material fact seek to procure (or have procured) a visa, other documentation or entry into the United States or other benefit under the Act;

- persons who have at any time assisted or aided any other alien to enter or try to enter the United States in violation of law;

- certain aliens who have departed the United States to avoid or evade U.S. military service or training;

- persons who are practicing polygamists; and

- persons who were unlawfully present in the United States for periods in excess of 180 days.

Each potential investor should review the substantive inadmissibility grounds (set forth in part above) with competent counsel to determine whether there may be a basis for denying admission of the potential investor notwithstanding eligibility for immigration based on an investment in the Partnership.

Following approval of an investor's I-526 Petition, the investor must apply for an immigrant visa or adjust his or her status to that of lawful permanent resident. Lawful permanent resident status may be applied for by the investor (who must be over the age of 18), his or her spouse and children who are under the age of 21 upon approval of the I-526 Petition, assuming there is no quota backlog, and the family promptly pursues the process. If the investor will be outside of the United States, the application is filed at the appropriate U.S. Consulate (or, if in Taiwan, at the A.I.T.). If the investor (or a derivative beneficiary family member) will be in the United States and if the investor is eligible to apply for adjustment of status in the United States, the application is filed at the appropriate office of the USCIS. The Consular interview process, or the USCIS adjustment of status process, as applicable (the "Visa Process"), is designed to enable the U.S. Government to determine whether a person is admissible to the United States or whether, as explained above, such person should be precluded from entering the United States. As part of this process, the investor is subjected to medical, police, security and immigration history checks. Upon approval, the investor (or a derivative beneficiary family member) is granted conditional permanent resident status.

An immigrant visa granting permanent resident status under the Act is conditioned upon the investor demonstrating his or her compliance with the requirements of the Pilot Program within two years following approval of the I-526 Petition. Investors who have been granted conditional permanent resident status must file a Form I-829 Petition by Entrepreneur to Remove Conditions ("I-829 Petition") within 90 days prior to the second anniversary of conditional permanent resident status being granted. The primary purpose of the I-829 Petition is to ensure that investors submit evidence establishing that they have successfully met the requirements of the Pilot Program, including the creation and maintenance of the requisite number of direct and indirect jobs by the end of the 21-month period. Except in rare cases, investors who fail to file this petition in a timely manner will automatically lose their permanent resident status.

The General Partner will send documentation regarding the Partnership and Harbourside Place to investors for their immigration attorneys to use in connection with preparation of the I-829 Petition. Within 30 days after receipt of this documentation, investors are required to send their I-829 Petitions to the Regional Center Administrator for review by its legal counsel, Foster Quan LLP, prior to filing with USCIS. Investors may not file their I-829 Petitions with USCIS unless and until the Regional Center Administrator confirms in writing that they may do so. The purpose of the review is to facilitate compliance with the requirements of the Pilot Program, and the Harbourside Parties are not responsible for any errors or omissions to any I-829 Petition, the contents of which are the sole responsibility of the investor.

Potential investors may choose to retain Foster Quan LLP to assist with any or all of the immigration process, including the I-526 Petition, the Visa Process and the I-829 Petition, which may facilitate the immigration process. However, no potential investor is under any obligation to do so, and each potential investor is responsible for retaining his or her own immigration legal counsel and for paying legal fees and expenses pursuant to the immigration process.

There can be no assurance that an I-526 Petition will be approved, that the potential investor will successfully complete the Visa Process, or that upon the approval thereof that the conditions attaching thereto will be removed through an I-829 Petition.

The foregoing description of the immigration procedures in connection with the Pilot Program is a summary description and each potential investor must seek advice from their immigration attorney to understand these procedures fully.

## IV.   USE OF PROCEEDS

The proceeds from the Offering will be used to fund the Loan to the Developer to finance the Developer's purchase, development, construction and operation of Harbourside Place.

## V.   HARBOURSIDE GROUP

Harbourside Group consists of a number of affiliated legal entities, all of which are ultimately controlled by the Principals. The following legal entities comprise the Harbourside Group:

***Allied Capital and Development of South Florida, LLC ("Allied")***. Allied is a Florida-based developer of commercial and residential real estate headquartered in Palm Beach Gardens, Florida. Allied is the original developer of Harbourside Place, and has been instrumental in the planning and development of Harbourside Place, including the process of obtaining financing and required governmental approvals. Allied's managing member and principal owner is Nicholas A. Mastroianni II, one of the Principals.

***Jupiter Waterways, LLC ("Jupiter Waterways")***. Jupiter Waterways is a Florida limited liability company that is the current owner of a tract of waterfront property with a gross surface area of approximately 8.04 acres located at the northeast quadrant of Indiantown Road and US Highway One (together with related entitlements, the "Primary Property") on which Harbourside Place is to be constructed, together with an adjacent tract of waterfront property currently owned by the town of Jupiter with a gross surface area of approximately 1.56 acres (the "Town Property" and, together with the Primary Property, the "Property"). Using proceeds from the Loan, the Developer intends to purchase the Primary Property from Jupiter Waterways and to purchase the Town Property from the town of Jupiter. See "Acquisition of the Property from Jupiter Waterways and the Town of Jupiter" section beginning on page 8.

***Florida Regional Center, LLC ("Regional Center Administrator")***. The Regional Center Administrator is a newly formed Florida limited liability company that will administer the Florida Regional Center designated by USCIS under the Pilot Program. The Regional Center Administrator is indirectly owned and controlled by the Principals, Nicholas A. Mastroianni II and Richard L. Yellen.

***Harbourside Place, LLC (the "Developer")***. The Developer is a newly formed Florida limited liability company specifically created for the sole purpose of purchasing, developing, constructing, owning and operating Harbourside Place. The Developer will be the borrower under the Loan and will purchase the Property from Jupiter Waterways and the town of Jupiter using proceeds of the Loan. The Developer will also develop, construct and operate Harbourside Place using proceeds of the Loan and other resources, including equity to be provided by the Principals and third parties. The Principals indirectly own and control the Developer through single-member limited liability companies.

***Harbourside Funding, LP (the "Partnership")***. The Partnership is a newly formed Florida limited partnership and the issuer of the Units. Using proceeds from the sale of Units in the Offering, the Partnership will make the Loan to the Developer to finance the purchase, development, construction and operation of Harbourside Place. The Partnership is controlled by the General Partner.

***Harbourside Funding GP, LLC (the "General Partner")***. The General Partner is a newly formed Florida limited liability company that will serve as general partner of the Partnership. The General Partner is indirectly owned and controlled by the Principals, Nicholas A. Mastroianni II and Richard L. Yellen. The Principals have appointed R. Bowen Gillespie to manage the General Partner in carrying out its

responsibilities as the General Partner of the Partnership. Mr. Gillespie is a licensed attorney who represents the Principals in various matters.

As described above, each legal entity comprising the Harbourside Group is under the ultimate control of the Principals, Nicholas A. Mastroianni II and Richard L. Yellen.

***Nicholas A. Mastroianni II.*** Mr. Mastroianni is founder, principal owner and manager of Allied Capital and Development of South Florida, LLC, a Palm Beach Gardens-based real estate development company founded in 2004. As the head of this organization, he has negotiated the purchase of thousands of acres of property and has led the design of several projects, both residential and commercial. The projects include single-family subdivisions, multi-family townhomes, multistory condominiums, apartment complexes and mixed-use retail and commercial sites. Mr. Mastroianni is a past Executive Vice President of the Rhode Island Chapter of the Association of Builders and Contractors and is a current member of the Association of General Contractors, the Association of Builders and Contractors and the Police Athletic League. Mr. Mastroianni resides in Jupiter, Florida.

***Richard L. Yellen, Esq.*** Mr. Yellen is a founding partner of Richard L. Yellen & Associates, LLP, a New York-based law firm specializing in real estate law, development and financing, condominium formation, copyright and intellectual property and general litigation. During the course of his legal practice he has argued cases at both the trial and appellate level in both federal and state court. Mr. Yellen has expertise in real estate development and financing and has served as lead counsel to a variety of projects including condominium and commercial developments with capital investments totaling in excess of $500 million. Mr. Yellen graduated from Dartmouth College in 1988 and received his Juris Doctorate in 1992 from New York University School of Law. Mr. Yellen resides in New York, NY.

## VI.  THE HARBOURSIDE PLACE PROJECT

The Developer will use the Loan to finance the purchase, development, construction and operation of Harbourside Place in Jupiter, Florida. Harbourside Place is an approximately 300,000 square foot mixed-use commercial complex to be constructed on the Property, consisting of waterfront property with a gross surface area of approximately 9.6 acres located at the northeast quadrant of Indiantown Road and US Highway One. Harbourside Place is expected to comprise a four-star hotel, offices, restaurants, retail space, marina, amphitheater and spa. Harbourside Place is part of a 2.5-mile waterfront promenade connecting a series of entertainment, retail and residential complexes along a pedestrian waterfront walkway. See Exhibit E to this Memorandum for an aerial photo and map of Harbourside Place site. No assurance can be given that all or any portion of Harbourside Place will be successfully developed or that the final development will have the elements set forth in this Memorandum.

Location
- 200 US Highway One, Jupiter, FL

Land
- 9.6 acres (418,176 square feet) gross surface area
- 2.59 acres (10,894 square feet) submerged land
- 1,045 feet of frontage on east side of Intracoastal Waterway

Building
- 5 Buildings up to 5 stories in height

Approved Entitlements
- Mixed-Use Planned Unit Development (PUD) Approved December 2, 2008
    - 112,840 square feet – Four-Star Hotel (178 Keys)
    - 34,855 square feet – Restaurant
    - 55,256 square feet – Retail

- o   58,791 square feet – Office
- o   2,500 square feet – Cultural Use
- o   31 Slips – Marina (22 Private; 9 Transient)
- o   929 Space Parking Garage

Approved Governmental Funding Sources

- • NRCDD (Northern Riverwalk Community Development District) Conditionally Approved May 15, 2009
  - o   Ability to issue up to $22.0 million in bonds to finance a portion of the costs for infrastructure.
- • TIF Agreement (Tax Incremental Financing) Conditionally Approved
  - o   Annual tax payments to the project of $350,000 for a duration of 15 years totaling $5,250,000.
- • FIND Grant (Florida Inland Navigation District) Conditionally Approved October 1, 2009; Disbursed July 1, 2011
  - o   State grant to assist in building the seawall and Riverwalk along the entire Intracoastal side of Harbourside Place approximating $1,865,000.

**The Market: Palm Beach County, Florida**

Palm Beach County, Florida, is the largest county in the state of Florida in area. As of 2007, the county's estimated population was 1,751,236, making it the third most populous in the state and the twenty-ninth most populous in the United States. Over 40 percent of the county's population lives in unincorporated areas near the Atlantic coast. Palm Beach County is one of three counties comprising the South Florida metropolitan area, and having been formed in 1909, is the area's second oldest. Its largest city and county seat is West Palm Beach (Central County), which has an incorporated population of over 105,000 and an unincorporated population of 250,000. Boca Raton (South County) is the second largest, having a population approaching 90,000. Boynton Beach (South County) is the third largest city, with a population nearing 70,000 residents. With wealthy coastal towns such as Palm Beach, Jupiter, Manalapan and Boca Raton within its limits, Palm Beach County is Florida's wealthiest county, with a per capita personal income of $44,518 as of 2004. In 2004, The Scripps Research Institute announced its first expansion from San Diego, California to be known as Scripps Florida and located in Jupiter, Florida. Scripps is one of the country's largest, private, non-profit research organizations and is considered one of the world's leaders in biomedical research.

**Harbourside Place / Jupiter Riverwalk District**

Situated on the Intracoastal Waterway, Harbourside Place is intended as the centerpiece of the ongoing Jupiter Riverwalk project, a 2.5-mile waterfront promenade connecting a series of entertainment, retail, office and residential complexes along a lengthy pedestrian waterfront walkway. Harbourside Place, which has been designated by the town of Jupiter as its central business and retail district, is expected to consist of a four-star hotel, general class "A" professional offices, restaurants, retail, marina, amphitheater and spa. Harbourside Place is expected to house the town of Jupiter's executive administration, police and emergency service, as well as the Jupiter Riverwalk activity center.

The Property is believed to be the largest remaining assemblage of property along the waterfront in the heart of Jupiter. The Property, which is located at the corner of US Highway One and Indiantown Road, is one of the most traveled intersections in Jupiter, with high visibility and ease of access. The Property is also located just south of the Jupiter Inlet, the main waterway access to the Atlantic Ocean from the Intracoastal Waterway. The location is proximate to other points of interest in Jupiter, including movie

theaters, the lighthouse at the Jupiter Inlet, beaches, Carlin Park Civic Center, grocery stores, indoor and outdoor shopping malls, and office parks.

Although the restaurant, retail, hotel, cultural, office and marina facilities will all contribute substantially to the economics of Harbourside Place, it is expected that Harbourside Place will become an attractive destination due to the restaurants and retail space on the ground floors. This space is expected to attract a high-end dining and retail crowd. It is anticipated that the restaurant and retail mix will consist of white tablecloth restaurants, casual restaurants, cafes, home furnishings, art galleries, boutiques, spa, fashion and cultural uses. To complement the retail space, it is expected that the hotel will function as a four star full-service hotel, catering to leisure, business and visitors of local residents. The office component will be marketed to small local firms and satellite offices for larger companies, such as banks, brokerage firms, hedge funds, attorneys and insurance companies. The marina component will provide relatively large deep-water slips to a market with little existing supply of comparable facilities. The marina will provide an additional attraction by making Harbourside Place convenient and accessible via the Intracoastal Waterway. A small outdoor amphitheater at the north end of the project will support numerous planned musical events and entertainment.

**Acquisition of the Property from Jupiter Waterways and the Town of Jupiter**

The Property on which Harbourside Place is anticipated to be constructed consists of the Primary Property and the Town Property. Jupiter Waterways is the current owner of the Primary Property, having acquired the Primary Property in 2006 from an unrelated party to whom Jupiter Waterways remains indebted for a portion of the purchase price. Along with Allied, the Regional Center Administrator, the Partnership, the General Partner and the Developer, Jupiter Waterways is part of the Harbourside Group and under the ultimate ownership and control of the Principals, Nicholas A. Mastroianni II and Richard L. Yellen.

Jupiter Waterways and affiliated entities have entered into a contract with the Developer under which Jupiter Waterways will sell the Primary Property to Developer on or before June 30, 2012, which date the contracting parties may agree to extend from time to time, for a total purchase price of $31.5 million, of which $22.5 million will be paid in cash. The remaining $9.0 million will take the form of a capital contribution by Jupiter Waterways in the Developer and will constitute a portion of the Principals' equity investment in Harbourside Place. At the option of the Principals following the closing of the Offering, the Developer will exchange this $9.0 million capital contribution into an unsecured promissory note (the "Related Party Note"), which will rank junior to all other indebtedness of the Developer including the Loan. The outstanding principal amount under the Related Party Note will accrue interest at the rate of two percent per annum. Principal and accrued interest under the Related Party Note will become due and payable only after the Partnership's Loan has been repaid in full.

It is anticipated that initial disbursements under the Loan will be utilized to fund the entire $22.5 million cash portion of the $31.5 million purchase price for the Primary Property.

Jupiter Waterways intends to apply the $22.5 million cash portion of the purchase price for the Primary Property to payment of certain outstanding obligations, anticipated to comprise repayment of approximately $15.0 million of secured bank debt, repayment of an approximately $2.0 million capital contribution to the estate of Jack P. Schleifer, an investor in Jupiter Waterways, repayment of approximately $1.5 million of seller financing obligations, and repayment of the initial installment of $585,067 due and payable to The Jupiter Community Redevelopment Agency ("CRA") under the CRA Loan. Jupiter Waterways intends to pay the remaining balance of approximately $3.4 million to or for the benefit of the Principals in respect of services previously rendered by the Principals to Jupiter Waterways, a portion of which amount the Principals intend to contribute to the Developer as a cash equity investment in Harbourside Place. See "Conflicts of Interest" section beginning on page 34.

Jupiter Waterways has entered into a contract to purchase the Town Property from the town of Jupiter on or before September 30, 2012, for a total purchase price of approximately $2.5 million in cash. The Harbourside Group anticipates that the town of Jupiter will consent to an assignment of purchaser rights under the contract from Jupiter Waterways to the Developer prior to September 30, 2012, and that the Developer will purchase the Town Property using initial disbursements under the Loan. Among other things, the purchase contract for the Town Property requires the buyer to provide proof of financing commitments not later than May 15, 2012 and to pay up to $500,000 in liquidated damages to the town of Jupiter if construction of Harbourside Place is not completed by December 15, 2013.

**Hotel Component**

The Harbourside Group anticipates that a four-star full service hotel will become an anchor for Harbourside Place. The Developer has entered into a non-binding letter of intent with a leading internationally recognized hotel and resort brand, with which the Developer is currently negotiating the terms of a definitive license. No guarantees or representations are being made as to whether any particular hotel brand will ultimately enter into an agreement relating to the proposed hotel.

The Developer is considering a number of potential hotel operators to manage the hotel, although no lease or operating agreement has yet been signed.

The Principals believe there is a need for a full service hotel in the Jupiter area. Based on its feasibility studies, the Harbourside Group has concluded the following:

- The local hotel market is dominated by low to mid-scale hotels, such as Comfort Inn, Fairfield Inn, Holiday Inn Express, La Quinta Inn and Wellesley Inn, all of which are without food and beverage services.

- The nearest mid-scale hotels with food and beverage service are 21 to 22 miles away and include two Best Westerns and two Holiday Inns in West Palm Beach with a total of 539 rooms.

- Operators of hotels in the Jupiter market reported that a lack of beachfront, extended-stay and full-service lodging facilities in the Jupiter area has resulted in some displacement of demand to other areas of Palm Beach County.

- Limited service properties in the market area such as Comfort Inn, Fairfield Inn & Suites, Hampton Inn, Holiday Inn Express and La Quinta (breakfast rooms only) historically show average occupancy at 78% at an ADR of $106.95 (RevPAR $86.06). The area hotels experience seasonality with low occupancy at 56% minimum ADR of $77.36 in September and peak occupancy of 96% in March and a maximum ADR of $156.94 in February.

**The following table is for illustrative purposes only.**

| Hotel | Amount |
|---|---|
| NOI | $4,688,813 |
| CAP Rate | 7.50% |
| Estimated Market Value | $62,517,506 |
| % Selling Costs | 1% |
| Amount Selling Costs | $625,175 |
| Revenue From Sale | $61,892,330 |
| Revenue From Rental | $4,095,391 |
| Total Revenues | $65,987,721 |

**Retail and Restaurant Component**

The Harbourside Group has developed preliminary plans for the retail and restaurant component of Harbourside Place, that include retail space for five major restaurants (5,000 square feet each), 2 mid-size restaurants (2,300 – 3,500 square feet each), a night club (6,000 square feet), a Starbucks or other coffee vendor (1,500 square feet), a Ben & Jerry's or other ice cream vendor (1,800 – 2,000 square feet). An organic grocery market chain has also shown interest (20,000 square feet). No leases have been negotiated or signed, and no guarantees or representations are being made as to whether potential tenants (including potential indicative tenants identified herein) will ultimately enter into leases. The Harbourside Group has assessed the retail and restaurant component of Harbourside Place and has identified the following information that it believes to be reliable (all rent figures are per month and triple net):

- There are several retail and restaurant projects in the area that are of similar quality to Harbourside Place as proposed, including PGA Commons, Donald Ross Village, Legacy Place and Downtown at the Gardens.

- The pricing for retail bays within these projects start as low as $35.00/square foot for Downtown at the Gardens.

- Comparable retail space is being delivered in a "Vanilla Shell" condition.

- Restaurant space is typically delivered in a "Raw Shell" condition with a build-out allowance in the $60-$100/square foot range.

- Cohen Commercial, a full service commercial real estate firm located in Palm Beach, Florida, has indicated to the Harbourside Group that it could market Harbourside Place retail space at $35.00/square foot and restaurant space at $40.00/square foot.

- There appear to be approximately 89 retail properties totaling 3.24 million square feet in Juno Beach and Jupiter, with average rates of $23.91/square foot and 5.6% vacancy. This survey included all retail properties in the market and the Harbourside Group expects that it includes properties inferior to Harbourside Place. Within two years, when Harbourside Place is expected to be operating, retail rates are expected to be closer to $36/square foot.

**The following table is for illustrative purposes only.**

| Retail | Amount |
|---|---|
| NOI | $3,381,662 |
| CAP Rate | 7% |
| Estimated Market Value | $48,309,454 |
| % Selling Costs | 1% |
| Amount Selling Costs | $483,095 |
| Revenue From Sale | $47,826,360 |
| Revenue From Rental | $3,381,662 |
| Total Revenues | $51,208,022 |

**Office Component**

The Harbourside Group has developed a preliminary assessment of the office component of Harbourside Place. Based on its feasibility studies, the Harbourside Group believes the following information to be reliable (all rent figures are per month and triple net):

- There appear to be a total of 111 office properties totaling approximately 3.17 million square feet in Juno Beach and Jupiter with average rates of $26.84/square foot with 11.4% vacancy. This survey included all office properties in the market and the Harbourside Group expects that it includes properties inferior to Harbourside Place.

- Comparable office lease information provided by Cohen Commercial reflected seven current leases (executed between 9/24/05 to 9/1/07) for terms from 2 to 7 years at rates ranging from $23.00 - $29.66/square foot.

**The following table is for illustrative purposes only.**

| Office | Amount |
|---|---|
| NOI | $1,573,913 |
| CAP Rate | 7% |
| Estimated Market Value | $22,484,464 |
| % Selling Costs | 1% |
| Amount Selling Costs | $224,845 |
| Revenue From Sale | $22,259,620 |
| Revenue From Rental | $1,573,913 |
| Total Revenues | $23,833,532 |

**Marina Component**

The Harbourside Group has developed its own assessment of the marina component that it believes to be reliable. The assessment has been confirmed by HMY Yacht Sales, which has executed a letter of intent to become a tenant in the Harbourside complex occupying 3,000 SF of ground floor retail space.

**The following table is for illustrative purposes only.**

| Marina | Amount |
|---|---|
| NOI | $526,680 |
| CAP Rate | 7% |
| Estimated Market Value | $7,524,000 |
| % Selling Costs | 1% |
| Amount Selling Costs | $75,240 |
| Revenue From Sale | $7,448,760 |
| Revenue From Rental | $526,680 |
| Total Revenues | $7,975,440 |

**Parking Component**

The Harbourside Group's preliminary development budget reflects total costs of $30,584,000 for the parking component. The revenue projection is $1,103,187.

| Parking | Amount |
|---|---|
| NOI | $1,103,187 |
| CAP Rate | 7% |
| Estimated Market Value | $15,759,814 |
| % Selling Costs | 1% |
| Amount Selling Costs | $157,598 |
| Revenue From Sale | $15,602,216 |
| Revenue From Rental | $1,103,187 |
| Total Revenues | $16,705,403 |

**Funding**

***CRA Loan.*** Construction of Harbourside Place began in July 2011 using the proceeds of the approximately $3.7 million unsecured CRA Loan to the Northern Riverwalk Community Development District (the "NRCDD") and extended by the NRCDD to Jupiter Waterways, the current owner of the Primary Property. Through an agreement concluded with the NRCDD, the Developer has undertaken to

repay the CRA Loan using disbursements under the Partnership's Loan to the Developer. Under the terms of the CRA Loan, compound interest accrues at an initial annual rate of 4.5%, which increases by an additional 1% per year on each of the first three anniversaries of the CRA Loan. The Developer is obligated to make a series of annual installment payments of principal and accrued interest as Loan proceeds become available to the Developer or on May 1 of each year, whichever occurs first. All principal and accrued interest is due and payable on May 1, 2015.

***Property Acquisition and Construction Funding.*** The Harbourside Group anticipates that Property acquisition and Harbourside Place construction will be funded through a combination of the Loan, Northern Riverwalk Community Development District ("NRCDD") Bonds, a Florida Inland Navigation District ("FIND") Grant and cash and in-kind equity contributions. The FIND Grant, a state-issued grant to assist in building the seawall and Riverwalk along the entire Intracoastal side of Harbourside Place, was disbursed to Jupiter Waterways in July 2011. In addition, the Harbourside Group has obtained the conditional right to receive a total of $5.25 million in Tax Incremental Financing (TIF) from the town of Jupiter, to be paid in annual installments of $350,000 over 15 years. Although the Harbourside Group anticipates that funding will be available from these sources, aside from the FIND Grant, there can be no guarantees or representations made as to the ultimate availability or amount of any such funding.

The following is a summary of projected sources and uses of funds, assuming the Partnership sells 160 Units in the Offering:

| Sources of Funds | Amount (millions) | Percentage |
|---|---|---|
| Partnership Loan (EB-5 Investors) (1) | $  80.000 | 55.6% |
| NRCDD Bonds (2) | $  22.000 | 15.3% |
| Florida Inland Navigation District Grant (3) | $    1.865 | 1.3% |
| Tax Incremental Financing (4) | $    5.250 | 3.6% |
| Current Developer Equity (5) | $  14.885 | 10.3% |
| Additional Developer Equity (6) | $20.000 | 13.9% |
| Total Sources of Funds | $144.000 | 100% |

| Uses of Funds | | |
|---|---|---|
| Primary Property Acquisition | $    31.5 | 21.9% |
| Town Property Acquisition | $      2.5 | 1.7% |
| Construction Costs | $ 110.0 | 76.4% |
| Total Uses of Funds | $144.0 | 100% |

Notes:

(1)  EB-5 Investment of $80,000,000 will require 160 investors.

(2)  NRCDD Bonds to be marketed by Royal Bank of Canada. Proceeds to fund infrastructure and parking garage build out.

(3)  FIND Grant has been issued by the State of Florida. Proceeds are being used to build marina facility, seawall and public docks as well as the entire Riverwalk.

(4)  Annual tax payments to the project of $350,000 for 15 years, totaling $5,250,000.

(5)  Consists of $9.0 in-kind capital contribution by Jupiter Waterways, and current committed Developer cash equity of $5.885 million.

(6)  The Principals intend to arrange an additional $20.0 million cash debt or equity investment in the Developer. To the extent such an investment is not available on terms

acceptable to the Principals, the Partnership intends to offer up to 40 additional Units in the Offering and to increase the principal amount of the Loan by an amount equal to $500,000 multiplied by the number of additional Units sold.

**General Contractor**

The NRCDD, acting on behalf of the Developer, has entered into an agreement with Moss & Associates ("Moss"), a privately held real estate construction company, for the construction of the seawall, town docks and the Riverwalk promenade. Construction began in July 2011. Moss has provided a 100% performance and payment bond guarantee to the NRCDD. Additionally, the Developer has entered into a letter agreement dated February 17, 2011 with Moss to perform certain pre-construction services in connection with Harbourside Place. It is anticipated that Developer will retain Moss to act as general contractor in connection with the construction of Harbourside Place. Harbourside Group believes Moss to be ranked, in terms of annual revenues, among the top 100 building contractors in the United States and the seventh largest in Florida. Moss has informed Harbourside Group that it has more than 160 employees, bonding capacity in excess of $750.0 million and annual revenues in excess of $650.0 million. In addition, Moss has advised Harbourside Group that it has extensive experience in the following types of real property developments:

- Major landmark mixed-use developments and luxury high-rise residential facilities
- Hotels, resorts, casinos, and entertainment venues
- Commercial office buildings
- Government centers
- Educational facilities
- Healthcare centers
- Biomedical and life science complexes
- Retail structures
- Criminal justice and correctional facilities

In the event that Moss is retained to act as general contractor in connection with the construction of Harbourside Place, it is anticipated that Moss will obtain a performance and payment bond guarantee for the benefit of the Developer and the Partnership, which will be issued by an insurance company or a financial institution to guarantee satisfactory completion of the construction of Harbourside Place.

Other than (i) the agreement between NRCDD and Moss and (ii) the February 17, 2011 letter agreement, no agreement has been signed with Moss, and no guarantees or representations are being made as to whether Harbourside Group will ultimately enter into any agreement with Moss relating to services as general contractor for construction of Harbourside Place.

**Architect**

Jupiter Waterways has entered into an agreement dated February 10, 2010 with STH Architectural Group, Inc. ("STH"), the West Palm Beach office of Leo A. Daly Architects, to provide architectural and engineering services in connection with Harbourside Place. Harbourside Group anticipates that this agreement will be assigned to Developer in connection with the sale of the Primary Property by Jupiter Waterways to Developer.

## VII.   CONSTRUCTION BUDGET

The following is a general construction budget for Harbourside Place. Certain amounts may change due to the changes during the construction process.

| Land/Site Costs | Amount (millions) |
|---|---|
| Primary Property Acquisition | $31,500,000 |
| Town Property Acquisition | $2,500,000 |
| Site Work (including building pad, foundations, utilities, parking and landscaping) | $10,850,000 |
| *Subtotal:* | $44,850,000 |
| Design Costs (including architecture, engineering, design reimbursements, security and special services design) | $2,488,010 |
| Hard Costs of Construction (including base building, common areas, contingency, insurances, contractor's fee, etc.) | $65,963,845 |
| Development Soft Costs (including geotechnical borings, survey, utilities connection, permits, etc.) | $3,438,832 |
| Other Soft Costs (including legal, insurance, placement fees, taxes, marketing, commissions, developers fee, contingency, etc.) | $9,966,571 |
| *Base Building Subtotal:* | $82,857,258 |
| Tenant Improvements | $9,119,320 |
| Construction Carry/Interest | $8,173,422 |
| **Total Uses of Funds** | **$144,000,000** |

## VIII.   LOAN AGREEMENT

**Purpose of Loan**

The Partnership has entered into an amended and restated convertible loan agreement (the "Loan Agreement") with the Developer. The Loan Agreement is attached to this Memorandum as Exhibit F. The Loan Agreement amends and restates an earlier loan agreement dated as of July 22, 2011, primarily to extend the maturity date from five years from the first disbursement under the Loan to five years from the date on which the last potential investor in the Offering submits his or her I-526 Petition to USCIS, or, no later than November 30th, 2012.

The proceeds of the Loan will be used as a construction loan to help build Harbourside Place, the approximately 300,000 square foot mixed-use commercial complex to be constructed on the Property, consisting of waterfront property with a gross surface area of approximately 9.6 acres located at the northeast quadrant of Indiantown Road and US Highway One. Harbourside Place is expected to comprise a four-star hotel, offices, restaurants, retail space, marina, amphitheater and spa. Harbourside Place is part of a 2.5-mile waterfront promenade connecting a series of entertainment, retail and residential complexes along a pedestrian waterfront walkway.

**Amount of Loan**

The initial maximum principal amount of the Loan is $80.0 million, which may be increased up to $100.0 million. The actual principal amount of the Loan will depend on the number of Units sold pursuant to this Offering and the anticipated number of jobs to be created from Harbourside Place. There is no minimum principal amount of the Loan, and the maximum principal amount of the Loan will be the number of Units actually sold pursuant to this Offering multiplied by the $500,000 per Unit subscription price. The Harbourside Group, acting through the General Partner but in a manner consistent with its fiduciary obligations to the holders of Units, may cause the Partnership to not extend the Loan or to disburse any amount under the Loan. In particular and without in any way limiting the discretion of the General Partner:

- The General Partner reserves the right to terminate the Offering at any time prior to receipt into escrow of subscription proceeds totaling $25.0 million, in which case the Partnership will not extend the Loan to the Developer and amounts deposited into the escrow will be refunded to potential investors;

- Once the Partnership has sold 80 Units, the General Partner may decide that the Partnership will not sell any additional Units if the General Partner reasonably determines that an insufficient number of direct and indirect jobs will be created to support the sale of additional Units or there is insufficient interest among potential investors in purchasing additional Units; and

- Once the Partnership has sold 160 Units, the General Partner may, in its sole discretion, decide that the Partnership will not sell any additional Units, in which case the maximum principal amount of the Loan will be $80.0 million.

If for any reason the maximum principal amount of the Loan is less than $100.0 million, the Principals reserve the right to seek funding from alternative sources, provided that the total principal amount of any additional indebtedness, together with the total principal amount of the Loan, may not exceed $110.0 million. See "Potential Subordination to Additional Loan" section beginning on page 17.

**Terms of Loan**

The Loan Agreement requires the Developer to make quarterly interest-only payments at a fixed rate equal to 2.0% per annum based upon the outstanding principal balance of the Loan from time to time. Interest will begin to accrue on the outstanding principal balance of the Loan on the date the last potential investor submits his or her I-526 Petition to USCIS, or, no later than November 30th, 2012. All principal and accrued interest under the Loan will become due and payable five years from the date the last potential investor submits his or her I-526 Petition to USCIS, or, no later than November 30th, 2012, as determined by the Partnership in good faith. The Developer may prepay the Loan without penalty only if and to the extent that the General Partner determines that prepayment will not jeopardize the conditional permanent resident status of any holder of Units in the Partnership. The Loan Agreement does not require the Developer to pay an origination fee. See "Return of Capital" section beginning on page 19.

**Right to Convert Loan Principal at Maturity**

It is the Developer's intention to repay the Loan at maturity with the proceeds of long-term financing or from other sources. If the Developer is unable to repay the Loan at maturity due to the unavailability of long-term financing or for any other reason, the Developer intends to convert the entire outstanding principal amount of the Loan into an ownership interest in the Developer, known as units of common membership interest, by giving at least 45 days' prior written notice to the Partnership (the "Conversion Notice"). The Developer will not have any right to convert the Loan if at maturity it is in material default under the Loan Agreement or if it has not paid all accrued interest under the Loan. The Developer's obligation either to repay the Loan at maturity or to convert the entire outstanding principal amount into

an ownership interest will be secured by substantially all of the Developer's assets. See "Security" section beginning on page 17.

The percentage ownership interest that the Partnership will acquire upon conversion depends on the outstanding principal amount of Loan at maturity and on the fair market value of Harbourside Place at that time. Upon receipt of the Conversion Notice, the Partnership will select three independent certified professional appraisers, each of which will determine the fair market value of Harbourside Place, based upon the actual occupancy rate and rental income of Harbourside Place and, after allowing for indebtedness represented by the Loan, capitalization rates and other valuation methods customarily used for professional valuations of similar property. The highest of the three determinations (the "Appraised Value") will be used to determine the Partnership's percentage ownership in the Developer following conversion. The Developer will be responsible for paying the costs of the appraisal.

Upon conversion, the Partnership will receive units of common membership interest in the Developer reflecting a percentage ownership interest in the Developer equal to the outstanding principal amount of the Loan divided by the Appraised Value, provided that the maximum percentage ownership interest that the Partnership will become entitled to receive as a result of the conversion will not exceed 65% of the total percentage ownership. For example, assuming the actual outstanding Loan principal is $80.0 million:

- if the Appraised Value is $200.0 million then the Partnership will acquire a 40% ownership interest in the Developer;

- if the Appraised Value is $120.0 million then the Partnership will acquire a 65% ownership interest in the Developer, the maximum percentage ownership interest that may be provided under the conversion mechanism; and

Conversion of the Loan into an ownership interest in the Developer will release the Developer from all its obligations under the Loan. As an owner of the Developer following conversion, the Partnership will have the rights provided in the Developer's operating agreement as it exists on the date of conversion, including the right to receive a share of distributable profits equal to the Partnership's percentage ownership in the Developer. However, the existence and amount available for distribution will depend on a variety of factors, including the ability of Harbourside Place to generate revenues in excess of expenses. In this regard, the Developer's expenses are anticipated to include a management fee payable to the Principals as compensation for their services to the Developer. The Developer's operating agreement currently provides for a management fee equal to 9% of the Developer's annual gross revenues and, in the event of a sale or refinancing, an amount equal to 9% of such sale of refinancing proceeds. Further, the Developer's operating agreement contains provisions that allocate substantially all decision-making powers to the Principals, regardless of the percentage ownership interest that the Partnership may acquire upon conversion of the Loan. As a result, investors in the Partnership will not have the right to participate in the management of the Developer or its business, and the General Partner will continue to represent the interests of the Limited Partners in the Partnership.

**Disbursement of Loan**

The Loan will be disbursed by the General Partner on behalf of the Partnership to the Developer in accordance with the requisition requirements of the Developer to fund the purchase of the Property and the construction of Harbourside Place. The initial disbursement under the Loan is anticipated to be at least $25.0 million. Loan amounts will be disbursed no more frequently than monthly.

**Security**

The Developer's obligations under the Loan Agreement, including its obligation to convert the principal amount of the Loan into units of membership interest in the Developer if the Loan is not repaid in full at maturity, will be secured by the following (collectively, the "Security"):

- a first-ranking mortgage lien on the real property and improvements comprising Harbourside Place;

- a first-ranking lien on all fixtures, chattels, building material and all personal property of Developer necessary to the maintenance or operation of Harbourside Place; and

- a first-ranking conditional assignment of contracts, leases, rents, profits, permits, deposits, approvals, licenses, warranties and other agreements in connection with Harbourside Place.

**Potential Subordination to Additional Loan**

The Developer may require additional funds in order to complete and operate Harbourside Place if, for example:

- the maximum Loan amount of $100.0 million is not advanced;

- the Principals determine that sufficient additional cash equity commitments are not available on commercially reasonable terms;

- the Principals determine that one or more funding sources are not available in the amounts, under the terms or at the times anticipated; or

- the actual costs of constructing and operating Harbourside Place are greater than the costs forecast in the Developer's budgets.

If for any reason the maximum Loan amount of $100.0 million is not advanced, and if the Developer requires additional funds in order to complete and operate Harbourside Place, the Harbourside Group may seek to arrange one or more additional loans (collectively, the "Additional Loan") from one or more additional lenders (collectively, the "Senior Lender"). The principal amount of the Additional Loan, together with the actual principal amount of the Loan, may not exceed $110.0 million. There can be no assurance that any efforts by the Harbourside Group to arrange the Additional Loan will be successful. The Additional Loan may not be available on favorable terms or at all. If the Additional Loan is available, it will only be available on terms and subject to conditions to be negotiated with the Senior Lender.

If required by a potential Senior Lender as a condition to providing the Additional Loan on terms the Principals consider commercially reasonable, the Harbourside Group may require the Partnership to subordinate its rights with respect to payment and security under the Loan to the rights of the Senior Lender under the Additional Loan. In that event, the terms of the relationship with respect to payments and security between the Senior Lender and the Partnership, as the principal secured creditors of the Developer, are anticipated to be set forth in a written intercreditor agreement among the Partnership, the Senior Lender and the Developer. The specific terms of the intercreditor agreement will be determined through negotiation with the Senior Lender, but such agreement will likely cover matters relating to rights and obligations for payment, subordination, priority and default.

## IX.    MANAGEMENT OF THE PARTNERSHIP

The General Partner of the Partnership is Harbourside Funding GP, LLC, a Florida limited liability company indirectly owned and controlled by the Principals, Nicholas A. Mastroianni II and Richard L. Yellen. The Principals have appointed R. Bowen Gillespie to manage the General Partner in carrying out

its responsibilities as the General Partner of the Partnership. Mr. Gillespie is a licensed attorney who represents the Principals in various matters.

The General Partner will conduct the day-to-day management of the Partnership. Under the laws of Florida, in order to maintain their limited liability, limited partners of a limited partnership may not take part in the management or control of the limited partnership. The approval of limited partners of the Partnership (the "<u>Limited Partners</u>") is required in connection with certain matters. See "Limited Partner Decisions" beginning on page 24. The duties of the General Partner, which are set out more fully in the Partnership Agreement, include:

- determining that the actions of the Partnership are consistent with the Pilot Program, the General Partner's fiduciary obligations to the Limited Partners and applicable laws and regulations, including state and federal securities laws and regulations;

- determining that the Loan to the Developer will be a Qualifying Investment under the Pilot Program;

- monitoring the Partnership's business with respect to continuing qualification under the Pilot Program;

- monitoring the investments and the financial performance of the Partnership;

- reporting to Limited Partners;

- calling meetings of Limited Partners, as necessary;

- maintaining Partnership books and records; and

- retaining lawyers, accountants and other professionals as may be required on behalf of the Partnership.

In addition, the General Partner may take such steps as may be required to protect the interests of the Partnership and the Limited Partners, including, if necessary, realizing upon the Security granted to the Partnership in connection with the Loan.

Any successful performance of the General Partner in prior businesses is not necessarily indicative of future results.

## X.   INVESTMENT STRATEGY

*Qualifying Investment.* The General Partner has reviewed the Loan to the Developer to fund the purchase, development, construction and operation of Harbourside Place, and believes it will be a Qualifying Investment under the Pilot Program for the following reasons:

- The Loan will be made based upon the USCIS Approvals of the Florida Regional Center designation and Harbourside Place as a capital investment project within a Targeted Employment Area of the Florida Regional Center, thus potentially meeting the minimum job creation requirements of the Pilot Program and entitling immigrant investors to make use of the minimum $500,000 investment threshold;

- The Loan will be funded from the proceeds of the sale of Units, by which each immigrant investor will meet the minimum $500,000 investment threshold;

- The Loan will be in a maximum principal amount of $100.0 million, with the actual principal amount of the Loan dependant on the number of Units sold and the number of jobs anticipated to be created from Harbourside Place; and

- The Developer is required either to repay the Loan at maturity or to convert the entire outstanding principal amount into an ownership interest in the Developer.

The term "Qualifying Investment" refers solely to the type of at-risk investments that will be made by the Partnership. A potential investor's capital contribution must be derived wholly from his or her personal assets and be entirely at risk.

*Investment Company Act of 1940*. The Partnership will not be registered as an "investment company" under the Investment Company Act of 1940 (the "Investment Company Act"). Among other things, the Partnership believes the nature of its business will cause it to fall outside the definition of an "investment company" under the Investment Company Act and that, in addition, it may rely on various exclusions from the definition of an "investment company" and exemptions from registration contained in the Investment Company Act. These include exclusions and exemptions (i) for a company engaged primarily in purchasing or otherwise acquiring mortgages and other liens on and interests in real estate, (ii) for an issuer that is not making a public offering of interests and whose outstanding interests are not beneficially owned by more than 100 persons or by persons who are "qualified purchasers" or "knowledgeable employees" or (iii) for a company primarily engaged in the business of constructing and operating Harbourside Place rather than the business of investing, reinvesting or trading in securities. No more than 45% of the Partnership's total assets will consist of, and no more than 45% of its income/loss will be derived from, securities of companies it does not control. The Partnership intends to obtain appropriate representations and undertakings in order to assure that the conditions of the relevant exemptions are met and to conduct its business so as not to be deemed an investment company under the Investment Company Act.   However, there can be no assurance that the Partnership will not be required to register as an investment company under the Investment Company Act, which may adversely affect the Loan and Harbourside Place.

## XI.   RETURN OF CAPITAL

An investment in the Units of the Partnership will fund the purchase, development, construction and operation of Harbourside Place through the Loan to the Developer. The Loan is anticipated to be secured by (i) a mortgage lien on the real property and improvements comprising Harbourside Place; (ii) a lien on all fixtures, chattels, building material and all personal property of Developer necessary to the maintenance or operation of Harbourside Place; and (iii) a conditional assignment of contracts, leases, rents, profits, permits, deposits, approvals, licenses, warranties and other agreements in connection with Harbourside Place. Even with all or some of these protections, there is no guarantee the Loan will be repaid by Developer.

The Developer is obligated to repay the principal amount of the Loan on or before the fifth anniversary of the initial disbursement to the Developer under the Loan. Prior to repayment, no Limited Partner should expect the Partnership to return a Limited Partner's $500,000 investment. At that time, the Partnership's partners will share pro rata in any income from the Partnership, which means that if some, but not all, of the Loan is repaid, it is possible that the Limited Partners would not receive a full return on their investment. See "Allocations and Distributions" section beginning on page 23.

At the maturity date of the Loan, it is anticipated that Harbourside Place will have been completed and in operation for approximately three years. At that time, the properties comprising Harbourside Place are expected to have predictable cash flows. The General Partner anticipates that the Developer will undertake one or more of the following transactions in order to repay the Loan at maturity:

- Refinance the Loan with an institutional lender;

- Repay the Loan with the proceeds of a sale of all or a portion of Harbourside Place.

There can be no assurance that at maturity the Developer will be able to refinance the Loan or engage in a sale of Harbourside Place, or that the proceeds of any refinancing or sale will be sufficient to repay the Loan. For this reason, an investor's capital contribution to the Partnership is entirely at risk.

If the Developer is unable to repay the Loan at maturity, the Developer intends to convert the entire outstanding principal amount of the Loan into an ownership interest in the Developer. See "Right to Convert Loan Principal at Maturity" section beginning on page 15.

## XII.    SUBSCRIPTION PROCEDURES

Potential investors wishing to subscribe for Units in the Partnership are required to comply with the following procedures (the "Subscription Procedures"):

**Step 1**             **Deposit and Preliminary Information**

1.  Complete and sign a Pre-Subscription Letter Agreement and Investor Suitability Questionnaire; deliver one copy of each signed document to the General Partner by fax to +1 561 799 0061 or by email to subscriptions@HarboursideFunding.com;

2.  Provide legible copies of the potential investor's **passport** and **one** of the following to the General Partner by fax to +1 561 799 0061 or by email to subscriptions@HarboursideFunding.com:

    - Credit Card
    - Student Identification Card
    - Workplace Identification Card
    - Non-US Driver's License

**Step 2**             **Document Execution**

After the General Partner has confirmed in writing that the potential investor may proceed with the investment, the potential investor must review carefully, complete as applicable and sign the following documents:

1.  Subscription Agreement;
2.  Accredited Investor Questionnaire, IRS Forms W-7 and W-8BEN (attached to the Subscription Agreement); and
3.  Limited Partnership Agreement

**Step 3**             **Delivery of Executed Documents and Funds**

After the potential investor has reviewed, completed and signed the above documents, the potential investor must do the following:

1.  Deliver one copy of each signed document to the General Partner by email to subscriptions@HarboursideFunding.com;
2.  Deliver one original of each signed document by courier to Harbourside Funding GP, LLC, 11770 US Highway One, Suite 301, Palm Beach Gardens, FL 33408, Attention: Managing Member; and
3.  For each Unit to be purchased, wire transfer $540,000 to the Escrow Agent as payment of (i) the subscription price and (ii) the $40,000 Administrative Fee, using the wire transfer instructions provided in the Escrow Agreement and in this Memorandum.

The Subscription Agreement, the form of which is attached as Exhibit B to this Memorandum, includes among other things an undertaking by the potential investor to: (i) diligently file and prosecute his or her I-526 Petition and complete the Visa Process; (ii) provide to the General Partner such information as the General Partner may require confirming that the funds to be invested were lawfully obtained, together

with such other documents as the General Partner may reasonably require; and (iii) diligently file and prosecute his or her I-829 Petition within 21 to 24 months after the date that conditional permanent resident status is obtained.

The Subscription Agreement, together with the Escrow Agreement with the Escrow Agent, provide for the release of the potential investor's $500,000 investment and $40,000 Administrative Fee upon written direction from the Partnership and the Regional Center Administrator. Written direction will be given within 90 days following the occurrence of one or more of the following events until the entire $500,000 investment and $40,000 Administrative Fee has been disbursed from escrow:

- the Partnership and the Regional Center Administrator delivering notice to the Escrow Agent that either or both of the USCIS Approvals have been revoked and either cannot be resubmitted or the Partnership chooses not to resubmit, in which case all amounts held in escrow on behalf of the potential investor will be returned to the potential investor;

- the Partnership and the Regional Center Administrator delivering notice to the Escrow Agent that the I-526 Petition of such potential investor has been submitted to USCIS for adjudication evidenced by official notice from USCIS confirming receipt, in which case the $40,000 Administrative Fee will be released to the Regional Center Administrator;

- the Partnership and the Regional Center Administrator delivering notice to the Escrow Agent that the I-526 Petition of such potential investor has been approved under the Pilot Program, whereupon the $500,000 investment will be released to the Partnership;

- the Partnership and the Regional Center Administrator delivering written notice to the Escrow Agent that the I-526 Petition of such potential investor has been denied for reasons other than fraud and/or misrepresentation by the potential investor in connection with the I-526 Petition, whereupon the Escrow Agent will return the $500,000 investment to the potential investor and the Regional Center Administrator will return the $40,000 Administrative Fee to the potential investor;

- the Partnership and the Regional Center Administrator delivering written notice to the Escrow Agent that the I-526 Petition of such potential investor has been denied for reasons including the potential investor's fraud and/or misrepresentation in connection with the I-526 Petition, whereupon the $500,000 investment will be returned to the potential investor and the $40,000 Administrative Fee will be forfeited; or

- the Partnership and the Regional Center Administrator delivering written notice to the Escrow Agent that (i) 12 months have expired from the date the potential investor completed the Subscription Procedures, (ii) the I-526 Petition, which was timely filed, has not been approved or denied within such 12-month period, unless the parties have agreed to a written extension of such 12-month period, and (iii) the potential investor has provided written evidence that following such 12-month period the potential investor has withdrawn his or her I-526 Petition, whereupon the Escrow Agent will return the $500,000 investment to the potential investor and the Regional Center Administrator will return the $40,000 Administrative Fee to the potential investor.

As set forth above, a potential investor's full subscription proceeds of $500,000 and $40,000 Administrative Fee will be returned to the potential investor unless the conditions for release from escrow to the Partnership have been met. Any funds returned to a potential investor shall be sent via wire transfer to the account from which the potential investor's funds originated. No Units will be offered for sale after the earlier of (i) the maximum number of Units being subscribed for under this Memorandum or (ii) two years from the date of this Memorandum, unless extended for an additional six (6) months by the General Partner with notice to the potential investors. The Partnership Agreement sets forth the rights of the Limited Partners pro rata irrespective of the date of subscription by a Limited Partner. No interest on escrowed subscription proceeds will be payable to Limited Partners, and such interest, if any, will be paid

to the General Partner. If for any reason the USCIS, any other governmental authority or applicable law prevents funds from being returned to a potential investor, the potential investor shall have no claim against the Escrow Agent, the Partnership, Harbourside Group or the Principals. The Escrow Agreement is attached as Exhibit D to this Memorandum.

In the event, after approval of the I-526 Petition, an investor's subsequent application for an immigrant visa or I-829 Petition is denied or not adjudicated by USCIS, the Administrative Fee will not be refunded to the investor and the investor's US$500,000 investment in the Partnership will remain invested in the Partnership and part of the Loan.

## XIII.   SUMMARY OF PARTNERSHIP AGREEMENT

The Partnership has been formed for the purpose of making the Loan to the Developer to partially fund the purchase, development, construction and operation of Harbourside Place. The Partnership will be governed by the terms of the Limited Partnership Agreement (also referred to as the "Partnership Agreement"), the form of which is attached to this Memorandum as Exhibit A. The partners in the Partnership (the "Partners") consist of the General Partner and the purchasers of Units in the Offering, who are Limited Partners admitted to the Partnership under the terms of the Partnership Agreement.

The following information is presented as a summary of principal terms only and is qualified in its entirety by reference to the Partnership Agreement.

### Units are all Equal

All Units will be of the same class and no Unit will have any priority over any other Unit of the same series. The Limited Partners will vote on all matters requiring the approval of Limited Partners.

### Partnership Purpose

The Qualifying Investment to be made by the Partnership will:

- fund the purchase, development, construction and operation of Harbourside Place through the Loan to the Developer;
- be projected to meet the minimum job creation requirements of the Pilot Program; and
- be a minimum of $500,000, which will qualify under the Pilot Program pursuant to the minimum investment criteria.

### Powers of Limited Partners

No Limited Partner, in his or her capacity as a Limited Partner, shall: (i) execute any document that binds, or purports to bind, the Partnership or any Partner; (ii) hold himself or herself out as having the power or authority to bind the Partnership or any Partner; (iii) undertake any obligation or responsibility on behalf of the Partnership; or (iv) bring any action for partition or sale in respect of any or all of the assets or property of the Partnership or record or permit any encumbrance in respect of any such property. Subject to the foregoing, Limited Partners shall have all the rights and powers set out under the Florida Revised Uniform Limited Partnership Act.

### Partnership Capital

Each Limited Partner is required to make a capital contribution equal to $500,000, the subscription price of one Unit. The capital of the Partnership consists of the aggregate capital contributions to the Partnership by the Partners. No Partner has the right to withdraw any amount or receive any distribution

from the Partnership, except as expressly provided in the Partnership Agreement. No interest shall be paid to any Partner on any capital contribution.

**Preferred Return**

As a Limited Partner in the Partnership, each owner of a Unit will be allocated a quarterly preferred return ("Preferred Return") equal to 2.0% per annum based on the Unit owner's $500,000 investment, commencing on the date the last potential investor submits his or her I-526 Petition to USCIS, as determined by the Partnership acting in good faith. The General Partner has the right, but not the obligation, to cause the Partnership to make quarterly cash distributions to the Limited Partners of some or all of their accrued and unpaid Preferred Return. Although it is anticipated that distributions of the Preferred Return will be funded through quarterly interest payments from the Developer under the Loan, there can be no assurance that the Developer will have sufficient resources to meet its interest obligations or that the General Partner will cause the Partnership to make distributions in respect of the Preferred Return.

**Allocations and Distributions**

Allocations of net income and loss, as determined for federal income tax purposes, shall be allocated among the Partners, and accordingly, will be credited or debited to their respective capital accounts in accordance with applicable U.S. Treasury regulations.

Each Limited Partner will be allocated the Preferred Return on a quarterly basis. The General Partner has the right, but not the obligation, to cause the Partnership to make quarterly distributions in respect of any accrued and unpaid Preferred Return; provided that no distribution of Preferred Return may cause any Limited Partner's capital account balance to fall below the $500,000 minimum investment required under the Pilot Program.

Except for any distributions of Preferred Return, no Limited Partner may receive distributions from the Partnership until the latter of (i) five years from the date the last potential investor submits his or her I-526 Petition to USCIS, as determined by the Partnership acting in good faith, and (ii) the date such Limited Partner's conditions to permanent resident status have been removed. Subject to the foregoing, distributable proceeds realized from the sale or repayment of all or any portion of the Partnership's Loan will be distributed by the General Partner, net of payment of Partnership expenses and net of any required tax withholdings. The General Partner will also be entitled to withhold from any distributions (including refinancing or disposition proceeds) amounts as are necessary to create, in its discretion, appropriate reserves for expenses and liabilities of the Partnership. Subject to the foregoing, such net proceeds shall be distributed first to the Limited Partners pro rata to the extent of their unpaid Preferred Return; second to the Partners pro rata in respect of their unreturned capital contributions until the unreturned capital contributions of each Partner is zero; and third to the Partners in proportion to their Partnership interests (where the General Partner has a 0.1% Partnership interest and the Limited Partners collectively have a 99.9% interest in the Partnership).

**Partnership Expenses**

The General Partner shall be responsible for all third party Offering expenses, including legal, accounting, printing, escrow and overseas marketing expenses, incurred in connection with the offering of Units. These expenses will be paid from the Administrative Fee. The Partnership will also pay all other expenses of the Partnership, including (i) all expenses of lawyers, accountants, custodians, professional advisors and service providers retained by the Partnership in connection with the operation of the business, tax compliance, reporting to the Limited Partners, and other similar operational expenses; (ii) insurance of the Partnership; (iii) all taxes, fees or other similar charges levied against the Partnership; and (iv) all

expenses incurred in connection with the fulfillment of statutory or other compliance requirements and in connection with reporting to or communicating with Limited Partners and convening any meeting of Limited Partners.

**Limited Partner Decisions**

Limited Partners may take part in the business of the Partnership as permitted under the Partnership Agreement. Approval of Limited Partners is required by ordinary resolution, i.e., the approval of a majority of the Limited Partners (an "Ordinary Resolution") when the General Partner suggests a material change to the terms of an investment.

Approval of the General Partner and Limited Partners is required by unanimous resolution, i.e., the approval of all Limited Partners to make investments other than the Qualifying Investment (other than temporary investments in certain prescribed investments).

**Term and Termination**

The Partnership will continue until it is dissolved on December 1, 2025, or January 1 of the year following the year in which all of the Partnership's assets have been realized upon (i.e., all investments have been returned to the extent possible) and distributed, whichever is earlier.

**Indemnification**

The Partnership will indemnify and hold harmless the General Partner and their respective directors, officers, members, partners and employees, from and against liabilities arising in connection with the Partnership to the fullest extent permitted by law.

**Transferability of Interests and Withdrawal**

Except as expressly provided for in the Partnership Agreement, no Limited Partner will be permitted to withdraw from the Partnership or to withdraw any portion of his or her capital account. Other than when a person becomes entitled to a Unit by operation of law, a Unit issued to a Limited Partner is non-transferable.

**Reports**

The Partnership will send to each Limited Partner after the end of each fiscal year of the Partnership an accounting report including a balance sheet and statements of income, changes in partner equity and cash flows, prepared in accordance with generally accepted accounting principles, plus a schedule and summary description of the investments owned by the Partnership at year-end and a statement for each Limited Partner of its capital account and tax information necessary for completion of its tax returns. The Partnership will also send its Limited Partners status reports from time to time.

**Amendments**

The Partnership Agreement may be amended from time to time with the consent of the General Partner and by Ordinary Resolution of the Limited Partners, unless the proposed amendment will, or is likely to, cause a Limited Partner to suffer an adverse economic effect, in which case the written consent of such Limited Partner is required. The Partnership Agreement may also be amended by the General Partner to correct ambiguities or inconsistencies provided the proposed amendment does not adversely affect the interest of any Limited Partner or to incorporate provisions, which in the written opinion of counsel to the Partnership are for the protection of Limited Partners.

## XIV.   RISK FACTORS

**INVESTMENT IN THE PARTNERSHIP IS HIGHLY SPECULATIVE. CERTAIN RISKS INHERENT IN THIS INVESTMENT ARE NOTED BELOW. IN ADDITION TO THE RISK FACTORS SET FORTH BELOW, BUSINESSES ARE OFTEN SUBJECT TO RISKS NOT FORESEEN OR FULLY APPRECIATED BY MANAGEMENT. IN REVIEWING THIS MEMORANDUM, POTENTIAL INVESTORS SHOULD KEEP IN MIND OTHER POSSIBLE RISKS THAT COULD BE IMPORTANT AND WHICH COULD ADVERSELY AFFECT THEIR INVESTMENT IN THE PARTNERSHIP.**

**Risks Relating to Real Estate and Financing of Real Estate**

***Investment in the Partnership is subject to general real estate risks.***

The Partnership will be subject to risks generally incident to the financing and development of real estate, including: (a) changes in general economic or local conditions; (b) changes in supply of or demand for similar or competing properties in an area; (c) bankruptcies, financial difficulties or defaults by vendors, contractors and others; (d) changes in tax, real estate, environmental and zoning laws; (e) periods of high interest rates and tight money supply; and (f) general overbuilding or excess supply in the market area. For these and other reasons, no assurance can be given that the Partnership will be profitable or that it will produce the targeted financial returns.

***The Partnership will rely on third parties to complete and operate Harbourside Place.***

The Partnership will make the Loan to the Developer and will rely on the Developer to construct and manage Harbourside Place. The success of Harbourside Place and thus the repayment of the principal and interest under the Loan are beyond the control of the General Partner. The Developer, in turn, will rely on various other third party contractors, subcontractors, and suppliers for the completion of Harbourside Place, and the Developer will rely on third party operators for the operation of Harbourside Place following construction. The ability of the Developer and the third party contractors, subcontractors and suppliers to complete the construction and development of Harbourside Place will be subject to typical construction and development risks, as well as acts of war, work stoppages, interruptions in transportation systems, and other force majeure events. Adverse changes in the operations and financial condition of the Developer, which may have a material adverse effect on Harbourside Place, are beyond the control of the General Partner. Further, no assurances can be given that the Developer will be able to retain competent third party contractors, subcontractors, suppliers or operators to construct or operate Harbourside Place. No assurances can be given that the Developer will be able to lease Harbourside Place in accordance with its projections or that any leases entered into in connection with Harbourside Place will be fully performed, either of which will adversely affect projected revenue from operation of Harbourside Place.

***The success of Harbourside Place depends on the successful development of the larger town of Jupiter waterfront real estate development.***

Harbourside Place is anticipated to be the centerpiece of the town of Jupiter's 2.5-mile waterfront real estate development. The purpose of the Partnership is to make a Qualified Investment and to that end enter into the Loan with the Developer to partially fund the purchase, development construction and operation of Harbourside Place, which represents the initial phase of the town of Jupiter's waterfront real estate development. While the success of the Partnership in obtaining the full repayment of the Loan principal and interest is dependant on the successful construction and operation of Harbourside Place, the long-term success of Harbourside Place may be adversely affected if the remaining phases of the town of Jupiter's larger waterfront real estate development are not successfully developed. The delay or failure of these additional real estate development projects to be properly developed in a timely manner may reduce

the value of Harbourside Place and negatively impact leases and the ability of Developer to repay the Loan.

***The rights of the Partnership under the Loan Agreement will be subordinated to the rights of third parties.***

The investment contemplated by the Partnership is the Loan to the Developer to help fund Harbourside Place. There is no guarantee that the Developer will repay all or any part of the Loan, either at maturity or ever, and the Loan is not guaranteed by any third party. The Partnership's rights to receive payments under the Loan will be subordinated to the Developer's obligations to pay property taxes and other assessments levied by governmental authorities. In addition, in certain situations the laws of Florida and other jurisdictions entitle third party contractors, subcontractors, and suppliers who provide goods and services to Harbourside Place to assert rights to receive payment from the Developer that are superior to the rights of the Partnership under the Loan.

***The Developer's actual construction costs may be greater than what has been budgeted.***

The development and construction of real estate assets such as Harbourside Place is subject to timing, budgeting and other risks that may adversely affect the Developer's operating results. The Developer may alter or abandon development activities associated with Harbourside Place after expending resources to determine their feasibility; occupancy rates and rents at Harbourside Place may not be sufficient to make the property profitable; required financing may not be available on favorable terms or at all; and the construction and lease up of Harbourside Place may not be completed on schedule (resulting in increased debt service and construction costs). Development activities are also subject to risks relating to an inability to obtain, or delays in obtaining, necessary zoning, land-use, building occupancy and other required governmental permit authorizations. Acts of God such as earthquakes, hurricanes, floods or fires could adversely impact Harbourside Place. If any of the above occurs, the ability of the Developer to repay the Loan and the ability of the Partnership Fund to make distributions to the Limited Partners could be adversely affected.

***If the Developer lacks sufficient funds to complete and operate Harbourside Place, the position of investors in the Partnership will be adversely affected.***

The Developer currently does not have sufficient funding to purchase, develop, construct and operate Harbourside Place, even if the Partnership were to extend the maximum principal Loan amount of $100.0 million. For this or other reasons, the Developer may need to finance Harbourside Place through additional funding, a portion of which may rank senior in terms of payment and priority to the Partnership's Loan to the Developer. In addition, to the extent cash flow from Harbourside Place is not sufficient to fund these additional obligations, the Developer may be required to obtain cash from other sources. Unless Harbourside Place generates such cash, the Developer might be required to raise additional equity investment or to borrow additional funds, and there can be no assurance that additional funds will be available on favorable terms, if at all. In that event, the Developer may be required to sell Harbourside Place on disadvantageous terms, or security agreements or guarantees securing any of the Developer's debt may be foreclosed and Harbourside Place sold by priority lenders to repay the debts owing them. This would have a materially adverse effect on the Partnership and its investors.

***There can be no assurance that the Developer will have sufficient funds to complete Harbourside Place and, in particular, the availability of TIF and CDD funding is subject to action by third parties over which the Harbourside Group has no control.***

Harbourside Group has estimated the total amount of funds required to complete the development of Harbourside Place and has also estimated the amount of financing that may be obtained based upon assumptions it deems reasonable. However, there can be no assurance that Harbourside Group's estimates are accurate. In particular, Harbourside Group's estimates assume that tax incremental financing ("TIF")

in the aggregate amount of $5,250,000 and Northern Riverwalk Community Development District ("NRCDD") bonds of up to $22.7 million will all be available to fund Harbourside Place. However, the availability of funds under the TIF program depends on further action by third parties, including governmental agencies, over which the Harbourside Group has no control. Further, the availability of funds under the NRCDD bond program depends on the sale of bonds through the NRCDD, and there can be no assurance that such a sale will be successful. If any of Harbourside Group's estimates or assumptions is inaccurate, additional funds will be required to complete Harbourside Place. There can be no assurance that additional funds will be available on reasonable terms, if at all. If adequate additional funds are not available on reasonable terms, completion of Harbourside Place and repayment of the Loan will be adversely affected.

### The Developer and Partnership may be subject to environmental liability.

Investing in businesses operated on real property involves risks relating to hazardous and toxic contamination of such property or adjacent property, including subsurface and underground water contamination. Such contamination could have a detrimental effect on the Partnership, and can result from the actions of tenants, contractors, patrons, visitors, and other parties, including adjacent property owners, over whom the Partnership could exercise little or no control. The Developer could be required to participate financially in the clean up or other abatement of such contamination, which could cause the Partnership to suffer a loss of some or all of the capital invested in Harbourside Place as well as the loss of any potential profits from Harbourside Place. Under certain circumstances, courts have held that a lender is responsible for the environmental clean-up obligations of its borrower imposed by applicable federal statutes. In the event such circumstances arise, a court might find that the Partnership is liable for such obligations.

### The Developer may face delays in obtaining, or be unable to obtain, required permits.

Prior to securing final certificates of occupancy for Harbourside Place, certain building and safety, handicapped, and other permits may need to be obtained or extended. Additionally, existing public health, fire and safety, liquor, and other licenses may also need to be obtained or extended. While the Partnership believes that the Developer should face no impediments to obtaining any necessary permits and licenses or obtaining any consents or approvals, no assurance can be made that they will be continued or obtained.

### The successful completion and operation of Harbourside Place depends heavily on economic, political, environmental and other factors over which the Partnership has no control.

The Developer's ability to successfully complete and operate Harbourside Place depends in large part on its ability to obtain and utilize equipment, materiel and services in a timely and efficient manner. In particular, Harbourside Place is susceptible to natural and man-made disasters, including war, terrorism, earthquakes, fires, floods, power loss, political or economic instability, disruptions to the financial markets, vandalism and other similar disruptive problems, any of which could adversely affect Harbourside Place and jeopardize repayment of the Loan. The Developer's insurance policies may not adequately compensate it for any losses that may occur due to any resulting damages or interruptions. Among other things, such problems could result in reduced investor confidence, substantial volatility in securities markets and a decline in real estate and related leasing and financing. In addition, general economic conditions may affect the Partnership's activities. Interest rates, general levels of economic activity, the price of securities and participation by other investors in the financial markets may affect the value of investments made by the Partnership or considered for prospective investment.

**Risks Related to the Offering and the Units**

*An investment in the Partnership requires a long-term commitment with no certainty of return.*

Harbourside Place will not generate current income and will not be able to repay the Loan for a number of years, if at all. The Partnership will not provide investors in Units with any return of capital until such time as the Developer has repaid some or all of the Loan. In addition, the Developer has no obligation to repay the Loan until five years from the date of the first advance under the Loan. The Partnership generally will not be able to sell its rights under the Loan. There are no assurances, obligations or guarantees that the Partnership will ever have positive cash flows, make any cash distributions or realize any return on investments in Units. The Limited Partners of the Partnership should be aware that if Harbourside Place is not successful in its business, their entire investment in the Partnership may become worthless.

*The availability and timing of cash distributions is uncertain.*

The Partnership does not expect to make any significant distributions to Limited Partners until Harbourside Place is fully constructed and favorable lease rates are achieved and consistently maintained. Further, the Partnership bears all expenses incurred by its operations, which are deducted from cash funds available for distributions. In addition, the General Partner, in its discretion, may retain any portion of such funds as reserves for working capital.

*Potential investors in Units must deliver their investment prior to acceptance of their subscriptions by the General Partner.*

Each potential investor is required to deliver the subscription price for his or her Unit, together with the $40,000 Administrative Fee, into escrow before the General Partner has accepted his or her subscription. The General Partner may reject a subscription for any reason or for no reason in the exercise of its sole discretion. In addition, a potential investor will not be admitted as a Limited Partner in the Partnership unless and until USCIS has approved the potential investor's I-526 Petition. Further, the General Partner reserves the right to terminate the Offering prior to receipt into escrow of subscription proceeds totaling $25.0 million. As a result, a potential investor may be required to wait an indefinite period before he or she has the right to submit an I-526 Petition. Upon submission of a potential investor's I-526 petition to USCIS, the potential investor's $40,000 Administrative Fee may be released from escrow and delivered to the Regional Center Administrator. In that event, the potential investor will not have the benefit of escrow with respect to these funds, although the Regional Center Administrator will remain obligated to return the $40,000 Administrative Fee to the potential investor if the I-526 Petition is denied, unless the denial results from the potential investor's fraud or misrepresentation.

*There are restrictions on transfer of Units and withdrawal of capital, and no public or other market for the Units exists or will exist.*

The Partnership Agreement imposes restrictions on the transfer, sale, gift or pledge of the Units. Further, the Units have not been and will not be registered under the Securities Act or the securities laws of any jurisdiction, including any foreign jurisdiction, and are being offered in reliance upon an exemption from registration under Section 4(2) of the Securities Act, Regulation S promulgated under the Securities Act and/or Regulation D promulgated under the Securities Act, each of which impose additional restrictions on transfer. The right of Limited Partners to sell, transfer, pledge or otherwise dispose of the Units will be limited by the Securities Act, the Exchange Act and state securities laws. There is no current trading market for the Units, and it is not anticipated that any such market will develop. Limited Partners have no right to withdraw capital from the Partnership. Consequently, holders of Units may not be able to liquidate their investments prior to the end of the Partnership's term.

*There are no firm commitments to purchase Units.*

No commitment has been extended by anyone to purchase all, or any portion, of the Units being offered. The Partnership can give no assurance that the maximum number of Units will be sold, or that any number of Units will be sold. As a result, there can be no assurance that the Partnership will raise sufficient funds in the Offering to carry out its business plan as currently proposed, or that the net proceeds from the initial subscriptions for Units will be in an amount sufficient to enable the Partnership or the Developer to continue operations in any meaningful manner. In the event insufficient subscriptions are received and accepted by the Partnership, the Partnership and the Developer may be forced to curtail or cease their activities, which would likely result in the loss to investors of all or a substantial portion of their investments.

*The Units will not be registered under the Securities Act.*

The Partnership does not intend to register the Units with the Securities and Exchange Commission in reliance upon an exemption from registration under Section 4(2) of the Securities Act, Regulation S promulgated under the Securities Act and/or Regulation D promulgated under the Securities Act. In order for the Partnership to be entitled to rely on these exemptions from the registration requirements of the Securities Act, the Offering must comply with certain requirements, including the requirement that offers and sales be made primarily to Accredited Investors, that no general solicitation take place in connection with the Offering and that no intermediary acting directly or indirectly on behalf of the Partnership engages in activities requiring such intermediary to be licensed as a broker or dealer under state or federal securities laws without having first obtained such a license. In order to benefit from the safe harbor provided by Rule 903 of Regulation S, offers and sales made prior to a one-year distribution compliance period must not be made to or for the benefit of a U.S. Person and in accordance with the following conditions: (i) the purchaser must certify it is either a non-U.S. Person and is not acquiring Units for the account of benefit of any U.S. Person or that it is a U.S. Person acquiring Units in an exempt transaction; (ii) the purchaser must agree (a) that any resale will either be in accordance with Regulation S, after registration, or under a registration exemption, and (b) that the purchaser will not engage in any hedging transaction in respect of Units, except in compliance with the Securities Act; and (iii) the Units will contain an appropriate restrictive legend. Under the terms of the Partnership Agreement, the Partnership is required to refuse to recognize or register any transfer of Units issued under the exemption provided by Regulation S that is not made in accordance with Regulation S, after registration or under a registration exemption. If the Offering does not comply with all of the applicable requirements for an exemption from the registration requirements of the Securities Act, regardless of whether or not the Partnership was aware of any such failure to comply, then the Offering will not be entitled to the applicable exemption. In that event, among other things, the General Partner would have the obligation to either register the Units or terminate the Offering, which would have a material adverse effect on the Partnership and Harbourside Place and could subject the Principals to potential civil or criminal liability.

*The Units will not be registered or qualified under the securities laws of any other jurisdiction.*

The Units have not been registered or qualified for public distribution under the securities laws of any jurisdiction. The Units will be offered without registration and without the filing of a prospectus in reliance upon exemptions available under applicable law. Each potential investor resident outside the United States must be, and will be required to represent that it is, entitled to acquire Units in reliance upon an exemption from the registration or prospectus requirements of applicable securities laws of the potential investor's jurisdiction of residence.  Failure to register or qualify Units in any jurisdiction where registration or qualification is required could have a material adverse effect on the Partnership and Harbourside Place and could subject the Principals to potential civil or criminal liability in that jurisdiction.

***The Partnership will not be registered as an "investment company," and investors in the Units will not receive the protections afforded by the Investment Company Act of 1940.***

The Partnership will not be registered as an "investment company" under the Investment Company Act. Accordingly, Limited Partners will not receive the protections afforded by the Investment Company Act to investors in a registered investment company. Although the Partnership intends to continue to conduct its business so as not to be deemed an investment company under the Investment Company Act, there can be no assurance that the Partnership will not be held to be in violation of the Investment Company Act and required to either register the Partnership as an investment company or terminate the Offering, which would have a material adverse effect on the Partnership and Harbourside Place and could subject the Principals to potential civil or criminal liability.

**Risks Related to the Regional Center Designation and Visa Process**

***The Regional Center Administrator must meet certain conditions in order to maintain USCIS approval of the Florida Regional Center designation and approval of Harbourside Place as a Qualifying Investment.***

The USCIS Approvals require the Regional Center Administrator to monitor the development of Harbourside Place, to meet USCIS recordkeeping and reporting requirements and to notify USCIS in the event of certain changes within the Florida Regional Center or the Harbourside Group. If for any reason the Regional Center Administrator fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the USCIS Approvals, which may have an adverse impact on the Offering and on the status of an investor's ability to complete the required immigration procedures or to maintain his or her visa status.

***Approval of a potential investor's I-526 Petition or application for permanent resident status is not guaranteed.***

Investors in the Offering who have subscribed for Units with the intention of applying for approval of an I-526 Petition under the Pilot Program should be aware of certain risk factors involving the Pilot Program and its administration. There can be no assurance that a potential investor's I-526 Petition will be approved, that an investor will successfully complete the Visa Process, or that upon the approval thereof that the conditions attached to the approval will be removed. Potential investors whose I-526 Petitions are denied will have their $500,000 subscriptions and their $40,000 Administrative Fee returned; provided, that a potential investor whose I-526 Petition is denied as a result of the potential investor's fraud and/or misrepresentation in connection with the I-526 Petition will forfeit his or her $40,000 Administrative Fee. Though the Partnership intends to replace returned subscriptions with the proceeds of subscriptions of other investors, there is no assurance that the Partnership will be able to do so, which may result in a failure to raise desirable or adequate amounts of capital needed to fund Harbourside Place. Even if the Partnership is able to attract replacement investors, the lengthy timing of the I-526 Petition process may delay construction of Harbourside Place.

***There are a limited number of EB-5 immigrant visas available under the Pilot Program, and certain requirements of the Pilot Program are subject to varying interpretation.***

In particular, under the Pilot Program the USCIS has allocated a maximum of 3,000 immigrant visas in each U.S. government fiscal year of October 1 through September 30, and there can be no assurance that one of these visas will be available to an investor or an investor's qualifying family member in any particular fiscal year or at all. Further, USCIS reserves the right to deny any I-526 Petition or I-829 Petition if USCIS deems a "material change" to have occurred with respect to the Qualifying Investment underlying the I-526 Petition or I-829 Petition. The Pilot Program does not define "material change," and there can be no assurance that USCIS will not consider any particular change to a Qualifying Investment to be material.

**Risks Related to Performance and Management of Harbourside Group**

*Harbourside Group includes newly formed legal entities which makes it difficult to evaluate their business and prospects.*

The Regional Center Administrator, the Partnership, the General Partner and the Developer are each newly formed entities, with no history of operations. As a consequence of being newly formed, these entities have no revenues or financial results upon which a potential investor can determine their ability to assess the financial feasibility of an investment in Units, the Loan or Harbourside Place. The Partnership's activities to date have been limited to the Offering. The Partnership anticipates that the profits, if any, generated by the interest payments under the Loan along with the repayment of principal under the Loan will be its sole source of its revenue.

*The Partnership's only business activity will be to extend the Loan to the Developer to partially fund the purchase, development, construction and operation of Harbourside Place.*

The Partnership expects to participate in one business activity, the Loan to the Developer to fund a portion of Harbourside Place's costs. In addition, if the Developer fails to repay the Loan at maturity, the entire outstanding principal amount of the Loan will be converted into an ownership interest in the Developer. As a consequence, the aggregate return of the Partnership will be substantially affected by the unfavorable performance of Harbourside Place.

*The success of Harbourside Place is dependant on key personnel.*

The success of Harbourside Place and therefore the repayment of the Loan to the Partnership depends in substantial part upon the skill and expertise of the Principals and the other individuals employed to assist them. There can be no assurance that the Principals or such other individuals will continue to be associated with Harbourside Place. The loss of the services of one or both Principals or such other individuals could have a material adverse effect on Harbourside Place.

*Harbourside Group consists of Allied, Jupiter Waterways, the Regional Center Administrator, the Developer, the Partnership and the General Partner, which are related entities under the ultimate control of the Principals, and the Principals may engage in similar or competing business activities.*

Harbourside Group, comprising Allied, Jupiter Waterways, the Regional Center Administrator, the Developer, the Partnership and the General Partner, is under the ultimate control of the Principals, who are not required to devote their full time to Harbourside Place and are free to engage in other business activities, including activities that compete with the business of Harbourside Group and Harbourside Place. Any fees, compensation or other amounts payable to the Principals and their respective affiliates from such business activities will inure solely to the benefit of such persons. Further, the General Partner, which is owned and controlled by the Principals, will effectively control all matters relating to the Partnership and its business. Except as expressly provided in the Partnership Agreement, the Limited Partners of the Partnership will not have the right to participate in the management of the Partnership or its business. Similarly, following any conversion of the Loan into an ownership interest in the Developer, the Limited Partners of the Partnership will not have any right to participate in the management of the Developer or its business.

*The manager of the General Partner is a licensed attorney with an attorney-client relationship with members of the Harbourside Group.*

The Principals have appointed R. Bowen Gillespie to manage the General Partner in carrying out its responsibilities as the General Partner of the Partnership. Mr. Gillespie is a licensed attorney who represents the Principals in various matters. If a dispute should arise between the Harbourside Group and investors, the professional rules applicable to lawyers may limit or prevent Mr. Gillespie from providing

further legal representation to the Harbourside Group and may require Mr. Gillespie to withdraw from his role as manager of the General Partner.

***The initial disbursements under the Loan to the Developer will be used to fund the purchase of the Primary Property from Jupiter Waterways, which will benefit third parties, including the Principals.***

The Developer, which is owned and controlled by the Principals, intends to purchase the Primary Property from its current owner, Jupiter Waterways, which is also owned and controlled by the Principals. Of the total purchase price of $31.5 million, approximately $22.5 million will be funded through Loan disbursements and used by Jupiter Waterways to retire existing secured bank debt and pay other outstanding obligations, including to return capital invested in Jupiter Waterways and to make payments to or for the benefit of the Principals. Allocation of large initial disbursements of investor funds to make these payments, rather than to fund construction of Harbourside Place, may adversely affect the Developer's ability to complete Harbourside Place in a timely manner or at all. Further, it is possible that the Partnership will sell sufficient Units to enable the Developer to acquire the Property and thereby fund payments by Jupiter Waterways to third parties and to the Principals, but insufficient Units to fund the Developer's actual development, construction and operation of Harbourside Place.

***The Developer must acquire the right to purchase the Town Property, and may not be able to perform its obligations to the town of Jupiter even if it does acquire the right to purchase the Town Property.***

Jupiter Waterways has entered into a contract to purchase the Town Property from the town of Jupiter on or before September 30, 2012, for a total purchase price of $2.5 million in cash. The Harbourside Group anticipates that the town of Jupiter will consent to an assignment of purchaser rights to the Developer. If the town of Jupiter does consent to an assignment, the Developer must demonstrate proof of financing commitments on or before May 15, 2012, and must purchase the Town Property prior to September 30, 2012. Further, the Developer must complete construction of Harbourside Place by December 15, 2013 or pay liquidated damages of up to $500,000. There can be no assurance that the town of Jupiter will consent to an assignment, or that the Developer will be able to perform its obligations under the purchase contract, particularly if the number and timing of Unit sales are insufficient to fund these obligations.

***The Partnership and the Developer will operate in a competitive marketplace.***

The Partnership will be competing with a significant number of similar investment opportunities under the Pilot Program, and the Developer will be competing with a significant number of high-quality real estate development projects for funding and prospective tenants. As a result, there can be no assurance that the Partnership will attract the desired number of Limited Partners or that it will acquire sufficient funds to make the Loan to the Developer. In addition, there can be no assurance that the Developer will be able to attract the additional funding required to successfully construct Harbourside Place or locate suitable tenants following completion of construction.

***The Partnership's creditors will have recourse to Partnership assets.***

The Partnership's assets, including any investments made by the Partnership and any capital held by the Partnership, are available to satisfy all liabilities and other obligations of the Partnership.  If the Partnership itself becomes subject to a liability, parties seeking to have the liability satisfied may have recourse to the Partnership's assets generally and not be limited to any particular asset, such as the asset giving rise to the liability.

***Uninsured losses may adversely affect the Partnership.***

Certain risks in connection with Harbourside Place are either uninsurable or not fully insurable at commercially reasonable rates. The occurrence of one or more of these risks could have a detrimental effect on the Partnership. Examples of uninsurable or partially uninsurable losses are those arising from

hurricane, flood, earthquakes, war and acts of nature, among others. Should such an uninsurable loss occur, the Partnership could suffer a loss of some or all of its capital.

***The Limited Partners may lose their investment in the event of the Developer's bankruptcy.***

The Developer may become the subject of voluntary or involuntary bankruptcy proceedings under applicable bankruptcy laws. Certain risks faced in bankruptcy cases that must be factored into the investment decision include, for example, the potential total loss of the Partnership's Loan to the Developer and, consequently, the potential total loss of the Limited Partners' investment in the Partnership. Upon confirmation of a plan of reorganization under applicable bankruptcy laws, or as a result of a liquidation proceeding, the Partnership could suffer a loss of all or a part of the value of the Loan.   A bankruptcy filing may adversely and permanently affect the Developer and Harbourside Place. The Developer could lose market position and key employees, and the liquidation value of the Developer may not equal the liquidation value that was believed to exist prior to the making of the initial investment.

### Legal, tax and regulatory risks

***There are general tax risks of which each potential investor should be aware.***

There are tax risks associated with the acquisition, holding and disposition of the Units. In addition, federal, state and local tax laws and rules relating to the Partnership and its activities are complex. Potential investors in the Units are strongly urged to review the Partnership Agreement and to consult their own professional advisors in this regard.

***The Partnership's tax status for federal income tax purposes could change.***

The Partnership intends to be taxed as a partnership for federal income tax purposes. If, as the result of changes in the law or the manner in which the Partnership is operated, the Internal Revenue Service were to successfully take the position that the Partnership should be treated for tax purposes as a corporation rather than a partnership, Partnership income could be taxed at the partnership level at corporate tax rates and Partnership distributions, if any, could be treated as dividends, among other consequences.

***Limited Partners may have taxable income without distributions.***

Income, gains, losses, deductions and credits from the Partnership will be allocated among the Limited Partners for U.S. federal income tax purposes in accordance with the Partnership Agreement, and Limited Partners will be required to report such income, gains, losses, deductions and credits on their own income tax returns whether or not they receive distributions of cash from the Partnership. It is possible that in a given year a Limited Partner will be allocated income or gain that will be subject to tax in an amount in excess of the amount of cash (if any) distributed by the Partnership to the Limited Partner, thus requiring the Limited Partner to use funds from other sources to pay any tax liability arising from such allocation. If the Partnership incurs losses, Limited Partners will not be able to deduct such losses if they exceed such Limited Partners' tax basis in their Units. In addition, the Internal Revenue Code imposes various limitations on the ability of certain persons to use losses and deductions arising from investments in entities such as the Partnership, including limitations relating to "passive losses," amounts "at risk" and "investment interest."

***Special tax rules may apply to tax exempt and foreign persons.***

Ownership of Units in the Partnership may result in adverse income tax consequences to tax exempt and foreign persons. Accordingly, tax exempt and foreign persons are strongly urged to consult their own professional advisors with respect to an investment in the Partnership.

***Certain risks are associated with forward-looking statements.***

This Memorandum or the other materials furnished to potential investors by the Partnership relating to Harbourside Place or an investment in the Units (the "Materials") may contain certain forward-looking statements regarding the plans and objectives of the Partnership, including plans and objectives relating to Harbourside Place. The forward-looking statements included herein are based on current expectations that involve numerous risks and uncertainties. Assumptions relating to the statements involve judgments with respect to, among other things, future political, economic, competitive and market conditions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Partnership or the General Partner, or any of their respective affiliates. The assumptions underlying the forward-looking statements may in retrospect turn out to have been unreasonable and inaccurate. Therefore, there can be no assurance that any forward-looking statements included in the Materials will prove to be accurate. In light of the significant uncertainties inherent in the forward- looking statements included herein, the inclusion of such information should not be regarded as a representation by the Partnership or any other person or entity that the objectives and plans of the Partnership will be achieved.

***Changes in applicable law may occur during the course of an investment in the Partnership.***

The Partnership must comply with various legal requirements, including requirements imposed by United States and foreign immigration laws, anti-money laundering laws, securities laws, commodities laws, tax laws and pension laws. Should any of those laws change over the life of the Partnership, the legal requirements to which the Partnership and the Limited Partners may be subject could differ materially from current requirements.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Partnership. Potential investors should read the entire Memorandum and consult their own counsel and advisors before deciding to invest in the Partnership.**

## XV.   CONFLICTS OF INTEREST

The following discussion enumerates certain conflicts of interest and potential conflicts of interest among the General Partner, its affiliates, the Principals, the Partnership and the Limited Partners. Such conflicts will have to be resolved through the exercise of the General Partner's judgment consistent with its fiduciary responsibility to the Limited Partners.

**Related Parties**

Harbourside Group, comprising Allied, Jupiter Waterways, the Regional Center Administrator, the Developer, the Partnership and the General Partner, is under the ultimate control of the Principals, Nicholas A. Mastroianni II and Richard L. Yellen. The Principals will effectively control all matters relating to the Partnership and its business, including the lender's rights under the Loan, while at the same time the Principals will effectively control all matters relating to the Developer and its business, including the borrower's obligations under the Loan. Under the terms of the Developer's operating agreement, the Principals are entitled to receive a management fee equal to 9% of the Developer's annual gross revenues and, in the event of a sale or refinancing, an amount equal to 9% of such sale of refinancing proceeds. Further, it is anticipated that Mr. Mastroianni will render construction management and other services to the Developer or other members of the Harbourside Group for compensation. It is also anticipated that Mr. Yellen will render legal services to the Developer or other members of the Harbourside Group for compensation. Any such compensation will inure solely to the benefit of Mr. Mastroianni and Mr. Yellen, respectively.

**Acquisition of the Primary Property from Jupiter Waterways, LLC**

The Developer, which is owned and controlled by the Principals, intends to purchase the Primary Property from its current owner, Jupiter Waterways, which is also owned and controlled by the Principals. The total purchase price of $31.5 million, of which $22.5 million will be paid in cash. The remaining $9.0 million will take the form of a capital contribution by Jupiter Waterways in the Developer and will constitute a portion of the Principals' equity investment in Harbourside Place. At the option of the Principals following the closing of the Offering, the Developer will exchange this $9.0 million capital contribution for the Related Party Note, which will rank junior to all other indebtedness of the Developer including the Loan. The outstanding principal amount under the Related Party Note will accrue interest at the rate of two percent per annum. Principal and accrued interest will become due and payable only when the Partnership's Loan to the Developer has been fully repaid.

The Developer intends to use initial disbursements under the Loan from the Partnership, which is controlled by the Principals, to fund the entire $22.5 million cash portion of the $31.5 million purchase price for the Primary Property. Jupiter Waterways intends to apply the $22.5 million cash portion of the purchase price for the Primary Property to payment of certain outstanding obligations, anticipated to comprise repayment of approximately $15.0 million of secured bank debt, repayment of an approximately $2.0 million capital contribution to the estate of Jack P. Schleifer, an investor in Jupiter Waterways, repayment of approximately $1.5 million of seller financing obligations, and repayment of the initial installment of $585,067 due and payable under the CRA Loan. Jupiter Waterways intends to pay the remaining balance of approximately $3.4 million to pay the initial installment of the CRA Loan in the amount of $585,067. Jupiter Waterways intends to pay the remaining balance of approximately $3.4 million to or for the benefit of the Principals in respect of services previously rendered by the Principals to Jupiter Waterways, a portion of which amount the Principals intend to contribute to the Developer as a cash equity investment in Harbourside Place.

**Diverse Membership**

The Limited Partners of the Partnership may include persons in various jurisdictions. As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one Limited Partner than for another. In making decisions appropriate for the Partnership the General Partner will consider the business objectives of the Partnership as a whole, not the objectives of any Limited Partner individually.

**Management of the Partnership**

It is expected that the Principals will continue to be fully engaged in their separate business endeavors, including investments in real estate or any other similar related matters, whether in competition with the Partnership or not. The Partnership Agreement permits Partners and their affiliates to engage in such activities that are competitive with the Partnership or otherwise and without incurring any obligation to offer any interest in such activities to the Partnership or any other Partners. Regardless, conflicts of interests may arise for the Principals in allocating their time, services or functions among Allied, Jupiter Waterways, the Regional Center Administrator, the Developer, Harbourside Place, the Partnership, the General Partner and their other professional commitments.

**Lack of Separate Representation**

The Principals and Harbourside Group, comprising Allied, Jupiter Waterways, the Regional Center Administrator, the Developer, the Partnership and the General Partner, may be represented by the same legal counsel, accountants, and other professional advisors. Certain potential investors may also seek legal representation from legal counsel to the Regional Center Administrator, Foster Quan LLP, or from other

immigration attorneys who have represented or advised the Principals or Harbourside Group and who may do so in the future. Any such potential investors seeking such representation may be required to execute a waiver of conflict of interest prior to engaging legal representation from any of these immigration attorneys.

## XVI.   INCOME TAX CONSIDERATIONS

An investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local income and other possible tax consequences of his or her investment in the Units, and no tax advice will be provided hereunder or at any time in the future. However, as a general rule, a resident alien of the United States will be taxed on all of his or her worldwide income and will be required to file a United States income tax return. In addition, if an alien is not a resident of the United States but has United States source income he or she generally will be subject to taxation in the United States on such income, and such income may be subject to withholding and/or reporting on a United States income tax return.

## XVII.   TAX AND LEGAL ASPECTS

Potential investors of the Units should not construe the contents of this Memorandum or any prior or subsequent communications from the Partnership, the General Partner, or any of their respective agents or representatives, as legal, tax, and/or investment advice. No representations are made as to the federal, state, or local income tax consequences resulting from an investment in the Units. No assurances are given that any deductions or other income tax advantages that may be contemplated will be available. Each potential investor should consult his or her own legal counsel, accountant, and/or other professional advisor as to legal, tax, investment, accounting, securities and/or related matters concerning an investment in the Partnership, and each potential investor is responsible for all fees or charges of any such advisor.

## XVIII.   RESTRICTIONS ON TRANSFERABILITY

The Units being offered hereby have not been registered under the Securities Act or the securities laws of any jurisdiction, including any foreign jurisdictions, and are being offered in reliance upon an exemption from registration under the Securities Act, as amended including a Section 4(2) and Regulation D and/or Regulation S promulgated under the Securities Act. The right of subscribers to sell, transfer, hedge, pledge or otherwise dispose of the Units will be limited by the Securities Act and state securities laws. The Partnership Agreement also restricts the ability of the Limited Partners to transfer their Units. See "Transferability of Interests and Withdrawal" section beginning on page 24.

**NOTICE TO RESIDENTS OF FLORIDA**

A purchaser (other than an institutional investor described in section 517.061(7), Fla. Stat.) who accepts an offer to purchase securities exempted from registration by section 517.061(11), Fla. Stat., may void such purchase within a period of three (3) days after (a) he first tenders consideration to the issuer, its agent or an escrow agent or (b) the availability of that privilege is communicated to the purchaser, whichever later occurs, unless sales are made to fewer than five (5) purchasers in Florida (not counting those institutional investors described in section 517.061(7)).

**NOTICE TO RESIDENTS OF ARGENTINA**

The Units shall not be publicly offered in Argentina. Therefore, this Memorandum has not been approved by the Comisión Nacional de Valores.  This offer does not constitute a public offering of securities within the scope of the Argentine Federal Law n°17.811. This Memorandum and other offering materials relating to the offer of the Units are being supplied only to those investors who have expressly requested it.  They are strictly confidential and may not be distributed to any person or entity other than the recipients hereof.

**NOTICE TO RESIDENTS OF AUSTRALIA**

Investment in the Units is available only to sophisticated investors and/or professional investors as these terms are defined in section 708 of the Corporations Act.  This Memorandum can only be used by investors receiving it (electronically or otherwise) in Australia. This Memorandum is not an offer or invitation in any place in which, or to any person to whom, it would not be lawful to make that offer or invitation. The distribution of this Memorandum outside Australia may be restricted by the laws of places where it is distributed and therefore persons into whose possession this Memorandum comes should seek advice on and observe those restrictions.  The Partnership is not registered as a managed investment scheme in Australia and this Memorandum will not be lodged with the Australian Securities and Investments Commission (AISC).

**NOTICE TO RESIDENTS OF AUSTRIA**

The Units may only be offered in the Republic of Austria in compliance with the provisions of the Austrian Capital Market Act and the Austrian Investment Funds Act and any other laws applicable in the Republic of Austria governing the offer and sale of the Units in the Republic of Austria.  The Units are not registered or otherwise authorized for public offer under the Capital Market Act or the Investment Funds Act or any other relevant securities legislation in Austria.  The recipients of this Memorandum and other selling material in respect to the Units have been individually selected and are targeted exclusively on the basis of a private placement.  Accordingly, the Units may not be, and are not being, offered or advertised publicly or offered similarly under either the Capital Market Act or the Investment Funds Act or any other relevant securities legislation in Austria. This offer may not be made to any persons other than the recipients to whom this Memorandum is personally addressed.

**NOTICE TO RESIDENTS OF BAHRAIN**

All applications for investment should be received, and any allotments should be made, in each case from outside Bahrain. This Memorandum has been prepared for private information purposes of intended investors only who will be high net worth individuals and institutions.  The Partnership represents and warrants that it has not made and will not make any invitation to the public in the Kingdom of Bahrain and that this Memorandum will not be issued, passed to, or made available to the public generally.  The Bahrain Monetary Agency ("BMA") has not reviewed, nor has it approved, this Memorandum or the

marketing of the Units in the Kingdom of Bahrain. Accordingly, the Units may not be offered or sold in Bahrain or to residents thereof except as permitted by Bahrain law. The BMA is not responsible for the performance of the Partnership.

**NOTICE TO RESIDENTS OF BELGIUM**

This Memorandum relates to a private placement and does not constitute an offer or solicitation to the public in Belgium to subscribe for or acquire the Units.   The Partnership has not been and will not be registered with the Belgian Banking, Finance and Insurance Commission (Commissie voor het Bank-, Financie- en Assurantiewezen / Commission bancaire, financière et des assurances (CBFA)) as a foreign collective investment institution under Article 4, 2°of the Belgian law of July 20, 2004 relating to certain forms of collective management of investment portfolios.   The offering in Belgium has not been and will not be notified to the CBFA. This Memorandum has not been and will not be approved by the CBFA. The Units may therefore not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, whether directly or indirectly, except to (i) eligible qualified investors referred to in Article 3.2(a) of Directive 2003/71/EC of November 4, 2003 (the "Prospectus Directive") or (ii) investors wishing to acquire Units for a total consideration of at least EUR€50,000 (or its equivalent in foreign currencies) per transaction, as specified in Article 3.2(c) of the Prospectus Directive.   This Memorandum has been issued to the intended recipient for personal use only and exclusively for the purposes of the offering.   Therefore, it may not be used for any other purpose or passed on to any other person in Belgium.

This Memorandum has been issued to the intended recipient for personal use only and exclusively for the purposes of the offering. Therefore, it may not be used for any other purpose nor passed on to any other person in Belgium.

**NOTICE TO RESIDENTS OF CANADA**

**Purchase and Resale Restrictions**

The Units are being offered on a private placement basis in reliance upon prospectus and registration exemptions under applicable securities legislation in each of the provinces of Canada.   Resale of the Units offered hereby will be subject to restrictions under applicable securities legislation, which will vary depending upon the relevant jurisdiction.   Generally, the Units may be resold only pursuant to an exemption from the prospectus and registration requirements of applicable securities legislation, pursuant to an exemption order granted by appropriate securities regulatory authorities or after the expiry of a hold period following the date on which the Partnership becomes a reporting issuer under applicable securities legislation.   It is not anticipated that the Partnership will become a reporting issuer.   In addition, Limited Partners reselling the Units may have reporting and other obligations.   Accordingly, Limited Partners are advised to seek legal advice with respect to such restrictions and obligations.   Resale of Units is also restricted under the terms of the Partnership Agreement.   Accordingly, each potential investor must be prepared to bear the economic risk of the investment for an indefinite period.

Each purchaser of Units will be required to deliver to the Partnership a subscription agreement in which such purchaser will represent to the General Partner and the Partnership that such purchaser is entitled under applicable provincial securities laws to purchase such Units without the benefit of a prospectus qualified under such securities laws.

**Rights of Action for Damages or Rescission**

Securities legislation in certain of the provinces of Canada provides certain purchasers with, or requires certain purchasers to be provided with, in addition to any other rights they may have at law, a right of action for rescission or damages or both, against the Partnership, and in certain cases, other persons, where this Memorandum and any amendment to it and, in certain cases, advertising and sales literature used in connection therewith, contains a misrepresentation. Where used herein, the term "misrepresentation" means an untrue statement of a material fact or an omission to state a material fact that is required to be stated or that is necessary to make any statement not misleading or false in light of the circumstances in which it was made, and the expression "material fact" means a fact that significantly affects or would reasonably be expected to have a significant effect on the market price or value of the Units. These remedies or notice with respect thereto must be exercised or delivered, as the case may be, by the purchaser within the time limits prescribed by applicable securities legislation. The following is a summary of the rights of rescission or damages, or both, available to purchasers under the securities legislation of certain of the provinces of Canada. Each purchaser should refer to the provisions of applicable securities legislation for the particulars of these rights or consult with a legal advisor.

**Ontario**

The rights of action for rescission or damages described herein is conferred by section 130.1 of the Securities Act (Ontario). In the event that this Memorandum, together with any amendments hereto, delivered to an Ontario purchaser contains a misrepresentation, a purchaser will, as provided below, have a right of action against the Partnership for damages, or for rescission, if still the owner of the Units, without regard to whether the purchaser relied on the misrepresentation, in which case, if the purchaser elects to exercise the right of rescission, the purchaser will have no right of action for damages against the Partnership provided that, among other limitations: in the case of an action for rescission, the purchaser must give notice to the defendant not more than 180 days after the date of the transaction that gave rise to the cause of action, that the purchaser is exercising such right; in the case of any action, other than an action for rescission, no action shall be commenced more than the earlier of (i) 180 days after the purchaser first had knowledge of the facts giving rise to the cause of action, or (ii) three years after the date of the transaction that gave rise to the cause of action; the Partnership will not be liable if it proves that the purchaser purchased the Units with knowledge of the misrepresentation; in the case of an action for damages, the Partnership will not be liable for all or any portion of the damages that the Partnership proves do not represent the depreciation in value of the interests as a result of the misrepresentation relied upon; and in no case will the amount recoverable in any action exceed the price at which the Units were offered.

The securities legislation in Ontario does not extend the above-mentioned statutory rights of action for damages or rescission to an Ontario purchaser that is: (a) a "Canadian financial institution" or a "Schedule III bank" (each as defined in NI 45-106); (b) the Business Development Bank of Canada; or (c) a subsidiary of any person referred to in (a) or (b) above, if the person owns all the voting securities of the subsidiary, except the voting securities required by law to be owned by the directors of that subsidiary.

**New Brunswick**

Pursuant to section 150 of the Securities Act (New Brunswick), in the event this Memorandum, together with any amendments hereto, or any information relating to the offering, delivered to a New Brunswick purchaser contains a misrepresentation and it was a misrepresentation at the time of purchase, the purchaser will be deemed to have relied upon the misrepresentation and will, as provided below, have a right of action against the Partnership for damages, or while still owner of the Units, for rescission, in

which case, if the purchaser elects to exercise the right of rescission, the purchaser will have no right of action for damages against the Partnership provided that, among other limitations: in the case of an action for rescission, the purchaser must give notice to the defendant not more than 180 days after the date of the transaction that gave rise to the cause of action; in the case of any action, other than an action for rescission, no action shall be commenced more than the earlier of (i) one year after the purchaser first had knowledge of the facts giving rise to the cause of action, and (ii) six years after the date of the transaction that gave rise to the cause of action; the Partnership shall not be liable where it is not receiving any proceeds from the distribution of the securities being distributed and the misrepresentation was not based on information provided by the Partnership unless the misrepresentation (i) was based on information that was previously publicly disclosed by the Partnership, (ii) was a misrepresentation at the time of its previous public disclosure, and (iii) was not subsequently publicly corrected or superseded by the Partnership before the completion of the distribution of the securities being distributed; in an action for damages, the Partnership will not be liable for all or any portion of the damages that it proves do not represent the depreciation in value of the Units as a result of the misrepresentation relied upon; in an action for damages or rescission, the Partnership will not be liable if it proves that the purchaser purchased the Units with knowledge of the misrepresentation; and in no case will the amount recoverable in any action exceed the price at which the Units were offered.

**General**

The rights discussed above are in addition to and without derogation from any other rights or remedies available at law to the purchaser and are intended to correspond to the provisions of the relevant securities legislation and are subject to the defenses contained therein.   The foregoing summaries are subject to the express provisions of the applicable securities legislation in each of the foregoing provinces and the regulations, rules and policy statements thereunder and reference is made thereto for the complete text of such provisions.

**Enforcement of Legal Rights**

All of the Partnership's, General Partner's and their affiliate's directors and officers will be located outside of Canada and, as a result, it may not be possible for Canadian purchasers to effect service of process within Canada upon the Partnership or such persons.   All or a substantial portion of the assets of the Partnership or such persons may be located outside of Canada and, as a result, it may not be possible to satisfy a judgment against the Partnership or such persons in Canada or to enforce a judgment obtained in Canadian courts against the Partnership or such persons outside of Canada.

**NOTICE TO RESIDENTS OF DENMARK**

This Memorandum does not constitute a prospectus under any Danish laws or regulations and has not been filed with or approved by the Danish Financial Supervisory Authority as this Memorandum has not been prepared in the context of either (i) a public offering of securities in Denmark within the meaning of the Danish Securities Trading Act no. 479/2006 as amended from time to time or any Executive Orders issued in connection thereto or (ii) an offering of a collective investment scheme comprised by the Danish Investment Association Act no. 55/2006 as amended from time to time or any Executive Orders issued in connection thereto. This Memorandum will only be offered directly or indirectly to Danish "qualified investors" as defined in Section 2 of Executive Order no. 306/2005.

**NOTICE TO RESIDENTS OF FRANCE**

French residents are hereby advised that this Memorandum has not been submitted to the French Autorité des Marchés Financiers for approval. Accordingly, the marketing of Units of the Partnership and the distribution of this Memorandum is restricted in France.

In particular, no direct or indirect offer to purchase the Units has been, or shall be, made to the public in France, and neither this Memorandum nor any other material relating to purchase or transfer of the Units may be distributed or caused to be distributed to the public in France. Any subsequent transfer of the Units will be subject to applicable restrictions relating to public offers of securities in France.

All such offers to purchase or transfer the Units have been and shall only be made in France to (i) qualified investors (investisseurs qualifiés), (ii) a restricted circle of investors (cercle restreint d'investisseurs), acting for their own account, and/or (iii) persons carrying out the activity of portfolio management on behalf of third parties (gestion de portefeuille pour compte de tiers), all as defined in, and in accordance with, Articles D. 411-1, D. 411-2, D. 734-1, D. 744-1, D. 754-1 and D. 764-1 of the French Monetary and Financial Code.

Units may only be offered to the public in France in accordance with Articles L. 411-1, L. 411-2, L. 412-1 and L. 621-8 et seq. of the French Monetary and Financial Code (formerly, Articles 6 and 7 of Ordinance No. 67-833 of 28th September 1967, as amended).

This Memorandum and other offering materials relating to the offer of Units are strictly confidential and may not be distributed to any person or entity other than the recipients hereof.

**NOTICE TO RESIDENTS OF GERMANY**

The offered Units may only be distributed or acquired within the Federal Republic of Germany ("Germany") in accordance with the German Investment Act (Investmentgesetz – "INVG"), the German Sales Prospectus Act (Wertpapier-Verkaufsprospekt-Gesetz – "VERKPROSPG"), the German Securities Prospectus Act (Wertpapierprospektgesetz – "WPPG") and any other laws and regulations applicable in Germany governing the issue, offering, distribution and sale of the offered Units.

The distribution of the offered Units has not been notified, and the offered Units are not registered or authorized for public distribution in Germany. This Memorandum has not been filed or deposited with the Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht – "Bafin"). Therefore, the offered Units must not be distributed (i) by way of a public offer, public advertisement or in any similar manner within the meaning of Section 2 (11) of the INVG or (ii) by way of public offering within the meaning of Section 8f of the VERKPROSPG or (iii) by way of public offering within the meaning of Section 2 no. 4 of the WPPG, nor shall this Memorandum constitute such public offer, public advertisement or similar offer. No German prospectus within the meaning of the INVG, the VERKPROSPG or the WPPG has been or will be prepared, published or otherwise provided.

This Memorandum shall only be addressed to recipients to whom this Memorandum is personally addressed and does not constitute an offer or advertisement to the public, nor may it be supplied to the public in Germany or used in connection with any offer for subscription of the offered Units to Germany.

The offered Units may fall within the scope of the German Investment Tax Act (Investmentsteuergesetz - "INVSTG"). Therefore, it cannot be excluded that German investors may be faced with taxes pursuant to the INVSTG. Please note that it is not contemplated to provide or issue certain information designated in the INVSTG.

All prospective German investors are urged to seek independent tax advice.   This Memorandum does not contain any tax advice or explain the possible tax consequences of an investment.

This Memorandum and other offering materials relating to the offer of Units are strictly confidential and may not be distributed to any person or entity other than the recipients hereof.

## NOTICE TO RESIDENTS OF GREECE

The Partnership has not been approved by the Greek Capital Market Commission for distribution in Greece.   This Memorandum and the information contained herein do not and shall not be deemed to constitute an invitation to the public in Greece to purchase the Partnership. The Partnership may not be distributed, offered or in any way sold in Greece except as permitted by Greek Law.   The Partnership does not have a guaranteed performance and past returns do not guarantee future ones.

## NOTICE TO RESIDENTS OF HONG KONG

No person may offer or sell in Hong Kong, by means of any document, any Units other than (a) to "professional investors" as defined in the Securities and Futures ordinance (cap. 571) and the Securities Futures (Professional Investors) Rules of Hong Kong; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that ordinance.

No person may issue, or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to the Units, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to Units which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance (cap. 571) and the Securities Futures (Professional Investors) Rules of Hong Kong.

The contents of this Memorandum have not been reviewed by any regulatory authority in Hong Kong. The recipient of this Memorandum is advised to exercise caution in relation to the offer.   If The recipient of this Memorandum is in any doubt about any of the contents of this Memorandum, such recipient should obtain independent professional advice.

This Memorandum is delivered only to the recipient solely for the purpose of evaluating a possible investment in the Partnership and may not be used, copied, reproduced or distributed in whole or in part, to any other person (other than professional advisors of the potential investor receiving this document who are subject to confidentiality obligations).   Subscriptions will not be accepted from any person other than the person to whom this Memorandum has been delivered.

This Memorandum may not be used, copied, reproduced or distributed in whole or in part by the recipient to any other person.

## NOTICE TO RESIDENTS OF ITALY

The Units to be offered pursuant to this Memorandum have neither been nor will be registered under the relevant securities laws of Italy.

This Memorandum does not constitute nor intend to be an offer to sell or a solicitation of any offer to buy the Units in the Italian jurisdiction.   Accordingly, where directed to an Italian resident, this

Memorandum is for information purposes only. Pursuant to this Memorandum, the Units may not be offered and any circular, advertisement or other document or offering material relating to such Units may not be published, distributed or made available in the Republic of Italy or to any Italian resident investor in circumstances which would be in breach of relevant Italian laws and regulations.

**NOTICE TO RESIDENTS OF JAPAN**

The Units have not been and will not be registered under the Securities and Exchange Law of Japan ("SEL"), and the Units may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (including Japanese corporations) or to others for re-offering or resale, directly or indirectly, in Japan or to any resident of Japan, except in compliance with the private placement directed solely to Qualified Institutional Investors (as defined under SEL) or otherwise except in compliance with the SEL and other applicable laws and regulations of Japan.   In particular, Investors in Japan may transfer the Units only to other Qualified Institutional Investors (a "Transferee") and should notify any Transferee in writing upon or prior to any transfer that (i) such Units may only be transferred to Qualified Institutional Investors and (ii) any Qualified Institutional Investors to whom the Units are subsequently transferred are subject to such condition.   In this paragraph, "a resident/residents of Japan" shall have the meaning as defined under the Foreign Exchange and Foreign Trade Law of Japan.

This Memorandum is confidential and is intended solely for the use of its recipient.   Any duplication or redistribution of this Memorandum is prohibited.   The recipient of this Memorandum, by accepting delivery thereof, agrees to return it and all related documents to the General Partner if the recipient elects not to purchase any of the Units offered hereby or if requested earlier by the General Partner.   Neither return of the principal amount nor distribution of profit is guaranteed.   This investment in the Units involves certain risks of deficit caused by fluctuation of interest rates, currency and other market factors, or the credit risk of the counter-parties or relevant parties thereof.   Please read the terms of the investment carefully, in particular, those relating to limitations on the period in which rights relating to such investment can be exercised.

**NOTICE TO RESIDENTS OF KUWAIT**

The offer of Units is aimed at institutions and sophisticated, high net worth individuals only, this Memorandum is being sent at the written request of the investor, no public offering of the Units is being made in Kuwait, no mass-media means of contact are being used and the transaction will be concluded outside Kuwait.

**NOTICE TO RESIDENTS OF LUXEMBOURG**

The Units may not be offered or sold in the Grand-Duchy of Luxembourg, except for Units which are offered in circumstances that do not require the approval of a prospectus by the Luxembourg financial regulatory authority in accordance with the Law of July 12, 2005 on prospectuses for securities.   The Units are offered to a limited number of investors or to sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement.   This Memorandum may not be reproduced or used for any purpose, nor be furnished to any other person other than those to whom copies have been sent.

**NOTICE TO RESIDENTS OF MEXICO**

The Units have not been and will not be registered with the Securities Section of the National Registry of Securities (Registro Nacional de Valores) maintained by the National Banking and Securities

Commission of Mexico (Comisión Nacional Bancaria y de Valores). This offer does not constitute a public offer or exchange under the Mexican Securities Act (Ley del Mercado de Valores).

**NOTICE TO RESIDENTS OF NEW ZEALAND**

The New Zealand Securities Act 1978 prohibits offers of securities being made to the public in New Zealand in the absence of a registered prospectus and investment statement.   Exceptions to this arise whether an offer is made to persons who are not the public. In particular, persons whose principal business is the investment of money or who in the course of and for the purposes of their business, habitually invest money are not members of the public.   In addition, persons who are each required to pay a minimum subscription price of at least NZ$500,000 for securities before the allotment of those securities are not members of the public.

The offer of Units in New Zealand is restricted to persons who are not members of the public for the purposes of the New Zealand Securities Act 1978 or in other circumstances where there is no contravention of the New Zealand Securities Act 1978.

**NOTICE TO RESIDENTS OF OMAN**

This Memorandum is being sent at the request of the investor in Oman and should not be distributed to any person in Oman other than its intended recipient without the prior consent of the Capital Market Authority.

**NOTICE TO RESIDENTS OF SAUDI ARABIA**

The Units may only be offered and sold in the Kingdom of Saudi Arabia in accordance with Article 4 of the Investment Funds Regulations issued on 24 December 2006 (the "Regulations").   Article 4(b)(4) of the Regulations states that, if investment fund units are offered to no more than 200 offerees in the Kingdom of Saudi Arabia and the minimum amount payable per offeree is not less than Saudi Riyals 1 million or an equivalent amount in another currency, such offer of investment fund units shall be deemed a private placement for purposes of the Regulations. Investors are informed that Article 4(g) of the Regulations places restrictions on secondary market activity with respect to such investment fund units.

**NOTICE TO RESIDENTS OF SPAIN**

The Offer in Spain of the Units is not subject to the Spanish Securities Market Law 24/1988, of July 28, nor to Royal Decree 1310/2005, of November 4, on securities admission to trade on secondary official markets, public offerings or subscriptions and prospectus required to such effects.   Consequently, this offer has not been and will not be verified or registered with the Spanish Securities Market Commission (Comisión Nacional del Mercado de Valores, the "CNMV").   No marketing or publicity activities will be carried out in Spain and, therefore, no action, whether direct or indirect, which could be considered as a marketing or promotional activity (including the provision of any documentation and/or advertising materials to any third party) may be taken.   The recipient hereof will be liable for any such action and neither the Partnership nor its agents will assume any liability in this respect.   The Partnership is not subject to the laws of Spain and hence the legal, tax and economic concepts used may be different to Spanish concepts.   For this reason, potential investors should obtain appropriate advice before making any investment in the Partnership.

**NOTICE TO RESIDENTS OF SWEDEN**

This Institutional Entitlements Offer in Sweden is directed to a limited number of investors who receive this Memorandum directly from the issuers and who may not disclose the information herein to any third party.   This Memorandum has not been nor will it be registered with or approved by Finansinspektionen (the Swedish Financial Supervisory Authority) and is not intended to and shall not be deemed to constitute a prospectus within the meaning of the Swedish Financial Instruments Trading Act (Sw. Lag (1991:980) om handel med finansiella instrument) ("FITA").   Accordingly, this Memorandum may not be made available, nor may the Units offered hereunder be marketed and offered for sale in Sweden, other than under circumstances which are deemed neither to require a prospectus under FITA nor to constitute fund operations in Sweden under the Swedish Investment Funds Act (2004:46).

Past performance is not a guarantee of a particular return in the future.   The money invested in the Partnership can increase or decrease in value, and there is no guarantee that all of the capital invested will be repaid.

**NOTICE TO RESIDENTS OF SWITZERLAND**

The Swiss Federal Banking Commission has not authorized the sale of the Units for public distribution in or from Switzerland. Accordingly, the Units may not be publicly offered or distributed in or from Switzerland, and neither this Memorandum nor any other offering materials relating to any of the Units may be publicly distributed in connection with any such offering or distribution. The Partnership has not been approved by the Federal Banking Commission as a foreign collective investment scheme pursuant to Article 120 of the Swiss Collective Investment Scheme Act of June 23, 2006 (the "CISA"). Accordingly, the Units in the Partnership may not be publicly offered in or from Switzerland and neither this Memorandum or any other offering materials relating to the Units in the Partnership may be distributed in connection with any such public offering.   Units may only be offered and this Memorandum may only be distributed in or from Switzerland to "Qualified Investors" (as defined in the CISA and its implementing ordinance) and to a limited number of other offerees without any public offering.   The Memorandum is for the recipient only and may not in any way be forwarded to any other person or to the public in Switzerland.   Any use in this Memorandum of the terms "fund" or "investment", or terms with similar meanings, should not be interpreted to imply that the Swiss Federal Banking Commission has reviewed or given their approval

**NOTICE TO RESIDENTS OF UNITED KINGDOM**

This Memorandum may only be communicated or caused to be communicated in the UK to persons authorized to carry on a regulated activity ("Authorized Persons") under the Financial Services and Markets Act 2000, as amended ("FSMA") or to persons otherwise having professional experience in matters relating to investments and qualifying as investment professionals under Article 19 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended, or to persons qualifying as high net worth persons under Article 49 of that Order, or to any other person to whom this Memorandum may otherwise lawfully be communicated or caused to be communicated.

In addition, insofar as the Units would be regarded in the UK as interest in a collective investment scheme, this Memorandum may only be communicated or caused to be communicated in the UK by authorized persons to: (1) persons qualifying as investment professionals under Article 14 of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001; (2) to persons qualifying as high net worth persons under Article 22 of that Order; (3) to persons who are classified as intermediate customers or market counterparties in accordance with the conduct of business rules of the UK Financial Services Authority; or (4) to any other person to whom this

Memorandum may otherwise lawfully be communicated or caused to be communicated (all such persons together being referred to as "relevant persons").   This Memorandum must not be acted on or relied on by persons who are not relevant persons.   Any investment or investment activity to which this Memorandum relates is available only to relevant persons and will be engaged in only with relevant persons.   Any person who is not a relevant person should not act or rely on this Memorandum or any of its contents.   This Memorandum must not be distributed, published, reproduced or disclosed (in whole or in part) by recipients to any other person.

**LIST OF EXHIBITS**

A        LIMITED PARTNERSHIP AGREEMENT

B        SUBSCRIPTION AGREEMENT

C        CHARTS SUMMARIZING IMMIGRATION AND INVESTMENT PROCEDURES

D        ESCROW AGREEMENT

E        RENDERING, AERIAL VIEW AND AREA MAPS FOR HARBOURSIDE PLACE

F        AMENDED AND RESTATED CONVERTIBLE LOAN AGREEMENT

Exhibit to Offering Memorandum for Harbourside Funding, LP

**<u>EXHIBIT A</u>**

**<u>LIMITED PARTNERSHIP AGREEMENT</u>**

[See Attached]

**THIS AGREEMENT HAS BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL**

HARBOURSIDE FUNDING, LP

LIMITED PARTNERSHIP AGREEMENT

NOVEMBER 1, 2010

# TABLE OF CONTENTS

1    **DEFINITIONS & INTERPRETATION** ................................................................ 1

2    **NAME, REGISTERED OFFICE & DURATION OF THE PARTNERSHIP** ............... 5

3    **PURPOSE OF THE PARTNERSHIP** ............................................................... 6

4    **POWERS OF THE PARTIES & MANAGEMENT OF THE PARTNERSHIP** ........... 6

5    **CAPITAL OF THE PARTNERSHIP** ............................................................... 9

6    **UNITS OF THE PARTNERSHIP** .................................................................. 9

7    **FEES AND EXPENSES** .............................................................................. 12

8    **DETERMINATION AND ALLOCATION OF NET INCOME OR LOSS** ............... 13

9    **DISTRIBUTIONS** ..................................................................................... 14

10   **TRANSFER AND ASSIGNMENT OF UNITS** ................................................ 15

11   **REPRESENTATIONS, WARRANTIES AND COVENANTS** ............................. 15

12   **LIABILITIES AND INDEMNIFICATION** ...................................................... 16

13   **WITHDRAWAL OF GENERAL PARTNER** ................................................... 18

14   **POWER OF ATTORNEY** ........................................................................... 19

15   **DISSOLUTION** ........................................................................................ 20

16   **MEETINGS** ............................................................................................. 21

17   **ACCOUNTING AND REPORTING** ............................................................. 22

18   **NOTICES** ................................................................................................ 23

19   **GENERAL** .............................................................................................. 23

**HARBOURSIDE FUNDING, LP**

**LIMITED PARTNERSHIP AGREEMENT**

THIS LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of Harbourside Funding, LP (the "Partnership") is made as of the 1st day of November, 2010 among Harbourside Funding GP, LLC, a Florida limited liability company (the "**General Partner**") and Donald M. Allison (the "**Original Limited Partner**") and each party who from time to time becomes a limited partner in accordance with the terms of this Agreement (hereinafter individually referred to as a "**Limited Partner**" and collectively with the Original Limited Partner referred to as the "**Limited Partners**"). See Section 1 for definition of terms used in this Agreement.

**RECITALS:**

(A) The Partnership intends to sell Units to investors and to admit as Limited Partners those investors whose subscriptions are accepted by the General Partner. Upon the admittance of the first Limited Partner, the Unit of the Original Limited Partner will be cancelled.

(B) This Agreement is being entered into to set forth the terms applicable to the relationship between the Partners and the conduct of the activities of the Partnership.

NOW THEREFORE in consideration of the respective covenants and agreements of the parties herein contained and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree with each other as follows:

**1       DEFINITIONS & INTERPRETATION**

1.1     <u>Definitions</u>. For the purposes of this Agreement (including the Recitals hereto), the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings:

1.1.1   "**Accountants**" means such firm of certified public accountants as the General Partner shall retain on behalf of the Partnership.

1.1.2   "**Act**" means the Florida Revised Uniform Limited Partnership Act.

1.1.3   "**Administrative Fee**" means a fee of $40,000 paid by each Limited Partner for expenses incurred in connection with the offering of the Units under the Offering Memorandum, including for example printing, accounting, escrow and overseas marketing expenses.

1.1.4   "**Affiliate**" of a person means, with respect to a person or entity, any other person or entity that, directly or indirectly, controls, is controlled by or has common control with the first person or entity.

1.1.5   "**Agreement**" means this limited partnership agreement (together with all Schedules hereto), as it may from time to time hereafter be amended, supplemented or otherwise modified in accordance

herewith, and "hereto", "herein", "hereof", "herewith" and similar terms refer to such Agreement in its entirety unless a specific provision is stipulated.

1.1.6    "**Business Day**" means a day other than a Saturday, a Sunday or a statutory holiday in the State of Florida.

1.1.7    "**Capital Commitment**" means the amount of capital agreed to be invested in the Partnership by a Limited Partner pursuant to Section 5.2.

1.1.8    "**Capital Contribution**" means, in respect of each Partner at any time, the amount of money that the Partner has actually contributed to the Partnership.

1.1.9    "**Certificate**" means the Certificate of Limited Partnership filed under the Act forming the Partnership as a limited partnership thereunder, as such certificate may be amended from time to time.

1.1.10   "**Conversion Notice**" means a written notice from Harbourside Place, LLC to the Partnership exercising the right to convert the outstanding principal amount of the Qualifying Investment from a loan into units of common membership interest in Harbourside Place, LLC, as described in the Offering Memorandum or any supplements or amendments thereto

1.1.11   "**Escrow Agent**" means such escrow agent as the General Partner may retain on behalf of the Partnership pursuant to the Escrow Agreement.

1.1.12   "**Escrow Agreement**" means the agreement entered into between the Partnership and the Escrow Agent dealing with deposits and the balances of Subscription Amounts with respect to the subscriptions for Units.

1.1.13   "**Fiscal Year**" has the meaning set out in Section 2.3.

1.1.14   "**Florida Regional Center**" means the high unemployment area in Palm Beach County, Florida, for which Florida Regional Center LLC has obtained designation from USCIS as a "Regional Center," pursuant to Section 610 of the U.S. Appropriations Act and the Immigration Act. The Florida Regional Center is centered around census tract 4.04 and includes the area for Harbourside Place.

1.1.15   "**GAAP**" means accounting principles generally accepted in the United States, as recommended in the handbook of the governing professional organization.

1.1.16   "**General Partner**" means Harbourside Funding GP, LLC and any successor general partner of the Partnership.

1.1.17   "**Immigration Act**" means 8 U.S.C. §1101, *et seq.*, together with regulations published at 8 C.F.R. § 1.1, *et seq.*, as the same may be amended from time to time.

1.1.18   "**includes**" and "**including**" means "includes without limitation" and "including without limitation" respectively.

1.1.19   "**Indemnified Party**" has the meaning set out in Section 12.1.

1.1.20   "**Initial Closing**" has the meaning set out in Section 6.7.1.

1.1.21   "**Initial Closing Date**" means the date of the Initial Closing.

1.1.22   "**Initial Limited Partners**" means those Limited Partners who acquired their Interests in connection with the Initial Closing.

1.1.23   "**Interest**" means the entire limited partnership interest in the Partnership owned by a Limited Partner at any particular time, including the right of such Limited Partner to any and all benefits to which a Limited Partner may be entitled as provided in this Agreement, together with the obligations of such Limited Partner to comply with all of the terms and provisions of this Agreement. For purposes hereof, any reference to an Interest includes the interest of the General Partner in the Partnership as the general partner thereof, except to the extent expressly provided in such reference.

1.1.24   "**Investment**" means the Qualifying Investment and any Other Investment made by the Partnership but excluding Temporary Investments.

1.1.25   "**Limited Partner**" means each of the persons shown as limited partners on the record of Limited Partners which the General Partner is required to maintain under the Act, including any person who has been admitted to the Partnership as a substituted or additional Limited Partner in accordance with this Agreement.

1.1.26   "**Liquidating Trustee**" has the meaning set out in <u>Section 15.3</u>.

1.1.27   "**Losses**" mean, in respect of any matter, all claims, demands, proceedings, losses, damages, liabilities, deficiencies, costs and expenses arising directly or indirectly as a consequence of such matter, including all legal and other professional fees and disbursements, interest, penalties and amounts paid in settlement, but excluding loss of profit.

1.1.28   "**Meeting Notice**" has the meaning set out in <u>Section 16.3</u>.

1.1.29   "**Meeting Request**" has the meaning set out in <u>Section 16.1</u>.

1.1.30   "**Offering Memorandum**" means the Confidential Offering Memorandum of the Partnership dated November 1, 2010, relating to the private placement of Units, as the same may be revised, amended or supplemented from time to time.

1.1.31   "**Ordinary Resolution**" means, (i) a resolution of Limited Partners approved by more than 50% of the votes cast by Limited Partners, in person or by proxy, at a meeting of the Partners (or any adjournment thereof) called in accordance with this Agreement; or (ii) a written resolution signed by Limited Partners holding more than 50% of the votes attached to all of the Units that would have been entitled to vote on such resolution at a meeting of the Partners called in accordance with this Agreement.

1.1.32   "**Organizational Expenses**" has the meaning set out in <u>Section 7.1</u>.

1.1.33   "**Other Investment**" means any real estate-related investment of the Partnership in or with an entity with operations within the geographic area of the Florida Regional Center and Temporary Investments, but excluding the proposed investment in Harbourside Place.

1.1.34   "**Partners**" means the General Partner and each of the Limited Partners.

1.1.35    "**Partnership**" means the limited partnership formed under the name "**Harbourside Funding, LP**" and registered as a limited partnership pursuant to the Act.

1.1.36    "**Partnership Expenses**" means all the expenses of the Partnership including expenses set out in <u>Section 7.2</u>.

1.1.37    "**Partnership Interest**" means the respective percentage interests that the Partners hold in the Partnership as set forth on Exhibit A (as Exhibit A may be amended from time to time).

1.1.38    "**person**" shall be broadly construed and means, without limitation, any individual, partnership, limited partnership, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such), government (or agency or political subdivision thereof) or other legal or business entity or enterprise.

1.1.39    "**Pilot Program**" means the EB-5 immigrant investment program established pursuant to the Immigration Act.

1.1.40    "**Preferred Return**" means, with respect to each Limited Partner, a sum equal to two percent (2%) per annum applied to the average daily balance of such Limited Partner's Unrecovered Capital Contribution, cumulative but not compounded, in each case determined on the basis of a 365/366 day year, as the case may be, for the actual number of days in the period for which the Preferred Return is being determined, commencing on the date the last potential Limited Partner submits his or her I-526 Immigrant Petition by Alien Entrepreneur to USCIS, as determined by the General Partner acting in good faith.

1.1.41    "**Qualifying Investment**" means the convertible loan to Harbourside Place, LLC to partially fund the purchase, development, construction and operation of Harbourside Place as described in the Offering Memorandum or any supplements or amendments thereto.

1.1.42    "**Register**" has the meaning set out in <u>Section 6.8</u>.

1.1.43    "**Securities Act**" means the Securities Act of 1933, as amended, and the regulations promulgated thereunder.

1.1.44    "**Subscription Agreement**" means a subscription agreement between the Partnership and a Limited Partner pursuant to which the Limited Partner subscribes for Units in a form acceptable to the General Partner.

1.1.45    "**Subscription Amount**" means $500,000.00.

1.1.46    "**Subsequent Closing**" has the meaning set out in <u>Section 6.7.2</u>.

1.1.47    "**Subsequent Closing Date**" means the date of a Subsequent Closing.

1.1.48    "**Targeted Employment Area**" means the high unemployment area within the Florida Regional Center, as designated pursuant to the Immigration Act.

1.1.49    "**Tax Act**" means the U.S. Internal Revenue Code and the regulations promulgated thereunder.

1.1.50   "**Temporary Investments**" means short-term investments in (i) short-term debt obligations or accounts denominated in U.S. dollars issued or guaranteed by the United States or a state thereof; or (ii) short term investments issued by a bank operating in the United States.

1.1.51   "**Termination Date**" has the meaning set out in <u>Section 15.1</u>.

1.1.52   "**Harbourside Place**" means the approximately 300,000 square foot mixed-use real estate development more fully described in the Offering Memorandum.

1.1.53   "**Unanimous Resolution**" means: (i) a resolution of Limited Partners approved by 100% of the votes cast by Limited Partners, in person or by proxy, at a meeting of the Partners (or any adjournment thereof) called in accordance with this Agreement, or (ii) a written resolution signed by Limited Partners holding 100% of the votes attached to all of the Units that would have been entitled to vote on such resolution at a meeting of the Partners called in accordance with this Agreement.

1.1.54   "**Unit**" means a unit of Interest in the Partnership.

1.1.55   "**Unreturned Capital Contributions**" means, with respect to any Partner the excess of (i) the amount of all Capital Contributions made by such Partner over (ii) the aggregate amount of distributions made to such Partner under <u>Section 9.1</u>.

1.1.56   "**USCIS**" means United States Citizenship and Immigration Services, an agency of the Department of Homeland Security of the United States of America.

1.2   <u>Interpretation Not Affected by Headings, etc</u>. The division of this Agreement into Sections and the insertion of headings are for reference purposes only and shall not affect the interpretation of this Agreement. Unless otherwise indicated, any reference in this Agreement to a Section refers to the specified Section of this Agreement

1.3   <u>Number and Gender</u>. In this Agreement, words importing the singular number include the plural and vice versa and words importing any gender include all genders and the neutral gender.

1.4   <u>Date for Any Action</u>. If any date on which any action is required to be taken under this Agreement is not a Business Day, that action shall be required to be taken on the next immediately following Business Day.

1.5   <u>Accounting Terms</u>. In this Agreement, accounting terms that are not defined herein shall be construed in accordance with GAAP.

1.6   <u>Currency</u>. In this Agreement, all dollar amounts are expressed in United States dollars.

## 2   NAME, REGISTERED OFFICE & DURATION OF THE PARTNERSHIP

2.1   <u>Name</u>. The Partnership shall carry on its activities under the name "Harbourside Funding, LP" or such other name, in accordance with applicable law, as the General Partner may determine from time to time. The General Partner shall notify each Limited Partner of any change in the name under which the Partnership carries on its activities within 10 Business Days of such change.

2.2   <u>Registered Office and Principal Address</u>. The registered office and principal address of the Partnership shall be located at 11770 US Highway One, Suite 301, Palm Beach Gardens, Florida

33408 or at such other location, in accordance with applicable law, as the General Partner may determine from time to time. The General Partner shall notify each Limited Partner of any change in the principal address of the Partnership within 10 Business Days of such change.

2.3    Fiscal Year. The fiscal year (the "**Fiscal Year**") of the Partnership shall begin on the 1st day of January and end on the 31st day of December of each calendar year.

2.4    Term. Subject to Section 15, the Partnership shall continue until the Termination Date.

2.5    Organizational Declarations and Other Filings. If requested by the General Partner, the Limited Partners shall promptly execute all declarations, certificates and other documents consistent with the terms of this Agreement necessary for the General Partner, acting reasonably, to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for: (i) the formation and operation of a limited partnership under the laws of the State of Florida; (ii) if the General Partner deems it advisable, acting reasonably, the operation of the Partnership as an entity or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate or in which Limited Partners have addresses of record in the Partnership records; and (iii) all other filings which the General Partner determines are required or advisable to be made by the Partnership.

## 3    PURPOSE OF THE PARTNERSHIP

3.1    Partnership Purpose. The Partnership has been formed as a commercial for-profit entity for the purpose of making the Qualifying Investment in the Targeted Employment Area, Other Investments, Temporary Investments, and all activities ancillary thereto.

3.2    Powers. The Partnership shall have the power to do and to perform any and all things necessary for, incidental to or connected with carrying on the activities of the Partnership.

3.3    Investment Guidelines.

3.3.1    Investment Approval. The Qualifying Investment set forth in the Offering Memorandum shall be deemed approved by a Limited Partner by the execution of the Subscription Agreement by such Limited Partner. All Other Investments other than Temporary Investments shall be made only upon the approval of Limited Partners by Unanimous Resolution. Temporary Investments may be made by the General Partner at its sole discretion, and each Temporary Investment shall be deemed approved by each Limited Partner upon the making of such Temporary Investment.

3.3.2    Idle Capital. Any funds of the Partnership that are not within 30 days to be invested in an Investment, distributed to the Partners or applied towards the satisfaction of Partnership Expenses shall be invested in Temporary Investments.

3.3.3    General Partner Interpretations. The foregoing investment guidelines and restrictions shall be subject to the good faith interpretation by the General Partner, which interpretation shall be conclusive, final and binding on the Partnership.

## 4    POWERS OF THE PARTIES & MANAGEMENT OF THE PARTNERSHIP

4.1    Powers of the General Partner. Subject to the terms of this Agreement and the mandatory provisions of the Act, the General Partner shall have the full unrestricted power and exclusive authority, without any consent or joinder of the Limited Partners except as specifically set forth in

this Agreement, (i) to carry on the activities of the Partnership and to do and to perform any and all things necessary for, incidental to or connected with carrying on the activities of the Partnership; and (ii) to represent and bind the Partnership.  Any action taken by the General Partner on behalf of the Partnership shall be deemed to be the act of the Partnership and shall bind the Partnership. No person dealing with the Partnership shall be required to inquire into the authority of the General Partner to do any act, take any proceeding, make any decision or execute or deliver any instrument, deed, agreement or document for or on behalf of or in the name of the Partnership.

4.2     Specific Powers of the General Partner. Without limiting the foregoing general powers set out in Section 4.1, the General Partner is hereby authorized and empowered on behalf and in the name of the Partnership, or on its own behalf and in its own name, or through agents, as it may determine appropriate, subject to the approval of Limited Partners where required under this Agreement and to any applicable limitations set forth in the Act, to take any and all of the following actions:

4.2.1   Investing. Subject to Section 16.11.2, recommend Investments to the Limited Partners and, make all decisions concerning the investigation, solicitation, origination, selection, development, negotiation, acquisition, management, structuring, restructuring, commitment to or monitoring of and disposition of Investments, including in connection with compliance with the job creation requirements of the Pilot Program.

4.2.2   Managing Investments, Exercising Rights as Security Holder. Acquire, hold, sell, transfer, exchange, pledge and dispose of Investments, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Investments, including the voting of securities, the approval of a restructuring of an Investment, participation in arrangements with creditors of the entity with or to whom an Investment has been made, the commencement and settlement or compromise of actions and administrative proceedings with respect to an Investment or the Partnership and other similar matters with respect to Investments.

4.2.3   Banking. Open, maintain and close bank accounts and draw checks or other orders for the payment of money and open, maintain and close custodian, brokerage and similar accounts.

4.2.4   Staffing. Hire for usual and customary payment and expenses, consultants, attorneys, accountants and such other agents and employees for the Partnership as it may deem necessary or desirable, acting reasonably.

4.2.5   Maintain Regulatory Filings. File such declarations, returns or other documents and comply with all applicable regulatory requirements, and do such other acts required or advisable to maintain the status of the Partnership as a limited partnership where deemed appropriate, including without limitation the obligation to renew the Certificate every five years or such other period as may be required under the Act.

4.2.6   Incur Liabilities of the Partnership. Incur liabilities in the name of the Partnership from time to time as the General Partner may determine, acting reasonably, without limitation with regard to amount, cost or conditions of reimbursement of such liabilities.

4.2.7   Commence and Defend Litigation. Commence or defend any action or proceeding in connection with the Partnership and handle and settle any claims of the Partnership.

4.2.8   Attend to Tax Matters. Make, in its sole discretion, any and all elections for federal, state, local, municipal and foreign tax matters and make for and on behalf of each Limited Partner in respect of such Limited Partner's Interest any and all elections, determinations, designations or filings of

-7-

any kind under the Tax Act or the taxation or other legislation or similar laws of the United States, any state, municipality or foreign jurisdiction.

4.2.9   <u>Engage Professionals</u>. Negotiate contracts with third party providers of services including the Advisors, accountants and other professionals.

4.2.10   <u>Bind the Partnership and Manage Its Activities Generally</u>. Enter into, execute, maintain, and/or terminate contracts, undertakings, agreements and any and all other documents and instruments in the name of the Partnership, and do or perform all such things as may be necessary or advisable in furtherance of the Partnership's powers, objects, or purposes or to the conduct of the Partnership's activities, including obtaining any insurance coverage, preparing financial statements, income tax returns, information returns and financial and accounting information and providing Limited Partners with financial statements and other reports, as required by the Partnership or by applicable law, and entering into acquisition agreements to make or dispose of Investments which may include such representations, warranties, covenants, indemnities, guarantees and security as the General Partner deems necessary or advisable.

4.2.11   <u>Admit Limited Partners</u>. Admit new Limited Partners to the Partnership in accordance with <u>Section 6.6</u>.

4.3   <u>No Commingling</u>. Notwithstanding any other provision hereof, the funds and other assets of the Partnership shall not be commingled with the funds or other assets of the General Partner or any other person.

4.4   <u>Indebtedness and Guarantees</u>. Unless the Limited Partners approve otherwise by Ordinary Resolution, the Partnership shall not borrow any funds or act as a guarantor of the obligations of any person.

4.5   <u>Standard of Care</u>. The General Partner shall exercise its powers and discharge its duties under this Agreement honestly, in good faith and in the best interests of the Partnership. The General Partner shall exercise the same degree of care, diligence and skill that a reasonable person would exercise in similar circumstances.

4.6   <u>Delegation</u>. The General Partner may delegate to any other person, any or all of its power and authority under this Agreement, including its power and authority to carry on the business of, and to represent, the Partnership. Any such delegation shall not relieve the General Partner of its obligations under this Agreement.

4.7   <u>General Partner</u>. Each Limited Partner acknowledges that neither the General Partner, nor any affiliated person or entity of the General Partner, is registered as an advisor or otherwise under the securities laws of any jurisdiction.

4.8   <u>No Restrictions on Other Business</u>. This Agreement shall not be construed in any manner to preclude any Partner (including in particular the General Partner), their respective Affiliates or Associates, or any of their respective directors, officers, employees, shareholders, members, partners or agents from engaging in any activity whatsoever permitted by applicable law.

4.9   <u>Powers of Limited Partners</u>. No Limited Partner, in his or her capacity as a Limited Partner, shall: (i) execute any document that binds, or purports to bind, the Partnership or any Partner; (ii) hold itself out as having the power or authority to bind the Partnership or any Partner; (iii) undertake any obligation or responsibility on behalf of the Partnership; or (iv) bring any action for partition or

sale in respect of any or all of the assets or property of the Partnership or record or permit any encumbrance in respect of any such property. Subject to the foregoing, Limited Partners shall have all the rights and powers set out under the Act.

4.10   <u>General Partner Affiliations</u>. The General Partner, at its sole discretion may engage the services of its affiliates to provide services to Partnership. Further, The General Partner and its affiliates will not be engaged full time with the Partnership's venture and may provide services to other business ventures in the same industry as the Partnership.

**5     CAPITAL OF THE PARTNERSHIP**

5.1   <u>Capital</u>. The capital of the Partnership shall consist of the aggregate Capital Contributions to the Partnership by the Partners at the relevant time.

5.2   <u>Commitments</u>. The Capital Commitment of each Limited Partner shall be equal to the Subscription Amount for each Unit held by such Limited Partner at the relevant time. Future requirements, if any, for Capital Commitments in connection with Other Investments shall be determined in accordance with <u>Section 6.3</u>.

5.3   <u>Capital Account</u>. A separate capital account (each, a "**Capital Account**") shall be established for each Partner and shall be maintained in accordance with applicable regulations ("**Treasury Regulations**") under the Tax Act. The liability of a Partner for the losses, debts and obligations of the Partnership shall be limited to the Capital Contributions theretofore made to the Partnership by such Partner (or its predecessor in interest) which have not been previously repaid to or withdrawn by such Partner (or its predecessor in interest) in accordance with the terms of this Agreement. No Partner shall have any liability to restore any negative balance in its Capital Account.

5.4   <u>No Right to Withdraw Amounts</u>. No Partner shall have the right to withdraw any amount or receive any distribution from the Partnership, except as expressly provided in this Agreement. Without limiting the generality of the foregoing, except as expressly provided herein, no Limited Partner may receive distributions from the Partnership until the latter of (i) five years from the date of such Limited Partner's payment of the Subscription Amount and (ii) the date such Limited Partner's conditions to permanent resident status have been removed.

5.5   <u>No Interest Payable on Accounts</u>. No interest shall be paid to any Partner on any amount in such Partner's Capital Account.

**6     UNITS OF THE PARTNERSHIP**

6.1   <u>Partnership Units</u>. The Interests of the Limited Partners in the Partnership shall be divided into and represented by Units issued in accordance with this Agreement, each representing a share of the aggregate Interests of the Limited Partners in the Partnership as determined pursuant to this Agreement.

6.2   <u>Unit Certificates</u>.

6.2.1   <u>Certificates</u>. The Partnership may issue certificates to evidence ownership of Units which shall be in such form as shall be approved from time to time by the General Partner and shall be signed manually or by facsimile by or on behalf of the General Partner. The certificates evidencing ownership of Units shall be endorsed with the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE PARTNERSHIP THAT SUCH REGISTRATION IS NOT REQUIRED PURSUANT TO REGULATION S, REGULATION D OR UNDER ANOTHER EXCEPTION FROM REGISTRATION UNDER THE ACT; AND THAT HEDGING TRANSACTIONS INVOLVING THOSE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFERS, REPURCHASE OPTIONS AND OTHER AGREEMENTS SET FORTH IN THAT CERTAIN LIMITED PARTNERSHIP AGREEMENT DATED EFFECTIVE AS OF NOVEMBER 1, 2010 AMONG HARBOURSIDE FUNDING GP, LLC, AS GENERAL PARTNER, AND CERTAIN PERSONS, AS LIMITED PARTNERS, A COPY OF WHICH IS ON FILE AND MAY BE OBTAINED FROM THE PRINCIPAL PLACE OF BUSINESS OF THE PARTNERSHIP."

6.2.2   Lost Certificates. Where a Limited Partner claims that a certificate evidencing its Units has been defaced, lost, apparently destroyed or wrongly taken, the General Partner shall cause a new Unit certificate to be issued in substitution for the original certificate if the Limited Partner: (i) files with the General Partner an indemnity bond (or other form of indemnity or guarantee) in form and amount satisfactory to the General Partner to protect the Partners and the Partnership from any loss, cost or damage that they may incur or suffer by complying with the request to issue a new Unit certificate, and (ii) satisfies such other reasonable requirements imposed by the General Partner including a requirement to deliver the defaced Unit certificate or a form of proof of loss.

6.2.3   Certificates on Dissolution. Upon the dissolution of the Partnership and distribution to a Limited Partner of the assets to which such Limited Partner is entitled hereunder or upon the withdrawal of a Limited Partner pursuant to Section 16.11.2, any certificate evidencing a Unit issued to such Limited Partner shall become null and void.

6.3   Offering Units. The General Partner may raise capital for the Partnership by offering for sale and selling Units pursuant to the Offering Memorandum from time to time at a price equal to the Subscription Amount. Concurrently with the presentation to the Limited Partners pursuant to Section 16.11 of any Other Investment opportunity, the General Partner shall also describe the terms of any additional Partnership capital that the General Partner intends to raise. All Limited Partners shall be granted a first opportunity to subscribe, pro rata, for such additional Partnership capital. The General Partner may determine the other terms and conditions of such sale and may do all things in that regard for, in the name of and on behalf of the Partnership including preparing and filing such offering or other documents as the General Partner determines to be necessary or desirable provided always that all such actions are completed in a manner that is not inconsistent with the provisions of the Offering Memorandum or any other offering document and all things done by the General Partner in that regard are hereby ratified and confirmed.

6.4   Subscription.

6.4.1   Each subscriber may subscribe for Units by delivering:

6.4.1.1   to the General Partner a completed and executed Subscription Agreement;

6.4.1.2   to the Escrow Agent a wire transfer of funds in an amount equal to the sum of the Subscription Amount plus the Administrative Fee for each Unit subscribed; and

6.4.1.3    such other documents and instruments as the General Partner may request.

6.4.2    The General Partner shall have the right to accept or reject subscriptions in whole or in part, including without limitation based upon a belief that the funds forming all or part of the subscription proceeds are from illegal or suspicious origins or activities. No subscriber shall be admitted to the Partnership at the Initial Closing or any Subsequent Closing unless such subscriber has executed and delivered a Subscription Agreement and authorized a counterpart of this Agreement to be executed by the General Partner on its behalf, all in form and substance satisfactory to the General Partner.

6.5    Use of Proceeds. Each Subscription Amount shall, upon fulfillment of the conditions for the release thereof to the Partnership pursuant to the Escrow Agreement (as described in the Offering Memorandum, including the approval of a Limited Partner's I-526 Petition), be utilized by the Partnership to make the Qualifying Investment. No issuance expenses may be paid with the Subscription Amount.

6.6    Admittance as Limited Partner. Upon acceptance by the General Partner of any subscription, in whole or in part, all Partners shall be deemed to consent to the admission of the subscriber as a Limited Partner and the Partnership may issue the subscribed Units to such subscriber. Each person becoming a party to this Agreement by the General Partner executing this Agreement on its behalf pursuant to the power of attorney granted to the General Partner in the Subscription Agreement of such person, shall be bound by the terms hereof and such person shall become a Limited Partner upon the entering of such person's name in the Register. The General Partner shall cause the Register to be amended and shall file with appropriate authorities all such other documents as may be required by the Act or under any other applicable legislation in other relevant provinces or territories and shall cause the admission of the new Limited Partner to be reflected in all other relevant Partnership books and records.

6.7    Closings.

6.7.1    Initial Closing. The first closing to take place at which the General Partner has received and accepted subscriptions representing Capital Contributions which aggregate not less than $500,000, shall be referred to as the "**Initial Closing.**"

6.7.2    Subsequent Closings. One or more closings (each a "**Subsequent Closing**") may take place following the Initial Closing Date, at which the General Partner may receive and accept subscriptions representing Capital Contributions in accordance with this Agreement.

6.7.3    Closing Condition. It shall be a condition to the Initial Closing and to each Subsequent Closing that the General Partner shall anticipate that the Qualifying Investment shall create the requisite number of jobs proscribed under the Pilot Program for each Limited Partner.

6.8    Register. The General Partner shall act as the registrar of the Units and shall maintain a record (the "**Register**") and such other books and records as are necessary or advisable to record the following information:

6.8.1    the Partner's surname, the given name by which the Partner is commonly known, the first letters of the Partner's other given names and the Partner's residential address or address for service, including municipality, street and number, if any, and postal code;

6.8.2    the amount of money contributed by the Partner to the Partnership;

6.8.3    the number of Units held by each Partner; and

6.8.4    particulars of any and all transfers, assignments and redemptions of Units.

6.9    <u>Inspection of Records</u>. The Register and any other such books or records shall be kept by the General Partner at the principal address of the Partnership. The General Partner shall make the Register and any other books or records relating to the Partnership or the Partners available for inspection by any Limited Partner during normal business hours following five Business Days advance written notice to the General Partner.

6.10    <u>Cancellation of Original Limited Partner's Unit</u>. Upon the admittance of the first Limited Partner, the Unit of the Original Limited Partner shall be cancelled in consideration of US$100.00.

**7    FEES AND EXPENSES**

7.1    <u>Offering and Organizational Expenses</u>. The General Partner shall be responsible for all third party offering expenses, including legal, accounting, printing, escrow and overseas marketing expenses, incurred in connection with the offering of Units, to be paid from the Administrative Fees.

7.2    <u>Partnership Expenses</u>. Examples of the Partnership Expenses that the Partnership shall pay directly, include the following:

7.2.1    all expenses of lawyers, accountants, custodians, professional advisors and service providers retained by the Partnership in connection with the operation of the business, tax compliance, reporting to the Limited Partners, and other similar operational expenses;

7.2.2    insurance of the Partnership;

7.2.3    expenses relating to litigation or to the enforcement and protection of rights of the Partnership;

7.2.4    all taxes, fees or other similar charges levied against the Partnership; and

7.2.5    all expenses incurred in connection with the fulfillment of statutory or other compliance requirements and in connection with reporting to or communicating with Limited Partners and convening any meeting of Limited Partners.

7.3    <u>Expenses of the General Partner</u>. The General Partner on behalf of the Partnership will be responsible for all of the General Partner's day-to-day operating and administrative expenses, including overhead and compensation of its employees and, except as expressly contemplated by this Agreement, shall not be entitled to reimbursement therefore.

7.4    <u>Allocation and Payment of Partnership Expenses</u>. Partnership Expenses may be allocated against all revenue derived by the Partnership in a manner reasonably determined by the General Partner. The General Partner, acting reasonably, may on a *pro rata* basis withhold from any distributions any amounts necessary to create appropriate reserves for expenses and liabilities, contingent or otherwise (including any reserve or hold back with respect to liability for representations, warranties and indemnities under a purchase agreement relating to a disposition) of the Partnership as well as for any tax withholdings.

7.5     Affiliate Services. The General may engage the services of the principals of the General Partner or their affiliated companies to provide certain services to the Partnership. Any such services will be provided at market rates charged by unaffiliated third parties.

## 8     DETERMINATION AND ALLOCATION OF NET INCOME OR LOSS

8.1     Determination of Net Income or Loss. The net income or loss of the Partnership for each Fiscal Year shall be determined by the General Partner in accordance with the method selected by the General Partner.

8.2     Allocations of Net Income and Loss. All items of income, gain, deduction and loss of the Partnership as determined for federal income tax purposes shall be allocated among the Partners, and shall be credited or debited to their respective Capital Accounts in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv), so as to ensure to the maximum extent possible that such allocations satisfy the economic effect equivalence test of Treasury Regulation Section 1.704-1(b)(2)(ii)(*i*). In accordance therewith, all items that can have economic effect shall be allocated in such a manner that the balance of each Partner's Capital Account at the end of any taxable year of the Partnership (increased by the *sum* of (i) such Partner's "share of partnership minimum gain" as defined in Treasury Regulation Section 1.704-2(g)(1) *plus* (ii) such Partner's "share of partner nonrecourse debt minimum gain" as defined in Treasury Regulation Section 1.704-2(i)(5)) would be positive in the amount of cash that such Partner would receive if the Partnership sold all of its assets for an amount of cash equal to the book value (as determined pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*)) of such assets (reduced, but not below zero, by the amount of nonrecourse debt to which property is subject) and all of the cash of the Partnership remaining after payment of all liabilities (other than nonrecourse liabilities) of the Partnership were distributed in liquidation of the Partnership immediately following the end of such taxable year pursuant to Section 15.3 hereof. All items of income, gain, deduction and loss that cannot have economic effect (including nonrecourse deductions) shall be allocated in accordance with each Partner's interest in the Partnership (*i.e.,* the "partner's interest in the partnership" within the meaning of Tax Act Section 704(b) and the Treasury Regulations thereunder) which, unless otherwise required by Tax Act Section 704(b) and the Treasury Regulations thereunder, shall be in proportion to the Partners' respective Partnership Interests.

8.3     Computation of Income or Loss for Tax Purposes. The General Partner shall have the right, in computing the income or loss of the Partnership for tax purposes, to: (i) adopt any permitted method of accounting; (ii) to the extent permitted or required by the Tax Act, adopt a different method of allocation than required in Section 8.2; and (iii) adopt different treatments of particular items and to make and revoke elections on behalf of the Partnership and the Partners as the General Partner deems appropriate.

8.4     Allocation of Income or Loss for Tax Purposes. Items of income, gain, deduction and or loss the Partnership for tax purposes for a Fiscal Year shall be allocated to the Partners in the same manner as set out in Section 8.2.

8.5     Tax Returns. Each Partner shall prepare and file such documents as may be required to be prepared and filed under the Tax Act and other similar legislation to which the Partner may be subject and shall include in its computation of income the income or loss of the Partnership for tax purposes as may be determined and allocated to it pursuant to this Section 8.

8.6     No Allocation or Distribution to Original Limited Partner. Notwithstanding any other provision of this Agreement, the Original Limited Partner shall not be entitled to receive any allocation or distributions pursuant to Section 8 or Section 9, except as specifically set forth therein.

## 9     DISTRIBUTIONS

9.1     Distributions.

9.1.1   Distributions in General. From time to time, on a quarterly basis (subject to Section 9.1.2), the General Partner may in the exercise of its sole discretion determine the amount, if any, of cash available for distribution after the payment of all Partnership Expenses and net of any required tax withholdings and any amounts which, in the opinion of the General Partner, are required to meet the ongoing obligations (whether certain or contingent) of the Partnership. The General Partner may in the exercise of its sole discretion cause the Partnership to distribute any cash available for distribution determined in accordance with this Section 9.1.1 as follows:

9.1.1.1 To the Limited Partners pro rata in accordance with their respective Partnership Interests, to the extent of their unpaid Preferred Return accrued as of the last day of the calendar quarter immediately preceding the date of such distribution; and

9.1.1.2 To the Partners pro rata in accordance with their respective Unreturned Capital Contributions until the Unreturned Capital Contributions of each Partner is reduced to zero; and then

9.1.1.3 To the Partners pro rata in accordance with their respective Partnership Interests.

Notwithstanding the foregoing, no distributions may be made to a Limited Partner pursuant to Sections 9.1.1.2 or 9.1.1.3 until the date a Limited Partner has been approved for Removal of Conditional Status through an approved I-829 Petition, or as determined by the General Partner in its sole discretion.

9.1.2   Distributions Following Disposition. Following the disposition by the Partnership of all or any portion of an Investment, the General Partner shall distribute to the Partners in accordance with Section 9.1.1, as soon as practicable, cash available for distribution net of any required tax withholding and any amounts, which, in the opinion of the General Partner, are required to meet the ongoing obligations (whether certain or contingent) of the Partnership, including, without limitation reserves to fund Partnership Expenses. Notwithstanding the foregoing, the Limited Partners who approve an Other Investment pursuant to Section 16.11.2 may elect to have all or any portion of such realization proceeds reinvested by the Partnership in such Other Investment.

9.1.3   Other Distributions. Subject to the provisions of this Section 9, the General Partner may make such other distributions out of the surplus funds of the Partnership, if any, as it determines, in its sole discretion, to be necessary or desirable.

9.1.4   Amounts Withheld. All amounts withheld or required to be withheld pursuant to the Tax Act (including, without limitation, pursuant to Section 1446 thereof) or any provision of any state, local or foreign tax law with respect to any payment, distribution, or allocation to the Partners and treated by the Tax Act (whether or not withheld pursuant to the Tax Act) or any such tax law as amounts payable by or in respect of any Partner or any Person owning an interest, directly or indirectly, in such Partner shall be treated as amounts distributed to the Partner with respect to which such amount was withheld pursuant to this Section 9 or allocated pursuant to Section 8 above for all purposes under this Agreement. The Partnership is authorized to withhold from

-14-

distributions or with respect to allocations to the Partners, and to pay over to any federal, state, local or foreign government any amounts required to be so withheld from distributions or with respect to allocations pursuant to the Tax Act (including, without limitation, pursuant to Section 1446 thereof) or any provisions of any other federal, state, local or foreign law. The Partnership is authorized to offset against any distribution to a Partner who is a "foreign person," as that term is defined in Section 1445(f)(3) of the Tax Act, an amount equal to any withholding to be paid by the Partnership on behalf of such Partner pursuant to the Tax Act (including, without limitation, Section 1446 thereof) to reimburse the Partnership for the amount of withholding paid by the Partnership on behalf of such Partner, and such amount shall be treated as having been distributed to such Partner for all purposes under this Agreement.

9.2     <u>Form of Distributions</u>. Except with respect to any distribution to be made in connection with the termination and dissolution of the Partnership, any and all distributions made pursuant to this <u>Section 9</u> shall be in the form of cash. Upon termination and dissolution of the Partnership pursuant to <u>Section 15</u>, distributions may also include other assets of the Partnership, in respect of which the General Partner will obtain an independent appraisal prior to any such distribution. Distributions upon the liquidation of the Partnership will be made in accordance with the distribution priorities set out in <u>Section 15.3</u>.

9.3     <u>Reinvestment</u>. Proceeds from the disposition of Investments will not be reinvested by the Partnership unless the Limited Partners determine otherwise by Unanimous Resolution.

9.4     <u>No Distributions in Certain Cases</u>. Notwithstanding the foregoing and any other provisions of this Agreement, the Partnership may not, pursuant to the Act, make distributions where such distribution would reduce its assets to an amount insufficient to discharge the liabilities of the Partnership to persons other than the Partners.

**10     TRANSFER AND ASSIGNMENT OF UNITS**

10.1     <u>Transfer and Assignment</u>. Subject to <u>Section 10.2</u>, a Limited Partner may not assign or otherwise transfer its Interest in whole or in part to any person or withdraw any Capital Contribution from the Partnership. In no event will the Partnership register the sale or transfer of any Units except in compliance with the U.S. securities laws as set forth in <u>Section 6.2.1</u> (reflecting the legend for Unit certificates) including Regulation D and Regulation S promulgated under the Securities Act.

10.2     <u>Transfer by Operation of Law</u>. When a person becomes entitled to a Unit by operation of law, such entitlement will not be recognized or entered in the Register evidencing ownership of the Units until that person (i) has produced evidence satisfactory to the General Partner of such entitlement; and (ii) has acknowledged in writing that such person is bound by the terms of this Agreement.

**11     REPRESENTATIONS, WARRANTIES AND COVENANTS**

11.1     The General Partner represents, warrants and covenants to each Limited Partner that, so long as it is the General Partner, it:

11.1.1     is and will continue to be a limited liability company under the laws of the State of Florida;

11.1.2     is and will continue to be duly registered and qualified to carry on business in each jurisdiction where it is necessary or advisable to be so registered or qualified;

11.1.3     has and will continue to have the capacity and authority to act as the General Partner;

11.1.4  can fulfill its obligations as General Partner without violating the terms of its any agreement to which it is or will be a party or by which it is or will be bound or any law or regulation applicable to it;

11.1.5  will devote as much time as is reasonably required to manage the activities and affairs of the Partnership; and

11.1.6  will not dissolve, wind-up or liquidate its business and affairs as long as it is the General Partner of the Partnership.

11.2  The General Partner further represents and warrants to each Limited Partner that the Partnership was formed, that the Partnership has filed the Certificate of Limited Partnership as a limited partnership under the Act, that such Certificate has not been withdrawn as of the date hereof and that the Partnership continues as a limited partnership under the Act as of the date hereof.

11.3  Survival of Representations and Warranties. The representations and warranties contained in this Section 11 shall survive the execution of this Agreement, the Initial Closing and each Subsequent Closing.

## 12   LIABILITIES AND INDEMNIFICATION

12.1  Limitation on Liability.

12.1.1  The General Partner shall be subject to all of the liabilities applicable under the Act; provided, however, that to the fullest extent permitted by law, the General Partner and any of its members, directors, officers, employees, affiliates and agents (each, an "**Indemnified Party**"), shall not be liable to the Partnership or to any Partner for liabilities arising in connection with the Partnership. Notwithstanding the foregoing, such limitation of liability shall not apply where the Indemnified Party is guilty of gross negligence, fraud, bad faith, willful misconduct or a willful material breach of this Agreement. For the purposes of this Agreement, all benefits accruing to an Indemnified Party that is not a party hereto shall be held in trust by the General Partner for such Indemnified Party.

12.1.2  To the extent that, at law or in equity, the General Partner has duties to the Partnership or to another Partner and liabilities relating thereto, the General Partner acting under this Agreement shall not, to the full extent permitted by law, be liable to the Partnership or to any such other Partner for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they expand or restrict the duties and liabilities of the General Partner otherwise existing at law or in equity, are agreed by the Partners to modify to that extent such other duties and liabilities of the General Partner.

12.1.3  The General Partner may consult with legal counsel and accountants selected by it and any act or omission suffered or taken by it on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith in reliance upon and in accordance with the advice of such counsel or accountants shall be full justification for any such act or omission, and the General Partner shall be fully protected and held harmless in so acting or omitting to act provided that such counsel or accountants were selected with reasonable care. The fees and costs associated with any such consultation shall be a Partnership expense.

12.1.4   The General Partner shall be liable for the debts and obligations of the Partnership to the full extent of its assets, but shall, as among the Partners, be entitled to require the prior exhaustion of the Partnership's assets and shall be entitled to the benefits of the indemnities provided herein.

12.2    Indemnification by Partnership.

12.2.1   To the fullest extent permitted by law, the Partnership shall indemnify and hold harmless each of the Indemnified Parties, from and against any and all claims, liabilities, damages, Losses, costs and expenses (including amounts paid by satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the affairs of the Partnership, including any mistake in judgment, any act performed or omission made by it, Losses incurred due to mistake, action, inaction or gross negligence of brokers or other agents (assuming that such agents and brokers were selected with due care and such Indemnified Party was responsible for the selection of such agents and brokers), the performance by such Indemnified Party of any of the General Partner's responsibilities hereunder or otherwise in connection with the matters contemplated herein; provided that an Indemnified Party shall be entitled to indemnification hereunder only to the extent that such Indemnified Party acted in good faith and such Indemnified Party's conduct did not constitute fraud, willful misconduct, a material breach of this Agreement or of such Indemnified Party's fiduciary duties to the Partnership, a breach of applicable laws which causes the Partnership to suffer a material adverse economic effect, or gross negligence. The satisfaction of any indemnification and holding harmless pursuant to this Section 12.2.1 shall be from and limited to Partnership assets, and no Partner shall have any personal liability on account thereof beyond the amount of its Capital Commitment. The General Partner shall on a regular basis keep the Limited Partners informed of the status of any claims.

12.2.2   The General Partner may, in its sole discretion, have the Partnership purchase insurance as a Partnership expense to insure the Indemnified Parties for any breach or alleged breach of their fiduciary responsibilities; provided that any person entitled to indemnification from the Partnership hereunder shall obtain the written consent of the General Partner (which consent shall not be unreasonably withheld) prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such person.

12.2.3   Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay such amount to the extent that it shall be determined ultimately that such Indemnified Party is not entitled to be indemnified hereunder. No advances shall be made by the Partnership under this Section 12.2.3 without the prior written approval of the General Partner (which may include the requirement that reasonable security be posted for the repayment).

12.2.4   The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which such Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Party's successors, assigns and legal representatives.

12.2.5   Any person entitled to indemnification from the Partnership hereunder shall first seek recovery under any other indemnity or any insurance policies by which such person is indemnified or covered, as the case may be, but only to the extent that the indemnifier with respect to such

-17-

indemnity or the insurer with respect to such insurance policy provides (or acknowledges its obligation to provide) such indemnity or coverage on a timely basis, as the case may be, and, if such person is other than the General Partner, such person shall obtain the written consent of the General Partner prior to entering into any compromise or settlement which would result in an obligation of the Partnership to indemnify such person.

12.2.6   If limited liability of the Limited Partners is lost by reason of an act or omission of the General Partner, the General Partner shall indemnify the Limited Partners against all claims arising from assertions that their respective liabilities are not limited as intended by the agreement as a result of such act or omission. This indemnification will not be available where the loss of liability is caused by an act or omission of the Limited Partner subject to such claims.

12.3   <u>Indemnification by General Partner</u>. Notwithstanding any other provision of this Agreement, the General Partner agrees that it shall indemnify, hold harmless and reimburse out of its assets each Limited Partner from all Losses sustained or incurred in connection with or arising out of the incorrectness of any representation or the breach of any warranty of the General Partner in <u>Section 11.1</u>.

# 13   WITHDRAWAL OF GENERAL PARTNER

13.1   <u>Withdrawal of General Partner; Assignment of Interest</u>. The General Partner may not sell, assign, transfer or otherwise dispose of its Interest, and the General Partner shall not have the right to withdraw from the Partnership, except upon written notice from the General Partner to the Partnership given at least 120 days prior to the proposed effective date of withdrawal. In the event of an assignment or other transfer of all of its Interest as a General Partner of the Partnership in accordance with this <u>Section 13.1</u>, its assignee or transferee shall be substituted in its place as General Partner of the Partnership and immediately thereafter the General Partner shall withdraw as General Partner of the Partnership.

13.2   <u>Transfer to New General Partner</u>. On or before the effective date of the General Partner's withdrawal, the new General Partner will execute a counterpart of this Agreement and will forthwith assume the obligations of the General Partner as of and from the date of its appointment and shall thereafter have the sole right to exercise all rights of the General Partner of the Partnership. The resigning General Partner shall be entitled to all amounts, including allocations of net income or loss and any distributions, to which it is entitled pursuant to this Agreement prior to the effective date of its withdrawal and the new General Partner shall be entitled thereto after such date and to receive the General Partner's share of net income or net loss of the Partnership. The withdrawing General Partner shall do all things and take all steps necessary to effectively transfer the management of the Partnership and all rights to which such new General Partner is entitled hereunder to the new General Partner and shall execute and deliver all deeds, certificates, declarations and other documents necessary or desirable to effect such transfer.

13.3   <u>Indemnification of Former General Partner</u>. In the event of a change of the General Partner, the Partnership and the Limited Partners shall release and hold harmless the former General Partner from all actions, claims, costs, demands, losses, damages and expenses with respect to events which occur in relation to the Partnership after the effective date of withdrawal of the former General Partner, unless such events arise from the fraud, gross negligence or willful misconduct of the General Partner, any of its Affiliates or any of their respective directors, officers, agents or employees or from any act or omission not believed by it in good faith to be within the scope of this Agreement occurring before such change of General Partner or the General Partner has committed a material breach of the terms of this Agreement, breached its fiduciary duty to the

Partnership or an applicable law which causes the Partnership to suffer a material adverse economic effect.

## 14   POWER OF ATTORNEY

14.1   <u>Power of Attorney of General Partner</u>. Each Limited Partner hereby irrevocably makes, constitutes and appoints the General Partner, and any successor to the General Partner under the terms of this Agreement, as its true and lawful attorney and agent, with full power of substitution and authority in the name, place and stead of such Limited Partner to:

14.1.1   execute, swear to, acknowledge, deliver, file and record in the appropriate public offices in any jurisdiction where the General Partner considers it appropriate any and all of:

14.1.1.1   this Agreement and any amendment hereto made in accordance with the terms hereof ;

14.1.1.2   any amendment to the Certificate of Limited Partnership and all certificates and other instruments necessary or appropriate to qualify or to continue the qualification of the Partnership as a limited partnership in the State of Florida and in each other jurisdiction where the Partnership may conduct its activities or where such qualification is necessary or desirable to maintain limited liability of Limited Partners in that jurisdiction;

14.1.1.3   all instruments and certificates and any amendment to the Certificate necessary or appropriate to reflect any amendment, change or modification of this Agreement, subject to the terms and restrictions of this Agreement;

14.1.1.4   all conveyances and other instruments and documents necessary to reflect the dissolution and liquidation of the Partnership, subject to the terms and restrictions of this Agreement, including cancellation of any certificate evidencing Units;

14.1.1.5   all instruments relating to the admission of additional or substituted Limited Partners, subject to the terms and restrictions of this Agreement; and

14.1.1.6   all elections, determinations or designations under the Tax Act;

14.1.2   execute and file with any government body any documents necessary and appropriate to be filed in connection with the activities of the Partnership or in connection with this Agreement; and

14.1.3   accept service for process for and on behalf of such Limited Partner at the principal office of the General Partner.

14.2   <u>Binding of Limited Partners</u>. Each Limited Partner will be bound by any deed or action made or taken by the General Partner pursuant to the power of attorney in this <u>Section 14</u> and waives any and all defenses which may be available to contest, negate or disaffirm any action of the General Partner taken in good faith under such power of attorney.

14.3   <u>Power of Attorney Irrevocable</u>. The power of attorney in this <u>Section 14</u> shall be irrevocable and is power coupled with an interest and shall bind the Limited Partner, and all heirs, executors, administrators and other legal representatives and the successors and assigns of the Limited Partner, notwithstanding the death or bankruptcy of the Limited Partner. The granting of these powers of attorney shall not terminate any continuing power of attorney previously granted by the Limited Partner and shall not be terminated by the Limited Partner on the execution of a continuing

-19-

power of attorney in the future, and the Limited Partner hereby agrees not to take any action in the future which results in the termination of any of these powers of attorney. These powers of attorney shall survive any dissolution or termination of the Partnership.

14.4    Execution of Documents on Behalf of Limited Partner. The General Partner shall have the power to execute documents in the name of all the Limited Partners pursuant to this power of attorney by affixing its signature thereto with the indication that it is acting on behalf of the Limited Partners.

14.5    Compliance by Limited Partners. Each Limited Partner will, on request by the General Partner, immediately execute every certificate or other instrument necessary to comply with any law or regulation of any jurisdiction in the United States for the continuation and good standing of the Partnership or to otherwise carry out the provisions of this Agreement.

## 15    DISSOLUTION

15.1    Termination. The Partnership, shall be terminated and dissolved on the first to occur of the following (the "**Termination Date**"):

15.1.1    The first Business Day of the calendar year following the date on which (i) all Limited Partners have either had the conditional status of their permanent residency removed or their permanent residency revoked and (ii) substantially all of the Partnership's Investments have been returned or written off in accordance with GAAP; or

15.1.2    If the conditions set forth in Section 15.1.1 have not been fulfilled, on December 31, 2025.

15.2    No Dissolution in Certain Events. The Partnership will not be dissolved or terminated by the withdrawal, death, incompetence, bankruptcy, insolvency, dissolution, liquidation, winding-up or receivership of, or the admission or withdrawal of, the General Partner or any Limited Partner.

15.3    Liquidation. Upon termination or dissolution of the Partnership, the Partnership shall be liquidated in an orderly manner in accordance with the provisions of this Agreement and the Act. The General Partner shall act as, or appoint a, liquidating trustee (the "**Liquidating Trustee**") of the Partnership. The Liquidating Trustee shall proceed diligently and expeditiously to liquidate the Partnership and to wind up its affairs and, in doing so, shall dispose of the property of the Partnership on commercially reasonable terms (to the extent the Liquidating Trustee determines such sale or other disposition is commercially desirable), as determined by the Liquidating Trustee in its sole discretion, in kind or by way of cash received on the disposition of property, as follows:

15.3.1    first, to pay and discharge all of the Partnership's debts, obligations and liabilities, including the expenses of its liquidation;

15.3.2    second, to establish any reserves that the Liquidating Trustee may deem necessary or advisable for any contingent or unforeseen debts, obligations or liabilities of the Partnership; and

15.3.3    third, to distribute the balance to the Partners in accordance with the order and priority set forth in Section 9.1.

15.4    No Returns of Capital. No Limited Partner is entitled to any reimbursement of his contribution to the capital of the Partnership except as funds or other property become available for distribution pursuant to Section 15.3 and Section 9.

15.5 <u>No Request for Dissolution by Limited Partners</u>. Except as provided for in this Agreement, no Limited Partner shall have the right to ask for the dissolution of the Partnership, for the winding-up of its affairs or for the distribution of its assets.

15.6 <u>No Termination of Agreement on Dissolution</u>. Notwithstanding the dissolution of the Partnership, this Agreement shall not terminate until the provisions of <u>Section 15.3</u> hereof shall have been fully performed.

# 16   MEETINGS

16.1 <u>Meetings of Partners</u>. The General Partner may at any time and from time to time call a meeting of the Partners for the purpose of considering any business set out in a Meeting Notice. Upon receipt of a request (a "**Meeting Request**") for a meeting of the Partners, the General Partner shall call such a meeting, provided that the Meeting Request: (i) is made either by the General Partner or by Limited Partners holding in the aggregate not less than 20% of the issued and outstanding Units; and (ii) contains sufficient detail of the business to be considered at the meeting to permit the General Partner to distribute a Meeting Notice in accordance with <u>Section 16.3</u> and <u>Section 16.4</u>.

16.2 <u>Requisitioned Meetings</u>. If the General Partner fails to call a meeting of Partners within 20 Business Days of receipt of a properly presented Meeting Request, any Limited Partners holding in the aggregate not less than 20% of the issued and outstanding Units may issue a Meeting Notice to call such a meeting to consider any matter of business set out in such Meeting Request.

16.3 <u>Delivery of Notice</u>. For each meeting of the Partners, a notice (a "**Meeting Notice**") of such meeting shall be sent to each of the Partners and the Accountants not less than 21 and not more than 50 days prior to the date of the meeting.

16.4 <u>Contents of Notice</u>. A Meeting Notice shall include the date and time of the meeting, the place of the meeting, and sufficient information to enable each Partner to make a reasoned judgment on each matter of business to be considered at the meeting.

16.5 <u>Place of Meetings</u>. A meeting of the Partners shall be held at a location in Palm Beach Gardens, Florida that is selected by the person that called the meeting.

16.6 <u>Quorum</u>. Limited Partners holding more than 50% of the votes able to be cast at the meeting of the Partners, present in person or by proxy (which must include at least three Limited Partners present in person) shall constitute a quorum for the transaction of any business at a meeting of the Partners. If no quorum is formed within 60 minutes of the date and time the meeting was to commence it shall be adjourned for no less than five and no more than 21 days and whoever attends the next scheduled meeting shall constitute a quorum.

16.7 <u>Chairman</u>. The General Partner shall appoint the chairman of the meeting who shall not carry a casting vote on any matters.

16.8 <u>Voting Rights</u>. On each question submitted to a meeting of Partners, except as expressly provided herein to the contrary, each Limited Partner shall be entitled to one vote for each Unit such Limited Partner holds and the General Partner shall be entitled to one vote. Except as provided in <u>Section 16.11.2</u>, all questions shall be decided by Ordinary Resolution.

16.9 <u>Proxies</u>. Each person entitled to vote at a meeting of the Partners may vote by way of proxy, provided that the proxy is received by the General Partner prior to the commencement of the

applicable meeting for the purpose of verification. Any individual may be appointed as a proxy holder, whether or not such individual is a Partner. Each proxy, whether for a specified meeting of the Partners or otherwise, shall be in a form reasonably acceptable to the chairman of the meeting.

16.10 <u>Conduct of Meetings</u>. To the extent that the rules and procedures for the conduct of a meeting of the Partners are not prescribed in this Agreement, such rules and procedures shall be determined by the chairman of the meeting, acting reasonably.

16.11 <u>Resolutions</u>.

16.11.1 Limited Partners may by Ordinary Resolution authorize a material change to the terms of an Investment recommended by the General Partner and take any other action provided for by Ordinary Resolution in this Agreement.

16.11.2 Limited Partners may by Unanimous Resolution approve an Other Investment recommended by the General Partner.

16.12 <u>Effect of Resolutions</u>. A resolution approved or consented to in accordance with this Agreement shall be binding upon each of the Partners and their respective heirs, executors, administrators, successors and permitted assigns.

16.13 <u>Minute Book</u>. All proceedings at a meeting of the Partners shall be recorded by the General Partner in a minute book, which shall be made available for inspection by each Partner during normal business hours.

16.14 <u>Resolution in Lieu of Meeting</u>. A resolution signed by Partners holding the requisite number of Units required to pass a written resolution is as valid and as effective as if it had been passed at a meeting of the Partners called in accordance with this Agreement.

## 17   ACCOUNTING AND REPORTING

17.1 <u>Books of Account</u>. The General Partner shall keep and maintain full, complete and accurate books of account and records of the Partnership with respect to the Partnership's activities and financial affairs at the principal address of the Partnership. Such books of account and records shall be retained by the General Partner for a minimum period of seven years or longer if required by applicable law and shall be made available for review by Limited Partners upon reasonable request.

17.2 <u>Annual Reports</u>. After the end of each Fiscal Year, the General Partner shall send to each person who is a Limited Partner at any time during such Fiscal Year a report summarizing the status of the activities of the Partnership as at the end of the Fiscal Year. The General Partner shall also send therewith a balance sheet, as of the end of such Fiscal Year as well as unaudited statements of income, each Limited Partner's capital account balance, gains and losses and cash flow statement for such Fiscal Year, all of which shall be prepared by the Accountants in accordance with GAAP. On or before the due date (including extensions) of the federal income tax return of the Partnership for each Fiscal Year of the Company, each Partner shall be furnished with such Partner's federal Schedule K-1 for such Fiscal Year and any other tax information reasonably required for state or local tax purposes.

17.3 <u>Other Reports</u>. The General Partner shall send to each Limited Partner such other reports as it shall deem advisable to describe the progress of the Partnership. Notwithstanding the foregoing, the

General Partner shall send to each Limited Partner a copy of any Conversion Notice within fifteen days following its receipt thereof.

## 18   NOTICES

18.1   <u>Notices</u>. Any notice, request or other communication required or permitted to be given hereunder shall be in writing and shall be delivered in person (including by courier) or transmitted by telecopy, shall be deemed to have been given and received on the day on which it was delivered (or, if such day is not a Business Day, on the next following Business Day), and shall be addressed as follows:

18.1.1   if to the General Partner of the Partnership: Harbourside Funding GP, LLC, 11770 US Highway One, Suite 301, Palm Beach Gardens, Florida 33408, Attention: Managing Member, facsimile 561-799-0061.

18.1.2   if to a Limited Partner, to the address or facsimile number of the Limited Partner appearing in the Register.

18.2   <u>Change of Address</u>. A Limited Partner may change its address by giving written notice of such change to the General Partner, and the General Partner may change its address by giving written notice thereof to each Limited Partner.

## 19   GENERAL

19.1   <u>Waiver of Accounting</u>. Except as may be otherwise required by law, each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for an accounting, partition or similar action in connection with the Partnership or any of the Partnership's property.

19.2   <u>Severability</u>. If any provision of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of this Agreement shall not in any way be affected or impaired thereby and this Agreement shall be carried out as nearly as possible in accordance with its original terms and conditions.

19.3   <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs executors, administrators, successors and assigns.

19.4   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and, all of which when taken together, shall be deemed to constitute one and the same instrument. Counterparts delivered by facsimile shall in all cases be deemed originals. It shall not be necessary in making proof of this Agreement to produce more than one counterpart.

19.5   <u>Entire Agreement</u>. This Agreement and the instruments and documents referred to herein constitute the entire obligation of the parties with respect to the subject matter hereof.

19.6   <u>Amendment</u>.

19.6.1   This Agreement may be amended in writing by the General Partner with the consent of the Limited Partners given by Ordinary Resolution.

19.6.2   This Agreement may also be amended in writing by the General Partner without prior notice to or consent from any Limited Partner:

19.6.2.1   for the purpose of adding to the Agreement (or amending existing provisions) any provisions which, in the written opinion of counsel to the Partnership, are for the protection of the Limited Partners, and

19.6.2.2   to cure any ambiguity or to correct or supplement any provisions which, in the written opinion of counsel to the Partnership, are defective or inconsistent with any other provision of the Agreement, provided that, in the written opinion of such counsel, the cure, correction or supplemental provision does not and will not adversely affect the interests of any Limited Partner. Notwithstanding any provision of this Agreement, no amendment to this Agreement shall be effective without the prior written approval of the General Partner and, in the event that the proposed amendment will, or is likely to, cause a Limited Partner to suffer an adverse economic effect, the written consent of such Limited Partner.

19.6.3   The General Partner shall notify the Limited Partners of the full details of any amendment to this Agreement within 20 Business Days of the effective date of the amendment.

19.7   <u>Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida and the federal laws of the United States applicable therein (excluding any conflict of laws rule or principle that might refer such construction to the laws of another jurisdiction).

19.8   <u>Confidentiality</u>. Each Limited Partner will maintain the confidentiality of information which is, to the knowledge of such Limited Partner, non-public information furnished by the General Partner regarding the General Partner and the Partnership (including (i) information regarding any person in which the Partnership holds, or contemplates acquiring, any Investment and (ii) the identity of any Limited Partner) received by such Limited Partner pursuant to this Agreement in accordance with such procedures as it applies generally to information of this kind (including procedures relating to information sharing with Affiliates), except (1) to the extent that such information is or becomes generally available to the public other than as a result of disclosure of a Partner, (2) to the extent such information was made or becomes available to a Partner on a non-confidential basis from a source which is not known to the Partner to be subject to any confidentiality obligation with respect to such information, (3) as otherwise required by governmental regulatory agencies, self-regulating bodies, law, legal process (including oral examination), or litigation in which such Limited Partner is a defendant, plaintiff or other named party and (4) as such Limited Partner furnishes to its Affiliates or advisors; provided that such Limited Partner shall be liable to the Partnership and the General Partner for any such Affiliate's or advisor's failure to comply with the terms of this <u>Section 19.8</u>.

19.9   <u>Third Party Beneficiaries</u>. Except as otherwise provided in this Agreement, the parties hereto intend that this Agreement shall not benefit or create any right or cause of action in, or on behalf of, any person, other than the parties to this Agreement and no person, other than the parties to this Agreement, shall be entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum.

19.10   <u>Attornment</u>. Each of the parties agrees that any action or proceeding arising out of or relating to this Agreement may be instituted in any state or federal court seated in Palm Beach County, Florida, waives any objection which it may have now or hereafter to the venue of any such action or proceeding, irrevocably submits to the non-exclusive jurisdiction of such courts in any such

-24-

action or proceeding, agrees to be bound by any judgment of such courts and agrees not to seek, and hereby waives, any review of the merits of any such judgment by the courts of any other jurisdiction.

19.11 <u>Time</u>. Time shall be of the essence hereof and no extension or variation of this Agreement shall operate as a waiver of this provision.

19.12 <u>Independent Business of a Partner</u>. Any Partner may engage in and possess any interest in any other business and real estate ventures of every nature and description whatsoever, independently or with other, and neither the Partners nor any Partner hereof shall have any rights in or to any independent venture or income or profits derived therefrom. Except as provided herein, nothing contained in this Agreement shall be construed to constitute any Partner hereof the agent of any other Partner hereof or to limit in any manner the Partners in the carrying on of their own respective business or activities.

19.13 <u>Investment Representations</u> In addition to the representations made by the Limited Partner in the Subscription Agreement with the Partnership, each Limited Partner hereby acknowledges that the Units have not been registered under the Securities Act or any other jurisdiction's securities statute or regulation; and represents, warrants, and agrees such Limited Partner is acquiring each Unit for such Limited Partner's own account for investment only and not for the purpose of, or with a view to, the resale or distribution of all any part thereof, nor with a view to selling or otherwise distributing such Unit or any part thereof at any particular time or under any pre-determined circumstances. Each Limited Partner further represents and warrants that such Limited Partner is a sophisticated investor, able and accustomed to evaluating and accessing financial matters, and that such Limited Partner has a sufficient net worth so that such Limited Partner does not anticipate a need for the funds to be invested, and that such Limited Partner understands investment in Units to be a speculative and illiquid investment. Each Limited Partner further warrants and represents that such Limited Partner is a bona-fide resident of the jurisdiction so referenced in the signature page to this Agreement. Each Limited Partner further warrants and represents that such Limited Partner has been given access to all necessary and relevant information regarding the Partnership.

19.14 <u>Representation of Each Limited Partner</u>. Acknowledging the reliance of the Partnership and General Partner hereon, each Limited Partner represents and warrants that such Limited Partner is an "accredited investor" within the meaning of the Securities Act. Such Limited Partner further represents that such Limited Partner has reviewed the subject investment with such financial, business and tax advisors as such Limited Partner has deemed necessary, and has determined that the investment in Units is suitable in light of the Limited Partner's financial condition and risk preferences; and the Limited Partner has all requisite power and authority to execute this Agreement.

19.15 <u>Additional Documents and Acts</u>. In connection with this Agreement, each Limited Partner agrees to execute and deliver such additional documents and instruments, and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement, and all such transactions.

19.16 <u>English Language Version Controls</u>. This Agreement has been initially written in the English language. In the event of any conflict between the original English version and any translations into other languages, the original English version shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first-mentioned above.

HARBOURSIDE FUNDING GP, LLC

By Florida 300 Investments, LLC, its
Managing Member


By_____
Name:
Title:

Name: Donald M. Allison
Original Limited Partner

**Signature Page for Individual (Non-Entity) Limited Partners**

**(For Harbourside Funding, LP Limited Partnership Agreement)**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.

**LIMITED PARTNER:**

_____
[Signature]

_____
[Print or Type Name]

_____
[Street Address]

_____
[City, Country, Mailing Code]

_____
[Telephone No.]

_____
[Facsimile No.]

_____
[Private E-mail Address]

UNITS PURCHASED: 1

CAPITAL CONTRIBUTION: US$500,000

Date:_____

**SCHEDULE OF EXHIBITS**

EXHIBIT A    -    Schedule of Partners and Partnership Interests

EXHIBIT B    -    Certificate of Good Standing of Partnership

**EXHIBIT A**

**SCHEDULE OF PARTNERS AND PARTNERSHIP INTERESTS**

| Name | Units | Partnership Interest | Capital Contribution |
|------|-------|----------------------|----------------------|
| **GENERAL PARTNER:** | | | |
| Harbourside Funding GP, LLC | -- | 0.1% | Upon formation $100 |
| **LIMITED PARTNERS:** | | | |
| Original Limited Partner | -- | -- | Upon formation $100 |
| See attached signature pages of Limited Partners for respective Partnership Interests and Capital Contributions. | Up to 200 | 99.9% | Per Unit upon subscription   $500,000<br>Maximum $100,000,000 |
| TOTAL: | Up to 200 | 100.00% | Up to $100,000,100 |

**EXHIBIT B**

**CERTIFICATE OF GOOD STANDING OF PARTNERSHIP**

[See Attached]

# *State of Florida*
## *Department of State*

I certify from the records of this office that HARBOURSIDE FUNDING, LP is a limited partnership or limited liability limited partnership organized under the laws of the State of Florida, filed on April 12, 2010.

The document number of this limited partnership or limited liability limited partnership is A10000000205.

I further certify that said limited partnership or limited liability limited partnership has paid all fees due this office through December 31, 2010, and its status is active.

*Given under my hand and the Great Seal of Florida, at Tallahassee, the Capital, this the Sixteenth day of April, 2010*

*Secretary of State*



Authentication ID: **500176130065-041610-A10000000205**

To authenticate this certificate, visit the following site, enter this ID, and then follow the instructions displayed.

**https://efile.sunbiz.org/certauthver.html**

Exhibit to Offering Memorandum for Harbourside Funding, LP

## **EXHIBIT B**

## **SUBSCRIPTION AGREEMENT**

[See Attached]

**THIS AGREEMENT HAS BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL**

**HARBOURSIDE FUNDING, LP**

**IMMIGRANT INVESTOR SUBSCRIPTION AGREEMENT**

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION AND ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND EXEMPTIONS FROM REGISTRATION PROVIDED BY THE SECURITIES LAWS OF SUCH STATE OR FOREIGN JURISDICTION. THE SECURITIES OFFERED HEREBY ARE HIGHLY SPECULATIVE AND INVOLVE SIGNIFICANT RISKS AND SHOULD NOT BE PURCHASED BY ANYONE WHO CANNOT AFFORD THE LOSS OF THE INVESTOR'S ENTIRE INVESTMENT.**

This Subscription Agreement (this "**Agreement**") is entered into as of the date set forth on the signature page hereto, between Harbourside Funding, LP, a Florida limited partnership (the "**Partnership**"), and the undersigned (the "**Subscriber**").

**BACKGROUND**

(A) Harbourside Place, a mixed use real estate development in Palm Beach County, Florida, is in the process of being developed by Jupiter Waterways, LLC ("**Jupiter Waterways**") and Harbourside Place, LLC (the "**Developer**"), which are affiliates of Allied Capital & Development of South Florida, LLC ("**Allied**") as more fully described in the Confidential Offering Memorandum provided by the Partnership to the Subscriber (the "**Offering Memorandum**").

(B) The Partnership is also an Allied affiliate and is governed by the terms of the Limited Partnership Agreement dated as of November 1, 2010 (the "**Partnership Agreement**"). The general partner of the Partnership is Harbourside Funding GP, LLC (the "**General Partner**") and is also an Allied affiliate.

(C) Florida Regional Center, LLC, an Allied affiliate ("**Florida Regional Center**" and, together with Allied, Jupiter Waterways, the Developer, the Partnership and the General Partner, the "**Harbourside Group**"), has applied to U.S. Citizenship and Immigration Services ("**USCIS**") to have a geographic area located in Palm Beach County, Florida, designated as a regional center (the "**Regional Center**") pursuant to the provisions of the Immigration and Nationality Act, 8 U.S.C. 1101, et seq., as amended (the "**Act**"), which application was approved by USCIS on September 14, 2010.

(D) The Offering Memorandum describes the offering by the Partnership of up to 200 units representing interests in the Partnership (the "**Units**") for an aggregate price of up to $108,000,000, which includes up to $8,000,000 of offering expenses (the "**Offering**").

(E) The Partnership has been formed to use the proceeds of the Offering to extend a convertible loan (the "**Loan**") to partially finance the purchase, development, construction and operation of Harbourside Place, comprising an approximately 300,000 square foot mixed-use real estate development more fully described in the Offering Memorandum ("**Harbourside Place**").

(F) The Offering is being made in connection with the U.S. EB-5 immigrant investment program (the "**Pilot Program**"), pursuant to which qualified individuals who invest a minimum of $500,000 in qualified investments within a regional center may submit Form I-526 Immigrant Petition by Alien Entrepreneur (the "**I-526 Petition**") to USCIS.

(G) The Partnership has appointed Citibank, N.A. as escrow agent (the "**Escrow Agent**") pursuant to the terms of an Escrow Agreement dated July 20, 2011 (the "**Escrow Agreement**").

(H) The summary set forth in paragraphs (A) through (G) above is qualified in its entirety by reference to the Offering Memorandum, the Partnership Agreement, the Escrow Agreement and this Agreement (collectively, the "**Offering Documents**").

(I) The Subscriber desires to subscribe to the Offering and become a limited partner in the Partnership (a "**Limited Partner**"), and the Partnership desires to consider the Subscriber for admission as a Limited Partner under the terms and subject to the conditions set forth in the Offering Documents.


## TERMS OF AGREEMENT


**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**1**   **Subscription.** The Subscriber, intending to be legally bound, hereby irrevocably agrees to purchase from the Partnership, the number of Units set forth on the signature page hereof, at a purchase price of $500,000 per Unit (the "**Subscription Price**"), plus a $40,000 fee per Unit to compensate the Partnership for Offering expenses, including legal, accounting, printer, escrow and overseas marketing expenses (the "**Administrative Fee**"). All funds are expressed and paid in U.S. dollars.

**2**   **Payment.** For each Unit subscribed, the Subscriber herewith tenders payment of $540,000, representing the Subscription Price and the Administrative Fee, by wire transfer. The Subscription Price and the Administrative Fee shall be delivered to the Escrow Agent and shall be held for Subscriber's benefit, subject to release in the manner and in accordance with the conditions set forth in the Offering Documents.

**3**   **Acceptance of Subscription.**

3.1   <u>Acceptance at Partnership's Discretion</u>. The Partnership in its sole and absolute discretion may accept this Agreement and the funds delivered to the Escrow Agent only by executing the signature page hereof and delivering a counterpart to the Subscriber. The Partnership shall have no obligation hereunder until the Partnership shall execute and deliver to the Subscriber an executed copy of this Agreement.

3.2   <u>Closing Procedure</u>. After the Partnership has executed and delivered this Agreement together with delivery of the corresponding payments to the Escrow Agent, the Partnership will provide notice to

the Subscriber to submit an I-526 Petition to USCIS. Upon submission of the Subscriber's I-526 Petition to USCIS evidenced by official notice from USCIS confirming receipt, at the joint instruction of the Partnership and the Regional Center Administrator, the Escrow Agent will release the Administrative Fee to the Florida Regional Center. The closing of the sale of the number of Units set forth on the signature page hereof will occur, if at all, upon final approval of the Subscriber's I-526 Petition by USCIS and satisfaction of all other conditions described in the Offering Documents. Upon closing, at the joint instruction of the Partnership and the Regional Center Administrator, the Escrow Agent will release the Subscription Price to the Partnership and the Subscriber will be accepted as a Limited Partner in the Partnership.

**4    Release from Escrow Without Closing.**

4.1    <u>Events Triggering Release from Escrow Without Closing</u>. Within ninety (90) days after the occurrence of any of the following events, the Partnership will cause the following to occur with respect to the Administrative Fee and the Subscription Price:

4.1.1    Either or both of the USCIS Approvals have been revoked and either cannot be resubmitted or the Partnership chooses not to resubmit, in which case the Subscription Price and the Administrative Fee will be returned to the Subscriber without interest or deduction;

4.1.2    The I-526 Petition of the Subscriber has been denied for reasons other than fraud and/or misrepresentation by the Subscriber in connection with the I-526 Petition, in which case the Subscription Price and the Administrative Fee will be returned to the Subscriber without interest or deduction;

4.1.3    The I-526 Petition of the Subscriber has been denied for reasons including the Subscriber's fraud and/or misrepresentation in connection with the I-526 Petition, in which case the Subscription Price will be returned to the Subscriber without interest or deduction and the Administrative Fee will be forfeited by the Subscriber;

4.1.4    All of the following have occurred:

4.1.4.1    12 months have expired from the date the Subscriber completed the Subscription Procedures (as defined in the Offering Memorandum),

4.1.4.2    the Subscriber's I-526 Petition, which was timely filed, has not been approved or denied within such 12-month period (or such longer period as the Subscriber and the Partnership have agreed in writing), and

4.1.4.3    the Subscriber has provided written evidence that following such period the Subscriber has withdrawn his or her I-526 Petition,

in which case the Subscription Price and the Administrative Fee will be returned to the Subscriber without interest or deduction. Any funds returned to the Subscriber shall be sent via wire transfer to the account from which the Subscriber's funds originated.

4.2    <u>Effect of Release from Escrow Without Closing</u>. Upon release of the Subscription Price and the Administrative Fee from escrow in accordance with Section 4.1, above, no closing will take place this Agreement shall be of no further force or effect, except for the confidentiality obligations of <u>Section 7</u> and the indemnification obligations of <u>Section 8</u>.

**5**    **Default.** The Subscriber's failure to pay the Subscription Price or the Administrative Fee in the manner and at the time set forth herein, or to observe, perform, or comply with any of the terms, representations, warranties or covenants set forth herein and applicable to the Subscriber, shall be a default under this Agreement, and upon the occurrence of any default, the General Partner may exercise any and all rights, remedies, and powers to cancel, terminate or revoke this subscription hereunder and to exercise any other right or privilege available to it under applicable law.

**6**    **Representations, Warranties, Covenants and Acknowledgements of Subscriber**. The Offering is intended to be exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), pursuant to Section 4(2) of the Securities Act, the provisions of Regulation D promulgated thereunder ("**Regulation D**") and/or the provisions of Regulation S promulgated thereunder ("**Regulation S**"). In furtherance thereof and as a material inducement for the Partnership to enter into this Agreement and to accept the Subscriber's subscription, the Subscriber hereby represents, warrants, covenants and acknowledges to the Partnership as follows:

6.1    Legal Competence. The Subscriber is at least 18 years of age and a bona fide resident and domiciliary of the country set forth on the signature page hereof ("**Country of Residence**") and has no present intention of becoming a resident of any other country other than the United States.

6.2    Pilot Program Compliance. The Subscriber complies with, and will continue to comply with, all Pilot Program requirements, terms and conditions and knows of no material facts that may result in the Subscriber's failure to meet the minimum requirements for permanent residency in the United States.

6.3    No Health Impairment. The Subscriber is in good health and is aware of no health impairment that may result in the Subscriber's failure to meet minimum health requirements stipulated under the Act, or any other U.S. immigration requirements.

6.4    No Criminal Offense. The Subscriber has not been convicted of any criminal or other offense that may result in the Subscriber's failure to meet the minimum conditions of permanent residency in the United States.

6.5    Independent Advice. The Subscriber has had the opportunity to consult with competent and independent advisors of the Subscriber's choice with respect to the suitability of the investment based on the Subscriber's individual circumstances and is making an investment in Units solely on the basis of those consultants and the Subscriber's own analysis of the Partnership. Subscriber represents and warrants that Subscriber is aware of no grounds of exclusion that would preclude the issuance of a conditional resident visa to either Subscriber or Subscriber's accompanying family members. Subscriber has not relied upon the Partnership, the General Partner or its affiliates for any financial or any other legal advice (including immigration advice) in connection with Subscriber's decision to participate in the Pilot Program as described in the Offering Documents. The Partnership and the General Partner, including their managers, officers, employees, representatives and agents, have not made any statement, promise or representation to the Subscriber regarding the likelihood of the Subscriber receiving conditional or unconditional permanent residency in the United States.

6.6    USCIS Discretion. USCIS has sole and absolute discretion with respect to the granting of conditional and unconditional permanent residency in the United States under the Pilot Program and may deny an I-526 Petition or a Form I-829 Petition by Entrepreneur to Remove Conditions ("**I-829 Petition**") for any reason or for no reason. In the event the Subscriber's I-526 Petition or I-829 Petition is not approved for any reason, the Subscriber shall have no claim against the

4

Harbourside Group or its affiliates, officers, directors, members, employees, agents or advisers (the "**Harbourside Parties**").

6.7     <u>U.S. Consulate Discretion</u>. The U.S. consulates abroad have sole and absolute discretion with respect to the granting of an immigrant visa.

6.8     <u>Subscriber Responsibilities</u>. The Subscriber is subscribing hereunder as principal and not on behalf of any other person. The Subscriber is solely responsible for (i) filing the I-526 Petition, (ii) applying for conditional permanent residence in the United States, (iii) filing the I-829 Petition and (iv) the costs and expenses relating thereto including, without limitation, fees and expenses of retaining immigration counsel or immigration broker. The Partnership has no obligation to assist or incur any cost on behalf of the Subscriber in connection with the I-526 Petition, application for conditional permanent residence in the United States or the I-829 Petition, other than to provide information and copies of documents that are in the Partnership's possession or can be obtained by the Partnership as a nominal expense and that are required by USCIS in connection with the foregoing.

6.9     <u>Accredited Investor</u>. The Subscriber is an "Accredited Investor" as defined in the Offering memorandum and is a sophisticated investor by virtue of Subscriber's education, training and numerous prior investments made on Subscriber's own behalf or through entities which Subscriber controls. The Subscriber is knowledgeable and experienced in financial and business matters and is capable of evaluating the merits and risks of an investment in the Units and has the capacity to protect Subscriber's own interests in connection with the purchase of the Units, either alone or in conjunction with Subscriber's professional advisors, who are unaffiliated with and who are not compensated, directly or indirectly, by the Partnership or any affiliate of the Partnership. All information which the Subscriber has provided to the Partnership concerning Subscriber and Subscriber's financial position is correct and complete including, without limitation, the information set forth on the Accredited Investor Questionnaire attached hereto as <u>Exhibit A</u> and executed by the Subscriber in connection herewith (the "**Accredited Investor Questionnaire**"), and IRS Forms W-7 and W-8BEN attached hereto as <u>Exhibit B</u> and executed by the Subscriber in connection herewith.

6.10    <u>Risk Assumption</u>. Subscriber has received and reviewed the Offering Documents. The Subscriber assumes full responsibility for making an investment in the Units and has received full independent advice regarding the risks associated with this investment. The Subscriber acknowledges that (i) the Partnership is a newly-formed limited partnership proposing to fund the purchase, development, construction and operation of Harbourside Place, with all the attendant business and financial risks of a newly-formed partnership, (ii) the investment in the Partnership contemplated herein is a speculative investment and involves substantial risks, including the potential loss of the Subscriber's entire investment. The Subscriber is able to hold the Units for an indefinite period of time and can bear the economic risk of Subscriber's investment in the Partnership, including the loss of the Subscriber's entire investment in the Units.

6.11    <u>Access to Information</u>. The Subscriber acknowledges the receipt of a copy of the Offering Documents. The Subscriber reads and understands English or has had the Offering Documents translated by a competent translator into a language the Subscriber understands. The Subscriber has fully read all the Offering Documents, including this Agreement, which describe certain material information concerning the Partnership and has carefully reviewed them and understands the information contained therein. The Subscriber acknowledges that the Offering Documents do not purport to contain all the information that would be contained in a registration statement under the Securities Act. The Partnership has agreed to make, and has made, available to the Subscriber prior

5

to any acquisition of the Units all information necessary to enable the Subscriber to evaluate the risks and merits of an investment in the Partnership. The Subscriber has received all information which Subscriber has requested regarding the Partnership and its current and proposed business and operations, and the Subscriber has been given reasonable opportunity to speak and meet with representatives of the Partnership for the purpose of asking questions of, and receiving answers from, such representatives concerning the foregoing and an investment in the Partnership, and the Partnership has responded to all such questions and inquiries to the satisfaction of the Subscriber. Notwithstanding the foregoing, the Subscriber has not relied upon any representation or other information other than as contained in the Offering Documents.

6.12    Estimates. The Subscriber acknowledges that any estimations of, among other things, commercial viability of the Partnership's business, anticipated expenses and other applications of proceeds of this Offering included in the Offering Documents were prepared by the Partnership in good faith but that such estimates are preliminary and subject to change and that the attainment of such estimations are not guaranteed by the Partnership

6.13    No General Solicitation. The Subscriber is unaware of and is no way relying on any form of general solicitation or general advertising in connection with the Offering in the United States or in any other jurisdiction. To the best knowledge of the Subscriber, neither the Partnership nor any other person has conducted or directed selling efforts including, without limitation, (i) any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the Units, (ii) mailing of printed material to persons residing in the United States, (iii) holding of promotional seminars in the United States, or (iv) the placing of advertising with radio or television stations broadcasting in the United States or in publications with a general circulation in the United States.

6.14    No Commissions by Subscriber Actions. The Subscriber has taken no action that would give rise to a claim by any person for brokerage commissions, finders fees or the like relating to this Agreement or the transactions contemplated hereby.

6.15    Purchase for Own Account. The Units the Subscriber is acquiring are being acquired for the Subscriber's own account for investment only and not with a view to sale or resale or other distribution of the Units. The Subscriber will not make any offer, sale, transfer or other disposition of the Units, including any hedging transaction (i) in violation of the Securities Act, the Securities Exchange Act of 1934, or any other applicable securities laws of any jurisdiction including, without limitation, the securities laws of the Country of Residence (collectively, the "**Securities Laws**"), or (ii) in violation of any offer, sale, resale or other distribution restriction contained in the Offering Documents. Furthermore, prior to any disposition of a Unit, or any portion thereof, by the Subscriber, the Subscriber shall provide the Partnership with an opinion of counsel in form and substance acceptable to the Partnership in its sole discretion, confirming that any such proposed sale is in compliance with the Securities Laws or an exemption therefrom.

6.16    Certification Regarding U.S. Person Status. The Subscriber is either (i) not a U.S. Person (as defined in the Offering Memorandum) and is not acquiring Units for the account of benefit of any U.S. Person or (ii) is a U.S. Person acquiring Units in an exempt transaction.

6.17    Restricted Securities. The Subscriber understands and acknowledges that the Units have not been registered pursuant to the provisions of any of the Securities Laws and that the purchase of Units is taking place in a transaction not involving a public offering. The Subscriber understands that Subscriber has no right to request, and the Partnership is under no obligation to register, the Units under any of the Securities Laws. The Units will be deemed "restricted securities" as defined under

Rule 144 of the Securities Act and subject to the resale limitations contained in the following section. If the Partnership becomes subject to reporting requirements under any Securities Laws, the Subscriber will provide such information, documents and materials, within five days after receipt of a request from the Partnership, as may reasonably be required to comply with such reporting requirements.

6.18   Certificates; Legends. The Subscriber understands that the Units may not be represented by certificates. In the event the Partnership does issue certificates evidencing the Units, such certificates will bear any legend required by the Securities Laws or any other applicable laws, including, without limitation, a legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE PARTNERSHIP THAT SUCH REGISTRATION IS NOT REQUIRED PURSUANT TO REGULATION S, REGULATION D OR UNDER ANOTHER EXCEPTION FROM REGISTRATION UNDER THE ACT; AND THAT HEDGING TRANSACTIONS INVOLVING THOSE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFERS, REPURCHASE OPTIONS AND OTHER AGREEMENTS SET FORTH IN THAT CERTAIN LIMITED PARTNERSHIP AGREEMENT DATED EFFECTIVE AS OF NOVEMBER 1, 2010 AMONG HARBOURSIDE FUNDING GP, LLC, AS GENERAL PARTNER, AND CERTAIN PERSONS, AS LIMITED PARTNERS, A COPY OF WHICH IS ON FILE AND MAY BE OBTAINED FROM THE PRINCIPAL PLACE OF BUSINESS OF THE PARTNERSHIP."

6.19   Accuracy of Disclosures. All of the information supplied by the Subscriber to the Partnership in connection with the acquisition of the Units (including, without limitation, the information set forth in the Accredit Investor Questionnaire), and the representations of the Subscriber contained in this Agreement, are true and complete, and do not contain any statement which, at the time and in light of the circumstances under which they were made, were false or misleading with respect to any material fact, and do not omit to state any material fact required to be stated in order to make the statements made not false or misleading.

6.20   Validity; Binding Effect. The Subscriber has the full power and authority to execute and deliver this Agreement and the Offering Documents and to perform Subscriber's obligations hereunder and thereunder. The Subscriber has taken all actions required by law to authorize Subscriber's execution and delivery of this Agreement and the Offering Documents and all transactions contemplated hereunder and thereunder. This Agreement and the other Offering Documents are valid and binding agreements of the Subscriber and are enforceable against the Subscriber in accordance with their terms. Neither the execution nor delivery of this Agreement or the Offering Documents nor the performance of any transactions contemplated hereunder or thereunder conflict with or constitute a default under any instruments governing the Subscriber, any law, rule, regulation or order, or any agreement to which the Subscriber is a party or by which the Subscriber is bound.

6.21   Tax Matters. The Subscriber acknowledges that no assurance is or has been made regarding any tax advantages that may accrue to an investor in the Units, and that existing tax laws and regulations could be modified in the future, thus denying the Subscriber all or a portion of the tax benefits that may currently be available under existing tax laws and regulations. The Subscriber acknowledges

that an investment in the Units, as well as sale or other disposition of the Units, may result in tax consequences under federal, state or other tax laws in the United States or the Country of Residence. The Subscriber has made such independent inquiries as the Subscriber deems necessary to evaluate properly an investment in the Units, including consultation with a personal tax adviser, to determine whether such investment is appropriate. The Subscriber acknowledges that it is the Subscriber's sole responsibility to file timely tax returns or any tax election relating to the Subscriber's investment, sale or other disposition of the Units.

6.22   <u>No Scheme to Evade Registration</u>. The Subscriber's purchase of the Units is not a transaction, or any element of a series of transactions, that is part of a plan or scheme to evade the registration requirements of the Securities Laws. The Subscriber has complied with all applicable laws in connection with the Subscriber's purchase of the Units including, without limitation, obtaining any required consents from any governmental authority in the Country of Residence or elsewhere, and observing any other applicable legal formality.

6.23   <u>Survival of Representations, Warranties, Covenants and Acknowledgements</u>. The Subscriber makes the representations, warranties, covenants and acknowledgments set forth in this Section 4 with the intent that they be relied upon by the Harbourage Parties in determining the Subscriber's suitability as a limited partner in the Partnership, and the Subscriber hereby agrees that all such representations, warranties, covenants and acknowledgments shall survive the consummation of the transactions contemplated by this Agreement.

6.24   <u>Joint and Several Undertaking</u>. If more than one person is executing this Agreement, each representation, warranty, covenant and acknowledgment set forth in this Section 4 by or on behalf of the Subscriber shall be a joint and several representation, warranty, covenant or acknowledgment of such person.

**7   Immigration Undertakings.** Following the notice from the General Partner that the Regional Center has received proper designation from the USCIS, the Subscriber shall: (i) diligently file and prosecute the I-526 Petition and complete all related procedures; (ii) provide to the General Partner such information as the General Partner may require confirming that the funds to be invested by the Subscriber were lawfully obtained, together with such other documents as the General Partner may reasonably require (which requirement may be met by providing a letter addressed to it from a recognized and qualified firm of accountants licensed to practice in Country of Residence, in form, substance and from a firm of accountants or other professionals acceptable to the General Partner); (iii) provide copies of the investor's passport and such other documentation that the General Partner or the Escrow Agent deems appropriate; and (iv) diligently file and prosecute the I-829 Petition within 21 to 24 months after the date that conditional permanent resident status is obtained.

**8   Obligation to Qualify.** The rights of the Subscriber to purchase the Units under this Agreement is expressly conditioned upon the exemption from all registration or qualification requirements under the Securities Laws. The Partnership shall not be required to register or qualify this transaction under the Securities Laws and, should such registration or qualification become necessary, the Partnership shall have the unconditional right to terminate this Agreement and rescind any sale of Units hereunder, all without further obligation or liability.

**9   Confidentiality.** The Subscriber acknowledges and agrees that any information or data acquired from or about the Partnership not otherwise in the public domain, was received in confidence. The Subscriber agrees not to divulge, communicate or disclose, except as may be required by law or for the performance of this Agreement, or use to the detriment of the Partnership or for the benefit of any other person or persons, or misuse in any way, any confidential information of the Partnership,

including any business secrets of the Partnership. The existence of and the terms and disclosures of the Offering Documents shall be considered confidential information.

10      **Indemnification.** The Subscriber shall defend, indemnify and hold harmless the Harbourside Parties who were or are a party to, or are threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of, or arising from any actual or alleged misrepresentation or misstatement of facts, or omission to represent or state facts, made by the Subscriber to the Partnership concerning the Subscriber or Subscriber's financial position, in connection with the offering and sale of the Units, against losses, liabilities and expenses actually incurred by a Harbourside Party (including without limitation attorneys' fees, judgments, fines and amounts paid in settlement) in connection with such action, suit or proceeding.

11      <u>**Miscellaneous.**</u>

11.1    <u>Entire Agreement</u>. This Agreement (including any other Exhibits and Schedules attached hereto) contains the entire understanding of the parties in respect of its subject matter and supersedes all prior agreements and understandings (oral or written) between or among the parties with respect to such subject matter

11.2    <u>Notices</u>. Any notice, request or other document required or permitted to be given under this Agreement shall be in writing and shall be deemed given to a party (a) upon delivery if delivered by hand, (b) three days after the date of deposit in the U.S. Mail, postage prepaid, if mailed by certified or registered mail, or (c) on the next business day, if delivered by confirmed facsimile or sent by prepaid overnight courier service, in each case, addressed in the case of the Subscriber to the address set forth on the signature page hereto and in the case of the Partnership to:

c/o Harbourside Funding GP, LLC
11770 US Highway One, Suite 301
Palm Beach Gardens, FL 33408
Attention: Managing Member
Facsimile: 561-799-0061

Any party may change the address to which notices shall be sent by delivering a written notice to the other parties in accordance with the terms of this Section.

11.3    <u>Modification</u>. This Agreement shall not be modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge or termination is sought.

11.4    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument. Counterparts delivered by facsimile shall in all cases be deemed an original.

11.5    <u>Survival of Representations, Warranties, Covenants, and Agreements</u>. The representations, warranties, covenants, acknowledgments and agreements of the Subscriber contained herein shall survive the completion of the sale of the Units. In the event the Offering is terminated or the Partnership does not accept Subscriber's subscription, <u>Section 7</u> (Confidentiality) and <u>Section 8</u> (Indemnification) shall nonetheless survive.

11.6   <u>Binding Effect</u>. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the parties and their heirs, successors and permitted assigns.

11.7   <u>Assignability</u>. This Agreement is not transferable or assignable by the Subscriber. Any purported transfer or assignment by the Subscriber in violation of the terms hereof shall be null and void.

11.8   <u>Applicable Law</u>. This Agreement shall be construed in accordance with the laws of the State of Florida applicable to contracts executed and to be wholly performed within such State. Each party hereby irrevocably and unconditionally consents and submits to the exclusive jurisdiction of the courts of the State of Florida sitting in Palm Beach County, Florida and of the United States District Court for the Southern District of Florida for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby and each party agrees not to commence any action, suit or proceeding relating thereto except in such courts. Each party further agrees that any service of process, summons, notice or document by U.S. registered mail to its address set forth herein shall be effective service of process for any action, suit or proceeding brought against it in any such court. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such courts, and irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

11.9   <u>No Waiver</u>. The failure or delay of any party to enforce any provision of this Agreement shall in no way affect the right of such party to enforce the same or any other provision of this Agreement. The waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver by such party of any succeeding breach of such provision or a waiver by such party of a breach of any other provision. The granting of any consent or approval by any party in any one instance shall not be construed as to waive or limit the need for such consent or approval in any other or subsequent instance.

11.10   <u>Severability</u>. If any term or provision of this Agreement shall be determined by a court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, the remaining provisions of this Agreement shall remain enforceable and the invalid, illegal or unenforceable provision shall be modified to the minimum extent possible so as to be enforceable and shall be enforced.

11.11   <u>English Language Version Controls</u>. This Agreement has been initially written in the English language. In the event of any conflict between the original English version and any translations into other languages, the original English version shall control.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year written below.

**SUBSCRIPTION:**

Number of Units subscribed for:                 _____

**Total Amount:**
Number of Units x (Subscription Price $500,000 +
Administrative Fee $40,000):                 $_____

**SUBSCRIBER:**

_____          _____
Signature                                                         Street Address

_____          _____
Print or Type Name of Subscriber                         City

_____          _____
Date                                                               State or Country

                                                                     Telephone: _____

                                                                     Facsimile: _____

                                                                     Email: _____

**PARTNERSHIP:**

**HARBOURSIDE FUNDING, LP**

By: HARBOURSIDE FUNDING GP, LLC
Its: General Partner

By Florida 300 Investments, LLC, its Managing Member

By: _____
Name:
Its:

**ACCEPTED SUBSCRIPTION:**

ACCEPTED AS OF _____, 20___, AS TO THE ABOVE SUBSCRIBED UNIT(S) UNLESS OTHERWISE INDICATED BELOW:

Number of Units Accepted: _____

Total Amount Accepted: $_____

_____

12

## SCHEDULE OF EXHIBITS

Exhibit A              Accredited Investor Questionnaire

Exhibit B              IRS Forms W-7 and W-8BEN

**EXHIBIT A**

**ACCREDITED INVESTOR QUESTIONNAIRE**
**Please Print or Type and Complete Fully**
**ACCREDITED INVESTOR STATUS**

**I HEREBY ACKNOWLEDGE THAT THE REPRESENTATIONS CONTAINED IN THIS EXHIBIT A ARE MADE FOR THE PURPOSE OF QUALIFYING ME AS AN "ACCREDITED INVESTOR" AS THAT TERM IS DEFINED IN REGULATION D. I HEREBY REPRESENT THAT THE STATEMENT OR STATEMENTS INITIALED OR CHECKED BELOW ARE TRUE AND CORRECT IN ALL RESPECTS. I UNDERSTAND THAT A FALSE OR INCOMPLETE REPRESENTATION MAY CONSTITUTE A VIOLATION OF LAW AND THAT ANY PERSON, INCLUDING THE HARBOURSIDE PARTIES, WHO SUFFERS DAMAGES AS A RESULT OF A FALSE REPRESENTATION MAY HAVE A LEGAL CLAIM AGAINST ME FOR DAMAGES.**

I represent and warrant that I am an Accredited Investor because:

☐    I have an individual net worth, or joint net worth with my spouse, which exceeds $1,000,000. I understand that "net worth" means the excess of total assets at fair market value over total liabilities, **EXCLUDING** the fair market value of my primary residence; or

☐    I had individual income (exclusive of any income attributable to my spouse) of more than $200,000 in each of the two most recent years, and I reasonably expect to have individual income in excess of $200,000 in the current year. I understand that individual income means my adjusted gross income, as would be reported for U.S. federal income tax purposes, less any income attributable to my spouse or to property owned by my spouse; or

☐    My spouse and I had joint income of more than $300,000 in each of the two most recent years, and we reasonably expect to have joint income in excess of $300,000 in the current year. I understand that joint income means my adjusted gross income together with that of my spouse, as would be reported for U.S. federal income tax purposes.

 IN WITNESS WHEREOF, Subscriber has caused this instrument to be duly executed on the date indicated below.

_____          _____
Signature                                                      Street Address

_____          _____
Print or Type Name of Subscriber                   City

_____          _____
Date                                                            State or Country

A-1

**EXHIBIT B**

**Internal Revenue Service Form W-7**
**Internal Revenue Service Form W-8BEN**

[See Attached]

Form **W-7**
(Rev. January 2010)
Department of the Treasury
Internal Revenue Service

### Application for IRS Individual Taxpayer Identification Number

▶ See instructions.
▶ For use by individuals who are not U.S. citizens or permanent residents.

OMB No. 1545-0074

*An IRS individual taxpayer identification number (ITIN) is for federal tax purposes only.*

**FOR IRS USE ONLY**

**Before you begin:**
● **Do not submit** this form if you have, or are eligible to get, a U.S. social security number (SSN).
● Getting an ITIN does not change your immigration status or your right to work in the United States and does not make you eligible for the earned income credit.

**Reason you are submitting Form W-7.** Read the instructions for the box you check. **Caution:** If you check box **b, c, d, e, f,** or **g, you must file a tax return with Form W-7** unless you meet one of the exceptions (see instructions).

- a ☐ Nonresident alien required to get ITIN to claim tax treaty benefit
- b ☐ Nonresident alien filing a U.S. tax return
- c ☐ U.S. resident alien **(based on days present in the United States)** filing a U.S. tax return
- d ☐ Dependent of U.S. citizen/resident alien    Enter name and SSN/ITIN of U.S. citizen/resident alien (see instructions) ▶ . . . . . . . . . . . . . . . .
- e ☐ Spouse of U.S. citizen/resident alien    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
- f ☐ Nonresident alien student, professor, or researcher filing a U.S. tax return or claiming an exception
- g ☐ Dependent/spouse of a nonresident alien holding a U.S. visa
- h ☐ Other (see instructions) ▶ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Additional information for **a** and **f:** Enter treaty country ▶ _____    and treaty article number ▶ _____

**Name**
(see instructions)

Name at birth if different  . .  ▶

| 1a | First name | Middle name | Last name |
|----|-----------|-------------|-----------|
| 1b | First name | Middle name | Last name |

**Applicant's mailing address**

2 | Street address, apartment number, or rural route number. **If you have a P.O. box, see page 4.**

City or town, state or province, and country. Include ZIP code or postal code where appropriate.

**Foreign (non-U.S.) address** (if different from above) (see instructions)

3 | Street address, apartment number, or rural route number. **Do not use a P.O. box number.**

City or town, state or province, and country. Include ZIP code or postal code where appropriate.

**Birth information**

| 4 Date of birth (month / day / year) | Country of birth | City and state or province (optional) | 5 ☐ Male  ☐ Female |
|---|---|---|---|
| / / | | | |

**Other information**

| 6a Country(ies) of citizenship | 6b Foreign tax I.D. number (if any) | 6c Type of U.S. visa (if any), number, and expiration date |
|---|---|---|

6d Identification document(s) submitted (see instructions) ☐ Passport    ☐ Driver's license/State I.D.
☐ USCIS documentation  ☐ Other . . . . . . . . . . . . . . .   Entry date in United States
Issued by: _____ No.: _____ Exp. date: / /    / /

6e Have you previously received a U.S. temporary taxpayer identification number (TIN) or employer identification number (EIN)?
☐ **No/Do not know.** Skip line 6f.
☐ **Yes.** Complete line 6f. If more than one, list on a sheet and attach to this form (see instructions).

6f Enter: TIN or EIN ▶ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   and
Name under which it was issued ▶

6g Name of college/university or company (see instructions)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
City and state      Length of stay

**Sign Here**

Under penalties of perjury, I (applicant/delegate/acceptance agent) declare that I have examined this application, including accompanying documentation and statements, and to the best of my knowledge and belief, it is true, correct, and complete. I authorize the IRS to disclose to my acceptance agent returns or return information necessary to resolve matters regarding the assignment of my IRS individual taxpayer identification number, including any previously assigned taxpayer identifying number.

Keep a copy for your records.

| Signature of applicant (if delegate, see instructions) | Date (month / day / year) | Phone number |
|---|---|---|
| Name of delegate, if applicable (type or print) | Delegate's relationship to applicant | ☐ Parent  ☐ Court-appointed guardian  ☐ Power of Attorney |

**Acceptance Agent's Use ONLY**

| Signature | Date (month / day / year) | Phone ( ) |
|---|---|---|
| | / / | Fax ( ) |
| Name and title (type or print) | Name of company | EIN |
| | | Office Code |

For Paperwork Reduction Act Notice, see page 5.    Cat. No. 10229L    Form **W-7** (Rev. 1-2010)

B-2

Form **W-8BEN**
(Rev. February 2006)
Department of the Treasury
Internal Revenue Service

## Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding

► Section references are to the Internal Revenue Code.   ► See separate instructions.
► Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

| Do not use this form for: | Instead, use Form: |
|---|---|
| ● A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . | W-9 |
| ● A person claiming that income is effectively connected with the conduct of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . | W-8ECI |
| ● A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . | W-8ECI or W-8IMY |
| ● A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization, foreign private foundation, or government of a U.S. possession that received effectively connected income or that is claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . | W-8ECI or W-8EXP |

**Note:** *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*

● A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . W-8IMY

**Note:** *See instructions for additional exceptions.*

### Part I   Identification of Beneficial Owner (See instructions.)

**1** Name of individual or organization that is the beneficial owner

**2** Country of incorporation or organization

**3** Type of beneficial owner:
☐ Individual ☐ Corporation ☐ Disregarded entity ☐ Partnership ☐ Simple trust
☐ Grantor trust ☐ Complex trust ☐ Estate ☐ Government ☐ International organization
☐ Central bank of issue ☐ Tax-exempt organization ☐ Private foundation

**4** Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

City or town, state or province. Include postal code where appropriate.

Country (do not abbreviate)

**5** Mailing address (if different from above)

City or town, state or province. Include postal code where appropriate.

Country (do not abbreviate)

**6** U.S. taxpayer identification number, if required (see instructions)
☐ SSN or ITIN ☐ EIN

**7** Foreign tax identifying number, if any (optional)

**8** Reference number(s) (see instructions)

### Part II   Claim of Tax Treaty Benefits (if applicable)

**9** I certify that (check all that apply):

**a** ☐ The beneficial owner is a resident of . . . . . . . . . . . . . . . . . . . . . . . . . . . within the meaning of the income tax treaty between the United States and that country.

**b** ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

**c** ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

**d** ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

**e** ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

**10** **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article . . . . . . . . . . . . of the treaty identified on line 9a above to claim a . . . . . . . . . . . . . . % rate of withholding on (specify type of income): . . . . . . . . . . . . . . . . . . . . . . . . . . .
Explain the reasons the beneficial owner meets the terms of the treaty article: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Part III   Notional Principal Contracts

**11** ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is **not** effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

### Part IV   Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

**1** I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,

**2** The beneficial owner is not a U.S. person,

**3** The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, **and**

**4** For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ►

Signature of beneficial owner (or individual authorized to sign for beneficial owner)    Date (MM-DD-YYYY)    Capacity in which acting

**For Paperwork Reduction Act Notice, see separate instructions.**    Cat. No. 25047Z    Form **W-8BEN** (Rev. 2-2006)

♻ *Printed on Recycled Paper*

B-3

Exhibit to Offering Memorandum for Harbourside Funding, LP

**<u>EXHIBIT C</u>**

**<u>CHARTS SUMMARIZING IMMIGRATION AND INVESTMENT PROCEDURES</u>**

[See Attached]

## Immigration Procedures

This overview is for general informational purposes only and shall not be construed as legal advice. Prospective investors must consult a qualified immigration attorney prior to commencing the procedures set forth below.



**Investment Procedures**

**PHASE 1: SUBSCRIPTION**

If you are a foreign citizen residing outside the United States and are interested in evaluating this investment opportunity, you will be asked to complete and sign an Investor Suitability Questionnaire and provide legible copies of certain identification documents.

If the General Partner confirms that you may proceed, you will be issued a set of confidential offering documents to evaluate the investment opportunity with your legal and financial advisers.

If you decide to proceed with the investment and if the General Partner confirms your eligibility to proceed, you will complete and sign the Subscription Agreement, the Accredited Investor Questionnaire and the Limited Partnership Agreement.

You will deliver all completed and signed documents to the General Partner. You will deliver the $500,000 subscription price, together with the $40,000 Administrative Fee to the Escrow Agent.

When you have completed the above steps, you will proceed to Phase 2 below.

**PHASE 2: I-526 PETITION**

You will provide contact information for your immigration attorney to the General Partner. The General Partner will provide your immigration attorney with documentation to support your I-526 Petition.

You and your immigration attorney must prepare your I-526 Petition within 30 days of receiving this documentation and send it to the Regional Center Administrator for review. You may proceed with submission of your I-526 Petition only after the Regional Center Administrator confirms in writing that you may do so.

Upon submission of your I-526 Petition, the Escrow Agent will release your $40,000 Administrative Fee to the Regional Center Administrator. If your I-526 Petition is approved, your immigration attorney will forward to the General Partner and the Escrow Agent a copy of your Form I-797 Approval Notice. The Escrow Agent will then release your $500,000 subscription to the Partnership.

You will proceed with the process of obtaining lawful permanent residence in the United States via consular processing or an adjustment of status application. You will proceed to Phase 3 below at the appropriate time.

If your I-526 Petition is denied, your $500,000 subscription will be returned to you, together with your $40,000 Administrative Fee; provided, that if your I-526 Petition was denied as a result of your fraud and/or misrepresentation in the I-526 Petition process, your $40,000 Administrative Fee will be forfeited.

**PHASE 3: I-829 PETITION**

Within 90 days prior to the end of the second year (21-24 months) of your admission to the United States, the General Partner will provide you and your immigration attorney with impact study results containing actual job creation numbers.

You and your immigration attorney must prepare your I-829 Petition within 30 days of receiving this documentation and send it to the Regional Center Administrator for review. You may proceed with submission of your I-829 Petition only after the Regional Center Administrator confirms in writing that you may do so.

If your I-829 Petition is approved, USCIS removes the conditions of your lawful permanent residence in the United States. You continue to be a Limited Partner and will receive distributions from your investment in the Partnership in accordance with the Partnership Agreement.

If your I-829 Petition is denied, you continue to be a Limited Partner and will receive distributions from your investment in the Partnership in accordance with the Partnership Agreement.

Exhibit to Offering Memorandum for Harbourside Funding, LP

**<u>EXHIBIT D</u>**

**<u>ESCROW AGREEMENT</u>**

[See Attached]



AMENDED AND RESTATED ESCROW AGREEMENT

among

**HARBOURSIDE FUNDING, LP**

**FLORIDA REGIONAL CENTER, LLC**

and

**CITIBANK, N.A., as Escrow Agent**

Dated as of July 20, 2011

**AMENDED AND RESTATED ESCROW AGREEMENT** (this "Agreement"), dated as of July 20, 2011, by and among Harbourside Funding, LP, a Florida limited partnership (the "Partnership"), Florida Regional Center, LLC, a Florida limited liability company ("FRC") and Citibank, N.A., a national banking association organized and existing under the laws of the United States of America ("Citibank") and acting through its Agency and Trust Division and solely in its capacity as escrow agent under the Agreement, and any successors appointed pursuant to the terms hereof (Citibank in such capacity, the "Escrow Agent"). The Partnership and FRC are sometimes collectively referred to herein as the "Interested Parties".

## BACKGROUND

A. The Partnership, FRC and the Escrow Agent entered into that certain Escrow Agreement, dated as of March 16, 2011 (the "Escrow Agreement").

B. The Partnership and FRC wish to amend the Escrow Agreement to provide for the release of the Administrative Fee to FRC upon the submission to the USCIS of an Investor's I-526 Petition.

C. The Partnership has been formed in order to extend a convertible loan (the "Loan") to Harbourside Place, LLC (the "Developer"), which in turn has been formed to purchase, develop, construct and operate Harbourside Place, a mixed-use real estate development located in Jupiter, Florida (the "Project").

D. In order to fund the Loan, the Partnership has offered, or will offer, units of limited partnership interest (the "Units") in the Partnership to potential investors (the "Offering"), as described in a Confidential Offering Memorandum dated November 1, 2010 prepared by the Partnership (the "Offering Memorandum").

E. The Project and the Offering are intended to be a qualifying investment under the United States EB-5 immigrant investor program (the "Pilot Program") authorized under the U.S. Immigration and Nationality Act (the "Act"), pursuant to which qualified individuals (each, an "Investor") who invest a minimum of US$500,000 in qualified investments in a targeted employment area within a designated regional center may attain lawful permanent residence in the United States.

F. The United States Citizenship and Immigration Services (the "USCIS") has designated the FRC as a regional center under the Pilot Program (the Regional Center Approval"), and the USCIS has designated the Loan to the Developer to carry out the Project as a qualifying investment under the Pilot Program (the "Project Approval" and together with the Regional Center Approval, the "USCIS Approvals").

G. Each person who wishes to purchase a Unit is required, among other things, (i) to enter into a subscription agreement (the "Subscription Agreement"), (ii) to deliver US$500,000.00 as the subscription price for such Unit (the "Subscription Price") and (iii) to pay US$40,000.00 as the administrative fee for such Unit (the "Administrative Fee"), all in the manner provided in the Offering Memorandum.

citi

H.  The Interested Parties wish to establish an escrow account for the purposes of holding, investing and disbursing funds deposited by Investors in accordance with Pre-Subscription Agreements and the Subscription Agreements.

I.  The Interested Parties wish to appoint Citibank as Escrow Agent and Citibank is willing to accept such appointment and to act as Escrow Agent, in each case upon the terms and conditions of the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby irrevocably acknowledged, the parties hereto agree as follows:

**1.    Deposit of Escrow Deposit.**

The Interested Parties will provide the Escrow Agent with no less than three (3) Business Day's prior written notice of the identity of any Investor, including without limitation, any and all information that the Escrow Agent may require in order to complete its initial due diligence procedures. The Interested Parties will instruct each Investor to deposit with the Escrow Agent in U.S. Dollars a minimum of US$540,000.00, comprising the Subscription Price and the Administrative Fee (collectively, the "Escrow Deposit"), and the Escrow Agent agrees to hold the Escrow Deposit in a non-interest bearing account established with the Escrow Agent (the "Escrow Account"), and to administer the Escrow Deposit in accordance with the terms of this Agreement. For purposes of this Agreement "*Business Day*" shall mean any day that the Escrow Agent is open for business.

**2.    Claims and Payment; Release from Escrow.**

(a)   Upon receipt of each Escrow Deposit, the Escrow Agent shall credit such funds to the Escrow Account.  In the event that the funds received from an Investor exceed an amount that is $250.00 less than the required Escrow Deposit amount, then the Escrow Agent without further direction may proceed with the deposit to the Escrow Account.  Any funding amounts that are deficient by more than $250.00 shall be deposited upon direction from an Authorized Person (as defined below).  During any period prior to an Investor's approval of its I-526 petition to participate in a Project, the Escrow Deposit shall remain the property of the Investor and, except as expressly provided in Sections 2(b) and 6(a) herein, shall not be subject to any liens or charges by the Interested Parties or the Escrow Agent until properly released by the Escrow Agent to the Partnership or the Investor via wire transfer to the Investor, as applicable in accordance with this Agreement.

(b)   An Investor's Escrow Deposit shall be disbursed upon receipt by the Escrow Agent of one or more written notices from the Interested Parties, substantially in the form of Schedule C attached hereto, upon the occurrence of one or more of the following events until the Investor's entire Escrow Deposit has been disbursed:

(i)    the Escrow Agent receiving written notice from the Interested Parties that either or both of the USCIS Approvals have been revoked and either cannot be resubmitted or the Partnership chooses not to resubmit, in which case the Escrow Deposit (or any undisbursed portion thereof) will be returned to the Investor;

citi

(ii)   the Escrow Agent receiving written notice from the Interested Parties that the I-526 Petition of such Investor has been submitted to USCIS for adjudication, whereupon the Administrative Fee will be released to FRC;

(iii)   the Escrow Agent receiving written notice from the Interested Parties that the I-526 Petition of such Investor has been approved under the Pilot Program, whereupon the Subscription Price will be released to the Partnership and the Administrative Fee (if not previously disbursed) will be released to FRC;

(iv)   the Escrow Agent receiving written notice from the Interested Parties that the I-526 Petition of such Investor has been denied, whereupon the Escrow Deposit (or any undisbursed portion thereof) will be returned to the Investor; or

(v)   the Escrow Agent receiving written notice from the Interested Parties that (i) 12 months have expired from the date the Investor completed the Subscription Procedures (as defined in the Offering Memorandum), (ii) the I-526 Petition, which was timely filed, has not been approved or denied within such 12-month period, or such longer period as the Investor and the Partnership have agreed in writing, and (iii) the Investor has provided written evidence to the Partnership that following such 12-month period the Investor has withdrawn his or her I-526 Petition, whereupon the Escrow Deposit (or any undisbursed portion thereof) will be returned to the Investor.

(vi)   For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Administrative Fee payable to FRC shall be the lesser of (A) $40,000 and (B) the difference between the original deposit amount and $500,000.

(c)   The Escrow Agent shall be entitled to rely on the Interested Parties' review of each Investor's I-526 petition and any other documentation or information provided by such Investor under the Interested Parties' anti-money laundering policies and procedures, and in the absence of written notice from the Interested Parties', the Escrow Agent shall be entitled to conclude that no risk of money laundering or fraud exists; *provided, however*, that the Escrow Agent (without undertaking any independent or additional responsibility for diligence or review) reserves the right at any time to reject or return an Investor's funds based on its own policies and procedures and determinations by providing notice to the Interested Parties.   Under no circumstances shall the Escrow Agent be liable for any fraud or money laundering activities by any Investor.

3.   **Investment of Funds.**

The Escrow Deposit will remain uninvested and no interest will accrue thereon.

4.   **Tax Matters.**

(a)   The Interested Parties agree that, for tax reporting purposes, the Escrow Deposit shall be allocated to the party to whom the Escrow Deposit is disbursed and shall be

3

citi

reported in the year of disbursement on a Form 1099-B, if applicable, in relation to principal and on a Form 1099-INT (or Form 1042S (income code 1, if such recipient is a non-U.S. person) for interest earned or on a Form 1099-DIV for dividends earned in the case of Money Market investments. The Interested Parties agree that this Agreement does not relieve the Interested Parties of their obligations for tax information reporting under Section 6041 of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), and the Treasury regulations thereunder, as well as the obligation to report amounts of imputed interest income to the extent required pursuant to Code Section 483 or Section 1272. The Escrow Agent shall not be responsible for determining or reporting such imputed interest.

(b)     The Interested Parties shall upon their execution of this Agreement provide the Escrow Agent with a duly completed and properly executed original IRS Form W-9 (or applicable Form W-8, in the case of a non-U.S. person) certifying its U.S. tax identification number if Form W-9 is provided, or status as a beneficial owner of the Escrow Deposit if a Form W-8 is provided. The Interested Parties shall also provide to the Escrow Agent any other forms and documents that the Escrow Agent may reasonably request to determine the amount, if any, to be withheld, and to complete such information and payee statements. In the event the payee is not an Interested Party or a party to this Agreement, the Interested Parties shall provide the Escrow Agent with a duly completed and properly executed original IRS Form W-9 (or applicable W-8, in the case of a non-U.S. person) from such payee prior to payment being made (or in the case of an Investor, at the time such Investor's funds are deposited with the Escrow Agent). The Interested Parties understand that, in the event valid U.S. tax forms, or other relevant forms, are not provided to the Escrow Agent, the tax law may require withholding of tax on disbursements and on a portion of any interest or other income earned on the investment of the Escrow Deposit.

(c)     Should the Escrow Agent become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Interested Parties agree, jointly and severally, to reimburse the Escrow Agent for such taxes, interest and penalties upon demand. Without limiting the foregoing, the Escrow Agent shall be entitled to deduct such taxes, interest and penalties from the earnings on the Escrow Deposit in accordance with Sections 2(b) or 6(a) hereof.

(d)     The Interested Parties acknowledge and agree that none of the payments under this Agreement are for compensation for services performed by an employee or independent contractor of the Interested Parties.

(e)     Citigroup, Inc., its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments are not intended or written to be used, and cannot be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

(f)     This Section 4 may be amended by the Escrow Agent as necessary and upon notice to the Interested Parties to conform to tax and regulatory requirements and any other changes to the current applicable governmental tax laws. The Escrow Agent's rights under this

Section shall survive the termination of this Agreement or the resignation or removal of the Escrow Agent.

**5.**     **Concerning the Escrow Agent.**

(a)     Escrow Agent Duties.  The Interested Parties acknowledge and agree that (i) the duties, responsibilities and obligations of the Escrow Agent shall be limited to those expressly set forth in the Agreement, each of which is administrative or ministerial (and shall not be construed to be fiduciary) in nature, and no duties, responsibilities or obligations shall be inferred or implied, (ii) the Escrow Agent shall not be responsible for any of the agreements referred to or described herein (including without limitation the Investors' I-526 petitions), or for determining or compelling compliance therewith, and shall not otherwise be bound thereby, (iii) this Agreement shall constitute the entire agreement of the parties with respect to the subject matter and supersedes all prior oral or written agreements in regard thereto, (iv) the Escrow Agent shall not be required to expend or risk any of its own funds or otherwise incur any financial or other liability in the performance of any of its duties hereunder and (v)  the Escrow Agent shall not be obligated to take any legal or other action hereunder which might in its judgment involve or cause it to incur any expense or liability unless it shall have been furnished with acceptable indemnification.

(b)     Standard of Care.  The Escrow Agent shall be under no duty to afford the Escrow Deposit any greater degree of care than it gives its own similar property.  The Escrow Agent shall not be liable for any damage, loss or injury resulting from any action taken or omitted in the absence of gross negligence or willful misconduct.

(c)     Limitation on Liability.   Notwithstanding any other provision of the Agreement, the Escrow Agent shall not be liable (i) for any indirect, incidental, consequential, punitive or special losses or damages, regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated, (ii) for the acts or omissions of any nominees, correspondents, designees, agents, subagents or sub-custodians, or (iii) for the investment or reinvestment of any Escrow Deposit, or any liquidation of such investment or reinvestment, executed in accordance with the terms of the Agreement, including, without limitation, any liability for any delays (not resulting from its gross negligence or willful misconduct as adjudicated by a court of competent jurisdiction) in the investment or reinvestment of the Escrow Deposit, any loss of interest incident to any such delays, or any loss or penalty as a result of the liquidation of any investment before its stated maturity date.

(d)     Reliance.  The Escrow Agent shall be entitled to rely upon any order, judgment, certification, demand, instruction, notice, instrument, certification, consent, authorization, receipt, power of attorney, e-mail, .pdf or other writing delivered to it without being required to determine the authenticity or validity thereof, or the correctness of any fact stated therein or the propriety or validity or the service thereof or the jurisdiction of the court issuing any judgment or order.  The Escrow Agent may act in reliance upon any signature believed by it to be genuine and may assume that any person purporting to make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

citi

(e)     Consultation.  The Escrow Agent may consult with counsel satisfactory to it, and the opinion or advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it in good faith and in accordance with the opinion and advice of such counsel.

6.     **Compensation, Expense Reimbursement and Indemnification.**

(a)     Compensation:  Each of the Interested Parties covenants and agrees, jointly and severally, to pay the Escrow Agent's fees and expenses specified in Schedule A.  In the event that such fees or expenses, or any other obligations owed to the Escrow Agent (or its counsel) are not paid to the Escrow Agent within 30 calendar days following the presentment of an invoice for the payment of such fees and expenses or the demand for such payment, then the Escrow Agent may, without further action or notice, pay such fees from the earnings on the Escrow Deposit and may sell, convey or otherwise dispose of any Escrow Deposit for such purpose.  The Escrow Agent may in its sole discretion withhold from any distribution of the Escrow Deposit an amount of such distribution it reasonably believes would, upon sale or liquidation, produce proceeds equal to any unpaid amounts to which the Escrow Agent is entitled to hereunder.

(b)     Indemnification:  Each of the Interested Parties covenants and agrees, jointly and severally, to indemnify the Escrow Agent and its employees, officers and directors (each, an "Indemnified Party") for, hold each Indemnified Party harmless from, and defend each Indemnified Party against, any and all claims, losses, actions, liabilities, costs, damages and expenses of any nature incurred by any Indemnified Party arising out of or in connection with this Agreement or with the administration of its duties hereunder, including but not limited to attorney's fees, tax liabilities (including any taxes, interest and penalties but excluding any income tax liabilities associated with the Escrow Agent's fees), any liabilities or damages that may  result from any inaccuracy or misrepresentation made in any tax certification provided to the Escrow Agent, and other costs and expenses of defending or preparing to defend against any claim of liability, except to the extent such loss, liability, damage, cost and expense shall be caused by the Indemnified Party's own gross negligence or willful misconduct. The foregoing indemnification and agreement to hold harmless shall survive the termination of the Agreement and the resignation or removal of the Escrow Agent.

7.     **Dispute Resolution.**  In the event of any disagreement among the Interested Parties and/or any other person, resulting in adverse claims or demands being made with respect to the subject matter of the Agreement, or in the event that the Escrow Agent, in good faith, is in doubt as to any action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands and refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be liable in any way or to any person for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to so refuse to act and refrain from acting until (i) the rights of all parties having or claiming an interest in the Escrow Deposit or the Escrow Account shall have been fully and finally adjudicated by a court of competent jurisdiction, or all differences and doubts shall have been resolved by agreement among all of the parties, and (ii) the Escrow Agent shall, in the case of adjudication by a court of competent jurisdiction, have received a final order, judgment or decree by such court of competent jurisdiction, which order, judgment or decree is not subject to appeal, and in the case of resolution of differences and doubts by agreement, have

received a notice in writing signed by an Authorized Person (as defined below) of the FRC setting forth in detail the agreement. The Escrow Agent shall have the option, after 30 calendar days' notice to the Interested Parties of its intention to do so, to file an action in interpleader requiring the Interested Parties to answer and litigate any claims and rights among themselves. The costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Escrow Agent in connection with such proceeding shall be paid jointly and severally by the Interested Parties. The rights of the Escrow Agent under this Section 7 are cumulative of all other rights which it may have by law or otherwise.

  **8.** **Exclusive Benefit.** Except as specifically set forth in the Agreement, the Agreement is for the exclusive benefit of the parties to the Agreement and their respective permitted successors, and shall not be deemed to give, either expressly or implicitly, any legal or equitable right, remedy, or claim to any other entity or person whatsoever. No party may assign any of its rights or obligations under the Agreement without the prior written consent of the other parties except that the Escrow Agent may resign upon the terms described in the Agreement.

  **9.** **Force Majeure.** Notwithstanding anything contained in the Agreement to the contrary, the Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, without limitation, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility).

  **10.** **Resignation and Removal.**

   (a) The FRC may remove the Escrow Agent at any time by giving to the Escrow Agent thirty (30) calendar days' prior written notice of removal signed by an Authorized Person of the FRC. The Escrow Agent may resign at any time by giving to the Interested Parties thirty (30) calendar days' prior written notice of resignation.

   (b) Within thirty (30) calendar days after giving the foregoing notice of removal to the Escrow Agent or within thirty (30) calendar days after receiving the foregoing notice of resignation from the Escrow Agent, the FRC shall appoint a successor escrow agent and give notice of such successor escrow agent to the Escrow Agent. If a successor escrow agent has not accepted such appointment by the end of such (i) 30-day period, in the case of the Escrow Agent's removal, or (ii) 30-day period, in the case of the Escrow Agent's resignation, the Escrow Agent may either (x) deliver the Escrow Deposit to the FRC OR Partnership at the address set forth on the signature page to the Agreement, or (y) apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief.

   (c) Upon receipt of notice of the identity of the successor escrow agent, the Escrow Agent shall either deliver the Escrow Deposit then held hereunder to the successor escrow agent, less the Escrow Agent's fees, costs, expenses and the value of other obligations owed to the Escrow Agent hereunder, or hold such Escrow Deposit (or any portion thereof) pending distribution, until all such fees, costs and expenses or the value of other obligations are paid to it.

(d)     Upon delivery of the Escrow Deposit to the successor escrow agent or to the FRC OR Partnership, the Escrow Agent shall have no further duties, responsibilities or obligations hereunder.

11.     **Governing Law; Jurisdiction; Waivers.**

(a)     The parties agree (pursuant to section 5-1401 of the General Obligations Law of the State of New York) that, to the extent such laws would otherwise not apply, the Agreement (including this choice-of-law provision) and the rights and obligations of the parties to the Agreement shall be governed by, construed in accordance with, and all controversies and disputes arising under, in connection with or in relation to the Agreement shall be resolved pursuant to, the laws of the State of New York applicable to contracts made and to be wholly performed in the State of New York.

(b)     The parties irrevocably and unconditionally submit to the exclusive jurisdiction of the federal and state courts located in the Borough of Manhattan, City, County and State of New York, for any proceedings commenced regarding the Agreement, including, but not limited to, any interpleader proceeding or proceeding for the appointment of a successor escrow agent the Escrow Agent may commence pursuant to the Agreement.  The parties irrevocably submit to the jurisdiction of such courts for the determination of all issues in such proceedings and irrevocably waive any objection to venue or inconvenient forum for any proceeding brought in any such court.

(c)     The parties irrevocably and unconditionally waive, to the fullest extent permitted by law, and agree not to plead or claim, any right of immunity from legal action, suit or proceeding, from setoff or counterclaim, from the jurisdiction of any court, from service of process, from attachment upon or prior to judgment, from attachment in aid of execution or judgment, from execution of judgment, or from any other legal process or proceeding for the giving of any relief or for the enforcement of any judgment, and consents to such relief and enforcement against it, its assets and its revenues in any jurisdiction, in each case with respect to any matter arising out of, or in connection with, the Agreement.

(d)     The parties irrevocably and unconditionally waive any right to trial by jury with respect to any proceeding relating to the Agreement.

12.     **Instructions, Verification, Communications.**

(a)     All instructions required under the Agreement shall be delivered to the Escrow Agent in writing, in English, in facsimile form and, if so requested by the Escrow Agent, an original, executed by an Authorized Person (as hereinafter defined) of each of the Interested Parties or an entity acting on its behalf.  The identity of such Authorized Person, as well as its specimen signatures, title, telephone number and e-mail address, shall be delivered to the Escrow Agent in the list of authorized signers forms as set forth on Schedule B and shall remain in effect until applicable Interested Party, or an entity acting on its behalf, notifies Escrow Agent of any change thereto (the person(s) so designated from time to time, the "Authorized Persons").  The Escrow Agent and the Interested Parties agree that the above constitutes a commercially reasonable security procedure and further agree not to comply with any direction or instruction

citi

(other than those contained herein or delivered in accordance with the Agreement) from any Interested Party.

(b)     In the event funds transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by telecopier, .pdf, e-mail, or otherwise, such funds transfer instructions should contain a selected test word also evidenced on Schedule B.     Test Words must contain at least 8 alphanumeric characters, established at document execution and changed each time Schedule B is updated in accordance with (a) above. In addition or in lieu of Test Words, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call back to the applicable person(s) specified to the Escrow Agent from time to time by an Authorized Person and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person(s) so designated.  To ensure the accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instruction, or is not satisfied in its sole discretion with the verification it receives, it will not execute the instruction until all issues have been resolved to its satisfaction. The persons and telephone numbers for call backs may be changed only in writing, signed by an Authorized Person, actually received and acknowledged by the Escrow Agent.  The Interested Parties acknowledge that these security procedures for funds transfers are commercially reasonable.

(c)     To help the U.S. government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  When an account is opened, and from time to time as may be required by the Escrow Agent's internal policies and procedures, the Escrow Agent will be entitled to ask for information that will allow the Escrow Agent to identify relevant parties.     The Interested Parties hereby acknowledge such information disclosure requirements and agree to comply with all such information disclosure requests from time to time from the Escrow Agent.

(d)     In accordance with the Unlawful Internet Gambling Act (the "Act"), the Interested Parties may not use the Escrow Account or other Citibank facilities in the United States to process 'restricted transactions' as such term is defined in 31 CRF Section 132.2(y). Therefore, neither the Interested Parties nor any person who has an ownership interest in or control over the Escrow Account may use it to process or facilitate payments for prohibited internet gambling transactions.  For more information about the Act, including the types of transactions     that     are     prohibited,     please     refer     to     the     following     link: http://www.federalreserve.gov/NEWSEVENTS/PRESS/BCREG/20081112B.HTM.

(e)     Notwithstanding anything to the contrary herein, any and all email communications (both text and attachments) by or from the Escrow Agent that the Escrow Agent deems to contain confidential, proprietary, and/or sensitive information shall be encrypted.  The recipient (the "Email Recipient") of the encrypted email communication will be required to complete a registration process. Instructions on how to register and/or retrieve an encrypted message will be included in the first secure email sent by the Escrow Agent to the Email Recipient.  Additional information and assistance on using the encryption technology can be found     at     Citibank's     Secure     Email     website     at www.citigroup.com/citi/citizen/finance/privacy/email.htmor by calling (866) 535-2504 (in the U.S.) or (904) 954-6181.

citi

(f)     The provisions of this Section 12(a)-(e) may be amended by the Escrow Agent unilaterally upon notice to the Interested Parties.

**13.     Notices; Wiring Instructions.**

(a)     Any notice permitted or required hereunder shall be in writing in English, and shall be sent (i) by personal delivery, overnight delivery by a recognized courier or delivery service, or (ii) mailed by registered or certified mail, return receipt requested, postage prepaid, or (iii) confirmed telecopy accompanied by mailing of the original on the same day by first class mail, postage prepaid, in each case addressed to the address and person(s) designated below their respective signature hereto (or to such other address as any such party may hereafter designate by written notice to the other parties). Notices to the Escrow Agent shall only be deemed given upon actual receipt by the Escrow Agent.  Whenever under the terms hereof the time for giving a notice or performing an act falls upon a Saturday, Sunday, or a banking holiday in New York, such time shall be extended to the next Business Day.

(b)     Any funds to be paid to or by the Escrow Agent hereunder shall be sent by wire transfer pursuant to the following instructions (or by such method of payment and pursuant to such instruction as may have been given in advance and in writing to or by the Escrow Agent, as the case may be, in accordance with Section 13(a) above):

If to the Partnership:

Bank: UBS AG, 677 Washington Blvd., Stamford CT 06901
ABA#: 026007993
A/C#: 101WA258641000
Further Credit: Harbourside Funding LP
Further Credit A/C: TF13390

If to the FRC:

Bank: Citibank, NA, Branch #64, Palm Beach Gardens FL 33410
ABA#: 266086554
A/C#: 9118610536
Account Name: Florida Regional Center, LLC

If to the Investor:

Any funds returned to an Investor shall be sent via wire transfer to the account from where such Investor's funds originated.

**If to the Escrow Agent:**

**CITIBANK, N.A.**

SWIFT ID: CITIUS33  (For use when remitting funds from outside the U.S.)

ABA: 0210-0008-9  (For use when remitting funds from within the U.S.)

Account Name: # 36935369 FRC/Harbourside Funding Concentration Account
CREDIT A/C No.: Reference: #798622 FRC/Harbourside Funding Escrow
Account

**14.**    **Amendment.**  Except as specifically set forth in the Agreement, any amendment of the Agreement shall be binding only if evidenced by a writing signed by each of the parties to the Agreement.

**15.**    **Severability.**  The invalidity, illegality or unenforceability of any provision of the Agreement shall in no way affect the validity, legality or enforceability of any other provision.  If any provision of the Agreement is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

**16.**    **Termination.**  The Agreement shall terminate upon the distribution of all Escrow Deposit from the Escrow Account established hereunder in accordance with the terms of the Agreement, subject, however, to the survival of obligations after specifically contemplated in the Agreement to so survive.

**17.**    **Use of Name.**  No printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank", or "Citigroup" or "Citi" by name or the rights, powers, or duties of the Escrow Agent under the Agreement shall be issued by the Interested Parties, or on such party's behalf, without the prior written consent of the Escrow Agent.

**18.**    **Counterparts.**  The Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement.  Facsimile signatures on counterparts of the Agreement shall be deemed original signatures with all rights accruing thereto except in respect to any Non-US entity, whereby originals are required.

**19.**    **Mergers and Conversions.**  Any corporation or entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or entity resulting from any merger, conversion or consolidation to which the Escrow Agent will be a party, or any corporation or entity succeeding to the business of the Escrow Agent will be the successor of the Escrow Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

citi

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed by a duly authorized representative as of the day and year first written above.

CITIBANK, N.A.,
as Escrow Agent

By: _____

    Name:
    Title:    Catherine Hughes
           Vice President
    Date: _

Notice to:
Citibank, N.A.
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY  10013
Attn.:  Catherine Hughes
Phone:  (212) 816-5812
Facsimile: (212) 657-2762
E-mail:
catherine.m.hughes@citi.com


HARBOURSIDE FUNDING, LP
By Harbourside Funding GP, LLC,
its General Partner


By: _____
    Name:
    Title:
    Date:


Notice to:
Harbourside Funding, LP
11770 US Highway One, Suite 165A
Palm Beach Gardens, FL 33408
Attention: General Partner
Facsimile: 561-799 0061
Email:
subscriptions@HarboursideFunding.
com

citi

IN WITNESS WHEREOF, each of the parties has caused this Agreement to
be executed by a duly authorized representative as of the day and year first written above.

CITIBANK, N.A.,
as Escrow Agent


By:_____
　　Name:
　　Title:
　　Date:


Notice to:
Citibank, N.A.
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY 10013
Attn.: Catherine Hughes
Phone: (212) 816-5812
Facsimile: (212) 657-2762
E-mail:
catherine.m.hughes@citi.com


HARBOURSIDE FUNDING, LP
By Harbourside Funding GP, LLC,
its General Partner


By:_____
　　Name: Florida 300 Investments,
　　LLC  Nicholas A. Mastroianni II
　　Title: Manager
　　Date: July 20, 2011


Notice to:
Harbourside Funding, LP
11770 US Highway One, Suite 165A
Palm Beach Gardens, FL 33408
Attention: General Partner
Facsimile: 561-799 0061
Email:
subscriptions@HarboursideFunding.
com

12                                                              citi

FLORIDA REGIONAL CENTER, LLC

By: _____
Name: Nicholas Mastroianni II
Title: Manager
Date: July 20, 2011

Notice to:
Florida Regional Center, LLC
11770 US Highway One, Suite 165A
Palm Beach Gardens, FL 33408
Attention: Managing Member
Facsimile: 561-799 0061
Email:
nicholas@flregionalcenter.com

List of Schedules and Exhibits

Schedule A     Escrow Agent Fee Schedule
Schedule B     Authorized List of Signers
Schedule C     Written Instructions

13

citi

## SCHEDULE A

### Escrow Agent Fee Schedule

The Escrow Agent shall be entitled to receive the fees and be reimbursed for the expenses set forth in this Schedule A.



388 Greenwich Street
New York, New York 10013

Ishween Sethi
Vice President
Tel 212 816-5835
Fax 212 816-5544
ishween.sethi@citi.com

## SCHEDULE OF FEES FOR SERVICES
## AS EB-5 ESCROW AGENT

### FOR

## FLORIDA REGIONAL CENTER, LLC

### IN CONNECTION WITH INVESTMENT OPPORTUNITIES FOR QUALIFIED INVESTORS ENTITLED TO OBTAIN PERMANENT RESIDENCY STATUS UNDER THE USCIS EB-5 PROGRAM

### February 18, 2011

**Acceptance Fee:**

To cover the acceptance of the Escrow Agent appointment, the study of the subscription materials, Escrow Agreement and all other supporting documentation submitted in connection with the execution and delivery of this transaction, and communication with other members of the working group.

$1,000

**Administration Fee:**

To cover the administrative functions of the Escrow Agent under the relevant agreements, including the establishment, activation and maintenance of the master escrow account, coordination with individual investors prior to receipt of deposits, establishment and maintenance of individual investor accounts, safekeeping of assets, investor-specific investment activity and reporting if required, disbursements including wire transfers and/or check processing, follow-up of the relevant agreement provisions and any other duties required of the Escrow Agent under the terms of the agreements.

$250        Per investor*

* PER INVESTOR FEE WILL BE WAIVED IF FUNDS ARE HELD UNINVESTED

**Legal Fees:**

To cover the review of legal documents by Citibank's external legal counsel on behalf of the Escrow Agent, if necessary.

AT COST

Assumptions:

- Investment of at least $500,000 per Investor for up to 160 investors totalling $80 million, to be deposited into a New York domiciled escrow account for a duration of 4 to 8 months.
- Escrow Agreement to be governed by New York law.
- Funds to be released upon receipt of written instructions from Authorized Person(s).
- Subject to internal approval and satisfactory review of documentation and due diligence by Citibank N.A. as Escrow Agent.
- Escrowed deposits will either be held un-invested or invested in an Institutional Money Market Fund from a list of providers we will supply to you. If invested in a Money Market Fund, fund distributors may provide Citibank with Shareholder Servicing fees in addition to the fees being directly billed to you by Citibank. These fees are discussed in the fund's prospectus, which will be delivered to you prior to investment. If an investment other than the list of funds on the referenced list is chosen, an investment administration fee of 25 basis points will be assessed based upon the average quarterly balance of the account for the duration of the transaction.

---

The above schedule of fees does not include reasonable charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform in either an agency or fiduciary capacity. Fees are also subject to Citibank's satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this transaction is subject to internal approval of all parties able to direct the agent and/or depositing moneys into the account(s). Should this schedule of fees be accepted and agreed upon, and work commenced on this transaction but subsequently halted, and the transaction described is not consummated within six months, the Acceptance Fee and legal fees incurred, if any, will still be payable in full. This Fee Schedule is offered for and applicable to the transaction described on page one only, and is guaranteed for sixty days from the date on this proposal. After sixty days, this offer can be extended in writing only.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citibank to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citibank. What this means for you: when you open an account or establish a relationship, we will ask for your business name, a street address and a tax identification number, that Federal law requires us to obtain. We appreciate your cooperation.

Signed:

**CITIBANK, N.A.**

_Ishween Sethi_

Ishween Sethi
Vice President

Agreed and Accepted:

FLORIDA REGIONAL CENTER

_(Signature)_

_NICHOLAS A MASTROIANNI, II_
(Print Name)

_MANAGER_
(Title)

_Feb 4, 2010_
(Date)

07/20/2011 WED 17:20  FAX                                                    ☑001/001

## SCHEDULE B
## AUTHORIZED LIST OF SIGNERS
## OR OFFICER'S CERTIFICATE

This form supplements the Amended and Restated Escrow Agreement and related documents and applies to instructions given by facsimile (or e-mail with .pdf attachment) for securities or funds transfers and for other purposes under the Amended and Restated Escrow Agreement.  In giving any facsimile (or e-mail with .pdf attachment) instruction as specified in the Amended and Restated Escrow Agreement the Interested Parties acknowledge that facsimile (or e-mail with .pdf attachment) present a high degree of risk or error, security and privacy.  Nevertheless the Interested Parties wish to use facsimile (or e-mail with .pdf attachment) as a means of instruction.  The Interested Parties designate below the individuals who are authorized to initiate transfers or other instructions by facsimile (or e-mail with .pdf attachment) on behalf of the Interested Parties and selects the security procedures specified herein, The Interested Parties accept the associated risks of unauthorized or erroneous instructions and agree to be bound by such instructions whether or not actually authorized by the Interested Parties, provided the Escrow Agent has complied with the stated security procedure.  The Interested Parties are responsible for keeping confidential the contents of this Schedule B.  The Interested Parties should be careful in completing this Schedule B as it may be rejected if it contains erasures or white outs.

☐ New              ☐ Addition          ☐ Supersede

**Florida Regional Center, LLC**

                                                              Specimen Signature

| | | |
|---|---|---|
| Name | NICHOLAS A MASTROINNI II | |
| Title | MANAGING MEMBER | |
| Phone | 561-799-0050 | |
| E-mail Address | NICHOLAS@acdofsouthflorida.com | |

| | |
|---|---|
| Name | |
| Title | |
| Phone | |
| E-mail Address | |

**Harbourside Funding, LP [**

| | | |
|---|---|---|
| Name | DAVID FINKELSTEIN | |
| Title | CHIEF FINANCIAL OFFICER | |
| Phone | 561-799-0050 | |
| E-mail Address | DAVID@acdofsouthflorida.com | |

| | |
|---|---|
| Name | |
| Title | |
| Phone | |
| E-mail Address | |

Where applicable, the Escrow Agent will confirm the instructions received by return call to one of the telephone numbers listed below.

| Telephone Number (including Country code) | Name |
|---|---|
| 561-368-5758 | R BOWAN GILLESPIE |
| 561-799-0050 | DAVID FINKELSTEIN |

### Test Word

FLREGIONAL                    PG. 1.

Test Words must contain at least 8 alphanumeric characters, and should be established at document execution and changed each time the List of Authorized Signers/Approvers is updated.  All instructions should clearly display the Test Word, which may be used in lieu

B-1                                                                          citi

### SCHEDULE B
### AUTHORIZED LIST OF SIGNERS
### OR OFFICER'S CERTIFICATE

This form supplements the Amended and Restated Escrow Agreement and related documents and applies to instructions given by facsimile (or e-mail with .pdf attachment) for securities or funds transfers and for other purposes under the Amended and Restated Escrow Agreement. In giving any facsimile (or e-mail with .pdf attachment) instruction as specified in the Amended and Restated Escrow Agreement the Interested Parties acknowledge that facsimile (or e-mail with .pdf attachment) present a high degree of risk or error, security and privacy. Nevertheless the Interested Parties wish to use facsimile (or e-mail with .pdf attachment) as a means of instruction. The Interested Parties designate below the individuals who are authorized to initiate transfers or other instructions by facsimile (or e-mail with .pdf attachment) on behalf of the Interested Parties and selects the security procedures specified herein. The Interested Parties accept the associated risks of unauthorized or erroneous instructions and agree to be bound by such instructions whether or not actually authorized by the Interested Parties, provided the Escrow Agent has complied with the stated security procedure. The Interested Parties are responsible for keeping confidential the contents of this Schedule B. The Interested Parties should be careful in completing this Schedule B as it may be rejected if it contains erasures or white outs.

☐ New            ☐ Addition            ☐ Supersede

**Florida Regional Center, LLC**

|  |  | Specimen Signature |
|---|---|---|
| Name | *Richard L. Yellen* |  |
| Title | *Manager* |  |
| Phone | *(212) 704 5788* |  |
| E-mail Address | *RICHARD @ FLREGIONALCENTER.com* |  |

| Name | | |
|---|---|---|
| Title | | |
| Phone | | |
| E-mail Address | | |

**Harbourside Funding, LP [**

| Name | | |
|---|---|---|
| Title | | |
| Phone | | |
| E-mail Address | | |

| Name | | |
|---|---|---|
| Title | | |
| Phone | | |
| E-mail Address | | |

Where applicable, the Escrow Agent will confirm the instructions received by return call to one of the telephone numbers listed below.

| Telephone Number (including Country code) | Name |
|---|---|
|  |  |
|  |  |

### Test Word

| *8* | SAME AS PG 1 |
|---|---|

Test Words must contain at least 8 alphanumeric characters, and should be established at document execution and changed each time the List of Authorized Signers/Approvers is updated. All instructions should clearly display the Test Word, which may be used in lieu



## SCHEDULE B
## AUTHORIZED LIST OF SIGNERS
## OR OFFICER'S CERTIFICATE

This form supplements the Amended and Restated Escrow Agreement and related documents and applies to instructions given by facsimile (or e-mail with .pdf attachment) for securities or funds transfers and for other purposes under the Amended and Restated Escrow Agreement.  In giving any facsimile (or e-mail with .pdf attachment) instruction as specified in the Amended and Restated Escrow Agreement the Interested Parties acknowledge that facsimile (or e-mail with .pdf attachment) present a high degree of risk or error, security and privacy.  Nevertheless the Interested Parties wish to use facsimile (or e-mail with .pdf attachment) as a means of instruction.  The Interested Parties designate below the individuals who are authorized to initiate transfers or other instructions by facsimile (or e-mail with .pdf attachment) on behalf of the Interested Parties and selects the security procedures specified herein, The Interested Parties accept the associated risks of unauthorized or erroneous instructions and agree to be bound by such instructions whether or not actually authorized by the Interested Parties, provided the Escrow Agent has complied with the stated security procedure.  The Interested Parties are responsible for keeping confidential the contents of this Schedule B.  The Interested Parties should be careful in completing this Schedule B as it may be rejected if it contains erasures or white outs.

☐ New                    ☐ Addition                    ☐ Supersede

**Florida Regional Center, LLC**

Specimen Signature

| | |
|---|---|
| Name | NICHOLAS A MASTROINNI II |
| Title | MANAGING MEMBER |
| Phone | 561-799-0050 |
| E-mail Address | NICHOLAS@acdofsouthflorida.com |

| | |
|---|---|
| Name | R BOWEN GILLESPIE |
| Title | MANAGER |
| Phone | |
| E-mail Address | |

**Harbourside Funding, LP [**

| | |
|---|---|
| Name | DAVID FINKELSTEIN |
| Title | CHIEF FINANCIAL OFFICER |
| Phone | 561-799-0050 |
| E-mail Address | DAVID@acdofsouthflorida.com |

| | |
|---|---|
| Name | |
| Title | |
| Phone | |
| E-mail Address | |

Where applicable, the Escrow Agent will confirm the instructions received by return call to one of the telephone numbers listed below.

| Telephone Number (including Country code) | Name |
|---|---|
| 561-368-5758 | R BOWAN GILLESPIE |
| 561-799-0050 | DAVID FINKELSTEIN |

## Test Word

| |
|---|
| FLREGIONAL |

Test Words must contain at least 8 alphanumeric characters, and should be established at document execution and changed each time the List of Authorized Signers/Approvers is updated.  All instructions should clearly display the Test Word, which may be used in lieu

**SCHEDULE C**

**Form of Written Direction**

**Florida Regional Center, LLC**

DATE_____

Citibank, N.A.
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY  10013
Attn.:  Catherine Hughes & Mark Altabe
Fax:  212-657-2762

      Re:    Investor Name _____

Reference is made to the Amended and Restated Escrow Agreement, dated as of July 20, 2011 ("Amended and Restated **Escrow Agreement**"), by and among the FRC, the Partnership and the Escrow Agent. Capitalized terms not otherwise defined have the meanings provided in the Amended and Restated Escrow Agreement.

The above-referenced Investor is a party to the Subscription Agreement, pursuant to which the following Escrow Deposit has previously been delivered into the Escrow Account [select all that apply]:

|  |  |  |
|---|---|---|
| ☐ | Administrative Fee: | $[    ] |
| ☐ | Subscription Price: | $500,000 |

The Interested Parties hereby direct release of the amounts designated above by wire transfer using the instructions set forth below. Release is directed for the following reason [select one only]:

☐    The I-526 Petition of the Investor has been submitted to USCIS for adjudication. The Administrative Fee designated above to be released to the FRC.

☐    The I-526 Petition of the Investor has been approved. The Subscription Price designated above to be released to the Partnership and the Administrative Fee designated above (if not previously disbursed) to be released to the FRC.

☐    Either or both of the USCIS Approvals (as defined in the Offering Memorandum) have been revoked and either cannot be resubmitted or the Partnership chooses not to resubmit. The Escrow Deposit designated above (or any undisbursed portion thereof) to be returned to the Investor.

☐    The I-526 Petition of the Investor has been denied. The Escrow Deposit designated above (or any undisbursed portion thereof) to be returned to the Investor.

☐    All of the following have occurred: (i) 12 months have expired from the date the Investor completed the Subscription Procedures (as defined in the Offering Memorandum), (ii) the Investor's I-526 Petition, which was timely filed, has not been approved or denied within such 12-month period (or such longer period as the

C-1

citi

Investor and the Partnership have agreed in writing), and (iii) the Investor has provided written evidence to the Partnership that following such period the Investor has withdrawn his or her I-526 Petition.  The Escrow Deposit designated above (or any undisbursed portion thereof) to be returned to the Investor.

Sincerely,

Authorized Representatives

**Florida Regional Center, LLC**

**Harbourside Funding, LP**

Exhibit to Offering Memorandum for Harbourside Funding, LP

## **EXHIBIT E**

## **RENDERING, AERIAL VIEW AND AREA MAPS FOR HARBOURSIDE PLACE**



Location of Palm Beach County and the Florida Regional Center in the State of Florida



Florida's location in the United States

**Artist's Rendering of Harbourside Place**



**Map of Targeted Employment Area Within the Florida Regional Center**



Harbourside Place is located in a Targeted Employment Area within the Florida Regional Center comprising Census Tracts 3.01, 3.03, 3.04, 4.04, 8.01, 9.02, 9.03, 11.01, 12, 13.01, 13.02, 14.02, 14.03, 14.04, 15, 16, 18.01, 21, 22, and 23.

**Aerial Photo of Harbourside Place Site**



**Map of Harbourside Place Site**



Exhibit to Offering Memorandum for Harbourside Funding, LP

## **EXHIBIT F**

## **AMENDED AND RESTATED CONVERTIBLE LOAN AGREEMENT**

[See Attached]

## AMENDED AND RESTATED CONVERTIBLE LOAN AGREEMENT

THIS AMENDED AND RESTATED CONVERTIBLE LOAN AGREEMENT ("Agreement") is made as of the 1st day of September, 2011, by and between **Harbourside Funding, LP,** a Florida limited partnership, c/o its General Partner, Harbourside Funding GP, LLC, a Florida limited liability company, having a place of business at 11770 US Highway One, Suite 301, Palm Beach Gardens, FL 33408 (hereinafter referred to as "Lender"); and **Harbourside Place, LLC,** a Florida limited liability company (hereinafter referred to as "Borrower"), having a place of business at 11770 US Highway One, Suite 301, Palm Beach Gardens, FL 33408.

1.   **RECITALS.**

(1)   Borrower has applied to Lender for a construction loan ("Loan") in the principal amount of up to One Hundred Million Dollars ($100,000,000) outstanding at any one time to be used by Borrower to finance the development and construction of a mixed use commercial development known as Harbourside Place (the "Project") located within the Town of Jupiter, Palm Beach County, Florida, as is more particularly described on **Exhibit A** hereto ("Property"), and to fund the construction of a hotel, offices, restaurants, retail space, marina and spa ("Improvements") in accordance with "Final Plans" prepared by the "Architect" (as those terms are hereinafter defined) and reviewed by Lender. The Improvements and Property may hereafter collectively called the "Premises."

(2)   Borrower and Lender entered into that certain Convertible Loan Agreement dated as of July 22, 2011 and now intend to enter into this Agreement in order to amend and restate the terms and conditions of the administration and disbursement of the Loan.

2.   **DEFINITIONS.** As used in this Agreement the terms listed below shall have the following meanings, unless otherwise required by the context:

(1)   **Advance**: A disbursement by the Lender of a portion of the proceeds of the Loan.

(2)   **Architect**: Leo A Daly Company and any successor architect employed by Borrower, with the prior written approval of the Lender, for preparation of the Final Plans for the design and construction of the Improvements.

(3)   **Assignment**: The Assignment of Contracts, Leases, Rents, Profits, Permits, Deposits, Approvals, Licenses, Warranties and Other Agreements, to be executed by Borrower and recorded in the Public Records of Palm Beach County, Florida, collaterally assigning to Lender all of Borrower's right, title and interest in and to Contracts, leases, permits, licenses, approvals and warranties of or for the Premises or any part thereof, and all rents, issues and profits derived or to be derived from the Premises.

(4)   **Final Plans**: The plans and specifications for the construction of the Improvements on the Property, prepared by the Architect, on file with Lender, and all amendments and modifications thereto approved in writing by the Lender. Prior to initial funding of hard costs under the Loan, Borrower shall submit two (2) complete sets of Final Plans to Lender.

(5)   **Financing Statements**: UCC-1 Financing Statements to be executed by Borrower to perfect Lender's security interest in the fixtures and personal and intangible property described in the "Mortgage" (as hereinafter defined) and recorded in the Public Records of Palm Beach County, Florida and filed with the Florida Secured Transactions Registry.

(6)   **Inspector**: Any person selected by the Lender as its Inspector and any successor inspecting engineering or architectural person or firm whether appointed or employed by Lender in its discretion, at the sole expense of Borrower.

1

(7)  **Loan Documents**: This Agreement, the "Construction Loan Note," the Mortgage, the Assignment, the Financing Statements (as those terms are herein defined), and all other documents, instruments or certificates now or hereafter evidencing or securing the Loan and all extensions, renewals and modifications thereof (collectively "Loan Documents").

(8)  **Mortgage**: A Mortgage and Security Agreement to be executed by Borrower in favor of Lender and recorded in the Public Records of Palm Beach County, Florida.

(9)  **Obligations**: Any indebtedness, liabilities or obligations, now existing or hereafter arising, due or to become due, absolute or contingent, of the Borrower to Lender.

(10)  **Requirements**: All building codes, zoning ordinances, restrictive covenants and other matters of record, and all local, state and federal statutes, laws, ordinances, administrative rules, regulations and requirements applicable to the Premises, including, but not limited to, air and water pollution laws and all applicable regulations, and other environmental laws and regulations, the Americans With Disabilities Act and securities laws and regulations.

(11)  **Title Company**: Chicago Title Insurance Company or another title insurance company accepted by Lender in writing.

3.  **GENERAL TERMS OF CONSTRUCTION LOAN.** Subject to the terms and conditions herein set forth, the Lender shall lend to the Borrower and the Borrower shall borrow from the Lender the Loan. The purpose of the Loan is to provide funds for certain Lender-approved hard and soft construction costs (together with an interest reserve) for the purchase of the Property and the construction of the Improvements within the Project. The Loan shall be fully reserved for the cost to complete the Improvements funded with proceeds of the Loan. Funding under the Construction Loan shall in no event exceed 100% of Lender approved construction costs. All draw requests shall be subject to the review and approval of Lender and all draw requests shall be funded within five (5) working days of receipt of all required information. Interest only payments shall be made monthly on the outstanding balance of the Loan at a fixed rate of 2.0% per annum. Construction is to be performed in accordance with Final Plans submitted to Lender and with the existing building codes and regulations of the governing authority. It is the responsibility of the Borrower to determine the applicable building regulations, to comply with them, and to determine that the construction is not in violation thereof.

4.  **REPAYMENT.** The total aggregate amount disbursed by the Lender to the Borrower under the Construction Loan Note and then outstanding plus all accrued interest shall be due and payable on the earliest of: (i) the occurrence of an "Event of Default" (as defined in the Construction Loan Note, the Mortgage or this Agreement); or (ii) the date that is five (5) years from the date on which the last investor in the EB-5 Offering (as defined in Section 8, below) submits his or her I-526 Petition to USCIS ("Maturity Date"), as determined by the Lender acting in good faith.

5.  **RIGHT TO CONVERT LOAN PRINCIPAL.** Notwithstanding any other provision of the Loan Documents, provided that no Event of Default has then occurred and is continuing as of the Maturity Date, the Borrower shall have the right on the Maturity Date to convert all then-outstanding principal under the Construction Loan Note into units of common membership interest in the Borrower (the "Conversion Right") in accordance with this Section.

(1)  The Borrower shall exercise the Conversion Right by delivery of written notice (the "Conversion Notice") to the Lender not less than forty-five (45) days prior to the Maturity Date.

(2)  Upon receipt of the Conversion Notice, the Lender shall retain three independent certified professional evaluation firms with experience valuing mixed-use properties of comparable size and scope to the Premises. Each firm shall appraise the fair market value of the Premises, based upon the actual occupancy rate and rental income of the Borrower and, after allowing for indebtedness of the Borrower, application of discounted cash flow, capitalization rates and other valuation methods

2

customarily used as at the time for professional valuations of like kind property. On or before the Maturity Date, each firm shall deliver a written report to the Lender and the Borrower setting forth its findings. The Borrower shall be responsible for payment of all fees and costs associated with the preparation and delivery of the three reports. For purposes of this Section 5, the "Appraised Value" of the Premises shall be the highest of the three values reported.

(3)     A fraction (hereafter referred to as the "Conversion Percentage") shall be determined whereby the numerator is the outstanding Loan principal as of the Maturity Date and the denominator is the Appraised Value. On and as of the Maturity Date, the Lender shall own a number of common membership units in Borrower equal to the Conversion Percentage multiplied by the total number of units of the Borrower on a fully diluted and as-issued basis; provided, however, that the number of common membership units the Lender shall be entitled to receive pursuant to this Section 5 shall not exceed eighty percent (80%) of the total number of units of the Borrower on a fully diluted and as-issued basis.

(4)     On and as of the Maturity Date, the Borrower shall pay all accrued and unpaid interest under the Construction Loan Note, together with any other amount that may be due and payable by the Borrower to the Lender under the Loan Documents.

(5)     On and as of the Maturity Date, the Lender shall surrender and deliver the Construction Loan Note to the Borrower in exchange for the issuance to the Lender of the number of units of common membership interest in the Borrower representing the Conversion Percentage. By surrendering and delivering the Construction Loan Note in exchange for the units of membership interest in the Borrower representing the Conversion Percentage, each party shall acknowledge and agree (i) that the Construction Loan Note shall be deemed satisfied and paid in full, (ii) that each party shall be deemed to have released all claims held by such party against the other party with respect to the Loan and the Loan Documents, and (iii) that the Borrower shall have no further obligations to the Lender pursuant to the Loan or the Loan Documents.

(6)     Any failure by the Borrower to comply with its obligations under this Section following delivery of a Conversion Notice shall constitute a Default.

6.     **SECURITY AND GUARANTY**. As security for the full and timely payment of the principal and interest under the Construction Loan Note, whether now existing or hereafter arising:

(1)     **Mortgage; Mortgagee Title Insurance Policy**. The Construction Loan Note shall be secured by the Mortgage, Assignment, Financing Statements and all other security documents executed by Borrower in connection with the Loan ("Other Security Documents"). Borrower shall cause to be delivered to Lender a Mortgagee Title Insurance Commitment (the "Title Commitment") to issue a Lender's Mortgagee Title Insurance Policy ("Policy") covering such Mortgage naming Lender as insured, having title insurance coverage in the original principal amount of the Construction Loan Note secured thereby, subject only to such exceptions as approved by Lender in writing and further guaranteeing the marketability of such title upon acquisition by Lender, without any exception for matters of survey, unrecorded easements, mechanics' liens and parties in possession. All other exceptions shall be subject to the approval of counsel to Lender. The Title Commitment must provide to Lender "gap" insurance coverage and include such endorsements as counsel to Lender deems reasonable and prudent. Borrower shall provide, at the request of Lender's counsel, any corrective instruments, releases, satisfactions, affidavits, etc., necessary to cause the Title Commitment and Policy to be issued. The Policy shall be furnished to Lender within thirty (30) days after the initial Advance.

(2)     **Lien; Setoff by Lender**. Borrower hereby grants to Lender a security interest and continuing lien for all indebtedness and other liabilities of Borrower to Lender upon any and all moneys, securities and other property of Borrower and the proceeds thereof, now or hereafter held or received by or in transit to, Lender from or for Borrower. Upon the occurrence of an Event of Default under the Loan Documents, Lender is hereby authorized at any time and from time to time, without notice to Borrower, to setoff, appropriate and apply any or all items hereinabove referred to against all

3

indebtedness and other liabilities of Borrower to Lender, whether under this Agreement, the Construction Loan Note or otherwise, and whether now existing or hereafter arising.

       7.    **SUBORDINATION**. In the event the Lender does not lend a total of $100,000,000 to Borrower then Borrower shall be entitled to obtain additional funding from one or more additional lenders (collectively, the "Senior Lender") in an amount not to exceed $110,000,000 minus the actual principal amount of the Loan. In that event, the rights of the Lender under the Loan Documents including, without limitation, Lender's rights under the Mortgage, the Assignment and the Other Security Documents, shall be subordinated to the rights of the Senior Lender in all respects; provided, Upon Borrower's request, the Lender shall execute an intercreditor agreement setting forth the respective rights and obligations of the Lender and the Senior Lender, which intercreditor agreement shall be in form and substance reasonably acceptable to the Lender and Senior Lender and shall, upon execution, be deemed to be a Loan Document.

       8.    **REPRESENTATIONS AND WARRANTIES**. To induce Lender to enter into this Agreement, Borrower makes the following representations and warranties, which shall be deemed to be continuing representations and warranties so long as any of the Construction Loan Note or other indebtedness of Borrower to Lender remain unpaid:

       (1)    **Organization and Standing**. Borrower is a single-purpose limited liability company validly existing under the laws of the State of Florida and has full capacity, power and authority to own all its property and to carry on its business as now conducted, including the ownership of the Property and constructing the Improvements thereon.

       (2)    **Power and Authority**. The execution, delivery and performance of this Agreement, the Note, Mortgage and the other Loan Documents by Borrower are within their powers and have been duly authorized by all necessary corporate action, if necessary. Neither the execution and delivery of this Agreement, the consummation of the transactions herein contemplated, nor the compliance with the terms, conditions and provision hereof, and of any other Loan Document delivered in connection herewith will conflict with, or result in a breach of, any of the terms, conditions or provisions of the Borrower's articles of organization or operating agreement, or of any agreement or instrument to which Borrower is now a party or by which any of the properties of Borrower are bound, or constitute a Default thereunder, or (except as contemplated by this Agreement) result in the creation or imposition of any mortgage or lien of any nature upon any of the assets of Borrower (whether such property or assets are owned legally or beneficially) pursuant to the terms of any agreement or instrument to which Borrower is a party or by which any of the properties of Borrower is bound except as provided in the Loan Documents.

       (3)    **Valid and Binding Obligation.** This Agreement, the Construction Loan Note, Mortgage and the other Loan Documents executed in connection with the Loan constitute the legal, valid and binding respective obligations of Borrower enforceable in accordance with their respective terms subject to applicable bankruptcy and insolvency laws and laws affecting creditors' rights and the enforcement thereof, generally and subject to the proper recordation of the Mortgage of even date hereof.

       (4)    **Title**. Borrower shall have good and marketable title to the Premises subjected to the lien and operation of the Mortgage. All of the collateral given as security to Lender is free and clear of all other mortgages, pledges, liens, security interests or other encumbrances.

       (5)    **Permits, Licenses and Contracts**. Borrower covenants and agrees that all necessary permits and licenses necessary to permit the construction of the Improvements (and the completion thereof) shall be kept in good standing and agrees to furnish upon receipt evidence to the satisfaction for Lender and its counsel showing such permits and licenses have been obtained, and that all materials contracted or purchased for delivery to the property, or for use in said construction, and all labor, contracted or hired for or in connection with said construction, shall be used and employed solely on the Property and in such construction, and only in accordance with the Final Plans. Building permits and the other agreements and permits in respect of the development of the Improvements, including the

Requirements, shall be and remain in full force and effect and the copies of each of these agreements and permits provided to the Lender are true copies and none of the agreements or permits have been amended. To the extent not already provided, Borrower shall provide to Lender copies of the building permits for the Premises to be constructed with the proceeds of the Loan at such time as Borrower has requested its first advance with respect to the applicable improvement.

Provided the Loan is in good standing and no cost is incurred by Lender, Lender agrees to join in any applications to any governmental or quasi-governmental authorities if consistent with the Lender approval plan of development and subject to reasonable requirements of Lender and its counsel. Borrower represents that all utility services necessary for the use of the Property and the construction of the Improvements and the operation thereof for their intended purpose are available at the boundaries of the Property, including water, storm and sanitary sewer facilities, electric and telephone facilities, and Borrower has obtained all necessary permits and permissions required from governmental authorities for access to the use of such services in connection with the construction and subsequent use of the Improvements. All roads necessary for the full utilization of the Improvements for their intended purposes have either been completed or the necessary rights of way therefor have either been acquired by the appropriate local authorities or have been dedicated to public use and accepted by such local authorities, and all necessary steps have been taken by Borrower and such local authorities to assure the complete construction and installation thereof.

Prior to the initial Advance, Borrower shall submit to Lender evidence that the Final Plan for "Harbourside" has been approved by governmental authorities, that zoning approvals are in place for the Improvements, that the Project is not a Development of Regional Impact and evidence satisfactory to Lender as to the availability of water and sewer service, and any permitting from the Army Corps of Engineers, the South Florida Water Management District or other applicable governmental or quasi-governmental entity, as applicable.

(6)    **Financial Statements and Other Information**. Subject to any limitation stated therein, all balance sheets, income statements and other financial data of Borrower which have been or shall hereafter be furnished to Lender to induce it to enter into this Agreement or make further advances in connection herewith do or will fairly represent the financial condition of Borrower as of the dates and the results of their respective operations for the period for which the same are furnished to Lender. All other information furnished to Lender are or will be, at the time the same are so furnished, accurate and correct in all material respects and complete insofar as completeness may be necessary to give Lender a true and accurate knowledge of the subject matter.

(7)    **Disclosure.** No representation or warranty made by Borrower in this Agreement, in any of the other Loan Documents or in any other document furnished or to be furnished from time to time in connection herewith or therewith contains or will contain any misrepresentation of a material fact or omits or will omit to state any material fact necessary to make the statements herein or therein not misleading. There is no fact known to Borrower which materially adversely affects, or which would in the future materially adversely affect, the business, assets, property, prospects or financial condition of Borrower, including the Project.

(8)    **Brokerage**. Neither Borrower nor Lender has dealt with a broker or finder in connection with the Loan and each party hereby agrees to indemnify the other against and to hold the other harmless in connection with any claims for finders' or brokerage fees or commission in connection with the Loan and agrees to pay all reasonable expenses (including but not limited to attorneys' fees and expenses) incurred by the other in connection with the defense of any action or proceeding brought to collect any such fees or commissions or otherwise relating to any such brokerage claims resulting from or arising out of any claim that the indemnitor consulted, dealt or negotiated with the person or entity making such brokerage claim.

(9)    **Hazardous Waste**. To the best of the knowledge of Borrower, the Premises have not in the past been used, are not presently being used, and will not in the future be used for the handling, storage, transportation or disposal of hazardous or toxic materials (including asbestos) and at

all times hereafter shall continue to be in full compliance with all federal, state and local environmental laws and regulations, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") and the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). Borrower agrees to indemnify, defend and hold harmless Lender from and against any loss to Lender, including, without limitation, reasonable attorneys' fees, incurred by Lender as a result of such past, present or future use, handling, storage, transportation or disposal of hazardous or toxic materials (including asbestos) with such indemnification to survive the repayment of the Loans. Borrower further warrants and represents that it shall promptly notify Lender of any change in the nature or extent of any hazardous materials on, in or under the Premises and supply Lender with copies of any government orders or notices. Upon reasonable cause, Lender may require a Phase I Report (and Phase II, if necessary) covering the Premises at Borrower's expense during the term of the Loan.

9.    **AFFIRMATIVE COVENANTS**. Borrower covenants and agrees that until the Construction Loan Note, together with interest and all other indebtedness to Lender under the terms of this Agreement, are paid in full, unless specifically waived by Lender in writing:

(1)    **Existence and Qualification**. Borrower shall do, or cause to be done, all things necessary to preserve, renew and keep in full force and effect its existence and its rights, licenses and permits and shall comply with all Requirements and all laws applicable to it and the Project.

(2)    **Financial Information**.  Within ninety (90) days of the end of each calendar year, Borrower shall provide Lender with its federal income tax returns, including all schedules (including K-1's), annual consolidated and consolidating financing statements to include a balance sheet, income statement and expense statement, accounts receivable aging report. All financing reporting is to be prepared in a form and substance acceptable to Lender.

(3)    **Insurance**. Borrower shall, at its expense, furnish to Lender, in form and terms and with insurers satisfactory to Lender, all-risk, builder's risk, windstorm and comprehensive general liability along with general contractor's general liability and workers' compensation insurance policies for the Premises and endorsements thereto covering each started single-family residence before each Advance shall be made under the Loan.

(4)    **Inspection by Lender**. Borrower shall allow any representative of Lender, including its Inspector, to visit and inspect the Premises. All Advances are subject to approval by Lender's Inspector. All inspections are the cost of Borrower. Lender and Borrower have agreed upon reasonable fees for inspections. It is understood that Lender is not responsible for the quantity or the quality of workmanship and material incorporated in the construction and any inspections made by Lender or its Inspector shall be solely for Lender's benefit. In no event shall Lender be considered a joint venture or partner of Borrower with respect to the construction of the Improvements.

(5)    **Litigation**. Borrower will promptly notify Lender upon the commencement of any material action, suit, claim, counterclaim or proceeding against or investigation of Borrower; and shall provide Lender with an opinion of counsel concerning the litigation or investigation and the probable outcome thereof.

(6)    **Defaults, Assessments and Change Orders**. Borrower shall promptly notify Lender in writing of: (a) any material assessment by any taxing authority for unpaid taxes as soon as Borrower has knowledge thereof; (b) any alleged default by Borrower in the performance of or any material modification of any of the terms or conditions contained in any agreement, mortgage, indenture or instrument to which Borrower is a party or which is binding upon Borrower and of any default by Borrower in the payment of any of its indebtedness; and (c) any contemplated material change in the construction work being performed under the Loan which may result in an increase in the budgeted cost therefor of at least 5% of such budget cost.

(7)     **Estoppel Affidavits**. Borrower, within ten (10) days after written request from Lender, will furnish a written statement, in form satisfactory to Lender, duly acknowledged: (i) stating whether or not any offsets or defenses exist against the payments due under the Construction Loan Note or any of the other Loan Documents applicable thereto; and (ii) setting forth such other information as Lender may request from time to time.

(8)     **Schedule of Construction**. Borrower agrees to furnish, or to cause the contractors it employs to furnish, all labor which may be necessary to construct the Improvements in accordance with the Final Plans which have been submitted to and approved by Lender. Borrower shall take all necessary steps to assure the completion of the Improvements and shall proceed continuously and diligently. In the event that construction of the Improvements shall at any time be stopped or suspended for a continuous period of thirty (30) days and such stoppage shall not be due to acts of God, strikes, war or other cause beyond the control of Borrower, then Lender shall have the right to declare this Agreement in Default. Time is of the essence with respect to Borrower's performance under this Agreement.

(9)     **Construction Contracts; Lender's Use of Plans and Specifications**. Borrower hereby collaterally assigns use of its right, title and interest under each construction contract so that, upon Default by Borrower, each contractor will, at the request of Lender, its successors or assigns, continue to perform its obligations as set forth in each contract. Should Borrower fail to construct and complete the Improvements in accordance with this Agreement, Borrower hereby assigns to Lender the right to possess and use the Final Plans for the purpose of completing the Improvements. Borrower shall construct the Improvements substantially in accordance with the Final Plans.

(10)    **List of Contractors**. Borrower further covenants and agrees to furnish Lender a list, under oath, containing the names of all "Major" contractors, subcontractors, sub-subcontractors, materialmen and laborers with whom Borrower expects to contract in connection with the construction of the Improvements, which list shall also contain their business addresses, the type of work or material each expects to perform or furnish, and the contract price of such work. Borrower shall deliver to Lender, within five (5) business days after its receipt of same, any and all notices or other instruments which may be served upon it or upon any agent of Borrower by any lienors, materialmen, laborers, contractors or subcontractors, pursuant to the provisions of the Florida Construction Lien Law. Any and all change orders or substitutions of materials which will result in a change in construction costs or in the value of the Improvements greater than five percent (5%) of the Lender approved construction costs must have prior written approval of Lender.

(11)    **Compliance With Requirements** Borrower shall do or cause to be done all acts and things necessary to effect compliance with all Requirements and shall do or cause to be done all acts and things required, such that the Project is, at all times, in compliance with all Requirements. Borrower shall also do or cause to be done all acts and things necessary so that the Premises shall at all times be in full compliance with all covenants, restrictions, agreements or instruments affecting the Premises and the uses thereof.

10.     **NEGATIVE COVENANTS**. Borrower covenants and agrees that from the date hereof and until payment in full of the principal of and interest on all of the Construction Loan Note, and all other indebtedness to Lender under this Agreement, unless Lender shall otherwise consent in writing, it will not, either directly or indirectly:

(1)     **Merger, Sale, Etc.** Borrower will not become a party to any transaction whereby all or any substantial part of the properties, assets or undertakings of Borrower (whether legally or beneficially owned) would become the property of any other person, whether by way of reorganization, amalgamation, merger, transfer, sale, lease, sale and leaseback, or otherwise.

(2)     **Change in Control**. Except for a change of control pursuant to the exercise of the Conversion Right set forth in Section 5, above, Borrower will not permit any change in the controlling legal or equitable ownership of Borrower without the written consent of Lender. Borrower will not permit

any other change in the legal or equitable ownership of the Borrower without the written consent of Lender, which consent shall not be unreasonably withheld.

(3)     **Changes in Plans, Agreements, Etc.** Borrower will not make any material changes in the Final Plans without the prior written approval of Lender.

11.     **GENERAL DISBURSEMENT CONDITIONS**. UNLESS OTHERWISE WAIVED IN WRITING BY LENDER ON A CASE BY CASE BASIS, THE TERMS OF THIS AGREEMENT (INCLUDING ALL EXHIBITS THERETO) SHALL GOVERN DISBURSEMENTS UNDER THE LOAN. IF AT ANY TIME, IN THE REASONABLE OPINION OF LENDER, THE UNADVANCED PORTION OF THE LOAN WILL BE INSUFFICIENT TO COMPLETE THE IMPROVEMENTS THEN UNDER CONSTRUCTION, IN ACCORDANCE WITH THE FINAL PLANS AND TO PAY THE COST THEREFOR (THE "COST TO COMPLETE"), BORROWER SHALL NOT BE ENTITLED TO REQUEST OR RECEIVE FURTHER ADVANCES UNDER THE LOAN AND SHALL, SO LONG AS SUCH CONDITION PERSISTS, UPON DEMAND BY LENDER DEPOSIT WITH LENDER AN AMOUNT EQUAL TO SUCH DEFICIENCY WHICH AMOUNT SHALL BE DISBURSED BY LENDER TO PAY FOR THE COST TO COMPLETE THE IMPROVEMENTS THEN UNDER CONSTRUCTION. UNTIL THE AMOUNT EQUAL TO THE DEFICIENCY IS DEPOSITED AS AFORESAID, LENDER SHALL BE UNDER NO OBLIGATION TO DISBURSE ANY ADDITIONAL FUNDS UNDER THE LOAN. NOTWITHSTANDING THE FOREGOING, LENDER SHALL BE OBLIGATED TO CONTINUE FUNDING PURSUANT TO A DRAW REQUEST SUBMITTED BY BORROWER SO LONG AS THE LENDER'S PRIVATE OFFERING OF UNITS OF LIMITED PARTNERSHIP INTEREST (THE "EB-5 OFFERING") REMAINS OPEN. IN ADDITION, BORROWER'S FAILURE TO DEPOSIT AN AMOUNT EQUAL TO THE AFOREMENTIONED DEFICIENCY WITHIN FIVE (5) DAYS AFTER DEMAND SHALL CONSTITUTE A DEFAULT HEREUNDER.

No Advances under the Loan shall be disbursed until Lender shall have received for its review and approval copies of the following:

(1)     Final Plans for the construction of Improvements on the Property at least twenty (20) business days prior to the first funding under the Loan. All material changes to the Final Plans must be approved in advance in writing by Lender, which approval will not be unreasonably withheld.

(2)     If requested by Lender, Itemized Cost Breakdowns and Contracts of all contractors in privity with Borrower and for all those major sub-contractors involved in the construction or development of the Improvements, including names, addresses, phone numbers and primary contact person for each contractor and major subcontractor, updated from time to time as requested by Lender. Borrower understands that disbursement of the Loan is subject to Lender's approval of the major subcontractor(s), the subcontracts and the cost breakdowns.

(3)     Contract(s) between Borrower and Architect.

(4)     For each contractor in privity with Borrower, copies of their current Contractor's License to operate in the state, county and/or municipality, as applicable, and evidence of their current General Liability and Worker's Compensation insurance.

(5)     Project Evaluation Report, acceptable to Lender and completed by the Lender's Inspector, which substantiates that the Final Plans are adequate to complete the Improvements and that the costs of constructing the Improvements in accordance with the Final Plans are fairly represented.

(6)     Written report satisfactory to Lender from a testing company acceptable to it setting forth the results of soil tests, and their recommendations, if any. Copies of recommended additional testing and Density/Compaction Certifications will be required with the first hard cost disbursement, as applicable.

(7)     Lender will require fulfillment of all governmental regulation requirements prior to

the commencement of construction. Evidence satisfactory to Lender of the issuance of proper zoning, development and building permit(s), and written evidence of the availability and irrevocable reservation of sufficient water, sewer and electricity to the site must be provided to Lender.

(8)     Other documents, exhibits and counsel opinions as Lender or its counsel may require.

Lender reserves the right to withhold disbursement of such Advances until verification that work required for funding each draw has been fully completed. The full and sole responsibility for the verification that all proper payments have been made pursuant to the Florida Construction Lien Law is on the Borrower. The Borrower further releases Lender from any liability, claims or damages which may arise at any time for any reason as the result of the disbursement of construction funds. Borrower further indemnifies Lender from any claims arising from the disbursement of funds that may be made by third parties.

Lender shall make Advances directly to Borrower. Upon a Default by Borrower under the Loan Documents, Lender reserves the right to make any Advances hereunder to the Title Company at the expense of Borrower or directly to the person to whom Lender determines that payment is due, and all such Advances shall be deemed disbursed and outstanding on the date of disbursement thereof by Lender, shall be in satisfaction of Lender's obligations hereunder and shall be fully secured by the Loan Documents.

Advances by Lender to Borrower hereunder are contingent upon compliance by Borrower with all provisions hereof. Lender shall have no obligation to advance any monies at any time that there is a claim of lien filed of record against the Property and the same has not been transferred to bond if disputed, or at any time that any condition precedent to such advance has not been met, or at any time Borrower shall have failed to comply with any provision of this Agreement, or at any time there shall be a Default hereunder, or there shall be a Default under any of the Loan Documents.

12.     **DISBURSEMENT METHOD**.  Loan proceeds for hard costs will be disbursed based upon material and work-in-place approved by the Inspector pursuant to a Schedule approved by the Lender, of which a sample is attached hereto. The final ten percent (10%) of the Loan funds allocated for construction of the Improvements will be retained until 50% of construction is completed, at which time the retention shall be reduced to five percent (5%). The final 5% shall be retained until the Borrower provides the lender with all documentation required for funding of the final hard cost loan proceeds for the Project. **No deposits** for material or equipment will be reimbursed from Loan proceeds until such **equipment or material is securely stored on the Project site.**

13.     **CONDITIONS TO ADVANCES**. All requisitions for Advances shall be made by Borrower to Lender on Lender's form of Construction Loan Requisition which is to be signed by Borrower.

(1)     It is understood that the first draw under the Loan shall be for the purchase of a portion of the Property from the Town of Jupiter in the approximate amount of $2,550,000.00.

(2)     It is further understood that Loan proceeds will also be utilized to purchase the remainder of the Property from Jupiter Waterways, LLC, an affiliate of the Borrower, and that a portion of the purchase proceeds shall be utilized by Jupiter Waterways, LLC for payment of the outstanding first mortgage to the Bank of Florida in the amount of approximately $15,000,000.00.

(3)     Prior to the receipt of the first construction draw, Borrower shall furnish Lender a copy of the Builder's Risk insurance, evidence of the recording in the Public Records of a Notice of Commencement in form approved by Lender (and the posting thereof on the job site.

(4)     The Inspector approved by Lender shall be required to certify to Lender's satisfaction at the time of each request for Advance as to the amount of work completed in accordance with the Final Plans previously submitted to and approved by Lender ("Progress Reports"), certify the

value of work in place is not less than the amount being requested and that there are sufficient funds remaining to complete the site development or the Improvements according to the Final Plans, as applicable. Borrower agrees that Lender's Inspector shall be entitled to payment for their services plus any of their out-of-pocket costs, and Borrower understands that such fees shall be the Borrower's expense and shall be paid by Borrower immediately upon receipt of a statement.

14.    **INTEREST RESERVE**.  Borrower agrees a portion of the proceeds of the Loan hereto shall be allocated for the payment of Loan interest and shall be available for application to the periodic payment of accrued interest due to Lender during the term hereof. No advances out of the interest reserve shall be available to Borrower while there is any Default by Borrower under the Loan Documents. Upon prior written notice to Lender, Borrower shall have the right, on any such payment date, to pay the accrued interest owing on such payment date, out-of-pocket from Borrower's funds. Borrower recognizes that the payment of interest by the method described herein is for its convenience and benefit. In the event of sums allocated for the interest reserve shall ever become depleted, all remaining interest charges shall be paid directly by Borrower to Lender on the relevant payment date.

15.    **EVENTS OF DEFAULT**. The occurrence of any one or more of the following events is a Default hereunder and the continuance of any such Default beyond the period (if any) provided below within which such Defaults may be cured shall be an Event of Default hereunder and under the Loan:

(1)    Any breach by Borrower of the terms of the Loan Documents; or

(2)    Any material noncompliance with the Requirements; or

(3)    Any material representation, warranty, statement, certificate, schedule or report made or furnished by Borrower proves to have been false or erroneous in any material respect at the time of the making thereof, or to have omitted any substantial liability or claim against Borrower, or if on the date of execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed therein, which change shall not have been disclosed to Lender at or prior to the time of such execution; or

(4)    The dissolution of Borrower; or

(5)    The filing by or against the Borrower of a petition in bankruptcy under any reorganization arrangement, readjustment of debt, dissolution, liquidation or similar proceeding under federal or state statute; or

(6)    A breach by Borrower of any obligation to the Senior Lender.

Then, upon the occurrence of any such Default, if not cured by Borrower within ten (10) days (or, in the case of (3) above, fifteen (15) days) of receipt of written notice of such Default from Lender, Lender, at its option, may terminate the Loan hereby granted, together with all obligations to make advances hereunder, by written notice to that effect to the Borrower and may declare (among other remedies) provided under the Loan Documents any or all principal and interest owing hereunder to be forthwith due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived.

16.    **WAIVER OF DEFAULT**. Lender at any time may waive any Default or any Event of Default which shall have occurred and any of its consequences; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon, and no such waiver shall be effective unless it is in a written document executed by a duly authorized representative of Lender.

17.    **RIGHTS AND REMEDIES CUMULATIVE**. No right or remedy herein conferred upon Lender is intended to be exclusive of any other right or remedy contained herein or in the other Loan Documents and every such right or remedy shall be cumulative and shall be in addition to every other

such right or remedy contained herein and therein or now or hereafter existing at law or in equity or by statute or otherwise.

18.     **PUBLICITY AND ADVERTISING**. Lender may, with Borrower's written consent, which consent is hereby given, announce and publicize the source of the financing contemplated hereunder, by means and media selected by Lender and may use Borrower's name in such releases. Lender, at its option, may deliver, at Lender's expense, a sign indicating that Lender is providing the financing for the Project. If such a sign is provided by Lender, Borrower agrees, subject to applicable zoning and other restrictions, to provide a prominent and suitable location for the display of this sign during the term of the Loan. Borrower shall not publicize or advertise in any signs, advertising materials or sales brochures Lender as a source of the financing without the prior written permission of Lender in each instance.

19.     **NONLIABILITY OF LENDER**. All inspections and other services rendered by the Inspector shall be rendered solely for the protection and benefit of Lender. Borrower shall not be entitled to claim any loss for damage against Lender for failure to discharge its duties properly, nor shall Lender or the Inspector be liable for failure of the contractor or contractors to construct the improvements in strict accordance with the Final Plans, or for the failure of any dealer, contractor, subcontractor, draftsman or laborer to deliver the goods or perform the services required to be delivered or to be performed by them, nor shall this Agreement be construed to make the Lender liable to materialmen, craftsmen, laborers, or others for goods or services delivered by them in or upon the Premises, or debts or claims accruing to the Premises against Borrower or any contractor. Lender shall not be liable to materialmen, contractors, subcontractors, laborers, or others, for goods or services delivered or performed by them in or upon the Premises or employed in said construction, or for any debts or claims accruing in favor of any such parties or against Borrower or others, or against the Premises. Borrower shall not be the agent of Lender for any purpose.

20.     **NOTICES**. All notices, consents, requests and demands to or upon the respective parties hereto to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand or when deposited in the mail, certified with return receipt requested, postage prepaid, addressed as appears at the beginning paragraph of this Agreement.

21.     **FURTHER ASSURANCES**. At any time upon Lender's written request and at the expense of Borrower, Borrower will promptly (and in no event within more than ten (10) days) and duly execute and deliver any further instruments and documents and take such further action as Lender may deem reasonable to effect the purposes of this Agreement and/or any of the other Loan Documents. In addition, upon written request of Lender from time to time, and at Borrower's sole cost and expense, Borrower will promptly (and in no event within more than ten (10) days) correct any defect which may be discovered in the Construction Loan Note, Mortgage, this Agreement or any of the other Loan Documents, and after the execution of same, Borrower will make, execute and deliver same to Lender and, where appropriate, will cause same to be recorded and/or filed and from time to time thereafter re-recorded and/or re-filed at such time and in such offices and places as are deemed desirable by Lender. Upon any failure by Borrower to comply with this Section, Lender may make, execute, record, file, re-record and/or refile any and all instruments, certificates and documents for and in the name of Borrower to effectuate the purposes of the Loan Documents, and Borrower and hereby irrevocably appoint Lender the agent and attorney-in-fact of Borrower and to do so to effectuate the purposes of the Loan Documents, which agency and appointment as attorney-in-fact shall be coupled with an interest.

22.     **SURVIVAL OF AGREEMENT**. The terms and conditions hereof shall survive the delivery to Lender of the Loan Documents and the making of any Advances to Borrower hereunder. The agreements of Borrower herein to pay or reimburse Lender for out-of-pocket expenses and costs of Lender shall survive the repayment of the Loan and the cancellation, satisfaction or release of the Loan Documents.

23.     **ATTORNEYS' FEES**. Any and all references to the payment of attorneys' fees and disbursements herein or in any of the other Loan Documents shall include those incurred before, during

and after litigation, whether in negotiating, drafting, closing, attempting collection without litigation, investigating and litigating in all trial and appellate levels, as well as those incurred in any bankruptcy proceedings and post-judgment proceedings. As used herein, attorneys' fees include paralegal fees, administrative costs and all other reasonable charges whatsoever.

24. **SEVERABILITY**. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

25. **COUNTERPARTS**. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

26. **CONFLICT**. If the terms and provisions of any of the other Loan Documents should conflict with any of the terms and provisions of this Agreement, the terms and provisions of this Agreement shall be interpreted as being paramount, superior and controlling but only to the extent of such conflict.

27. **HEADINGS**. The headings of the Articles, Sections and Subsections of this Agreement are for convenience of reference only, and are not to be considered a part hereof, and do not limit or otherwise affect any of the terms hereof.

28. **JURISDICTION AND VENUE**. Each of the parties irrevocably and unconditionally: (a) agrees that any suit, action or other legal proceeding arising out of or relating to this Agreement may be brought in the courts of record of the State of Florida in Palm Beach County or the District Court of the United States, Southern District of Florida; (b) consents to the jurisdiction of each such court in any such suit, action or proceeding; and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any of such court.

29. **AMENDMENTS**. The provisions of this Agreement may not be amended, supplemented, waived or changed orally, but only by a written document signed by Borrower and Lender and making specific reference to this Agreement.

30. **WAIVERS**. Borrower waives presentment, demand, protest, notice of default, nonpayment, partial payments and all other notices and formalities relating to this Agreement other than notices specifically required hereunder. Borrower consents to and waives notice of the granting of indulgences or extensions of time of payment, the taking or releasing of security, the addition or release of persons primarily or secondarily liable on or with respect to liabilities of Borrower to Lender, all in such manner and at such time or times as Lender may deem advisable. No act or omission of Lender shall in any way impair or affect any of the indebtedness or liabilities of Borrower to Lender or rights of Lender in any security. No delay by Lender to exercise any right, power or remedy hereunder or under any security agreement, and no indulgence given to Borrower in case of any Default, shall impair any such right, power or remedy or be construed as having created a course of dealing or performance contrary to the specific provisions of this Agreement or as a waiver of any Default by Borrower or any acquiescence therein or as a violation of any of the terms or provisions of this Agreement.

31. **GOVERNING LAW; BENEFIT; ASSIGNMENT**. This Agreement shall be governed by the laws of the State of Florida. This Agreement shall bind and inure to the benefit of, and the terms "Borrower" and "Lender," respectively, as used in this Agreement shall include, the respective parties and their respective heirs, personal representatives, successors and assigns. However, Borrower may not assign its rights and obligations under this Agreement, except pursuant to this Agreement. Lender may assign, in whole or in part, and issue participating interests in and to this Agreement, any of the Construction Loan Note and/or any of the Loan Documents. No consent of Borrower to such assignment or participation shall be required. In such event, Borrower agrees to attorn to such assignee and to

execute such estoppel certificates and consents thereto and other documentation as may reasonably be required to facilitate such assignment, provided such consents and documentation do not add to the obligations of Borrower nor decrease those of Lender.

32. **ABSENCE OF CONTROL**. In no event shall Lender's rights hereunder or under any of the Loan Documents grant Lender the right to, or be deemed to indicate that, Lender is in control of the business, management or properties of Borrower, or has power over the daily management functions and operating decisions made by Borrower. LENDER IS A LENDER ONLY AND SHALL NOT BE CONSIDERED A JOINT VENTURER OR PARTNER OF BORROWER.

33. **WAIVER OF JURY TRIAL**. BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (INCLUDING, BUT NOT LIMITED TO, ANY CLAIMS, CROSS CLAIMS OR THIRD-PARTY CLAIMS) ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN. BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF LENDER OR LENDER'S COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. BORROWER ACKNOWLEDGES THAT LENDER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, INTER ALIA, THE PROVISIONS OF THIS SECTION.

IN WITNESS WHEREOF, the parties have executed this Amended and Restated Convertible Loan Agreement on the day and year first above written.

**LENDER:**

Harbourside Funding LP
By: Harbourside Funding GP, LLC


By:_____


**BORROWER:**

Harbourside Place, LLC



By: _____

13