UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:20-cv-80102-CANNON/BRANNON

TING PENG and LIN FU, on behalf of
themselves individually and all others similarly
situated, and derivatively on behalf of
HARBOURSIDE FUNDING, LP, a Florida
limited partnership,

     Plaintiffs,

        vs.

NICHOLAS A. MASTROIANNI II;
FLORIDA REGIONAL CENTER, LLC, a
Delaware limited liability company;
HARBOURSIDE FUNDING GP, LLC, a
Florida limited liability company; and
HARBOURSIDE PLACE, LLC, a Delaware
limited liability company,

     Defendants,

and

HARBOURSIDE FUNDING, LP, a Florida
limited partnership,

     Nominal Defendant.

<u>JURY DEMAND</u>

**SECOND AMENDED CLASS-ACTION AND DERIVATIVE COMPLAINT
FOR EQUITABLE RELIEF AND DAMAGES**

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiffs Ting Peng and Lin Fu, on behalf of themselves and all others similarly situated, and derivatively on behalf of Nominal Defendant Harbourside Funding, LP, hereby submit this Second Amended Complaint ("SAC") in response to the Order on Motions for Reconsideration (ECF 73) by which the Court dismissed without prejudice Counts V, VI, VIII, and IX of Plaintiffs' First Amended Complaint ("FAC") and instructed Plaintiffs to file their SAC within 14 days of the Order on Motions for Reconsideration (*i.e.,* by January 28, 2021). Accordingly, Plaintiffs hereby submit their SAC and allege as follows upon personal knowledge as to Plaintiffs' own conduct and experience, and on information and belief as to all other matters based on an investigation by counsel:

## **INTRODUCTION**

1.      In or about 2010, Defendant Nicholas Mastroianni and attorney Richard Yellen became the principals of the Harbourside Group, a group of entities they created for the purpose of building a mixed-use commercial development in Jupiter, Florida (the "Harbourside Project"), financed by a loan to Harbourside Place, LLC (the "Developer"). The loan was funded by the sale of membership units in Harbourside Funding, LP (the "Funding Partnership") at $500,000 per unit to immigrant investors who applied for permanent residence in the United States via the EB-5 Immigrant Investor Visa Program (the "EB-5 Program").

2.      Defendants sold 199 of the 200 available units of membership in the Funding Partnership, which provided $99,500,000 in funding for the Developer. Members of the Funding Partnership (the "Limited Partners") were to receive interest payments each month until the loan matured on November 30, 2017, when the $99,500,000 principal was to be repaid in full. If the Developer's capital was insufficient to repay the principal when it became due, the Developer was to obtain refinancing from an institutional lender or obtain the necessary capital through the sale

of some or all of the Harbourside Project. And if those efforts failed, the principal could be converted to common membership units in the Developer unless one or more events of default had occurred and had not been cured as of the maturity date.

3.      As of August 2017, the Developer had yet to pay a single monthly interest payment to the Limited Partners. Mastroianni offered to pay all the interest that had accrued, repay the loan principal, and establish a plan that would protect the Limited Partners' interests if they would consent to converting the Funding Partnership's investment into a "preferred" equity stake in the Developer. And although the Developer had made no effort to refinance the loan or to sell some or all of the Harbourside Project, Mastroianni also told the Limited Partners that the principle would be converted to common membership interests in the Developer per the conversion provision in the loan agreement.

4.      When the Limited Partners declined his proposal, Mastroianni advised the Funding Partnership that the Developer would exercise the conversion provision of the loan agreement, and that the debt would be converted to equity in the Developer.

5.      The conversion was invalid for three basic reasons. ***First***, Mastroianni had failed to distribute to the Limited Partners notice of the Developer's intent to invoke the conversion provision of the loan agreement, as required by the Limited Partnership Agreement. ***Second,*** the Developer had engaged in multiple events of default, which precluded the exercise of the conversion provision. ***Third,*** the conversion required the Limited Partners' approval, which was neither sought nor obtained, (a) because the Developer was converted from a Florida LLC to a Delaware LLC, which constitutes a change in the plan described in the offering documents and constitutes an "Other Investment," as that term is defined in the Limited Partners' Agreement; and (b) because the loan principal was to have been converted to common units of membership interest

- 2 -

in the Developer, but was converted instead to a single unit of "preferred" membership that was issued in the name of the Funding Partnership, which prevented the Limited Partners from exercising rights of membership in the Developer.

6.      As a result of engaging in this course of conduct, Mastroianni and the general partner of the Funding Partnership have breached their fiduciary duties to the Funding Partnership and to the Limited Partners, and Mastroianni and the Developer have breached the loan agreement and have seized control of the limited partners' property—*i.e.,* the $500,000 investments that were to have been returned to each of them when the loan matured in November 2017—which renders Mastroianni and the Developer liable for conversion and civil theft under Florida law.

7.      Accordingly, Plaintiffs bring this action on behalf of themselves and a proposed class of limited partners and derivatively on behalf of the limited partnership to obtain judicial declarations (a) that exercising the conversion provision was prohibited by the loan agreement and (b) that the conversion of the developer from a Florida LLC to a Delaware LLC, and the conversion of the debt to a single unit of "preferred" membership in the developer LLC, are invalid due to the failure to obtain the Limited Partners' approval.

8.      Plaintiffs also seek an award of compensatory and, where applicable, punitive damages for, *inter alia,* Defendants' breaches of fiduciary duty, breaches of contract, conversion, and an award of treble damages for civil theft.

## PARTIES

### PLAINTIFFS

9.      Plaintiff Ting Peng is an individual participant in the EB-5 Program who became a member of the Funding Partnership on April 2, 2013. Ms. Peng was born in mainland China and has been employed as a teacher and a corporate financial planner. Ms. Peng now resides in Sammamish, Washington.

10.      Plaintiff Lin Fu is an individual participant in the EB-5 Program who became a member of the Funding Partnership on December 16, 2011. Ms. Fu was born in mainland China and is a physician who received her medical degree from Shanghai Medical University and practice as an OB/Gyn for more than a decade in Shanghai, China. Ms. Fu now resides in Princeton, New Jersey.

### DEFENDANTS

11.      Defendant Nicholas Mastroianni is an individual who resides in Palm Beach County, Florida. Mastroianni, along with attorney Richard Yellen, was one of two principals who controlled a group of companies called the "Harbourside Group," which are among the entities named Defendants in this action.[1]

---

[1] As discussed in paragraph 137, below, on December 23, 2019, Plaintiffs served Defendants with a demand letter as required by F.S.A. § 772.11 and a draft of the original complaint. After meeting and conferring with Defendants' counsel, Plaintiffs filed the original complaint on January 27, 2020. One month later (on February 28, 2020), Defendants advised Plaintiffs that Richard Yellen, who was named as a Defendant in the original complaint, had terminated his participation in the Harbourside Project as of September 30, 2014. On March 3, 2020, Plaintiffs offered a stipulated dismissal without prejudice of their claims against Yellen in exchange for an affidavit in which Yellen affirmed that he had no role in the Harbourside Project after that date, subject to Plaintiffs amending their complaint to include Yellen as a defendant if facts obtained in discovery contradicted Yellen's affidavit. On March 25, 2020, Yellen answered the complaint and filed a motion for judgment on the pleadings. Shortly thereafter, the parties agreed to a stipulation and proposed order dismissing their claims again Yellen without prejudice, which has been filed with this First Amended Complaint.

12.     Defendant Florida Regional Center, LLC (the "Regional Center") is a Delaware limited liability company and is one of the entities that comprise the Harbourside Group.

13.     Defendant Harbourside Place, LLC (the "Developer") was formed as a Florida limited liability company and was converted to a Delaware limited liability company in or about December 2017. The Developer was created and operated by Mastroianni and Yellen, was managed by Mastroianni, and is one of the entities that comprise the Harbourside Group.

14.     Defendant Harbourside Funding GP, LLC (the "General Partner") is a Florida limited liability company that served as the general partner of the Funding Partnership. The General Partner was created and operated by Mastroianni and Yellen, was managed by Mastroianni, and is one of the entities that comprise the Harbourside Group.

15.     Nominal Defendant Harbourside Funding, LP (the "Funding Partnership") is a Florida limited liability company that was established for the purpose of financing the "Harborside Project" (a mix-used commercial development in Jupiter, Florida) with a loan to the Developer, which was funded by EB-5 investors' purchase of membership units in the Funding Partnership and who, like Plaintiffs, became Limited Partners in the Funding Partnership. The Funding Partnership is one of the entities that comprise the Harbourside Group.

## JURISDICTION AND VENUE

16.     **JURISDICTION**.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and Plaintiffs and Defendants are citizens of, and domiciled in, different states. This action, which is brought in part under Fed. R. Civ. P. 23.1, is not a collusive one to confer jurisdiction that the court would otherwise lack.

17.     **VENUE**. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. 1391(b)(2) because the vast majority of acts and omissions giving rise to the claims asserted herein occurred and continue to occur in this District, and a substantial part of the property that is the subject of this action is situated here.

## GENERAL ALLEGATIONS

### THE EB-5 PROGRAM

18.     To provide an incentive for foreign investment to benefit the American economy by creating or preserving American jobs, Congress created the EB-5 Program in 1990 with the enactment of the Immigration Act of 1990. Pub. L. 101-649, 104 Stat. 4978. The EB-5 Program enabled immigrant investors ("EB-5 Investors") to become permanent residents of the United States by investing at least $500,000 in a U.S. business that will use the funds in a manner that creates or maintains at least 10 full-time American jobs. *See, e.g.,* 8 U.S.C. § 1153(b)(5).

19.     At the outset of the application process, which normally takes two or more years before it is complete, the EB-5 Investor submits a Form I-526 Immigration Petition by Alien Entrepreneur ("I-526 Petition"), which, if approved, permits the EB-5 Investor to reside and travel within the U.S. while his or her application is pending. If the I-526 Petition is approved, the EB-5 Investor may then seek permanent U.S. residency status (and obtain a green card) by submitting a Form I-829 Petition by Entrepreneur to Remove Conditions ("I-829 Petition"). If the I-829 Petition is granted, the EB-5 Investor and his or her immediate family members are granted permanent immigrant visas (*i.e.,* green cards).

20.     In 1993, Congress modified the EB-5 Program by adding the Immigrant Investor Pilot Program, which allowed EB-5 Investors to invest in a commercial enterprise associated with a regional center. Regional centers, like the one involved in the present case, are Regional centers

are essentially clearinghouses for eligible investment opportunities. They are private entities that have received approval from the U.S. Citizenship & Immigration Services ("USCIS") to administer EB-5 investments in a given geographical area, and enable EB-5 Investors to pool their investments in a specific project with other EB-5 Investors, thereby making it easier to demonstrate that a given project has created or preserved at least 10 jobs per investment.

21.     Although EB-5 was created in the 1990s, it was not commonly used to fund real estate projects until after the Great Recession in 2008, when funding became more difficult to obtain and EB-5 represented an alternative source of capital.

**FUNDING THE HARBOURSIDE PROJECT VIA THE EB-5 PROGRAM**

22.     In September 2010, USCIS approved Defendant Mastroianni's proposal to designate Defendant Florida Regional Center as the administrator of the regional center for Palm Beach County, Florida, and to approve the Harbourside Project as the first capital investment project that would be located in the Florida Regional Center.

23.     To fund the Harbourside Project, Mastroianni and Yellen created the Funding Partnership for the purpose of raising up to $100 million through the sale of up to 200 membership units to EB-5 Investors for $500,000 per unit plus a $40,000 administration fee. The revenue generated by the sale of Funding Partnership membership units funded a loan to the Developer of up to $100,000,000 (the "EB-5 Loan").

24.     In advertising materials circulated by the Regional Center, prospective EB-5 Investors were told that the Harbourside Project's completion was guaranteed by a $750 million policy issued by a major insurance company, and that

> the value of just the real estate collateral is more than twice the amount of the EB-5 loans, and the security of the funds is fully guaranteed. The [Harbourside] Project is a four-year bridge loan with a safe and reliable exit mechanism: Ackman-Ziff, the largest real estate company in New York, has signed a contract to provide a

$100 million refinancing loan after the Project is completed and put into operation. Investors will recover 50% of their funds immediately after receiving their permanent green card, and the full amount of the investment will be safely recovered in the fourth year. . . .

25.     Defendants made similar statements in the Offering Documents[2] (which were printed in English and which Plaintiffs and other prospective EB-5 Investors were shown only the signature pages by Defendants' agents in China), including a promise that the EB-5 Loan would not be subordinated to loans by other lenders unless the General Partner failed to sell all 200 units of membership in the Funding Partnership, and even then, the Developer would borrow no more than a total of $110,000,000, including the amount of the EB-5 Loan. As explained in the Offering Documents, each EB-5 Investor's $500,000 investment would be paid into an escrow fund, which would provide up to $100 million for the EB-5 Loan to the Developer for the construction of the Harbourside Project.

26.     The EB-5 Loan would be secured by a perfected, first-priority lien and would yield interest at a rate of 2.0% per year that would be paid in monthly installments to the EB-5 Investors who became Limited Partners in the Funding Partnership.

27.     The Offering Memorandum explained that the EB-5 Loan would be repaid. "within five years from the date the last potential investor submits his or her I-526 Petition to USCIS, or, no later than November 30, 2012, as determined by the Partnership in good faith." And, to do so,

---

[2] The Offering Documents are composed of Subscription Instructions and a Confidential Offering Memorandum ("Offering Memorandum") to which the following exhibits are attached: the Limited Partnership Agreement for the Funding Partnership (the "Limited Partnership Agreement"); the Subscription Agreement; Charts Summarizing the Immigration and Investment Procedures; the Escrow Agreement; a Rendering, Aerial Photo and Area Maps of Harbourside Place; and the Amended Restated Convertible Loan Agreement (the "EB-5 Loan Agreement"). A true and correct copy of the Offering Documents, which has been bookmarked for ease of reference, is attached hereto as collective **Exhibit 1**.

the Developer would "[r]efinance the Loan with an institutional lender" and/or "[r]epay the Loan with the proceeds of a sale of all or a portion of Harbourside Place."

28.     In the event the Developer was unable to refinance the EB-5 Loan through an institutional investor or sell some or all of Harbourside Place to repay it, prospective EB-5 Investors were told that "the Developer intends to convert the entire outstanding principal amount of the Loan into an ownership interest in the Developer." As the EB-5 Loan Agreement explained, this would entail converting the outstanding principal "into units of common membership interest in the [Developer]," but that conversion could not be effectuated if an Event of Default had occurred and was continuing on the Maturity Date.[3]

29.     Although there was no minimum principal amount for the EB-5 Loan, the General Partner had the right to terminate the offering at any time before 50 membership units were sold. After 80 membership units were sold, the General Partner had the right to refrain from selling any additional membership units in the Limited Partnership if  it was reasonably determined that (a) the sale of additional membership units would not result in a sufficient number of jobs or (b) there was insufficient interest in purchasing additional membership units.

30.     Neither eventuality occurred. Demand for membership units remained high. And although the General Partner had the right to stop selling additional membership units after 160

---

[3] Although the EB-5 Program requires that each applicant's investments remain "at risk" during their conditional residency status (*i.e.,* until their I-829 Petition is granted), "[n]othing prevents an immigrant investor from receiving a return on his or her capital in the form of profits from the new commercial enterprise." USCIS Policy Manual, Chapter 2. And although the regulations require investors to continuously maintain their capital investment over the two years of their conditional residence, the regulations do not prevent investors from selling their investments after the end of the two-year period of conditional residence, or create requirements that extend beyond that period. *See* 8 C.F.R. § 216.6(c)(1)(iii).

units were sold, sales continued through 2013 and, as the Offering Documents acknowledged, there was a ***need*** to sell every single membership unit:

> The Developer currently does not have sufficient funding to purchase, develop, construct and operate Harbourside Place, even if the Partnership were to extend the maximum principal Loan amount of $100.0 million. For this and other reasons, the Developer may need to finance Harbourside Place through additional funding, a portion of which may rank senior in terms of payment and priority to the Partnership's Loan to the Developer.

31.     But the Offering Documents also state that $110 million is the ***maximum*** amount of funds that could be raised for the Harbourside Project—***including*** the funds raised by the sale of membership units to EB-5 Investors—and borrowing additional funds from other sources is permitted only if ***fewer than 200*** membership units were sold:

> If for any reason the maximum principal amount of the [EB-5] Loan is less than $100.0 million, the Principals reserve the right to seek funding from alternative sources, provided that the total principal amount of any additional indebtedness, together with the total principal amount of the Loan, may not exceed $110.0 million.

32.     Despite the ongoing high demand for membership units, however, the General Partner stopped selling them after only ***199*** of the 200 membership units had been sold because Defendants never intended to sell all 200 units. This single-unit shortfall thus triggered the right under the EB-5 Loan Agreement to seek an additional $10,500,000 in the form of loans from alternative sources because the sale of 199 membership units generated only $99,500,000 of the $100 million principal amount for the EB-5 Loan.

### THE DEVELOPER BORROWS FROM ALTERNATIVE SOURCES IN VIOLATION OF THE EXPRESS TERMS OF THE EB-5 LOAN AGREEMENT

33.     In July 2012—the year ***before*** the sale of membership units ceased—Mastroianni and Yellen had ***already*** procured two senior loans from a third party, Putnam Bridge Funding III ("Putnam"), on behalf of the Developer, which totaled ***$12,700,000*** ($2,700,000 ***more*** than the

$110 million maximum allowed by the terms of the EB-5 Loan Agreement *if* 200 membership units had not been sold), without advising the Limited Partners or prospective EB-5 investors who had yet to become Limited Partners in the Funding Partnership. Moreover, during the next several months, the Developer borrowed an additional ***$7,498,000*** from the same lender (*i.e.,* Putnam), bringing the total amount of loans from an alternative source to approximately $20 million before the end of 2012.

34.     Specifically, Mastroianni and Yellen procured for the Developer an $11,350,000 bridge loan that was secured by a first priority mortgage on the property on which the Harbourside Project was built (the "Mortgage Loan"), and a $9,000,000 revolving-credit loan, from which Mastroianni and Yellen had already drawn $1,350,000 on behalf of the Harbourside Project by July 2012, which was secured by a second-priority mortgage (the "Revolving Loan"). Several months later, Mastroianni and Yellen borrowed an additional $7,498,000 under the Revolving Loan, for a total of more than $20 million. Thus, the Developer substantially exceeded the $10,500,000 limit on additional funds—***even though EB-5 Investors were still buying membership units well into 2013***—in utter disregard of the EB-5 Loan Agreement.

35.     Shortly thereafter, Mastroianni and Yellen caused the Developer to breach the EB-5 Loan Agreement again. On December 27, 2012, Mastroianni and Yellen caused the Developer to expend $11,350,000 of the EB-5 Loan funds to pay off the Mortgage Loan. Four days later (on December 31, 2012), Mastroianni and Yellen caused the Developer to expend $3,500,000 of the EB-5 Loan Funds to repay part of the Revolving Loan. Mastroianni and Yellen's use of loan funds for this purpose was expressly prohibited by the EB-5 Loan Agreement, which states unambiguously that

> [t]he purpose of the Loan is to provide funds ***for certain Lender-approved hard and soft construction costs (together with an interest reserve) for the purchase of***

*the Property and the construction of the improvements within the Project*. The Loan shall be fully reserved for the cost *to complete the improvements funded with proceeds of the Loan*. . . .

(Emphasis added.)

36.      It was not until April 15, 2013—after Plaintiffs and most other EB-5 Investors had already purchased their membership units and became Limited Partners in the Funding Partnership—that Mastroianni even hinted at the existence of the Mortgage Loan or the Revolving Loan. On that date, Mastroianni, acting in his capacity as Managing Member of the General Partner and the Florida Regional Center, circulated a letter to the Limited Partners (the "April 2013 letter") that states, among other things, that in December 2012 "a mortgage was recorded against the Property in favor of the [Funding] Partnership to secure repayment of the [EB-5] Loan" and that $26 million in EB-5 Loan funds were released from escrow and used "to fund construction of Harbourside Place." (Plaintiff Fu received the April 2013 letter in May 2013 and Plaintiff Peng never received it.)

37.      Mastroianni also stated that, "in December 2012, the Developer obtained an Additional Loan of up to $18 million from Putnam Bridge Funding III, LLC as Senior Lender *to provide the Developer with additional construction funds*." (Emphasis added.)

38.      This was also false and misleading. In actuality, Mastroianni and Yellen had caused the Developer to borrow from Putnam a total of $12,700,000 in *July 2012*, and by December 2012 they had spent $14,850,000 of the EB-5 Loan funds to *repay* the $11,350,000 Mortgage Loan and $3,500,000 of the $8,848,000 Revolving Loan. Yet, the April 2013 letter says nothing about this unauthorized expenditure of EB-5 Loan funds, nor anything about the decision to borrow an additional $7,498,000 from Putnam on behalf of the Developer in December 2012 via the Revolving Loan.

39.     Aside from oblique references, the April 2013 Report provides no substantive (or truthful) information about the Mortgage Loan or the Revolving Loan, such as when, how, or why the money was borrowed in July 2012, why they decided to subordinate the EB-5 Loan to two other loans for millions of dollars each, or why they chose to use EB-5 Loan funds to repay the Mortgage Loan before borrowing more from the credit line made available by the Revolving Loan.

40.     The April 2013 letter did, however, advise the Limited Partners that, the

[Funding] Partnership has entered into a revised [EB-5] Loan Agreement with the Developer, amending and restating earlier versions of the Loan Agreement dated as of July 22, 2011 and as of September 1, 2011, to effect changes to the [EB-5] Loan required by the intercreditor agreement and the different versions of the Offering Memorandum. As stated in the Offering Memorandum, Developer has the option to convert all outstanding principal into units of ownership interest in the Developer (the "Developer Units"). *The actual number of Developer Units that would be acquired upon conversion will depend on the Appraised Value of Harbourside Place and the principal amount of the Loan outstanding at the time*.

(Bold italics added.)

41.     Mastroianni also explained that, "[p]ursuant to Section 19.6.2 of the [Limited] Partnership Agreement, the General Partner has amended and restated the [Limited] Partnership Agreement . . . ." Although Section 19.6.1 of the Limited Partnership agreement states that the General Partner may amend the Limited Partnership Agreement in writing "with the consent of the Limited Partners given by Ordinary Resolution," Section 19.6.2 provides an exception to the consent requirement if an amendment is necessary "for the protection of the Limited Partners" or "to cure an ambiguity" or inconsistency that exists in a written opinion of counsel to the Limited Partnership.

42.     Mastroianni also stated that the following provisions had been added to the Limited Partnership Agreement:

1.      If the Partnership decides to distribute the Developer Units [*i.e.,* units of common membership in the Developer's LLC], or the proceeds of any sale

of the Developer Units, to the Limited Partners, all Limited Partners will participate in the distribution pro rata in accordance with their Unit holdings until Developer Units, or the proceeds of any sale of Developer Units, equal to 65% of all issued and outstanding Developer Units on the date of conversion have been distributed; and

2.  All remaining Developer Units (the "Excess Developer Units"), or the proceeds of any sale of Excess Developer Units, will be distributed to the Initial Limited Partners, pro rata in accordance with their holdings.

43.  Less than a year later, in March 2014, Mastroianni issued a report to the Limited Partners (the "March 2014 Report") together with an Ordinary Resolution that sought the Limited Partners' approval for the Developer to borrow more than $60 million in the form of another senior mortgage loan (the "Senior Loan") to which the EB-5 Loan would be subordinated. Mastroianni also advised the Limited Partners "that *if we do not receive a signed copy of the Ordinary resolution from a Limited Partner on or before April 15, 2014, the Partnership will consider that you have consented to the Ordinary Resolution*." (Emphasis added.)

44.  Thus, the Limited Partners were told that *not* returning a signed Ordinary Resolution would have the same effect as signing it. Although Defendants claim that a majority of the Limited Partners "signed" the Ordinary Resolution, this is not true. In actuality, there were *two different versions* of the Ordinary Resolution, hence the Limited Partners who actually did consent sign an Ordinary Resolution (and, in some cases, agents signed without the Limited Partners' knowledge or consent) were consenting to two materially different proposals. Accordingly, there actually was no majority vote in favor of the Ordinary Resolution.

45.  Even if the Limited Partners had validly authorized the Senior Loan, the Ordinary Resolution would not and could not have negated the effect of taking Mortgage Loan or the Revolving Loan before all 200 membership units had been sold, and would not and could not have

constituted ratification by the Limited Partners of Defendants' decision to take the Mortgage Loan or the Revolving Loan.

46.      In short, neither the Ordinary Resolution nor the March 2014 Report that accompanied it disclosed the existence, nature, magnitude, or duration of the Mortgage Loan or the Revolving Loan; rather, the Project Update Report makes a vague allusion to an "existing bridge loan" (in the singular) and to a "Putnam Bridge Loan" (in the singular) and contains no discussion of Mortgage Loan or the Revolving Loan, how much was borrowed, when or why the loans were taken, or that EB-5 Loan funds were used to repay those loans. Thus, the failure to disclose would render any purported ratification ineffective and the ratification language Defendants included in the Ordinary Resolution is applicable to the Mortgage Loan and the Revolving Loan in any event.

### DEFENDANTS PROCEED WITH CONVERTING THE LOAN PRINCIPAL TO EQUITY IN THE DEVELOPER

47.      The next time Defendants sought approval of an Ordinary Resolution, the Limited Partners flatly refused to provide it. Despite the rosy picture that Mastroianni and Yellen painted in the March 2014 Report, the Developer still had yet to make a single monthly interest payment to the Limited Partners, as required by the EB-5 Loan Agreement. Instead, in a letter dated December 14, 2016, Mastroianni advised the Limited Partners that the Senior Loan would be replaced by another Senior Loan and asked them to consent to another Ordinary Resolution that would extend the Maturity Date of the EB-5 Loan from November 30, 2017, to December 31, 2020.

48.      This time, the Limited Partners simply declined Mastroianni's proposal.

49.      Thus, on August 25, 2017, Mastroianni tried again in a letter he wrote to the Limited Partners in his capacity as General Partner. There, Mastroianni promised to pay all the interest that

had accrued to date, to repay the loan principal, and to effectuate a plan that would protect the Limited Partners' interests in exchange for their consent to convert the Funding Partnership's investment into a "preferred" equity stake in the Developer.

50.     Like the proposal that was made in the March 2014 Report, Mastroianni included with this proposal a pronouncement that "***[i]f we do not receive the required number of consents, the Loan will be converted to common equity*** under the same formula (in accordance with the existing [EB-5] Loan Agreement) . . . ." (Emphasis in original.)

51.     When the Limited Partners would not consent to this proposal, Mastroianni wrote to the Limited Partnership again on October 13, 2017. There, Mastroianni advised the Limited Partnership that the Developer had "elected to exercise the Conversion Right pursuant to the terms of the Loan Agreement." Although Mastroianni was also the managing member of the General Partner, he failed to circulate to that notice to the Limited Partners, as required by Section 17.3 of the Limited Partnership Agreement, which provides that "the General Partner shall send ***to each Limited Partner*** a copy of any Conversion Notice within fifteen days following its receipt thereof." (Emphasis added.)

52.     Mastroianni went on in the October 13 letter to note that "[t]he Conversion Right contemplates conversion of the outstanding principal of the loan into common equity membership interests of Borrower, but Borrower hereby acknowledges that Borrower and Lender may conduct good faith negotiations to enhance the terms of the conversion (e.g., preferred equity membership interests), though Borrower is under no obligation to do so."

53.     Mastroianni was not offering to simply forego the "right" to convert the EB-5 Loan principal into common equity interests and give the Limited Partners a "preferred" equity interest out of the goodness of his heart. In actuality, "preferred" equity status was just another way of

extending the Maturity Date. It also meant that the Limited Partners would an illiquid investment with no voting rights—notwithstanding that the EB-5 Loan Agreement provided that the conversion would result multiple common membership interests to which they were entitled under the Limited Partnership, which were guaranteed voting rights as provided by F.S.A. § 605.04073(1)(a).

54.     Similarly, Mastroianni expressed a "willingness" to negotiate because he knew that, although the EB-5 Loan Agreement includes a provision that *contemplated* conversion from a loan into units of a common membership interest in the Developer, the conversion could not be effectuated without the approval of the Limited Partners for two basic reasons.

55.     *First*, multiple Events of Default existed at the time the Developer sought to exercise its "right" of conversion, and the EB-5 Loan Agreement as well as the Offering Documents make clear that the EB-5 Loan could not be converted if an Event of Default existed at the time of a proposed conversion.

56.     The EB-5 Loan Agreement defines "Events of Default" as follows:

**EVENTS OF DEFAULT**. The occurrence of any one or more of the following events is a Default hereunder and the continuance of any such Default beyond the period (if any) provided below within which such Defaults may be cured shall be an Event of Default hereunder and under the Loan:

(1)     Any breach of the terms of the Loan Documents; or

(2)     Any material noncompliance with the Requirements; or

(3)     Any material representation, warranty, statement, certificate, schedule or report made or furnished by Borrower proves to have been false or erroneous in any material respect at the time of the making thereof, or to have omitted any substantial liability or claim against Borrower, of if on the date of execution of this Agreement there shall have been any materially adverse change in any of the facts disclosed therein, which change shall not have been disclosed to Lender at or prior to the time of such execution . . . .

57.     At the time the Developer invoked the conversion provision of the EB-5 Loan Agreement, Events of Default existed as a result of the Developer taking the Mortgage Loan and the Revolving Loan, which subordinated the EB-5 Loan to the Mortgage Loan, and as a result of the Developer using EB-5 Loan funds to pay off the Mortgage Loan in contravention of the express purpose of the EB-5 Loan Agreement. All of this was inconsistent with the representations made about these issues in the Offering Documents, as was the Developer's failure to make any effort to repay the EB-5 Loan by taking a loan and/or selling some or all of Harbourside Place.

58.     **Second**, the conversion could not occur without the approval of the Limited Partners, even if the Events of Default had not precluded it. Although the Offering Memorandum, the EB-5 Loan Agreement, and the Limited Partnership Agreement all refer to the prospect of converting the EB-5 Loan into units of a common membership interest in the Developer, the actual conversion plan was significantly different than the one described in those documents.

59.     Despite the existence of Events of Default and despite the lack of consent from the Limited Partners, Defendants simply proceeded to convert the EB-5 Loan principal to a "preferred" equity interest in the Developer for the Funding Partnership as an entity, rather than issuing units of common membership interests for distribution to the Limited Partners, as provided in the Loan Agreement and the revised Limited Partnership Agreement—both of which had been amended for that purpose, purportedly for the "protection" of the Limited Partners. Defendants then converted the Developer from a Florida LLC to the New LLC.

60.     Moreover, rather than paying off the Senior Loan and freeing the Developer of that debt, Mastroianni purchased the senior loans by creating the New Senior Lender with funds from a different EB-5 Project, thereby ensuring that the Developer would continue to be saddled with

debt after the Funding Partnership was made a member of the Developer, while Mastroianni profited from that debt.

61.     None of this was mentioned in the Offering Documents, nor were the Limited Partners given notice of these events, as required by the Limited Partnership Agreement, and the deceptive nature of the transaction precluded Mastroianni (in his capacity as General Partner) from claiming that his knowledge of these events were sufficient notice to the Limited Partners under Section 620.8102(6) of the Florida Revised Uniform Partnership Act of 2005.

62.     The failure to obtain the Limited Partners' approval as to the plan for converting the Developer to the New LLC also violated Section 16.8 of the Limited Partnership Agreement, which requires *unanimous* consent of the Limited Partners as a prerequisite to placing their investment in a LLC that was governed by Delaware law and an entirely different operating agreement (*i.e.,* an "Other Investment," as that term is defined by Section 1.1.33 of the Limited Partnership Agreement. Once again, the Limited Partners were not given proper notice of Defendants' plan to convert the Developer to a Delaware LLC or to convert the EB-5 Loan Agreement principal to a single unit of "preferred" interest in the Developer's LLC, and the Limited Partners' approval was neither sought nor obtained.

## VEIL-PIERCING ALLEGATIONS

63.     Mastroianni is now the sole Principal of the Harbourside Group after Richard Yellen allegedly withdrew as a Principal and as a manager of the Harbourside Group entities on September 30, 2014. Mastroianni and, until his withdrawal, Yellen, used this status to dominate and control the entities within the Harbourside Group to such an extent that these entities' independent existence was in fact non-existent and Mastroianni and Yellen were in fact their alter egos. Mastroianni commingled these entities' assets and used their limited liability status as mere

instrumentalities for personal benefit and other improper and misleading purposes, such as frustrating creditors (*i.e.,* the Limited Partners), to the detriment of and injury to the Funding Partnership and the Limited Partners.

64.     As David Finkelstein, the former Chief Financial Officer for the Developer and the Regional Center, has explained, "Mastroianni, along with those in his employ, routinely conducted side deals, and funneled money in and out of various accounts without conferring with the CFO and . . . in non-compliance with the EB-5 requirements, something that would cause serious problems should there ever be a USCIS or SEC audit." *Finkelstein v. Allied Capital and Devel. of So. Fla., LLC*, No. 2014CA006733 (Palm Beach Cty. Cir. Ct.) ¶ 32.

## DERIVATIVE ACTION ALLEGATIONS

65.     Plaintiffs bring this action derivatively on behalf of the Funding Partnership, pursuant to Fed. R. Civ. P. 23.1 and F.S.A. § 620.2002(2), to enforce the claims for relief set forth below against each Defendant.

66.     The conduct about which Plaintiffs complain herein occurred while Plaintiffs were limited partners in the Funding Partnership, hence they standing to pursue this derivative action for damages and other relief on behalf of the Funding Partnership, which is necessary and proper to protect the interests of the Funding Partnership.

67.     If Plaintiffs are successful in this action, the recovery will be of substantial benefit to the Funding Partnership and its Limited Partners, each of whom was a member of the Funding Partnership when it was converted to the New LLC.

## DEMAND FUTILITY

68.     Plaintiffs did not make a demand that Defendant Mastroianni take action in his capacity as the Principal of the Harbourside Group and/or as managing member of the General

Partner to remedy the harm alleged herein before they filed this Complaint because such a demand would have been futile. This was so for several reasons, including, but not limited to, the following circumstances:

a.     *First*, Mastroianni faces a substantial likelihood of liability in connection with his role in failing to disclose material facts to the Funding Partnership, grossly mismanaging the Funding Partnership, breaching his fiduciary duties to the Funding Partnership, and violating state and federal law to effectuate the conversion provision of the EB-5 Loan despite the existence of Events of Defaults that precluded it, and other acts of self-dealing that harmed the Funding Partnership and the conversion of its assets.

b.     *Second,* Mastroianni's conduct, as alleged herein, deprived him of the requisite independence and valid business judgment needed to properly assess a demand that the General Partner take action to remedy alleged harm to the Funding Partnership.

c.     *Third*, the blatantly unfair and one-sided nature of the decision to convert the EB-5 Loan principal to a membership interest in the Developer made it impossible to approve that decision through the exercise of valid business judgment, as did the lack of good faith with which Mastroianni was required to exercise valid business judgment in any event, as evidenced by the failure to disclose material information to the EB-5 Investors and their failure to comply with the most basic provisions of the EB-5 Loan Agreement, the Limited Partnership Agreement and the Florida Revised Uniform Partnership Act of 2005 in carrying out the conversion of the Developer from a Florida LLC to the New LLC.

d.     *Fourth,* Mastroianni's direct involvement in the unlawful conduct alleged herein negates the presumption that they could have considered a pre-suit demand in an objective, disinterested manner.

e.      ***Fifth,*** Mastroianni created and controlled each of the other entities that comprise the Harbourside Group, which also participated in the unlawful, unfair, and fraudulent conduct alleged herein, and are subject to personal liability for their actions in connection with that conduct. These facts also negate the presumption that Mastroianni could have considered a pre-suit demand in an objective, disinterested manner

f.      ***Sixth,*** Mastroianni and entities that are part of the Harbourside Group have already been named as defendants in a related action that was filed by 79 individual EB-5 Investors in Palm Beach County Circuit Court in or about October 11, 2018. *See Fu v. Mastroianni,* No. 502018CA012883 (Palm Beach Cir. Ct, 15th Jud. Cir.). Under the circumstances, Mastroianni would have been unable to evaluate a pre-suit demand with the requisite disinterest and independence, much less exercise disinterested business judgment.

## CLASS ALLEGATIONS

69.     Plaintiffs bring this lawsuit as a Class action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

70.     The Class is defined as follows: All persons who invested in the Funding Partnership (*i.e.,* all Limited Partners). Excluded from this Class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees; the Court and its staff; and any Limited Partner who has entered into an enforceable agreement to settle, waive, or otherwise resolve their claims against Defendants.

71.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether class certification is appropriate.

72.     The Class satisfies the requirements of Rule 23(a), as well as 23(b)(3).

73.     **NUMEROSITY**. The Class consists of approximately 199 geographically dispersed individual Limited Partners. Joinder of the Class members is not practicable. The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

74.     **ASCERTAINABILITY**. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by the Developer and the General Partner. Notice of this action can thus be provided to all members of the proposed Class.

75.     **TYPICALITY**. Plaintiffs were investors in the Harbourside Project at the time of the wrongdoing alleged herein. Plaintiffs' claims are typical of the claims of all proposed Class members as all Limited Partners are similarly affected by Defendants' wrongful conduct as complained of herein.

76.     **ADEQUACY**. Plaintiffs are committed to prosecuting the action, will fairly and adequately protect the interests of the members of the proposed Class, and have retained competent counsel who are experienced in class-action and derivative litigation, including that pertaining to breaches of fiduciary duty, breaches of contract, conversion, and other claims like those alleged herein. Plaintiffs have no interests antagonistic to or in conflict with other members of the proposed Class.

77.     **COMMONALITY AND PREDOMINANCE**. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. The questions of law and fact common to the Class include, but are not limited to, the following:

a.      Whether Defendants breached their fiduciary duties to the proposed Class;

- 23 -

b.      Whether Defendants converted the property of the proposed Class; and

c.      Whether Defendants engaged in civil theft in violation of F.S.A. § 812.014.

78.     The Class may be certified under Rule 23(b)(3) and Rule 24(c)(4). Questions of law or fact common to proposed Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this action as a Class action.

## CLAIMS FOR RELIEF

### COUNT I
### DECLARATORY RELIEF ON BEHALF OF PLAINTIFFS AND THE PROPOSED CLASS

79.     This Count is brought on behalf of Plaintiffs and the other Limited Partners (*i.e.,* the Proposed Class) against Defendants Mastroianni, the General Partner, and the Developer pursuant to Federal Rule of Civil Procedure 57 for the purpose of obtaining a judicial declaration of the parties' respective rights and duties in connection with the allegations set forth in paragraph 47 to 62, above.

80.     Plaintiffs have alleged that Defendants' decision to convert the Developer from a Florida LLC to a Delaware LLC constituted an "Other Investment" (as that term is defined by the Limited Partnership Agreement), which required a unanimous vote by the Limited Partners in accordance with the Limited Partnership Agreement and a majority vote in accordance with Section 620.8401(10) of the Florida Revised Uniform Partnership Act of 2005. Moreover, the plan to convert the Developer from a Florida LLC to a Delaware LLC constituted an "Other Investment," as that term is defined by the Limited Partnership Agreement, which required

unanimous approval by the Limited Partners. Plaintiffs have also alleged that Mastroianni and the General Partner failed to seek or obtain the requisite approval from the Limited Partners, but proceeded with the plan to convert the Developer to a Delaware LLC nonetheless, thereby rendering the conversion invalid.

81.     Plaintiffs also allege that the conversion provision of the EB-5 Loan Agreement calls for converting the loan principal into units of common membership interest in the Developer as a Florida LLC, but that Mastroianni and the Developer converted the loan principal into a single "preferred" unit of membership in the Developer after it had become a Delaware LLC, and that the unit of membership was issued to the Funding Partnership, which prevented the Limited Partners from exercising rights of membership in the Developer they would have had if the Developer had remained a Florida LLC and they had received units of common membership interest, as contemplated by the Offering Documents.

82.     Defendants dispute these allegations. Therefore, an actual controversy has arisen and now exists between Plaintiffs and Defendants. Accordingly, Plaintiffs hereby request a judicial declaration of the rights and duties of the parties with respect to each of the foregoing issues in controversy.

## COUNT II
### BREACH OF FIDUCIARY DUTIES OWED TO THE FUNDING PARTNERSHIP

83.     This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Mastroianni and the General Partner.

84.     Defendants are fiduciaries of the Funding Partnership and they owed a duty to conduct its business loyally, faithfully, carefully, diligently, and prudently.

85.     In blatant disregard for his fiduciary duties and for the conflicts of interests resulting from roles as a Principal of the Harbourside Group, as manager of the General Partner, and as

manager of the Developer, Mastroianni breached his fiduciary duties to the Funding Partnership by, *inter alia*, engaging in the following conduct:

      a.      causing the Developer to take senior loans while the Funding Partnership was still selling membership units, and thereby subordinating the Funding Partnership's priority rights to other lenders;

      b.      causing the Funding Partnership to stop selling membership units after it had sold 199 units for the purpose of enabling the Developer to take millions of dollars in additional loans from other lenders;

      c.      failing to make any effort to obtain a loan and/or sell some or all of Harbourside Place as a means of repaying the loan principal to the Funding Partnership on or after the Maturity Date (November 30, 2017);

      d.      failing to repay the $99,500,000 loan principal to the Funding Partnership on the Maturity Date;

      e.      causing the Developer to improperly invoke the conversion provisions of the EB-5 Loan Agreement notwithstanding the existence of multiple Events of Default;

      f.      causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

      g.      causing the Developer to be converted from a Florida LLC (in which members are guaranteed voting rights) into the New LLC; and

      h.      creating the New Senior Lender with funds from a different EB-5 Project, thereby ensuring that the Developer would continue to be saddled with debt after the Funding Partnership was made a member of the Developer, while Mastroianni profited from that debt.

86.     Mastroianni and the General Partner breached their fiduciary duties to the Funding Partnership by, *inter alia*, acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval of that plan, and by failing to take any action to protect the interests of the Funding Partnership in response to the conduct described above.

87.     Such conduct and inaction contravened Defendants' duty to promote the interests of the Funding Partnership, and could not have been a good-faith exercise of disinterested business judgment.

88.     As a direct and proximate result of Defendants' conduct, the Funding Partnership has been damaged in amounts that will be proved at trial.

89.     In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership with a conscious disregard of their fiduciary duties, which entitles the Funding Partnership to an award of punitive and exemplary damages.

## COUNT III
### BREACH OF FIDUCIARY DUTIES OWED TO PLAINTIFFS AND THE PROPOSED CLASS

90.     This Count is brought on behalf of Plaintiffs and the Proposed Class against Defendants Mastroianni and the General Partner.

91.     Defendants are fiduciaries of Plaintiffs and the other Limited Partners, and they owed a duty to conduct the business of the General Partner and the Funding Partnership loyally, faithfully, carefully, diligently, and prudently.

92.     In blatant disregard for his fiduciary duties and for the conflicts of interests resulting from roles as a Principal of the Harbourside Group, as manager of the General Partner, and as

manager of the Developer, Mastroianni breached his fiduciary duties to Plaintiffs and the other Limited Partners by, *inter alia*, engaging in the following conduct:

a. failing to make any effort to obtain a loan and/or sell some or all of Harbourside Place as a means of repaying the loan principal to the Funding Partnership on or after the Maturity Date;

b. failing to repay the $99,500,000 loan principal to the Funding Partnership on the Maturity Date;

c. causing the Developer to improperly invoke the conversion provisions of the EB-5 Loan Agreement notwithstanding the existence of multiple Events of Default;

d. causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

e. using funds from other EB-5 Projects to purchase over $60,000,000 in Senior Loans to the Developer, thereby ensuring that the Developer continued to be saddled with debt represented by the New Senior Loan so Defendants could profit from it; and

f. causing the Developer to be converted from a Florida LLC (in which members are guaranteed voting rights) into the New LLC.

93. Mastroianni and the General Partner breached their fiduciary duties to the Funding Partnership by, *inter alia*, engaging in the following conduct:

i. acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval;

j.      causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

k.      acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval; and

l.      failing to take any action to protect the interests of Plaintiffs and the other Limited Partners in response to the conduct described above.

94.     Such conduct and inaction contravened Defendants' duty to promote the interests of the Limited Partners, and could not have been a good-faith exercise of disinterested business judgment.

95.     As a direct and proximate result of Defendants' conduct, the Limited Partners have been damaged in amounts that will be proved at trial.

96.     In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership with a conscious disregard of their fiduciary duties, which entitles the Funding Partnership to an award of punitive and exemplary damages.

**COUNT IV**
**AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY TO THE FUNDING PARTNERSHIP**

97.     This Count is brought derivatively on behalf of the Funding Partnership against Defendants Regional Center (which administered all aspects of the EB-5 Program) and the Developer (which received , which Mastroianni dominated and controlled by virtue of his status

as the sole principal of the Harbourside Group, as the sole manager of the Developer, and as the sole manager of the Regional Center.

98.     As alleged in Count II, above, Defendants Mastroianni and the General Partner had fiduciary duties to the Funding Partnership, and Defendants breached those duties by, *inter alia*, engaging in the following conduct:

a.     causing the Developer to take senior loans while the Funding Partnership was still selling membership units, and thereby subordinating the Funding Partnership's priority rights to other lenders;

b.     causing the Funding Partnership to stop selling membership units after it had sold 199 units for the purpose of enabling the Developer to take millions of dollars in additional loans from other lenders;

c.     failing to make any effort to obtain a loan and/or sell some or all of Harbourside Place as a means of repaying the loan principal to the Funding Partnership on or after the Maturity Date (November 30, 2017);

d.     failing to repay the $99,500,000 loan principal to the Funding Partnership on the Maturity Date;

e.     causing the Developer to improperly invoke the conversion provisions of the EB-5 Loan Agreement notwithstanding the existence of multiple Events of Default;

f.     causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

g.     causing the Developer to be converted from a Florida LLC (in which members are guaranteed voting rights) into the New LLC; and

h.      creating the New Senior Lender with funds from a different EB-5 Project, thereby ensuring that the Developer would continue to be saddled with debt after the Funding Partnership was made a member of the Developer, while Mastroianni profited from that debt.

99.     The Regional Center and the Developer, with knowledge of Mastroianni and the General Partner's breaches of fiduciary duty, aided and abetted, provided substantial assistance, and encouraged those breaches of duty.

100.    As a proximate result of Defendants' conduct, the Funding Partnership has been damaged in amounts that will be proved at trial.

101.    In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Funding Partnership with a conscious and intentional disregard of its rights, which entitles the Funding Partnership to an award of punitive and exemplary damages.

### COUNT V
### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
### TO PLAINTIFFS AND THE PROPOSED CLASS

102.    This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Regional Center and the Developer.

103.    As alleged in Count III, above, Defendants Mastroianni and the General Partner had fiduciary duties to Plaintiffs and the other Limited Partners, and Defendants breached those duties.

104.    The Regional Center and the Developer, with knowledge of Mastroianni and the General Partner's breaches of fiduciary duty, aided and abetted, provided substantial assistance, and encouraged those breaches of duty by, *inter alia*, engaging in the following conduct:

a.      failing to make any effort to obtain a loan and/or sell some or all of Harbourside Place as a means of repaying the loan principal to the Funding Partnership on or after the Maturity Date;

b.      failing to repay the $99,500,000 loan principal to the Funding Partnership on the Maturity Date;

c.      causing the Developer to improperly invoke the conversion provisions of the EB-5 Loan Agreement notwithstanding the existence of multiple Events of Default;

d.      causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

e.      using funds from other EB-5 Projects to purchase over $60,000,000 in Senior Loans to the Developer, thereby ensuring that the Developer continued to be saddled with debt represented by the New Senior Loan so Defendants could profit from it;

f.      causing the Developer to be converted from a Florida LLC (in which members are guaranteed voting rights) into the New LLC;

g.      acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval;

h.      causing the Developer to ignore its obligations under the EB-5 Loan Agreement, which called for the conversion of the EB-5 Loan principal to multiple units of common membership in the Developer that would be distributed to the Limited Partners;

i.      acting on a conversion plan that materially differed from the conversion plan described in the Offering Documents without obtaining the Limited Partners' consent or approval; and

j.      failing to take any action to protect the interests of Plaintiffs and the other Limited Partners in response to the conduct described above.

105.    Such conduct and inaction contravened Defendants' duty to promote the interests of the Limited Partners, and could not have been a good-faith exercise of disinterested business judgment.

106.    As a proximate result of Defendants' conduct, Plaintiffs and the other Limited Partners have been damaged in amounts that will be proved at trial.

107.    In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure Plaintiffs and the other Limited Partners with a conscious and intentional disregard of their rights, which entitles Plaintiffs and the other Limited Partners to an award of punitive and exemplary damages.

## COUNT VI
### BREACH OF CONTRACT

108.    This Count is brought derivatively on behalf of the Funding Partnership against the Developer.

109.    The Funding Partnership entered into the EB-5 Loan Agreement with the Developer on or about September 1, 2011.

110.    The Funding Partnership did all, or substantially all, of the significant things that the EB-5 Loan Agreement required it to do.

- 33 -

111.    All conditions required for the Funding Partnership's performance had occurred when it deposited the proceeds from the sale of units of membership in the Funding Partnership, the aggregate amount of which was $99,500,000, into the escrow account for the purpose of funding the EB-5 Loan.

112.    The EB-5 Loan Agreement prohibited the Developer from borrowing more than a total of $110,000,000, including the funds the Developer borrowed under the EB-5 Loan.

113.    The EB-5 Loan Agreement restricted the Developer from using funds from the EB-5 Loan for any purpose other than the payment of interest to the Funding Partnership and to pay for the cost of construction of the Harbourside Project.

114.    Notwithstanding the foregoing provisions of the EB-5 Loan Agreement, the Developer (a) borrowed nearly $13 million from Putnam in or about July 2012, (b) used EB-5 Loan funds to repay some or all of those loans; and (c) continued to borrow from Putnam while the General Partner was still selling units of membership in the Funding Partnership.

115.    The Developer's conduct, as alleged in paragraphs 33 to 62, above, constituted multiple Events of Default, as defined by the EB-5 Loan Agreement, which precluded the Developer from exercising the conversion provisions of the EB-5 Loan Agreement.

116.    The Developer breached its obligations under the EB-5 Loan Agreement, which required the Developer to repay the EB-5 Loan on the Maturity Date. Notwithstanding the existence of this and other Events of Default that had occurred, which the Developer did not cure and the Funding Partnership did not waive, the Developer failed to repay the EB-5 Loan and purported to invoke the conversion provisions of the EB-5 Loan Agreement instead.

117.     As a proximate result of the Developer's breaches of contract, the Funding Partnership has been damaged in an amount equal to the $99,500,000 agreed to return to the Partnership on the Maturity Date, plus applicable interest.

### COUNT VII
### CONVERSION

118.     This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Mastroianni and the Developer.

119.     Defendants have engaged in acts of dominion wrongfully asserted over the Limited Partners' property—namely, the $500,000 that Plaintiffs and other Limited Partners each deposited in escrow, which amounted to an aggregate deposit of $99,500,000, for the purpose of funding the EB-5 Loan (the "Property")—in a manner inconsistent with Plaintiffs and the other Limited Partners' ownership and immediate right of possession of the Property; that is, Defendants lawfully obtained possession of the Plaintiff's funds and thereafter converted the funds for their own use.

120.     Specifically, Defendants explained in the Offering Memorandum that the EB-5 Loan would be repaid "within five years from the date the last potential investor submits his or her I-526 Petition to USCIS, or, no later than November 30, 2012, as determined by the Partnership in good faith." To ensure repayment, the Developer was to "[r]efinance the Loan with an institutional lender" and/or "[r]epay the Loan with the proceeds of a sale of all or a portion of Harbourside Place."

121.     Plaintiffs and the other Limited Partners had an immediate right of possession of their $500,000 investments as of the EB-5 Loan's Maturity Date—November 30, 2017—regardless of the EB-5 Program's requirement that each EB-5 investor' funds be "at risk" during the pendency of the I-829 Petition. By that date, Plaintiffs and most, if not all, of the other Limited Partners' I-829 Petitions had been granted and, because EB-5 investors are free to withdraw from

the EB-5 Program if they no longer seek permanent residency status, any Limited Partner whose I-829 Petition had not been granted had the right to withdraw and to the repayment of his or her $500,000.

122.   Defendants did not ask any Limited Partner whose I-829 Petitions had yet to be granted whether he or she wished to receive repayment, regardless of whether doing so would preclude them from receiving permanent residency status. Nor did Defendants even attempt to repay the EB-5 Loan. Defendants made no effort to refinance the EB-5 Loan with an institutional lender, and no effort to sell all or a portion of Harbourside Place, despite their obligation to do so. Instead, Defendants ignored the prohibition against invoking the conversion provision of the EB-5 Loan and proceeded to invoke it anyway for the purpose of retaining possession of Plaintiffs and other Limited Partners' Property.

123.   Despite the Limited Partners' explicit refusal to extend the Maturity Date, despite their explicit refusal to convert the $99,500,000 into "Preferred" equity interests in the Developer LLC, and despite the contractual and fiduciary obligations that prohibited it, Mastroianni used his complete control over the Developer and the General Partner to simply convert the $99,500,000 into a single unit of "Preferred" membership in the Developer and gave that membership unit to the Funding Partnership, thereby preventing the Investors from receiving their $500,000 investments until Mastroianni decides to return them.

124.   Defendants' conduct, as alleged herein, deprived Plaintiffs and the other Limited Partners of the Property permanently or for an indefinite period of time.

125.   As a proximate cause of Defendants' unlawful conduct, Plaintiffs and the other Limited Partners have each been damaged by the deprivation of their Property, which amounts to $500,000 each, plus applicable interest.

**COUNT VIII**
**CIVIL THEFT**

126.    This Count is brought on behalf of Plaintiffs and the other Limited Partners against Defendants Mastroianni and the Developer.

127.    Plaintiffs and the other Limited Partners each deposited $500,000 in escrow, which amounted to an aggregate deposit of $99,500,000, for the purpose of funding the EB-5 Loan (*i.e.,* the Property).

128.    To deprive Plaintiffs and the other Limited Partners of their Property when it was due to be returned to each of them, Defendants knowingly and in violation of F.S.A. § 812.014 participated in a scheme by which they improperly invoked the conversion provisions of the EB-5 Loan Agreement to transform the Property into an illiquid investment that was, at best, an indirect interest that was devoid of any rights, control, or reasonable return. Specifically, despite the Limited Partners' explicit refusal to extend the Maturity Date, despite their explicit refusal to convert the $99,500,000 into "Preferred" equity interests in the Developer LLC, and despite the contractual and fiduciary obligations that prohibited it, Mastroianni used his complete control over the Developer and the General Partner to simply convert the $99,500,000 into a single unit of "Preferred" membership in the Developer and gave that membership unit to the Funding Partnership, thereby preventing the Investors from receiving their $500,000 investments until Mastroianni decides to return them.

129.    As a result of this brazenly deceptive transaction, Mastroianni, with criminal intent, used his control of the General Partner and the Developer to knowingly and intentionally obtain the Property belonging to Plaintiffs and members of the proposed class for the purpose of depriving them of their Property. Mastroianni did not simply fail to return the Investors' $500,000 investments in a timely manner; rather, after the Limited Partners expressly rejected his attempts

to defer the Maturity Date for more than three years and to persuade them into converting their investments into "Preferred" units of membership in the Developer LLC, Mastroianni executed a byzantine scheme by which he brazenly ignored his fiduciary duties to the Investors by creating a new LLC and issuing a single unit of "Preferred" membership interest in that LLC to utterly preclude the Limited Partners from having any say about the management or control of the company, and thereby effectively locked up nearly $100 million of the Limited Partners' money until Mastroianni decides to return it to them—if ever. Moreover, Mastroianni has been accused of "routinely conducted side deals, and funneled money in and out of various accounts" by the Developer and Regional Center's former CFO. (*See* paragraph 64, above.)

130.    Mastroianni intended to appropriate and/or has appropriated the Property to his own use without any legitimate entitlement to those funds.

131.    Mastroianni's actions were the product of a scheme of deceit and theft.

132.    Defendants intentionally violated Florida Statute § 812.014, which prohibits theft.

133.    As a result of Defendants' violation of Florida Statute § 812.014, Plaintiffs and the other Limited Partners have been injured and have lost at least $500,000 each.

134.    On December 23, 2019, before the filing of the original Complaint, Plaintiffs made written demand for payment and return the Property in accordance with F.S.A. § 772.11.

135.    Defendants have yet to agree to return the Property to Plaintiffs or other Limited Partners or to pay treble damages for their theft of it.

136.    Plaintiffs and the other Limited Partners have been injured because of Defendants violations of F.S.A. § 812.014.

137.    Pursuant to F.S.A. § 772.11(a), Defendants are liable to Plaintiffs and the other Limited Partners in the amount of three times the value of the funds Defendants have stolen from them.

138.    Plaintiffs and the other Limited Partners are entitled to recover reasonable attorneys' fees and costs, as well as accrued interest, as a result of Defendants' civil theft.

COUNT IX
ACCOUNTING

139.    This Count is brought derivatively on behalf of the Funding Partnership against Defendants Mastroianni, the General Partner and the Developer.

140.    Plaintiffs seek an equitable accounting of the accounts, assets, and liabilities of the Funding Partnership.

141.    Mastroianni, as Principal of the Harbourside Group and acting by and for the General Partner, the Developer, and the Regional Center as those entities' manager, has engaged in self-dealing and have mismanaged the business and affairs of the Funding Partnership and the Developer in the manner alleged herein, thereby placing the Funding Partnership's assets at undue risk due to the Funding Partnership having become a member of the Developer.

142.    Plaintiffs do not have an adequate remedy at law because Defendants have control over the accounts, records, and assets of the Funding Partnership and the Developer.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated individuals, and derivatively on behalf of the Funding Partnership, demand judgment against Defendants as follows:

(1)      declaring this action to be a proper class action maintainable pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and to be a proper derivative action maintainable pursuant to Federal Rule of Civil Procedure 23.1 and declaring Plaintiffs and their counsel to be representatives of and counsel for the proposed class;

(2)      declaring that Defendants' exercise of the conversion provisions of the EB-5 Loan Agreement, as alleged in Count I;

(3)      declaring that the conversion of the Developer from a Florida limited liability company to a Delaware limited liability company, was invalid and void, as alleged in Count II;

(4)      awarding compensatory and punitive damages for Defendants' breaches of fiduciary duty, as alleged in Count III;

(5)      awarding compensatory and punitive damages for Defendants' breaches of fiduciary duty, as alleged in Count IV;

(6)      awarding compensatory and punitive damages for Defendants' aiding and abetting breaches of fiduciary duty, as alleged in Count V;

(7)      awarding compensatory and punitive damages for Defendants' aiding and abetting breaches of fiduciary duty, as alleged in Count VI;

(8)      awarding compensatory damages for Defendants breaches of contract, as alleged in Count VII;

(9)      awarding compensatory and punitive damages for Defendants' conversion of the Property, as alleged in Count VIII;

(10)     awarding treble damages and attorney fees and costs as a result of Defendants' civil theft, as alleged in Count IX; and

(11)     an accounting of the Funding Partnership and the Developer's assets, as alleged in Count X;

(12)     awarding Plaintiffs and members of the proposed class attorney fees and costs pursuant to the common fund doctrine and F.S.A. § 772.1(a);

(13)     awarding the Funding Partnership, Plaintiffs and the members of the proposed class prejudgment interest at the maximum rate allowable by law; and

(14)     awarding such other and further relief the Court deems just, proper and equitable.

Dated: JANUARY 28, 2021                    Respectfully submitted,

                                           by /s/ *Matthew Fornaro*

                                           Matthew Fornaro (mfornaro@fornarolegal.com)
                                           Florida Bar No. 0650641
                                           **MATTHEW FORNARO, P.A.**
                                           11555 Heron Bay Boulevard, Suite 200
                                           Coral Springs, FL 33076
                                           T: 954-324-3651
                                           F: 954-248-2099

                                           Jeffrey L. Fazio (jfazio@dehengsv.com)
                                           Admitted *Pro Hac Vice*
                                           **DEHENG LAW OFFICES**
                                           Silicon Valley Office
                                           7901 Stoneridge Drive, Suite 208
                                           Pleasanton, CA 94588
                                           T: 925-399-5856
                                           F: 925-397-1976

                                           *Counsel for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and the proposed Class of Limited Partners, and derivatively on behalf of the Funding Partnership, hereby request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: JANUARY 28, 2021

Respectfully submitted,

by /s/ *Matthew Fornaro*

Matthew Fornaro (mfornaro@fornarolegal.com)
Florida Bar No. 0650641
**MATTHEW FORNARO, P.A.**
11555 Heron Bay Boulevard, Suite 200
Coral Springs, FL 33076
T: 954-324-3651
F: 954-248-2099

Jeffrey L. Fazio (jfazio@dehengsv.com)
Admitted *Pro Hac Vice*
**DEHENG LAW OFFICES**
Silicon Valley Office
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-5856
F: 925-397-1976

*Counsel for Plaintiffs*